IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

DONALD DALLAS,                )
                              )
      Petitioner,             )
                              )        CIVIL ACTION NO.
      v.                      )        2:02cv777-MHT
                              )            (WO)
COMMISSIONER, ALABAMA         )
DEPARTMENT OF CORRECTIONS,    )
et al.,                       )
                              )
      Respondents.            )

OPINION AND ORDER

Petitioner Donald Dallas, an Alabama inmate under

sentence of death, filed a petition in this court for

writ of habeas corpus under 28 U.S.C. § 2254.  Initially,

this court ordered that this case should proceed in two

stages: first, to determine which claims should be

dismissed on procedural-default grounds and which

non-defaulted claims require an evidentiary hearing; and

second, to determine the merits of the non-defaulted

claims.  The magistrate judge oversaw the first stage.

Later the court decided that it would oversee both stages. The court now decides that, because the procedural-default issue is more difficult than expected, it is best to narrow this case substantially and resolve now all the claims for which there is no procedural-default defense and for which the court believes an evidentiary hearing is unnecessary. As explained below, the court concludes that Dallas is not entitled to habeas relief on these claims.

## I.

The Alabama Court of Criminal Appeals summarized the facts of this case as follows:

> "The record indicates that on July 12, 1994, Mrs. Hazel Liveoak left her home in Millbrook to go grocery shopping in Prattville. As she was placing her groceries into her car, ... appellant [Dallas] and co-defendant Carolyn Yaw, pushed Mrs. Liveoak into the car and forced her to lie face down on the floorboard. He and Yaw got into the car. The appellant told Mrs. Liveoak that he wanted her money. When she informed him that she only had $ 10.00

2

with her, he replied that that was not
enough and began to drive toward
Greenville. Mrs. Liveoak told the
appellant that she had a credit card
that could be sued at an automatic
teller machine. In Greenville, the
appellant drove to the end of the dirt
road, opened the trunk and forced Mrs.
Liveoak into it. With Mrs. Liveoak in
the trunk, the appellant and Yaw
travelled to Montgomery. The appellant
drove the car to the bank and parked in
an area of the parking lot far removed
from the bank building. Yaw was
successful in using Mrs. Liveoak's
credit card in 3 of 11 transactions to
obtain $ 300.00. The appellant remained
at the car, talking to Mrs. Liveoak
while Yaw withdrew the money. Mrs.
Liveoak prayed for the appellant and his
family while she was in the trunk. The
appellant told Mrs. Liveoak that he and
Yaw would abandon the car and telephone
for help to ensure that she was released
from the trunk. Mrs. Liveoak was never
released from the trunk and she suffered
a heart attack and died.

"Evidence was presented tending to prove
that Mrs. Liveoak did not die
immediately but rather lived for a
number of hours. Evidence was also
presented that Mrs. Liveoak had a number
of bruises and cuts on her hands
consistent with trying to free herself
or calling for help. The State
presented evidence that the appellant
and Yaw, after leaving Mrs. Liveoak,

3

went to a 'crack house' to purchase cocaine with the stolen money. They then went to a motel and spent the night smoking crack cocaine. The testimony of Dennis Bowen, an acquaintance of the appellant, indicated that the appellant and Yaw were bragging at the crack house that they had placed an elderly lady in the trunk of a car and had left her there. When Bowen questioned the appellant about his statement, he responded that he 'hoped the old lady would die.' Evidence was also presented showing that, three days before this offense, the appellant had abducted and robbed Wesley Portwood, an 80-year-old man, in the parking lot of a K-Mart in Prattville. As with Mrs. Liveoak, the appellant made Portwood lie face down on the floorboard of his car, then drove to a remote area and ordered him out of the car. The appellant told Portwood to lie down in the weeds or he would place him in the trunk of the car. Portwood told the appellant that he did not want to get into the trunk because he would 'smother inside.' The appellant then robbed Portwood of $ 160.00. Portwood survived the abduction.

"The appellant testified at trial. On cross-examination, when asked why he left Mrs. Liveoak in the trunk knowing of her condition, he replied that '[h]e didn't want to get caught.'"

4

Dallas v. State, 711 So. 2d 1101, 1103-1104 (Ala. Crim. App. 1997).

An Alabama jury found Dallas guilty of the capital offense of the murder of Liveoak during the course of a kidnapping in the first degree, in violation of 1975 Ala. Code § 13A-5-40(a)(1), and the capital offense of the murder of Liveoak during the course of a robbery in the first degree, in violation of 1975 Ala. Code § 13A-5-40(a)(2). The jury recommended by a vote of 11 to one that Dallas should receive a death sentence. The state trial court sentenced Dallas to death.

The Alabama Court of Criminal Appeals affirmed Dallas's convictions and death sentence. Dallas v. State, 711 So. 2d 1101 (Ala. Crim. App. 1997), and Alabama Supreme Court then affirmed the lower appellate court. Ex parte Dallas, 711 So. 2d 1114 (Ala. 1998). The United States Supreme Court denied Dallas's petition for writ of certiorari. Dallas v. Alabama, 525 U.S. 860 (1998).

5

Acting pro se, Dallas filed a Rule 32 petition for post-conviction relief in a state trial court. The state court appointed an attorney to represent him during his Rule 32 proceeding. The state court dismissed certain claims and held an evidentiary hearing on others. The state court eventually denied Dallas's Rule 32 petition in full. Dallas filed a motion with the state court to alter, vacate, or amend its final order, but the state court denied that motion as well.

Dallas appealed to the Alabama Court of Criminal Appeals, but that court dismissed his appeal as "untimely filed." Dallas filed a motion asking the state trial court to find that his time for filing his notice of appeal was tolled by his motion to alter, vacate, or amend, and the state court granted the tolling motion. Dallas appealed a second time to the Alabama Court of Criminal Appeals, but the appellate court dismissed the second appeal on the ground that the first appeal was untimely. Dallas filed a petition for writ of certiorari

in the Alabama Supreme Court, but that court dismissed Dallas's petition for failure to comply with Ala. R. App. P. 39( c) (1).

Dallas then filed for habeas relief in this court. Initially, the State of Alabama, acting through respondents, filed a motion to dismiss Dallas's petition on the ground that it was filed outside the one-year time limit prescribed by 28 U.S.C. § 2244 (d). This court adopted the magistrate judge's recommendation to deny the dismissal motion, and this case was referred back to the magistrate judge for further proceedings.

The State then filed its answer to the habeas-corpus petition. In its answer, the State of asserted that a number of the claims raised by Dallas were precluded from review in this court because the claims are barred by procedural default. The magistrate judge ordered the parties to file briefs on the issues of procedural default and whether an evidentiary hearing should be held. Following the filing of these briefs, the court required

7

the parties to file briefs on the merits of all claims for which there is no agreement that the claim is procedurally defaulted.

Thereafter, because the parties failed to file briefs on the merits of all claims as instructed, the court required supplemental briefs from the parties addressing the merits of all claims not previously addressed.  The State moved for reconsideration of this order, contending that a large number of claims are procedurally defaulted, and thus do not warrant briefing on the merits.  The court granted the State's motion for reconsideration and deferred merits briefing by the parties on certain claims until further order.

The court therefore now turns its attention to those claims for which the parties agree procedural default is not a defense.

II.

There are 11 claims for which the State has not asserted a procedural-default defense.  These claims are properly before the court, for they were raised by Dallas in the state court and rejected by those courts on the merits.

However, before addressing the merits these claims, this court will set out the standard governing federal review of them.  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs their review.  Under the AEDPA,

> "(d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination

9

of the facts in light of the evidence presented in the State court proceeding.

"(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254.

Under the "contrary to" phrase, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the way the United States Supreme Court did on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 404-405 (2000). In other words, a state-court decision is contrary to clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in United States Supreme Court precedent. Id.;

see also McIntyre v. Williams, 216 F. 3d 1254 (11th Cir. 2000).  There is a distinction between an interpretation which is contrary to Supreme Court precedent and "an unreasonable application" of that precedent.  Williams, 529 U.S. at 406.  An unreasonable application is an objectively unreasonable application of the federal law set forth by the United States Supreme Court cases.  Id. at 408-410; McIntyre, 216 F. 3d at 1257.

The United States Supreme Court has therefore cautioned as follows: "If this standard is difficult to meet, that is because it was meant to be. ... [Section] 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. ... It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther. Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal

11

justice systems,' not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington v. Richter, ___ U.S. ____, ____, 131 S.Ct. 770, 786-787 (2011) (citations omitted).

Bearing in mind these standards and the caution about their application, the court will address in turn each of the claims at issue at this time.


**A.**

The court will consider ten of Dallas's claims as a group.  First and second, Dallas claims that the state trial court erred in denying his objection to three of the State's proposed jury instructions.   In rejecting the

first claim, as to jury instruction three, the Alabama

Court of Criminal Appeals stated the following:

> "The appellant cites the following
> charge as improper as he alleges that it
> effectively shifted the burden of proof
> as to the element of intent to the
> appellant:
>
> 'You may infer that a person intends the
> natural consequences of what he does if
> the act is done intentionally.'
>
> However, because the language of the
> trial court's instruction is permissive
> rather than mandatory, it is not an
> unconstitutional, burden-shifting
> instruction so as to violate Sandstrom
> v. Montana, 442 U.S. 510, 99 S. Ct.
> 2450, 61 L.Ed.2d 39 (1979). See Freeman
> v. State, 555 So. 2d 196, 208-09 (Ala.
> Crim. App. 1988), affirmed, 555 So. 2d
> 215 (Ala. 1989), cert. denied, 497 U.S.
> 1046, 111 S. Ct. 8, 111 L.Ed.2d 823
> (1990). A review of the entire jury
> charge given by the trial court in the
> guilt phase indicates that the jury was
> properly and thoroughly instructed as to
> its role as factfinder as well as to the
> law related to this case."

Dallas, 711 So. 2d at 1109. In rejecting the second

claim, as to jury instructions 20 and 21 regarding the

credibility and impeachment of the witnesses, the Alabama

Court of Criminal Appeals stated the following:

> "The record indicates that, after some
> alteration, the trial court gave the
> following instructions, to which the
> appellant takes issue:
>
> 'Charge # 20:
>
> 'In this case the defendant has
> testified, as he has a perfect right to
> do. He has a perfect right to have his
> testimony considered with the testimony
> of each and every other witness who has
> testified in this case. However, in
> passing upon his testimony, you ladies
> and gentlemen of the jury have a right
> to consider the fact that he is the
> defendant and as such has an interest in
> the outcome of this case.
>
> 'Charge # 21:
>
> 'If you find from the evidence that any
> witness has been impeached by a prior
> inconsistent statement or by giving
> contradictory testimony in court, you
> may, in your discretion, consider that
> in evaluating and weighing that witness'
> testimony.'
>
> "The trial court properly charged the
> jury that it had the exclusive
> prerogative to determine the weight or
> credibility to be afforded the evidence
> presented. The jury charges in their

14

> entirety, including the two charges
> quoted above, made clear to the jury
> that it could accept or reject any part
> of the testimony given by any witness
> and were correct statements of law.  See
> Slaton v. State, 680 So. 2d 879, 895
> (Ala. Crim. App. 1995), affirmed, 680
> So. 2d 909 (Ala. 1996)."

Dallas, 711 So. 2d at 1108.

Third, Dallas claims that the state trial court erred in denying his requested jury charges on the lesser included offenses of reckless murder and criminally negligent homicide at the guilt phase of his trial.  In rejecting this claim, the Alabama Court of Criminal Appeals stated the following:

> "The appellant argues that the reckless
> murder instruction was warranted because
> of his alleged voluntary intoxication at
> the time of the offense.  Additionally,
> he argues that a criminally negligent
> homicide instruction was warranted
> because 'he inadvertently created the
> risk of death by placing the victim in
> the trunk and he should have been aware
> of the risk but was not due to his
> intoxication.'

> "Although the trial court properly
> charged the jury on the lesser included
> offenses of felony murder and

15

manslaughter, it correctly denied the charge on reckless murder and criminally negligent homicide because there was no rational basis for a verdict finding the appellant guilty of either offense. No evidence supported a basis for an instruction on reckless murder as defined by § 13A-6-2(a)(2), Code of Alabama 1975, because the appellant's actions were directed solely at the victim and therefore did not '"manifest [ ] extreme indifference to human life."' Parker v. State, 587 So. 2d 1072, 1084 (Ala. Crim. App. 1991), quoting Northington v. State, 413 So. 2d 1169 (Ala. Crim. App. 1981), cert. quashed, 413 So. 2d 1172 (Ala. 1982). Additionally, there was no evidence presented at trial that the appellant was under the influence of cocaine at the time of the killing and thus voluntarily intoxicated at the time of the offense. The evidence presented by the State indicated that the appellant acted with the specific intent to kill. He had been informed by the victim of her heart condition and did not want to 'get caught.' Because the evidence tended to show that the appellant acted with the specific intent to kill, the instruction on criminally negligent homicide was also correctly refused. Certainly, it cannot be said that the appellant failed to perceive that death might result if an elderly woman with a heart condition was locked in the trunk of a car and left in the middle of summer in Alabama. Therefore, the trial

16

> court was correct in refusing the
> appellant's charge."

<u>Dallas</u>, 711 So. 2d at 1107-1108.

Fourth, Dallas claims that the state trial court erred in denying his counsel's request for a continuance. In rejecting this claim, the Alabama Court of Criminal Appeals stated the following:

> "The appellant argues that he received
> ineffective assistance of trial counsel
> because, he says, the trial court
> refused to grant his motion for a
> continuance based on grounds that his
> trial attorneys' caseloads were so heavy
> that they could not devote sufficient
> time to the preparation of his trial.
>
> 'Applying the principles of the capital
> case of <u>Ex parte Hays</u>, 518 So. 2d 768
> (Ala. 1986), we find it extremely
> improbable that the additional time for
> preparation requested by the defendant
> would have changed the result of the
> trial and that the defendant has not met
> his burden of showing actual prejudice
> in the defense of the charge for which
> he was convicted. In <u>Hays</u>, our Supreme
> Court wrote:
>
> "'Hays contends that the trial court's
> denial of his motion for continuance,
> under the facts of this case, denied him
> his constitutional right to effective

17

assistance of counsel under the Sixth Amendment of the United States Constitution. The Court of Criminal Appeals rejected this argument because Hays failed to show any actual prejudice in the defense of his case as a result of the trial court's denial of his motion. We agree.'

"'The United States Supreme Court in Morris v. Slappy, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 1616, 75 L.Ed.2d 610, 619 (1983), recognized that:

"Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. See Chambers v. Maroney, 399 U.S. 42, 53-54, 90 S. Ct. 1975, 1982-83, 26 L.Ed.2d 419 (1970). Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of justifiable request for delay' violates the right to assistance of counsel. Ungar v. Sarafite, 376 U.S. 575, 589, 84 S. Ct. 841, 849, 11 L.Ed.2d 921 (1964).

18

See also <u>Avery v. Alabama</u>, 308 U.S. 444,
60 S. Ct. 321, 84 L.Ed. 377 (1940);
<u>Connor v. State</u>, 447 So. 2d 860 (Ala.
Crim. App. 1984). Furthermore, it is
evident from recent Supreme Court
precedent that, although certain
criteria such as the time provided for
the investigation and preparation of the
case, counsel's experience, the gravity
of the charge and complexity of
defenses, and counsel's accessibility to
witnesses are relevant factors to
consider when evaluating effectiveness
of counsel, the controlling analysis is
whether the action prejudiced the
accused in the defense of his or her
case. <u>See</u> <u>United States v. Cronic</u>, 466
U.S. 648, 104 S. Ct. 2039, 80 L.Ed.2d
657 (1984). The accused has the burden
of proving prejudice by making a showing
that he or she did not receive 'a fair
trial, a trial whose result is
reliable.' <u>Strickland v. Washington</u>,
466 U.S. 668 [687], 104 S. Ct. 2052,
2064, 80 L.Ed.2d 674, 693 (1984). As
opined in <u>United States v. Cronic</u>,
<u>supra</u>:

"The right to the effective assistance
of counsel is thus the right of the
accused to require the prosecution's
case to survive the crucible of
meaningful adversarial testing. When a
true adversarial criminal trial has been
conducted--even if defense counsel may
have made demonstrable errors--the kind
of testing envisioned by the Sixth
Amendment has occurred.' 466 U.S. at

656, 104 S. Ct. at 2045, 80 L.Ed.2d at 666."'"

Hays, supra, 518 So. 2d at 771-72.

'Fortenberry v. State, 545 So. 2d 129, 130-40 (Ala. Crim. App. 1988), affirmed, 545 So. 2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S. Ct. 1937, 109 L.Ed.2d 300 (1990).'

McWilliams v. State, 640 So. 2d 982, 992-93 (Ala. Crim. App. 1991).'

"In the present case, the appellant failed to demonstrate that he was prejudiced by the trial court's denial of his motion for continuance and that, therefore, his counsel's performance was deficient for failing to secure the continuance. Moreover, a review of the entire record indicates that the appellant received effective representation at all stages of trial. Because the appellant failed to make a showing that he did not receive a fair trial, his argument that his counsel was ineffective must fail."

Dallas, 711 So. 2d at 1111-1112. (The court recognizes that Dallas has submitted additional evidence on this claim. The court is treating this additional evidence as a separate claim, to which the State asserts the procedural-default defense.)

Fifth, Dallas claims that that his right to conflict-free counsel was violated because one of his attorneys had a conflict of interest. In rejecting this claim, the Alabama Court of Criminal Appeals stated the following:

> "The appellant argues that he received ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, because of, he says, an actual conflict of interest on the part of his trial counsel.

> "A review of the record indicates that the appellant's argument is without merit. Before trial, one of the appellant's attorneys filed a motion to withdraw from representation of the appellant. The motion was based upon that attorney's having been previously appointed by the attorney general to represent the Alabama Department of Mental Health and Mental Retardation in an unrelated civil case. The attorney stated in his motion that he had conferred with the Disciplinary Commission of the Alabama State Bar Association, which issued an advisory opinion stating that a conflict did not exist. The trial court denied the motion without a hearing.

"'In order to demonstrate a violation of his Sixth Amendment rights, a defendant must show that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). "An actual conflict of interest exists when an attorney owes loyalty to a client whose interests are adverse to another client." Self v. State, 564 So.2d 1023, 1033 (Ala. Crim. App. 1989), cert. quashed, 564 So.2d 1035 (Ala. 1990).

"While it is true that the attorney general had appointed the appellant's trial counsel as a deputy attorney general in an unrelated civil matter, an actual conflict of interest did not exist in this case because the appellant's interests were not adverse to that of the Alabama Department of Mental Health and Mental Retardation. The appellant argues that we must presume prejudice is in this case because the attorney had to struggle to serve two different 'masters.' On the one hand he was commissioned as a deputy attorney general and in that capacity his superior was the attorney general. On the other hand, he was representing a defendant charged with a crime that the attorney general is charged with enforcing. However, prejudice is presumed only when an actual conflict is shown. Cuyler, 446 U.S. at 349-50, 100 S.Ct. at 1719. See also Browning v. State, 607 So.2d 339, 342 (Ala. Cr.App.

22

1992).   Because no actual conflict of
interest existed in this case, prejudice
is not presumed.

"Additionally,   the   appellant   has
not demonstrated that he was prejudiced
as   a   result   of   the   fact   that   his
attorney represented the State in the
civil   case.   Nor   has   the   appellant
established   by   any   evidence   that   his
attorney's   performance   was   adversely
affected   by   his   appointment   in   that
case.   The appellant must make a factual
showing that his attorney 'made a choice
between possible alternative courses of
action, such as eliciting (or failing to
elicit) evidence helpful to one client
but   harmful   to   the   other.'   <u>Self v.
State</u>, <u>supra</u>. (citations omitted.)

"Therefore, the appellant was not denied
effective   assistance   of   counsel   or   a
fair   trial   because   of   an   alleged
conflict of interest on the part of his
trial counsel."

<u>Dallas</u>, 711 So. 2d at 1114.

Sixth, Dallas claims that the state trial court erred

in failing to remove a prospective juror for cause.   In

rejecting   this   claim,   the   Alabama   Court   of   Criminal

Appeals stated the following:

"As   to   the   trial   court's   refusal   to
grant   the   appellant's   challenge   for

23

> cause on the other potential juror,
> which was based on her alleged
> reverse-<u>Witherspoon</u> responses, the
> record indicates that this veniremember
> stated that she would not automatically
> impose the death penalty in every
> capital case, but would follow the trial
> court's instructions and would base her
> decision regarding punishment upon the
> aggravating and mitigating circumstances
> that were presented. <u>Taylor v. State</u>,
> [666 So.2d 36 (Ala. Cr. App. 1994)].
> For this reason, we find no error in the
> trial court's failure to grant the
> appellant's challenge for cause."

<u>Dallas</u>, 711 So. 2d at 1107.

Seventh, Dallas claims that the state trial court erroneously allowed the jury to consider the aggravating circumstance that the capital murder of Liveoak was especially heinous, atrocious, or cruel. In rejecting this claim, the Alabama Court of Criminal Appeals stated the following:

> "The appellant argues that the trial
> court erred in giving an instruction to
> the jury during the sentencing phase on
> the aggravating circumstance that the
> offense was especially heinous,
> atrocious, or cruel when compared to
> other capital offenses because, he says,

24

the facts of the case did not support
such an instruction.

"The trial court made the following
specific findings of fact with regard to
that aggravating circumstance:

'This Court finds that the State has
proven beyond a reasonable doubt the
aggravating circumstance that this
offense was especially heinous,
atrocious, or cruel compared to other
capital offenses. The aggravating
circumstance "the capital of offense was
especially heinous, atrocious, or cruel
compared to other capital offense" was
intended to apply "to only those
consciousness or pitiless homicides
which are unnecessarily tortuous to the
victim." Ex parte Kyzer, 399 So.2d 330,
334 (Ala. 1981). The State must prove
beyond a reasonable doubt, as the court
finds in this case, that Mrs. Liveoak
experienced pre-mortem suffering;
however, the suffering may either be
physical or psychological. "Heinous"
means extremely wicked or shockingly
evil. "Atrocious" means outrageously
wicked and vile. "Cruel" means designed
to inflict a high degree of pain with
utter indifference to or even the
enjoyment of the sufferings of others.
This Court cannot imagine a more
depraved and cruel murder of a person
than what Mrs. Liveoak suffered at the
hands of Dallas. He left her in the
trunk of her automobile on a summer
afternoon so that she would die simply

25

because he did not want to get caught. He literally entombed her in the trunk of her car. The suffering of Mrs. Liveoak is unimaginable. She lay helpless in the hot, stuffy trunk and fought to escape, until the conditions that she was left in caused her death. Yet, even as torturous as her death, the cruelest act committed by Dallas was that he gave Mrs. Liveoak false hope; he told her, as she was praying for him, and that he would send help. The help never arrived because the evidence clearly showed that he had no intention of sending her help. Mrs. Liveoak was tortured at the hands of Dallas, and this Court finds that this killing was especially heinous and atrocious or cruel as envisioned under Ala. Code, Section 13A-5-49(8) (1975).'

"Because the evidence supported the finding that the aggravating circumstance that the killing was especially heinous, atrocious, or cruel, the jury's consideration of that circumstance during the sentencing phase was proper. The jury was instructed on the meaning of the words of the aggravating circumstance in the context of capital sentencing. Those instructions correctly followed the recognized construction of that aggravating circumstance established by the Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), in which the court stated: 'The aggravating circumstance listed in

> § 13-1-6(8) [now § 13A-5-49(8)] was
> intended to apply to only those
> consciousness or pitiless homicides
> which are unnecessarily torturous to the
> victim.' <u>See also</u> <u>Ex parte Rieber</u>, 663
> So.2d 999 (Ala. 1995), <u>cert. denied</u>, 516
> U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437
> (1995). Thus, the trial court's
> instruction was supported by the
> evidence and was sufficient to guide the
> jury in deciding whether to recommend
> the death penalty."

<u>Dallas</u>, 711 So. 2d at 1110.

Eighth, Dallas claims that the the State failed to prove a prima-facie case of capital murder. In rejecting this claim, the Alabama Court of Criminal Appeals stated the following:

> "The appellant argues that the State
> failed to prove a prima facie case of
> capital murder against him because, he
> says, he lacked the specific intent to
> kill. More particularly, he argues that
> the State failed to prove that he
> intentionally caused the death of the
> victim because her death resulted from
> a heart attack. He also argues that the
> State presented no evidence as to the
> time of the victim's death.
>
> "However, the record, including the
> trial court's specific findings of fact,
> reveals that the State presented

27

sufficient evidence from which the jury could reasonably infer that the appellant intended to kill the victim and that the murder was committed during a robbery and a kidnapping in the first degree.

'"'To affirm a finding of a "particularized intent to kill," the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.' Ex parte Raines, 429 So.2d 1111, 1113 (Ala. 1982).  Both prongs of this test are satisfied in this case." Kennedy v. State, 472 So.2d 1092, 1105 (Ala. Cr. App.), affirmed, 472 So.2d 1106 (Ala. 1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).'

Nichols v. State, 624 So.2d 1328 (Ala. Cr. App. 1992).

"The jury was presented with evidence that clearly established that the appellant had committed the robbery and kidnapping, with full awareness of the victim's heart condition, and that his treatment of the victim directly exacerbated her heart condition, which ultimately resulted in her death. Evidence was also presented that the victim did not die immediately but rather survived for a number of hours in the trunk.

28

> "Applying the aforestated authority to
> the evidence in this case, we conclude
> the State presented sufficient evidence
> to support the appellant's conviction."

<u>Dallas</u>, 711 So. 2d at 1112-13.

Ninth and tenth, Dallas claims that the state trial court improperly considered victim-impact evidence. In rejecting these claims, the Alabama Court of Criminal Appeals stated the following:

> "The appellant argues that the trial
> court erred in allowing the State to
> introduce victim impact testimony into
> evidence during the sentencing phase
> because, he says, it violated his due
> process rights under the Eighth and
> Fourteenth Amendments to the United
> States Constitution. Specifically, he
> argues that statements by the victim's
> son concerning how the death of his
> mother had affected him and his family,
> as well as a letter sent by the victim's
> daughter to the trial judge, rendered
> the trial fundamentally unfair.
>
> "An examination of the record indicates
> that the victim's son testified that his
> mother was a Christian and that her
> murder had a profound impact on her
> children and grandchildren. Mr. Liveoak
> did not express any opinion about the
> crime, the appellant, or the
> appropriateness of a death sentence.

Mr. Liveoak's statements with respect to the impact of his mother's murder on him and on his family were relevant to the jury's decision as to whether to recommend that the death penalty be imposed. <u>See</u> <u>Payne v. Tennessee</u>, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Additionally, there is no indication from the record that a victim impact statement was included in the presentence investigation report. <u>Cf</u>. <u>Ex parte Rieber</u>, supra. ('[A] remand is not required in every death penalty case in which a victim impact statement appears in a presentence investigation report.')

"Nor was there any indication that the trial court considered a letter written by the victim's daughter to the trial court addressing her thoughts on the appellant and the appropriate punishment. Because the letter was received by the trial court approximately two weeks after the court entered its sentencing order, the letter could not have been considered in determining the sentence; thus, the appellant's due process rights were not violated."

As to all of the above ten claims, the Alabama Supreme Court, on direct appeal, summarily affirmed the Alabama Court of Criminal Appeals as follows:

30

"Dallas raises the same issues here that
he argued in the Court of Criminal
Appeals.  We have thoroughly reviewed
the Court of Criminal Appeals' opinion,
which addressed each of these issues on
the merits, and we have considered the
arguments made in Dallas's brief and
advanced by his counsel during oral
arguments.  We have given specific
attention to Dallas's argument that the
trial judge erred in not instructing the
jury on reckless murder and on
criminally negligent homicide and that
the judge erred in not granting a
continuance.  We have also examined the
record for any plain error.  Based on
our review, we find no reversible errors
in either the guilt phase or the
sentencing phase of Dallas's trial.  We
therefore affirm the judgment of the
Court of Criminal Appeals."

<u>Dallas</u>, 711 So. 2d at 1114.

Applying § 2254 and the United States Supreme Court's

caution about its application, this federal court cannot

say that Dallas is entitled to habeas relief on any of the

above ten claims.  Dallas has not shown, pursuant to

§ 2254(e)(1), that the decisions of the state courts were

contrary to or involved an unreasonable application of

clearly established federal law or that the decisions of

31

those courts were based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings.

## B.

The court turns next to Dallas's eleventh claim: the State exercised its peremptory strikes in a racially discriminatory manner.  The court has considered this claim separately because it is troubling and requires more discussion.

In <u>Batson v.  Kentucky</u>, 476 U.S. 79 (1986), the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits the use of peremptory challenges of venire members based solely on the fact that the venire members belong to the same race as a criminal defendant.  <u>Batson</u> has been extended to peremptory challenges of venire members who did not share the same race with the defendant.  <u>Powers v. Ohio</u>, 499 U.S. 400 (1991).

32

In <u>Rice v. Collins</u>, 546 U.S. 333 (2006), the United
States Supreme Court summarized the legal standard that
courts must apply in analyzing <u>Batson</u> claims:

> "A defendant's <u>Batson</u> challenge to a
> peremptory strike requires a three-step
> inquiry.  First, the trial court must
> determine whether the defendant has made
> a prima facie showing that the
> prosecutor exercised a peremptory
> challenge on the basis of race.  476
> U.S., at 96-97, 106 S. Ct. 1712.
> Second, if the showing is made, the
> burden shifts to the prosecutor to
> present a race-neutral explanation for
> striking the juror in question.  <u>Id.</u>, at
> 97-98, 106 S.Ct. 1712.  Although the
> prosecutor must present a comprehensible
> reason, '[t]he second step of this
> process does not demand an explanation
> that is persuasive, or even plausible;'
> so long as the reason is not inherently
> discriminatory, it suffices.  <u>Purkett v.
> Elem</u>, 514 U.S. 765, 767-768, 115 S.Ct.
> 1769, 131 L.Ed.2d 834 (1995) (per
> curiam).  Third, the court must then
> determine whether the defendant has
> carried his burden of proving purposeful
> discrimination.  <u>Batson</u>, <u>supra</u>, at 98,
> 106 S.Ct. 1712.  This final step
> involves evaluating 'the persuasiveness
> of the justification' proffered by the
> prosecutor, but 'the ultimate burden of
> persuasion regarding the racial
> motivation rests with, and never shifts

> from the opponent of the strike.'
> <u>Purkett</u>, <u>supra</u>, at 768, 115 S.Ct. 1769."

546 U.S. at 338.

The state trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal. <u>See</u> <u>Hernandez v. New York</u>, 500 U.S. 352, 364 (1991) (plurality). Thus, the ultimate question for this federal court is whether the state appellate courts' determination that peremptory challenges of black jurors in this case were not "motivated by intentional racial discrimination" is a decision which was "contrary to" or "an unreasonable application of federal law" or a decision "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254 (d)(1) and (2). Moreover, there is a presumption of correctness to factual determinations made by state courts, and the presumption may be rebutted by only "clear and convincing evidence." 28 U.S.C. 2254 (e)(1) at 364.

On direct appeal, the Alabama Court of Criminal
Appeals and the Alabama Supreme Court reviewed and
rejected Dallas's claim that the prosecution exercised its
peremptory strikes in a racially discriminatory manner to
exclude black venire members.  In rejecting that claim,
the Alabama Court of Criminal Appeals stated the
following:

> "The appellant argues that the
> prosecution struck black veniremembers
> in a racially discriminatory manner in
> violation of Batson v. Kentucky, 476
> U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69
> (1986), and Ex parte Branch, 526 So. 2d
> 609 (Ala. 1987), by using 12 of his 16
> strikes to remove 12 of the 15 black
> veniremembers.

> "Although the trial court acknowledged
> that the appellant had failed to prove
> a prima facie case of racial
> discrimination based solely on these
> numbers, it nevertheless required the
> prosecutor to explain his reasons for
> his strikes.  Therefore, we must examine
> the stated reasons.  '[O]nce a
> prosecutor has offered a race-neutral
> explanation for the peremptory
> challenges and the trial court has ruled
> on the ultimate question of intentional
> discrimination, the preliminary issue of
> whether the defendant had made a prima

facie showing becomes moot.' <u>Hernandez v. New York</u>, 500 U.S. 352, 358, 360, 111. S. Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). Where the challenged party's explanations for its strikes are a part of the record, the appellate court will review those explanations regardless of the manner in which they came into the record. <u>See</u>, <u>e.g.</u>, <u>Huntley v. State</u>, 627 So. 2d 1013, 1016 (Ala. 1992); <u>Jackson v. State</u>, 594 So. 2d 1289, 1293 (Ala. Crim App. 1991); <u>Williams v. State</u>, 548 So. 2d 501, 504 (Ala. Crim. App. 1988), <u>cert. denied</u>, 489 U.S. 1028, 109 S. Ct. 1159, 103 L.Ed.2d 218 (1989). Additionally, '[a] circuit court's ruling in a <u>Batson</u> objection is entitled to great deference and we will reverse a circuit court's <u>Batson</u> findings only if they are "clearly erroneous."' <u>Branch</u>, 526 So. 2d at 625-26.

"The prosecutor stated that 5 of the 12 veniremembers were struck because they indicated that they were opposed to the death penalty. 'Although a juror's reservations about the death penalty may not be sufficient for a challenge for cause, his view may constitute a reasonable explanation for the exercise of a peremptory strike.' <u>Johnson v. State</u>, 620 So. 2d 679, 696 (Ala. Crim. Appl. 1992), <u>reversed on other grounds</u>, 620 So. 2d 709 (Ala. 1993), <u>on remand</u>, 620 So. 2d 714 (Ala. Crim. App.), <u>cert. denied</u>, 510 U.S. 905, 114 S. Ct. 285, 126 L.Ed.2d 235 (1993). Two of the 12 veniremembers were struck because the

36

prosecutor thought they were inattentive during voir dire.   The fact that a veniremember 'appear[ed] to be asleep or inattentive' during voir dire has been held to be an acceptable reason for a strike. Kelley v. State, 602 So. 2d 473, 476 (Ala. Crim. App. 1992).   Four of the 12 veniremembers were struck because they had family members who had been convicted of a crime, which has also been held to constitute a race-neutral reason for striking a potential juror. See Gorum v. State, 671 So. 2d 764 (Ala. Crim App. 1995); Fort v. State, 668 So. 2d 888 (Ala. Crim. App. 1995).

"The last veniremember to be struck by the prosecutor was struck because he could not complete his jury questionnaire.   He did, in fact, serve as an alternate juror.   The prosecutor stated that 'although [he] liked him in all other respects, with the bank record and the Computer Crime Act allegations, [he] felt it would not be the best for him to sit as a juror in this case.' Cf. Vanderslice v. State, 671 So. 2d 769, 770 (Ala. Crim. App. 1995) (a veniremember's apparent inability to understand what was being said to him was a sufficient race-neutral reason to justify a peremptory strike).   As long as there is a legitimate nonracial reason for the challenged strike, the Batson principles are not violated. Zanders v. Alfa Mutual Insurance Co., 628 So. 2d 360, 361 (Ala. 1993).

> "In the present case, the trial court's
> denial of the appellant's <u>Batson</u> motion
> was not 'clearly erroneous.' <u>Ex parte</u>
> <u>Branch</u>, 526 So. 2d at 625-26."

<u>Dallas</u>, 711 So. 2d at 1104-1105.  As with all the other claims asserted by Dallas on direct appeal, the Supreme Court of Alabama did not write separately to this issue; rather, conducting a "plain error" review, the court summarily affirmed the judgment of the Court of Criminal Appeals.  <u>Dallas</u>, 711 So. 2d at 1114.[1]

Although the state trial court did not find that Dallas made a prima-facie showing that the prosecutor exercised his peremptory strikes on the basis of race, the court required the prosecutor to proffer his reasons for his peremptory strikes.  Tr. Vol. 5 pp. 478-479.  The prosecutor stated his reasons for his strikes as follows:

---

1.  The State, pointing to facts from the record on venire, Tr. Vol. 5 pp. 479-490, argues that, in fact, 16 (not 15) of the 44 venire members were black.  Even though this appears to be verified by the state-court record and would further support the State's position that there was no purposeful discrimination, this court will analyze the facts as they were presented to and recited by the Alabama appellate courts.

"The State's first strike was Juror 113 .... [A]s the court will remember, was a challenge for cause. She was very ambivalent as to the death penalty. I wrote down she seemed very confused as to whether she could follow the law in regards to the capital phase of this trial. And that's why I struck here.

"The state's next strike was Juror 73. I have written down in my notes that she was extremely weak on the death penalty. She said at first she could not entertain it, but after questioning from the Court and defense counsel she said she could probably consider the death penalty. I didn't know - - my opinion, that did not raise to a challenge for cause, but it certainly raise to a peremptory strike. That's Juror 73 .... She was [a] black female, and the other one [Juror 113] was a black female.

"The next strike is Juror 91, [a] black female. Again, I have in my notes that she said it would be hard for her to vote for the death penalty. Her feelings are very strong on that. She thought that she could overcome it. I wrote weak on death penalty. Also, she had in her questionnaire that she was taking medication as to diabetes and high blood pressure. She checked that it could interfere with her ability to sit as a juror. So that's why she was struck.

"The next strike was Juror 45 .... She is a white female. She was the one, if the Court will remember, had a brother with a drug problem and was involved in some type of a murder case. It came out to some type of reckless homicide. I am not sure what it was. She said, and would make me very concerned, [when he] was under the influence of drugs her brother would turn into a Jekyll and Hyde. That seemed to go to pretty much what the defense is in this case. And that's why I struck Juror 45.

"The next strike was Juror 67 .... She is a black female. Although she did not say so in her questioning to me, she did check on her questionnaire that she takes high blood pressure medication, and that would interfere with her ability to sit as a juror. She had two uncles that was somehow or another in a self-defense type of shooting and killed some person and was prosecuted for it. Also, I had that she was extremely weak on the death penalty. I have against the death penalty. She may be able to consider it, but she was not sure. That's why I struck Juror 67.

"The next strike was Juror Number 20 ..., [a] black female. One reasons I struck her was because she had a seventh grade education. There are going to be bank records, and there are a lot of--as the Court is aware of the indictment--things concerning the Computer Crime Act and such that may be

40

difficult for her to follow. Her spelling was very poor on the questionnaire. I noted on two occasions she had her eyes closed and seemed to be asleep during voir dire. I noticed that she walker with a cane. And she said as far as the death penalty, she doesn't favor it, but she would consider the factors that you would give her, impose the death penalty, but her first response out of her mouth was that she did not favor the death penalty. That's why Juror Number 20 was struck.

"My next strike was Juror 27 .... We showed him with some criminal arrests just as recently as four years ago. He is a white male. One reason I struck him, also, is he is [R.B.]'s son, and I know [R.B.] real well, and I have gotten into a lot of arguments with [R.B.] about the death penalty. And if he has got any of his daddy's stubbornness in him with regard to the issues, I just didn't feel comfortable leaving him on the jury.

"My next strike was Juror Number 93 .... He was a white male. We showed him also with a large number of arrests as recently as June of 1995. He was twenty-four years old. I thought that was a little young for this case. I didn't particularly like his dress. That's not the main reason, but all of that together was why he was struck.

"The next strike Juror Number 1 .... I have noted that he was wearing earrings each time in court. Call me old fashioned. I do not like people wearing earrings, whether black or white or whatever. Also, he had a large number of arrests. And in August of 1993 he was prosecuted for Theft I by our office. The case was nol-prossed on payment of restitution in February of '94. He was a black male.

"Next strike was Juror Number 31 .... He was the teacher from Goodwyn High School. He sat on the front row. He looked totally disinterested during the entire voir dire process. Several times he rolled his eyes. I just couldn't get a feel for him, Judge, because of his disinterest in everything. Everything else looked fine on, except I did not like the way he acted in his mannerisms and responses. And it is kind of similar to the reason we struck [the] juror back a few .... And for that reason, I struck him.

"The next strike was Juror Number 58 ..., [a] white female. She stated that she believes in the death penalty but she was very uncomfortable about having to imposed it and having to make that decision. She said it would be agonizing for her. I felt she was very weak on that issue, and for that reason I struck her. Juror 58 ..., [a] white female.

"The next strike was Juror 95. ... She is a black female. I struck her basically for the same reason I struck [Juror 58]. She first said during general voir dire that she would have problems sitting in judgement of another person. She regards the death penalty, she said she couldn't express an opinion. She knew the Bible stood for it, but she said that she was more inclined to go for life without parole, and she personally did not want to have to make the decision to sentence someone to death. She was unemployed. All those reasons together is the reason I struck [her].

"Next strike was ... Juror 94. The Court is aware that he was late for court. Not only was he wearing an earring, but he was wearing two earrings. He had his arms crossed several times. I did not particularly like his attitude during questioning. The clincher of all was, when I was leaving the courtroom, he came down to our office and was asking about were child support court was. I am not sure whether he had to go to child support court or know somebody in child support court. But, again, I did not want to take the risk of him either being prosecuted for child support or having some friend of his being prosecuted for child support sitting on a capital murder case, and that's why I struck him.

"My next strike was Juror 29 .... The reason he was struck was because he had a reading disorder as he stated. He also stated he had a cousin that was convicted of drugs. This spelling, again, on the jury questionnaire was very poor. Again, it is going to be bank records and such that are going to be coming in in this case, and that's the reasons I struck him. Juror 29 ..., black male.

"This juror was going to be my alternate until a couple of my strikes got eaten up. This was ... [a] black female, Juror Number 26. The reason I struck her was because, even though she said her brother got what he deserved, still having someone of her family, immediate family, convicted of murder, I just felt it was too big of a risk for them to sit as a juror in my case.

"The last strike, Juror 52 .... He was going to be on the jury, but I left him as the alternate. And the reason I struck him was, again, that he had--he could not even complete his questionnaire, if the Court recalls. Donna had to do it for him. I liked him in all other respects, but, again, with the bank records and the Computer Crimes Act allegations, I felt it would not be best for him to sit as a juror in this case.

"Judge, those are my reasons. And I would now make an objection as to the

44

> defense' strikes of fifteen out of
> sixteen whites."

Tr. Vol. 5 pp. 479-489.

In overruling Dallas's and the State's <u>Batson</u> objections, the court concluded that, "It seems to me the responses given by both sides are fairly consistent, the majority of which appear to be the perceptions of the lawyers about individuals and whether or not they may be hesitant in their responses, whether or not they were attentive to their responses, whether or not they expressed strong or weak opinions on the death penalty." Tr. Vol.5 p. 511.   As stated, the trial judge's conclusion was affirmed on appeal.[2]

The ultimate question for this federal court is whether the state appellate courts' determination that peremptory challenges of black jurors in this case were not motivated by intentional racial discrimination is a decision that was "contrary to" or "an unreasonable

---

2. The court will not address the State's <u>Batson</u> objections to Dallas's strikes of certain jurors because that issue is not relevant here.

45

application of federal law" or a decision "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d)(1) and (2).

Dallas argues that his claim that the prosecutor used his peremptory strikes in a racially discriminatory manner is premised on evidence of disparate treatment of black and white jurors and a documented history of race discrimination by the district attorney's office. He notes that the prosecutor used 12 of his 16 peremptory strikes to strike African-American jurors: Jurors 1, 20, 26, 29, 31, 52, 67, 73, 91, 94, 95, and 113. He then argues that the six 'race neutral' reasons given for striking these 12 jurors were pretexts for racial discrimination. Those reasons were as follows: (1) certain jurors were "weak" on the death penalty, (2) certain jurors were on medication that would interfere with their jury service; (3) certain male jurors demonstrated poor "attitudes"; (4) one juror had an

alleged "large" number of arrests; (5) certain jurors had relatives involved in homicides or drug use; and (6) certain jurors appeared to have low education levels or learning disabilities which might make it "difficult" for them to "follow" the evidence of bank records that would be introduced in the case.

The prosecutor struck African-American Juror 113 because she was "very ambivalent" about the death penalty and because she was "very confused as to whether she could follow the law." Tr. Vol. 5 pp. 479-480. Although her testimony, which was less than clear, might be read to indicate that she could consider the death penalty "[i]f the fact was proven", the statement made immediately prior to this testimony was that "I would vote for life without parole before I would vote for the death penalty." Tr. Vol. 5 pp. 410-411. In addition, when Dallas's counsel asked her whether she thought that she would be able to follow the law as it was explained to her by the trial court, she responded, "I am confused. I am really

confused." Tr. Vol. 5 p. 412.   In fact, in response to the prosecutor's challenge of this juror for cause, Dallas's own counsel stated, "I think this juror may not be the most desirable juror for a number of reasons, but I don't think those rise to the level of a factual basis requiring ... a challenge for cause." Tr. Vol. 5 pp. 414-415.

The law is well-settled that a juror's attitude toward the death penalty constitutes a valid race-neutral reason for exercising a peremptory strike against the juror. Atwater v. Crosby, 451 F. 3d 799, 806-807 (11th Cir. 2006) ("[T]he prospective juror had difficulty answering the questions put to her and her demeanor indicated that she was hesitant and uncomfortable regarding the death penalty.  This is a valid, race-neutral reason for exercising a peremptory challenge, and the court did not abuse its discretion in upholding the challenge.").  The issue is not whether this juror was qualified or disqualified as a matter of law, but rather

whether the prosecutor had a non-racial reason to strike her.  Mere hesitancy about the death-penalty could be such a reason. In response, Dallas argues that this reason is a pretext for the discriminatory striking of Juror 113 because certain white jurors who "expressed concerns about the death penalty" were not struck.

However, the record reflects that, unlike Juror 113, white Jurors 63, 87, and 115 testified that they did not have a personal opinion about the death penalty and that they would be able to consider recommending either a sentence of death or life without parole.  Tr. Vol. 5 pp. 260-65, 318-323; Vol. 6 pp. 416-422.  Moreover, the record reflects that the prosecutor struck two white jurors (Jurors 27 and 58) because of their attitude toward the death penalty.  Tr. Vol. 6 pp. 468-469.

The prosecutor also struck African-American Juror 73 because she was "extremely weak on the death penalty." Tr. Vol. 6 p. 480.  Although she testified, after being pressed on the issue, that she "probably could" consider

recommending the death penalty, she first testified as follows:

> "THE COURT: Do you think given the appropriate evidence and circumstances you could entertain the death penalty as an appropriate punishment?
>
> "[JUROR]: No
>
> "THE COURT: You don't think so?
>
> "[JUROR]: (Shakes head negatively)."

Tr. Vol 5 p. 300. Then later when the prosecutor asked her whether she would be more inclined to recommend a sentence of death or a sentence of life without parole, she testified that she would be more inclined to recommend a life without parole sentence. <u>Id.</u> at 304. As stated, mere hesitancy about the death-penalty is a race-neutral reason.

The prosecutor struck African-American Juror 91 because of her attitude toward the death penalty and because she indicated on her juror questionnaire that she was taking medications that could interfere with her

ability to serve as a juror.[3]   Tr.   Vol. 6 pp. 480-481.

Although this juror testified that she would "try" to set

aside her personal opinion against the death penalty, she

also testified as follows:

> "THE COURT: Do you think given the
> appropriate circumstances, the evidence
> and the law, that you could consider the
> death penalty as an appropriate penalty?
>
> "[JUROR]: That would be hard..
>
> "THE COURT: It would be more difficult
> to do that is what you are saying?
>
> "[JUROR]: Uh-huh.
>
> "THE COURT: I understand that because of
> the weight of the decision.
>
> "[JUROR]: Right.
>
> "THE COURT: But your personal opinion is
> that that would just be more difficult
> to do?

---

      3.   The jury questionnaires were not included in the
state appellate record, and, therefore, are not before
this court for consideration. Even so, the Eleventh
Circuit has clearly held that one race-neutral reason for
a peremptory strike, which is supported by the record, is
sufficient to meet the prosecutor's burden even where
another of the proffered reasons for the strike is not
supported by the record. United States v. Diaz, 26 F. 3d
1533, 1543 (11th Cir. 1994).

"[JUROR]: Right.

"THE COURT: If the law says that you should consider that under these circumstances, would you be able to do that?

"[JUROR]: Yes, sir, based on my knowledge.

"THE COURT: You don't think your personal opinion would be so great that it would prevent you from being able to consider the death penalty?

"[JUROR]: Well, I must say, it would be pretty strong, but I would try to do the best to my knowledge.

                    ***

"THE COURT: And what you are telling me is that your personal opinion would be in favor of life without parole.  But do you think you could set that aside and consider the death penalty as an appropriate penalty, also?

"[JUROR]: Sir, I would try.

"THE COURT: Are you uncertain whether you could do it or not?

"[JUROR]: Kind of.   That's a tough decision."

Tr. Vol. 5. pp. 334-335.   Furthermore, during her questioning by the prosecutor, this juror again testified that she was not sure that she could set aside her personal opinion about the death penalty, and she repeatedly stated that she would be more comfortable recommending a sentence of life without parole.   Tr. Vol. 5 pp. 337-338.   As stated, mere hesitancy about the death-penalty is a race-neutral reason.

The prosecutor also struck African-American Juror 67 because of her attitude toward the death penalty. Although this juror finally testified that she might be able to consider voting for the death penalty, she also testified as follows:

> "THE COURT:  .  .  .   Do you have a personal opinion one way or the other about the death penalty for life without parole?
>
> "[JUROR]:  I  am  against  the  death penalty.   I would rather them have life without parole.
>
> "THE COURT: You would be more inclined to vote for life without parole in the appropriate case?

"[JUROR]:  Right

                    ***

"[LAWYER]:  Your  preference  for  life
without parole, ... what is that based
upon?

"[JUROR]:  Based upon I just feel like
that's the way I feel.  I am not for
the death penalty.  I just feel life
without parole.  A person's death, they
have to deal with it.

"LAWYER]: It is just a personal belief
of yours?

"[JUROR]: Yes.

"LAWYER]: Are there any circumstances
that you can think of where you would
vote to recommend the death penalty?

"[JUROR]: I haven't reached that far.
No."

Tr. Vol. 5 pp. 284-287.  As stated, mere hesitancy about

the death-penalty is a race-neutral reason.

   The  prosecutor  struck  Juror  67  also  because  she

testified that two of her uncles were involved in the

death of another person and that one of her uncles was in

prison, apparently as a result of that crime.  Tr. Vol.

54

5 p. 288.   The Eleventh Circuit has held that a party may exercise a peremptory strike against a juror who has family members with criminal histories.  <u>See,</u> <u>e.g.</u> <u>United States v. Houston</u>, 456 F. 3d 1328, 1337 (11th Cir. 2006) ("This court has previously held that prior family involvement with drug charges is a 'reasonably specific' and 'neutral' explanation for a prosecutor's exercise of a peremptory strike.  We see no reason why prior family involvement with armed robbery would not be considered as a neutral explanation for a strike--particularly when the case to be tried includes an armed robbery charge.")

However, Dallas contends that this reason was a pretext for discrimination because the prosecutor failed to strike similarly situated white jurors.  Specifically, Dallas argues that the prosecutor failed to strike white Juror 84, whose wife had a drug conviction; white Juror 19, who was "critical" of the way the District Attorney's office prosecuted the woman who killed her son; and white Juror 108, who had a relative with a drug problem.

However, a review of the record demonstrates that Dallas's defense counsel struck Jurors 19 and 108.  Tr. Vol. 6 pp. 468-469.  As to Juror 84, he testified that his wife plead guilty to abusing a "diet suppressant."  Tr. Vol. 5 pp. 316-317.  It could be reasonably argued that a juror who has a family member with a conviction for abusing a "diet suppressant" is not "similarly situated" to a juror who has family members who were involved in the death of another person due to an argument and for which one family member went to prison.  See, e.g., Hollingsworth v. Burton, 30 F. 3d 109, 112-113 (11th Cir. 1994) (no Batson violation where the prosecutor struck a black juror who had some of the same characteristics as a seated white juror, but where, under the facts of the case, race-neutral reasons existed making the white juror more preferable to the prosecution.).[4]

---

    4.  The prosecutor said he struck this juror also because she was taking medicine to treat her high blood pressure.  Since this juror testified that her blood pressure medication would not interfere with her ability to serve as a juror, the State conceded in its brief that
(continued...)

The prosecutor also struck African-American Juror 20 because of her attitude toward the death penalty; "because she had her eyes closed and seemed to be asleep during voir dire"; and because of her seventh grade education and her "very poor" spelling on her juror questionnaire.  Tr. Vol. 6 pp. 482-483.  With respect to the death penalty, although this juror ultimately testified that she could consider voting for the death penalty, she also testified as follows:

> "THE COURT: ...  Do you have an opinion about capital punishment; that is, the death penalty?  Do you have an opinion one way or the other about that?
>
> "[JUROR]:  I don't favor the death penalty.

---

4.   (...continued)
one of the reasons given for striking her is not credible.   However, as stated, the Eleventh Circuit has held that one race-neutral reason for a peremptory strike which is supported by the record is sufficient to meet the prosecutor's burden even where another of the proffered reasons for the strike is not supported by the record.   <u>See supra</u> note 3.   Accordingly, the court will evaluate the other two reasons given by the prosecutor for striking this juror.

> "THE COURT: Do you favor life without
> parole over the death penalty if those
> are the choices?
>
> "[JUROR]: Yes."

Tr. Vol. 4 pp. 158-161.   As stated, mere hesitancy about the death-penalty is a race-neutral reason.

As to Juror 20, the prosecutor stated that, "I noted on two occasions she had her eyes closed and seemed to be asleep during voir dire.  I noticed that she walked with a cane."  Tr. Vol. 5 p. 483.  Dallas argues that the State's "alleged personal preferences" were used as a pretexts for race-based strikes.  He argues that the prosecutor's reasons for striking her based upon her lack of attention during voir dire and because she walked with a cane were pretexts.  However, Dallas provides no evidence of similarly situated white jurors who were not struck   It is well-settled that a party may exercise a peremptory strike against a juror who is inattentive or who appears to be sleeping during voir dire.  See United States v. Diaz, 26 F. 3d 1533, 1542-1543 (11th Cir. 1994)

(citing <u>United States v. Hendrieth,</u> 922 F. 2d 748, 749-750 (11th Cir. 1991) ("upholding trial court's decision to allow strike based upon juror's inattentiveness and her rolling and rubbing her eyes during voir dire.")).

As stated, the prosecutor struck Juror 20 also because she had a seventh grade education and because her spelling on her juror questionnaire was "very poor." Tr. Vol. 6 pp. 482-483. The United States Supreme Court has indicated that a juror's education level constitutes a valid race-neutral reason for a party to exercise a peremptory challenge. <u>See</u>, <u>e.g.</u>, <u>Batson v. Kentucky,</u> 476 U.S. 79, 89 n. 12 (1986) ("Prior to voir dire examination, which serves as the basis for exercise of challenges, lawyers wish to know as much as possible about prospective jurors, including their age, <u>education</u>, employment, and economic status, so that they can ensure selection of jurors who at least have an open mind about the case.") (emphasis added). Indeed, "[t]he attainment of a certain educational level has been accepted by numerous circuits

as a race-neutral criterion for exercising a peremptory challenge under the <u>Batson</u> mandate."   <u>United States v. Marin,</u> 7 F. 3d 679, 686 (7th Cir. 1993).

Dallas argues that this reason for the strike is a pretext because it is not supported by the record and because similarly situated white jurors were not struck. As to his first contention, Dallas says that, because the evidence of bank transactions referenced--records of ATM withdrawals--was undisputed, there was no chance less educated jurors would be confused by this information as Respondent claims.   Tr. Vol. 7, pp. 846-47.   Indeed, Dallas argues that "the State surely knew at the time of voir dire there was no dispute as to the charged financial crimes."  Petitioner's Brief on the Merits (Doc. No. 88) at p. 36.   However, Dallas presents no evidence that the State <u>did</u> know this fact during voir dire.   Rather, he argues that, because his counsel conceded commission of the financial crimes during opening statement to the jury, Tr. Vol. 5 p. 545, and during closing argument, Tr. Vol.

7 p. 870, that the State must have known during voir dire there was no issue surrounding the bank records.  Without more, however,  the court can not conclude that the State knew, at the time of voir dire, that there was no dispute as to the charged financial crimes.

Dallas also maintains that the State failed to strike two white jurors who made mistakes in filling out their jury questionnaires, thus demonstrating that the strike of Juror 20 based upon her education level was a pretext. Dallas points to the State's failure to strike Juror 19, who failed to characterize her son's death as resulting from a crime, and Juror 111, who failed to recall that she heard something previously about the facts of this case. However, there is no evidence as to the education levels of these jurors.  Moreover, the evidence before the court is that the spelling on Juror 20's questionnaire was "very poor."  Tr. Vol. 6 pp. 482-483, which could be viewed as indicating repeated errors on the questionnaire.  There is

no evidence Jurors 19 and 111 made repeated errors in fact
or spelling on the questionnaire.

The prosecutor struck Juror 1 because of his arrest
record and because he was wearing earrings.   Indeed, the
prosecutor stated:   He struck this juror because he "had
a large number of arrests.   And in August of 1993 he was
prosecuted for Theft I by our office.   The case was nol-
prossed on payment of restitution in February of 94."   Tr.
Vol. 5 p. 484.   Dallas argues that the State's reason for
striking this juror because he "has a large number of
arrests" is not supported by the facts.   However, whether
the juror had many arrests or just one is immaterial; the
important fact is that he had one.   It is well-settled
that a juror's prior criminal history or arrest record
constitutes a valid race-neutral reason for a party to
exercise a peremptory challenge.   <u>Murphy v. Dretke</u>, 416 F.
3d 427, 433 (5th Cir. 2005).   Moreover, before striking
Juror 1, the prosecutor struck two white male jurors

(Jurors 27 and 93) who also had prior arrests.  Tr. Vol. 5 p. 483-484.

The State struck Juror 1 also because he was wearing earrings.  The prosecutor explained: "Call me old fashioned.  I do not like people wearing earrings, whether black, white, or whatever."  Tr. Vol.5 p. 484.  In <u>Purkett v. Elem,</u> 514 U.S. 765 (1995), the United States Supreme Court held that the prosecutor's explanation that he struck one of the jurors because the juror "had long, unkempt hair, a mustache, and a beard" was race-neutral and satisfied the State's burden of articulating a non-discriminatory reason for the strike."  <u>Id.</u> at 769.

The prosecutor next struck African-American Juror 31 because of his demeanor and inattentiveness during voir dire.  The prosecutor explained:  This juror "sat on the front row.  He looked totally disinterested during the entire voir dire process.  Several times he rolled his eyes.  I just couldn't get a feel for him, Judge, because of his disinterest in everything.  Everything else he

looked fine on, except I did not like the way he acted in his mannerisms and responses." Tr. Vol. 5 at pp. 484-485. It is well-settled that a juror's inattentiveness during voir dire constitutes a valid race-neutral reason for a party to exercise a peremptory strike against the juror. See United States v. Cordoba-Mosquera, 212 F. 3d 1194, 1197 (11th Cir. 2001).

The prosecutor struck African-American Juror 95 because "she said that she  was more inclined to go for life without parole, and she personally did not want to have to make the decision to sentence someone to death." Tr. Vol. 5 at 486.  Although she testified that she could consider recommending death, she also testified as follows:

> "THE COURT: But if the evidence supported a finding of capital murder, you are telling me--would you be more inclined to give the death penalty or is what you are saying--well, you tell me what you are saying.  If there was a verdict of capital murder, what do you think you would do at that time?

[JUROR]: I would say life without parole. But as far as the death penalty, I don't believe in killing anyone. But in the Bible, like I say, you know, if ye kill, ye shall be killed. So I try to live by the Bible.

"THE COURT: I think I understand a little bit better what you are saying now. You personally wouldn't want to make a decision where somebody's life had to be taken?

"[JUROR]: Yes, sir."

"THE COURT: You would lean towards life without parole?

"[JUROR]: Yes, sir.

"THE COURT: But if the law supported a finding of the death penalty, you think you could possibly do that?

"[JUROR]: Yes, sir.

"THE COURT: Do you think you could set your personal feelings about the death penalty aside long enough to rule based upon the evidence and the law in the case?

"[JUROR]: I would have to pray very hard to do so.

* * *

"[LAWYER]: ... [Y]esterday when being questioned by the Judge in the whole group, you indicated that you may have

some problems sitting in judgment of
another person.   I know you also said
that you do believe in justice.   What
problem would you have?

"[JUROR]: Well, as far as individual
actions of a person without breaking the
law, I could not judge them.   But as far
as breaking the law and doing something
wrong or hurting somebody or taking
somebody's life, I guess I could go
along with it.   But what I meant by that
is that I don't want to judge anybody
just by individual everyday living.
That's what I meant.   But, still, at the
same time, I don't want to make a
decision, you know, to take somebody's
life, even though they are in the wrong.
It is kind of a hard decision for me.

"[LAWYER]: I understand.   I know it is a
very hard decision.   Do you think you
would be able to set aside this conflict
that you have and be able to sit as a
juror in this case?

"[JUROR]: Yes, sir, like I say, I would
have to pray very hard to have that type
attitude.

"[LAWYER]: But you are not comfortable?

"[JUROR]: No sir."

Tr Vol 4, pp. 359-361.   Dallas points to the testimony of

Juror 95, where she references the Bible's instructions,

"[y]e shall kill, ye shall be killed" as evidence that Juror 95 was impartial on the death penalty. However, taking that statement in context within the entire dialogue, it could be reasonably argued that Juror 95 was not comfortable with her role as a juror in this case and was much more inclined to recommend a sentence of life without parole. As stated, mere hesitancy about the death penalty is a race-neutral reason.[5]

The prosecutor struck Juror 94 because he wore two earrings and because he was late to court; and because of his attitude and demeanor during voir dire, Tr. Vol. 5 pp. 486-487; struck Juror 52 because "he could not even complete his questionnaire," id.; struck Juror 29 because "he had a reading disorder" and because "he had a cousin that was convicted of drugs," id.; and struck Juror 26 because she had "someone of her family, immediate family,

_____

5.   Moreover, prior to striking Juror 95, the prosecutor struck a white Juror 58 because she testified that "she was very uncomfortable about having to impose [the death penalty] and having to make that decision. Tr. Vol. 5 p. 485.

convicted of murder." Id.  As this court has explained with regard to other similarly situated African-American jurors who were struck, these reasons are all race-neutral.

The above summary of the evidence demonstrates that the State had race-neutral reasons, albeit some quite subjective and some even weak, for the striking the African-American jurors that it did.  Nonetheless, the questions still remains as to whether those reasons are credible.  This court is most deeply troubled by the fact that the prosecutor used 12 of his 16 strikes to strike African-American jurors.  There is also a strong suggestion in the record that the prosecutor may have targeted African-American jurors for questioning so as to elicit reasons to use to get rid of them.  There is also a serious question as to whether the prosecutor's office has a history of Batson violations.

If this federal court were the state trial court, with the opportunity to get a first-hand impression of whether

the prosecutor was targeting African-American jurors for more questioning and with an institutional knowledge of the overall pattern of jury striking in the prosecutor's office and by the prosecutor himself, this court might, therefore, very well have reached a difference conclusion on Dallas's <u>Batson</u> challenge.   However, as the United States Supreme Court has repeatedly reminded lower federal courts, they are not the state courts, and, as a result, are not the factfinders on whether a prosecutor's race-neutral reasons were, in fact, credible.   Nor are the federal courts even general courts of error for the state courts.   Their deference is much greater.   As Justice Breyer has explained (and lamented) about the application of <u>Batson</u> in the habeas context:

> "The [state] trial judge is best placed to consider the factors that underlie credibility: demeanor, context, and atmosphere.  And the trial judge is best placed to determine whether, in a borderline case, a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a rational reason for an instinctive decision.  Appellate judges

> cannot on the basis of a cold record
> easily second-guess a trial judge's
> decision about likely motivation. These
> circumstances mean that appellate courts
> will, and must, grant the trial courts
> considerable leeway in applying <u>Batson</u>.
> ... As the present case illustrates,
> considerations of federalism require
> federal habeas courts to show yet
> further deference to state-court
> judgments. <u>See</u> 28 U.S.C. § 2254(d)(2)
> (state-court factual determination must
> stand unless 'unreasonable')."

<u>Rice</u>, 546 U.S. at 343-344 (Breyer, J., concurring).

Faced with race-neutral reasons and constrained by clear legal precedent, this court, therefore, cannot conclude that the Alabama courts' credibility determination that the peremptory challenges of black jurors in this case were not "motivated by intentional racial discrimination" is a decision that was "contrary to" or "an unreasonable application of federal law" or a decision "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d)(1) and (2).

70

Dallas further argues that the state trial court erred because it "seemed to collapse" the first and third prongs of the Batson analysis "into one" and failed to determine whether Dallas satisfied his burden of proving purposeful discrimination.   However, the Eleventh Circuit has held that denial of a Batson objection by a trial judge is an "implicit" conclusion that the prosecutor's race-neutral explanations were credible and thus, that there was no purposeful discrimination.  See Hightower v. Terry, 459 F. 3d 1067, 1072 n. 9 (11th Cir. 2006) ("The trial court's overruling of Hightower's Batson objection would have defied logic had the court disbelieved the prosecutor's race-neutral explanations.  We may therefore make 'the common sense judgment'--in light of defense counsel's failure to rebut the prosecutor's explanations and the trial court's ultimate ruling--that the trial court implicitly found the prosecutor's race-neutral explanations to be credible, thereby completing step three of the Batson inquiry.")  In any event, the Alabama Court

71

of Criminal Appeals found that the prosecutor's reasons were credible and not based on intentional discrimination. <u>Dallas</u>, 711 So.2d at 1104-1105.

***

For the above reasons, it is the ORDER, JUDGMENT, and DECREE of the court that petitioner Donald Dallas is not entitled to habeas relief on the above-discussed claims to which the respondents have not asserted a procedural-default defense.  By later separate order, the court will address those claims to which the respondents have asserted a procedural-default defense.

DONE, this the 12th day of January, 2012.


                 /s/ Myron H. Thompson     
              UNITED STATES DISTRICT JUDGE