IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DONALD DALLAS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:02-CV-777-WKW |
| | ) | |
| JEFFERSON S. DUNN, | ) | |
| Commissioner, Alabama Department | ) | |
| of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Donald Dallas filed this federal habeas corpus action pursuant to 28 U.S.C. §2254 challenging his October 1995 Montgomery County conviction for capital murder and sentence of death. For the reasons set forth below, Petitioner is entitled to neither habeas corpus relief nor a Certificate of Appealability.

## I. BACKGROUND

### A. The Offense

There is no genuine dispute as to the facts of Petitioner's offense. The day of his arrest for the murder of 73-year-old Hazel Liveoak, Petitioner gave police a videotaped statement in which he admitted he and an accomplice (1) kidnapped the elderly Mrs. Liveoak from a grocery store parking lot in Prattville, Alabama, on the afternoon of July 12, 1994, (2) drove her in her own vehicle to a location south of

Montgomery where, despite her protests that she had a heart condition, he convinced her to get into the trunk of her car with a promise to release her once they reached her bank, (3) drove Mrs. Liveoak to a parking lot in south Montgomery where Petitioner and his accomplice convinced her to furnish the access code for her bank card and withdrew money from her bank account using her bank access card after promising to notify police of her location, (4) abandoned Mrs. Liveoak's vehicle (with her still in the trunk) in an isolated area of a K-Mart parking lot where it was discovered the following day containing Mrs. Liveoak's lifeless body, and (5) despite Petitioner's repeated assurances and promises, made no effort to contact or notify anyone of Mrs. Liveoak's location or perilous predicament.[1]   Petitioner

---

[1] Petitioner's videotaped statement to police was admitted into evidence without objection during his capital murder trial as State Exhibit 40 and played in open court for the jury.  State Court Record (henceforth "SCR"), Volume 7, at pp. 647-48 (*i.e.,* 7 SCR 647-48).   A verbatim transcription of the audio portion of the same videotape recording was admitted into evidence as State Exhibit 41 and appears among the State Court Record at 3 SCR 457-69.   Petitioner's statement was actually a series of questions and answers during a *Mirandized* custodial interview in which Petitioner stated that (1) he told Mrs. Liveoak he would check on her and call police to tell them where she was, 3 SCR 458-49, 463, (2) Mrs. Liveoak informed him she had a heart condition, 3 SCR 458, (3) as he drove Mrs. Liveoak to Greenville immediately after her abduction, Petitioner informed her that he had a crack problem and she prayed for him, 3 SCR 463, (4) he promised his accomplice he would let Mrs. Liveoak out of the trunk, 3 SCR 461, (5) once he and his accomplice obtained money from Mrs. Liveoak's bank account, they left the scene in a cab, 3 SCR 459, (6) after abandoning Mrs. Liveoak in her trunk, he and his accomplice went to a location in Montgomery where they purchased and used crack cocaine, 3 SCR 461, (7) the morning after he abandoned Mrs. Liveoak in the trunk of her car, Petitioner awoke and assumed it was too late to call police to help her so he began shoplifting to get more money, 3 SCR 461, 463, and (8) when he learned from a television report that Mrs. Liveoak had been found dead, he cut his hair and planned to commit suicide-by-police during an armed robbery of a bank, 3 SCR 461.   In his statement, Petitioner specifically denied any intent to harm anyone.  3 SCR 464.

testified at the guilt-innocence phase of his trial in a manner consistent with his post-

arrest statement to police.[2]

---

[2] More specifically, Petitioner testified on direct examination at the guilt-innocence phase of his capital murder trial that (1) he pushed Mrs. Liveoak into her vehicle and drove off from the WalMart parking lot, (2) she was scared and volunteered to get money from her credit card, (3) he told her he had a crack problem, (4) she prayed for him, (5) he told her he would not hurt her, (6) he drove them on the Interstate south and exited on a dirt road, (7) he directed her to get out and walk into the woods but she said she was scared so he suggested she get into the trunk, (8) he told her she would get out as soon as he got to the bank and got the money, (9) he drove to the AmSouth Bank on South Boulevard in Montgomery, (10) his accomplice Carolyn "Polly" Yaw was initially unable to get the bank's teller machine to work, (11) he got out of Mrs. Liveoak's car and sat on the trunk so he could hear her better, (12) Mrs. Liveoak told him the phone number of her son but he did not write it down and, instead, told her he would call police to rescue her, (13) after he and Yaw obtained money from Mrs. Liveoak's bank account, they called a cab and left the scene, (14) they went to Chester Foley's house to get crack cocaine, (15) they next went to a motel where they smoked crack until the crack of daylight, (16) they left the motel at checkout time and returned to Chester Foley's house, (17) they went with Dennis "Tony" Bowen to get money for more drugs, (18) he and Dale Blake went to steal more items to trade or sell to get more drugs, (19) he assumed Mrs. Liveoak had gotten out of her vehicle and he was going to be arrested for kidnaping and robbery, (20) he made an attempt the day after he left Mrs. Liveoak in her trunk to return to the bank parking lot but the car in which he was riding broke down, and (21) he never intended to kill Mrs. Liveoak.  7 SCR 794-803.

Significantly, Petitioner also testified on direct examination that he made an attempt to return to the place where he left Mrs. Liveoak because he "wanted to make sure she was gone":

> Once I went to the motel, I never left the motel.  I tried one time, but the guy that came over that Chester knew, I had asked Chester if he knew anybody with a car that could take me somewhere and bring me back.  This is when Chester first came back with the drugs, *because at the time I wanted to make sure she was gone*.  But I didn't want to call a cab, because I didn't want to get caught, because I took a cab away from there.  I knew if I called the Yellow Cab Company or any cab company, that they would be looking out for me.  8 SCR 801-02 (emphasis added).

On cross-examination, Petitioner testified (1) he had previously been convicted on charges of possession of a forged instrument, first degree burglary, first degree kidnaping, and second degree robbery, 8 SCR 803, (2) on the drive from Prattville after he abducted Mrs. Liveoak, she informed him she had a heart problem, 8 SCR 816, (3) "Like I say.  I wasn't thinking too many things but one thing.  I am robbing somebody, and I am going to be in big trouble.  I am going to spend a lot of time in jail if I get caught doing this.", *Id.,* (4) he was not thinking and only wanted to get dope and get into his own world, 8 SCR 817, (5) he never thought about killing anyone, 8 SCR 818, (6) he passed a number of pay phones on the way to the crack house and the motel on the evening he abandoned Mrs. Liveoak in her trunk but he made no effort to stop and place a call to anyone to alert them to Mrs. Liveoak's location, 8 SCR 822, (7) he did not use the motel phone

## B.  Indictment

In October 1994, a Montgomery County grand jury returned a seventeen-count indictment charging Petitioner with  (1) two counts of capital murder, *i.e.,* intentionally causing the death of Hazel Liveoak (a) by inducing a heart attack by confining her in an automobile trunk during a kidnaping, to wit, abducting her with the intent to accomplish or aid the commission of felony robbery and (b) intentionally causing the death of Hazel Liveoak by confining her in an automobile trunk and causing death during a robbery, *i.e.,* the theft of a VISA card by force with the intent to overcome her physical resistance causing serious physical injury, (2) three counts of fraudulent use of a credit card, (3) one count of theft of property by deception, and (4) eleven counts of unauthorized use of a communications device.[3]

## C.  Guilt-Innocence Phase of Trial

The guilt-innocence phase of Petitioner's capital murder trial commenced on October 17, 1995.

### 1.  The Prosecution's Evidence

The prosecution presented Mrs. Liveoak's son who testified regarding the circumstances surrounding her disappearance and his delivery of a spare key to her

---

to call for help for Mrs. Liveoak, 8 SCR 823, and (8) he was worried about getting caught and cut his hair after he learned of Mrs. Liveoak's death, 8 SCR 825.

[3] 1 SCR 7-23.

vehicle to a law enforcement officer in Millbrook.[4] A university maintenance worker testified that (1) he heard a radio broadcast regarding a missing person driving a maroon Chrysler with an Elmore County license plate, (2) he observed a red vehicle with an Elmore tag parked in a very isolated location within a K-Mart parking lot in South Montgomery, and (3) he called police when he got home.[5] The former police chief of Millbrook testified he (1) delivered the key to Mrs. Liveoak's vehicle to Montgomery police officers at the K-Mart parking lot and (2) was present when other law enforcement officers opened her automobile trunk and discovered her lifeless body.[6] A Montgomery police patrol officer testified regarding the isolated location of Mrs. Liveoak's vehicle within the K-Mart parking lot and the conditions inside her passenger compartment when the vehicle was discovered, including the fact no keys were found inside the vehicle.[7]

---

[4] 6 SCR 548-54 (testimony of Larry Liveoak). More specifically, Mr. Liveoak testified that (1) he last saw his widowed mother on the afternoon of July 12, 1994, (2) when he went by her home later that same day, she was not there, (3) he contacted the police dispatcher in Millbrook to report her missing, (4) after an unsuccessful all-night search for her and her vehicle, he went to a television station to seek assistance in locating her, (5) the following day, he was notified her vehicle had been found, and (6) a Millbrook police officer picked up his mother's keys from him. *Id.* Mr. Liveoak also identified photographs of his mother and her vehicle. *Id.*, at 553.

[5] 6 SCR 554-60 (testimony of Richard Walker). Mr. Walker also identified photographs of Mrs. Liveoak's car in the location where it was parked in the K-Mart parking lot. 6 SCR 560.

[6] 6 SCR 561-68 (testimony of Danny Pollard). Mr. Pollard also testified that, upon the discovery of Mrs. Liveoak's body, the Violent Crimes Task Force was notified of the crime. 6 SCR 567.

[7] 6 SCR 568-75 (testimony of R.C. Cleghorn). Officer Cleghorn also testified (1) the vehicle did not contain a trunk release in the passenger compartment or glove box, (2) the vehicle was parked a "good distance" from the store and bank and all other vehicles in the parking lot, (3)

A Montgomery police evidence technician testified that (1) he photographed Mrs. Liveoak's lifeless body after it was discovered inside the trunk of her car, (2) her vehicle was located 350 feet from the K-Mart store, 202 feet from the AmSouth Bank, and 166 feet from East South Boulevard, (3) after her body was removed, her vehicle was taken to a police facility and processed for fingerprints, (4) the entire crime scene was photographed and videotaped, (5) an earring matching one found inside the trunk was found outside the lip of the trunk, (6) no fingerprints were found inside the interior of the vehicle, but (7) a palm print was found on the outside of the vehicle's trunk.[8]  A latent fingerprint examiner testified that Petitioner's palm print matched that lifted from the driver's side of the trunk lid of Mrs. Liveoak's vehicle.[9]

The state medical examiner testified that (1) he performed an autopsy on the 73-year-old Mrs. Liveoak on July 14, 1994, (2) Mrs. Liveoak had bruising on the right side of her head, the backs of both hands and wrists, and her right biceps, (3)

---

the driver's and passenger side front windows were partially down and a strong foul odor emanated from inside the vehicle, (4) a drop of blood was observed underneath the rear trunk lid, and (5) spoiled food in a plastic bag was found on the floor inside the passenger compartment.  *Id.*  He also identified photographs of the interior of the passenger compartment.  *Id.*, at 573-74.

[8] 6 SCR 575-600, 7 SCR 601-02 (testimony of S.Z. Smith).  Detective Smith also testified (1) a useless fingerprint was lifted on a window, (2) a brownie wrapper was found on the rear seat of the car's interior, (3) no other vehicles were located around Mrs. Liveoak's vehicle, (4) no sounds came from inside the vehicle or its trunk before the arrival of the vehicle key, (5) Mrs. Liveoak's left hand showed visible bruising, (6) a cloth purse was found inside the vehicle containing an address book and pocket planner but no money or credit cards, and (7) Mrs. Liveoak's tennis shoes were found inside the trunk of the car after her body was removed.  *Id.*

[9] 6 SCR 603-07 (testimony of Danny Smith).

she also had non-life-threatening minor cuts to both her palms, (4) the bruising and
lacerations to her hands were consistent with efforts to bang on a trunk lid to get out,
(5) the bruising to her right arm was consistent with someone grabbing her in an
effort to control or manipulate her, (6) her heart displayed extreme arthrosclerosis,
*i.e.,* blockage, in the descending coronary artery, (7) he found evidence she had
suffered a prior heart attack but had recovered from same, (8) he did not find
evidence of a recent heart attack, (9) her general cardiac health was "very
questionable," (10) there was evidence the blood supply to the heart was markedly
diminished, (11) he found severe pulmonary edema, *i.e.,* fluid backed up into the
lungs, (12) her heart was failing, (13) her cause of death was cardiac failure, (13) the
manner of her death was homicide, (14) while Mrs. Liveoak apparently was able to
do her daily chores and take care of her personal affairs, she lacked the cardiac
reserve to be able to handle the extremely stressful confines in which she was placed,
*i.e.,* being confined in a hot, dark, space for hours, and (15) her heart could not take
the stress, which is why he concluded her death was the result of "homicide by heart
attack."[10]

    A Montgomery Police Detective testified that (1) there were no signs of life
but there was a strong odor of spoiled milk and a body when he arrived at the K-

---

[10] 7 SCR 609-24 (testimony of Allan Stillwell).  On cross-examination, Dr. Stillwell
admitted he could not testify as to the intent of the actor who placed Mrs. Liveoak inside her
automobile trunk.  *Id.,* at 623.

Mart parking lot around 2010 hours on July 13, 1994, (2) no other cars were parked near Mrs. Liveoak's vehicle, (3) when the trunk lid was opened, there was condensation on the inside lid of the trunk, (4) Mrs. Liveoak's pants were stained and there were visible bruises and scratches on her hands, (5) paramedics present when the trunk was opened found no signs of life in Mrs. Liveoak's body, (6) her body was taken away for autopsy, (7) no car keys were found inside Mrs. Liveoak's vehicle, (8) her purse was found but not her billfold, (9) after speaking with Tony Bowen, he and other law enforcement officers developed Petitioner and Carolyn "Polly" Yaw as suspects, (10) he discovered Petitioner and Yaw had registered at a motel on July 13, 1994, (11) a search for a white vehicle driven by "Blake" led to the arrests of Petitioner and Yaw after a brief chase, (12) he gave Petitioner his *Miranda* warnings, (13) Petitioner indicated that he understood his rights, read his rights form, and signed same, (14) he advised Petitioner he was charged with capital murder and faced the death penalty or life in prison, (15) Petitioner did not appear to be intoxicated or under the influence of alcohol or narcotics, (16) Petitioner was cooperative, (17) during his initial interview, Petitioner stated that (a) he found Mrs. Liveoak's vehicle with the keys inside it in the Wal-Mart parking lot in Prattville, (b) he drove the vehicle to the K-Mart in Montgomery, (c) he opened the trunk of her vehicle, (d) he found her body, and (e) he closed the trunk lid and left the scene, (18) after further questioning, Petitioner admitted that (a) he grabbed the lady in the

WalMart parking lot, (b) she screamed and hollered as he drove her vehicle to Greenville, (c) he put the lady in the trunk of her car despite the fact the victim said she had a bad heart, (d) he told her he would send someone to get her out once he left her, (e) he passed out after doing crack the evening of the kidnaping and did not wake until the following morning, and (f) when he awoke he figured it was too late to get help for the lady, (19) a knife was recovered from the rear passenger side floorboard of the white vehicle in which Petitioner was riding at the time of his arrest, and (20) Petitioner gave a voluntary videotaped statement that was not induced by any promises, threats, or other forms of coercion.[11]

Dennis Anthony Bowen testified that (1) he met Petitioner in July 1994 when he went to Chester Foley's house to smoke crack cocaine, (2) at the time of Petitioner's capital murder trial, he had been in an outpatient drug treatment program for about a year, (3) in July 1994 he drove Petitioner and Carolyn "Polly" Yaw to WalMart to shoplift cigarettes to get money to buy drugs, (4) Petitioner ran out of the store carrying a television in a box, (5) Petitioner threw the box into the bed of Bowen's truck, wrestled with a store employee, and then jumped into the truck, (6) Bowen drove away, (7) Bowen and Petitioner were both later arrested in connection

---

[11] 7 SCR 624-64 (testimony of Steve Saint).  Detective Saint also testified without contradiction that the transcription of Petitioner's videotaped statement admitted without objection at trial as State Exhibit 41 was an accurate transcription of the videotaped recording admitted without objection at trial as State exhibit 40. *Id.,* at 648.

with the incident at WalMart, (8) through conversations with Chester Foley, Petitioner, and Yaw, Bowen became aware that Petitioner and Yaw claimed they robbed and placed an old lady in a trunk and got money with the lady's bank card, (9) when Bowen asked Petitioner and Yaw about their claims, Petitioner sarcastically responded that he wished or hoped the old lady died, and (10) Bowen saw an article in the next morning's newspaper about the missing woman, went to visit his attorney, and met with police to reveal what he knew.[12]

An elderly man testified that (1) he went to the WalMart in Prattville on July 9, 1994 to return a microwave oven, (2) as he was returning to his car, a robber with a knife got into his car and struck his fingers, (3) the robber drove his car to Millbrook and stopped in a wooded area, (4) after he gave the robber about $170 in cash, the robber forced him to get out of the car and lie down in the woods, (5) the robber threatened to lock him in the trunk of the car but he protested that he would "smother to death in there," (6) the robber drove off in the victim's car, (7) he got

---

[12] 7 SCR 664-701 (testimony of Dennis Anthony Bowen). Bowen acknowledged on direct examination that he was high on crack cocaine at the time of his conversations with Petitioner and Yaw. *Id.,* at 672. On cross-examination, Bowen admitted (1) crack cocaine has a very intense high which wears off very fast and leaves you with a craving for more, (2) he began using crack cocaine in 1992, (3) when he met with police, Bowen did not inform them he had heard Petitioner say he hoped Mrs. Liveoak would die, (4) he was charged with robbery and later pleaded guilty to theft in connection with the incident at WalMart in July 1994, (5) an arrest warrant was then outstanding for him due to his failure to comply with the conditions of his probation, and (6) that day at Petitioner's trial was the first time he had ever told anyone that Petitioner said he hoped or wished Mrs. Liveoak died. *Id.,*at 675-08. On redirect, Bowen testified he had not been promised anything to induce his testimony at Petitioner's trial. *Id.,* at 699.

up and walked about a mile down the road where he found his car but not the keys, (8) he later saw a newscast regarding a missing lady and recognized Petitioner as his robber, and (9) Petitioner pleaded guilty to robbing him.[13]

### 2. The Defense's Evidence

Called by the defense, an acquaintance of Petitioner testified that (1) Petitioner was crying and appeared to be worried after Petitioner saw television coverage of the discovery of Mrs. Liveoak's body and (2) Petitioner said that he had tried to get "that boy" to take him back over there.[14]

A clinical psychologist who had examined Petitioner for competency to stand trial testified that (1) Petitioner had a long history of substance abuse beginning with alcohol abuse around age 7-8, regular marijuana use around age 12-13, and intravenous drugs – including crystal meth and dilaudid – around age 13-14, (2) people with an early history of IV drug abuse have a more difficult time quitting because it retards social and psychological development, (3) those who smoke or inhale crack cocaine have a harder time stopping its use and staying off it, (4) while

---

[13] 7 SCR 703-12 (testimony of Wesley Orville Portwood).  Petitioner's videotaped statement to police admitted into evidence as State Exhibit 40 included admissions by Petitioner that he was the individual who kidnaped and robbed Portwood.  3 SCR 459, 465-68.

[14] 7 SCR 727-30 (testimony of Rhonda Sue Chavers).  On cross-examination, Ms. Chavers testified the Petitioner cut his hair after seeing reports of Mrs. Liveoak's death and never mentioned Mrs. Liveoak on the night he stayed at Chavers' residence, *i.e.,,*July 13, 1994.  *Id.,* at 730-31.

crack is not physically addictive, *i.e.,* there is no treatment regimen for addiction, it results in a very intense psychological addiction causing a craving for the drug and a dependence that requires users to need more of the drug to get the same effect, (5) the psychological craving resulting from crack cocaine abuse causes intense discomfort and irritability, (6) Petitioner has been diagnosed as dependent upon cocaine, (7) at the time of his capital offense, Petitioner was binging on crack, *i.e.*, he wanted more and more of the drug and used large quantities of crack within shorter time periods, (8) Petitioner had been binging on crack for twelve days prior to his encounter with Mrs. Liveoak and was oblivious to time at that time, (9) Petitioner was functioning at below the average intelligence level at the time of his capital offense, (10) despite his abuse of crack, Petitioner knew the difference between right and wrong, (11) Petitioner became tearful when he related the circumstances of Mrs. Liveoak's death, and (12) Petitioner was remorseful – denying he ever intended for Mrs. Liveoak to die.[15]

---

[15] 7 SCR 743-61 (testimony of Dr. Guy Renfro). On cross-examination, Dr. Renfro testified that (1) Petitioner knew it was wrong to abduct and rob Mrs. Liveoak and leave her in the trunk of her car, (2) not every drug addict commits violent crimes, and (3) crack use increases the propensity for violence because it makes users more confrontational. *Id.,* at 761-64. On re-direct examination, Dr. Renfro testified (1) the craving effects of crack affect a user's choices and (2) crack is a "drug of concern." *Id.,* at 764-66.

An attorney (and Petitioner's court-appointed mitigation specialist) testified the federal Sentencing Guidelines treated crack cocaine as more dangerous and addictive than powder cocaine.[16]

Petitioner testified on direct examination that (1) he was born and raised in New York until age 6 or 7 when his parents divorced and he moved with his mother and two of his siblings to Florida, where he began abusing alcohol, (2) he skipped school regularly, (3) he played in a band in bars with his step-father beginning around age 10 and continued drinking alcohol, (4) he began using marijuana around age nine and often stole from his mother to pay for pot when he was in middle school, (5) he had no parental supervision growing up and did not attend church, (6) he began using cocaine intravenously around age 13, (7) crystal meth, used intravenously, became his drug of choice around the same time, (8) he also abused Quaaludes, Placidyls, Desoxyns, Mepergan, Deerol, and LSD, (9) he "discovered" crack cocaine in 1992 which he smoked, (10) he had been doing crack for about two weeks immediately prior to his encounter with Mrs. Libeoak, (11) he pawned everything he owned to buy crack, (12) he stole cigarettes and meat from grocery stores to pay for drugs, which he bought from Chester Foley, (13) he and Carolyn Yaw have five children, (14) he and Mike Kelly robbed Mr. Portwood at knife point,

---

[16] 7 SCR 767-77 (testimony of Susan James).

13

(15) he never touched Portwood but did threaten him, (16) the night before he encountered Mrs. Liveoak, he traded a stolen bicycle for crack, (17) he pushed Mrs. Liveoak into her car and drove away from the WalMart in Prattville, (18) Mrs. Liveoak was scared and offered to get money for him from her credit cards, (19) as he drove Mrs. Liveoak's car south on the Interstate, he told her he had a crack problem and she prayed for him, (20) he drove to a road in the woods, stopped the car, and directed Mrs. Liveoak to get out and walk into the woods, (21) when she said she was scared, he suggested she get into the trunk and promised she would get out as soon as he got to the bank and got the money, (22) when they reached the AmSouth Bank on South Boulevard in Montgomery, initially Carolyn Yaw could not get the teller machine to work, (23) he had been speaking with Mrs. Liveoak from inside the car but he got out and sat on the trunk to hear her better, (24) when Mrs. Liveoak gave him the phone number for her son, he did not write it down, (25) he promised Mrs. Liveoak he would call the police to let her out of the trunk, (26) after he and Carolyn Yaw got money from Mrs. Liveoak's bank account, they called a cab and left for Chester Foley's house, (27) they later went to a motel where they smoked crack until dawn, (28) at check-out time, they went back to Chester Foley's house, (29) he, Yaw, and Dennis Bowen went to the WalMart in Prattville to steal things to trade for more crack, (30) he and Dale Blake went to Wetumpka and Millbrook and stole items to trade for crack, and (31) when he awoke the morning

14

after his encounter with Mrs. Liveoak, he assumed she had gotten out of her trunk

and he was likely wanted for kidnaping and robbery.[17]

---

[17] 7 SCR 778-800, 8 SCR 801-03 (testimony of Donald Dallas).  Petitioner's direct examination ended with the following exchanges:

> Q:     Mr. Dallas, this jury and this Court and this family want to know why you didn't make the phone call?
>
> A:     Once I went to the motel, I never left the motel.  I tried one time, but the guy that came over that Chester knew, I had asked Chester if he knew anybody with a car that could take me somewhere and bring me back.  This is when Chester first came back with the drugs, *because at the time I wanted to make sure she was gone*.  But I didn't want to call a cab, because I didn't want to get caught, because I had took a cab away from there.  I knew if I called the Yellow Cab Company or any cab company, that they would be looking out for me.  So Chester brung [sic] the guy that lives across the street from him to the motel.  Of course, he knows that I am a crack addict.  I told him I would give him twenty-five dollars to carry me over to the Southern Bypass to let me look at something, and if everything was okay, then I would give him some more money to fill his car up with gas and buy his beer, because he was young.  So we started over there, and his car overheated, so we didn't make it no further than the first store we stopped to get gas at.  So me being in the public when I am hitting crack, I can't do, so I suggested to go back to the motel, and I asked Chester to find us another ride.  Chester knew, I guess, what I was trying to do, because he was the only one I had told.  I never left again.  I smoked crack to daylight.  I never used the phone.  And by the next day, I never heard anything about it, so I started hustling trying to get money to get more crack.
>
> Q:     Mr. Dallas, did you intend to kill Hazel Liveoak?
>
> A:     No, I did not.  I didn't intend to kill nobody.
>
> Q:     Was your purpose just to get money?
>
> A:     (No verbal response.)

8 SCR 801-03 (Emphasis added).

During his cross-examination, Petitioner testified as follows:

> Q:     But you were more comfortable just to leave her in the trunk of the car?  Were you more comfortable leaving her in the trunk of the car, putting her in the trunk of the car?
>
> A:     For me to get away?
>
> Q:     Period.  When you put her in the trunk of that car.  Were you more comfortable putting her inside -- a seventy-three-year-old woman, inside the trunk of a car?
>
> A:     I wasn't even thinking about nothing like that.  I was thinking about getting the money.
>
> Q:     When did you start thinking about the heart condition that she told you about, Mr. Dallas?
>
> A:     When we was going down the interstate, like I said, we was talking.  And she said she had a heart problem.  I asked her was she okay.  She said, yes, I

Petitioner's cross-examination concluded as follows:

     Q:     There you are driving around, riding around in that parking lot, and there was Mrs. Liveoak still in the trunk of that  car?
     A:     Yes.
     Q:     And did you park the car back in the K-Mart parking lot?
     A:     Yes.
     Q:     Mr. Dallas, why didn't you leave the keys with the car?
     A:     I thought I did.
     Q:     But you didn't, did you?

---

am okay.  I guess in my mind, you know, my daddy died of a heart attack.  He was a real physically active man.  He died in his sleep of a heart attack.  I just never really thought about the heart attack.  I don't guess I thought it would ever happen.

     Q:     Wait a second.  You said your daddy died of a heart attack?
     A:     Yes, he did.
     Q:     And she tells you she has a heart condition, and you thought it was okay to put a seventy-three-year-old woman with a heart condition on a summer afternoon in the trunk of a car?
     A:     Like I say, I wasn't thinking about too many things but one thing.  I am robbing somebody, and I am going to be in big trouble.  I am going to spend a lot of time in jail if I get caught doing this.  And wasn't really -- if I had been thinking, it would have never happened.
     Q:     Spent a lot of time in jail if you get caught.  Kind of cut down the chances of getting caught, Mr. Dallas, if the witness who you abducted is dead, isn't it?
     A:     No.
     Q:     You don't think that would cut down your chances of getting caught?
     A:     No. I knew I was going to get caught for robbing her.  I didn't wipe off no fingerprints or try to do nothing.  I wasn't even thinking.  I just wanted to get the money and get the dope and get in my own world.
     Q:     You were just talking about getting caught, Mr. Dallas.  You just abducted someone just a few days beforehand, correct?
     A:     Correct.
     Q:     You left that person alive, correct?  That was the person that could identify you possibly; isn't that right?
     A:     That's why I knew I would get caught.  Sooner or later, everybody knows they are doing a crime they are going to get caught.  With the drugs, you don't comprehend it.
     Q:     But you also knew, Mr. Dallas, that if Mrs. Liveoak was dead, she could not really identify you very well, could she?
     A:     That ain't so.  That ain't so.  Never in my mind have I ever thought about killing anybody.

8 SCR 815-18.

A:     If you didn't find them, then, obviously not.

Q:     Mr. Dallas, why didn't you at least move that car in a closer position where someone might happen upon it?

A:     I wasn't thinking about that.

Q:     You weren't thinking about Mrs. Liveoak at all, were you?

A:     I just wanted to get out.

Q:     You didn't care about Mrs. Liveoak, did you?

A:`    That's not so.

Q:     Mr. Dallas, this is a woman that was praying for your crack addiction.  I think that's what you testified to.  Is that right?

A:     Yeah.

Q:     And you were paying her by leaving her in the trunk of a car and parked that car in an area where it was not likely to be found and she was not likely to be found.  Is that how you repaid her, Mr. Dallas?

A:     No.

Q:     Let me ask you this, Mr. Dallas.  When you went over to that crack house and got in that cab, it is a long way from K-Mart parking lot to Chisholm, isn't it?

A:     It is.

Q:     Do you have any idea how many pay phones you passed along the way?

A:     I guess I figured she got found, because --

Q:     That wasn't my question.

A:     Redo your question, please.

Q:     Do you have any idea how many pay phones you passed along the way?

A:     Five hundred.

Q:     A bunch?

A:     A bunch.

Q:     And you had eight hundred dollars on you, right?  That's what you testified to?

A:     Right.

Q:     Out of that eight hundred dollars, do you think you may could have gotten a quarter to use one of those pay phones?

A:     We never stopped.

Q:     Did you ever ask the cab driver to stop?

A:     No.

Q:     When you went to the Coliseum Motel that night, you didn't have a way there, did you?

17

A:    Yes.

Q:    You did?

A:    Yes, sir.

Q:    I take it back.  I am sorry.  You had to get a ride to go there, right?

A:    Yes, I did.

Q:    From the crack house, Chester Foley's house or whatever it was in Chisholm to the Coliseum Motel, did you pass a number of pay phones at that time?

A:    Yes.

Q:    Still had money on you, too, didn't you?

A:    Yeah.

Q:    Obviously you had money on you, because you had enough money to get a hotel room?

A:    Correct.

Q:    Didn't use a quarter at that time to call for help, did you?

A:    I never used the phone.

Q:    Never stopped, did you?

A:    No.

Q:    How about the Coliseum Motel itself, there were phones in that motel, weren't there?

A:    I expect so.

Q:    You expect so.  Only you didn't even try, did you?

A:    I never used the phone.  I never used it.

Q:    I think you said you didn't call a cab to go back over to the K-Mart parking lot to check on her, because you felt it may draw too much attention to yourself?

A:    (No verbal response.)

Q:    Is that a yes?

A:    Yes.

Q:    Mr. Dallas, you don't dispute at all that you intended to abduct and kidnap Hazel Liveoak, correct?

A:    Correct.

Q:    And you don't dispute that you did intend to rob Hazel Liveoak?

A:    No.

Q:    You don't dispute the fact that you intended to place Mrs. Liveoak in the trunk of the car there on that dirt road?

A:    No.

Q:     And you don't dispute the fact that you intended to leave and drive around with Mrs. Liveoak in the trunk of that car; is that right?

A:     Yes.

Q:     You don't dispute the fact that you intended to leave, when you left the K-Mart parking lot, to keep Mrs. Liveoak in the trunk of that car when you left?

A:     I never thought too much about it.  When the money came out of the machine, I guess that was it.  I never thought about anything but getting out of there.

Q:     And you were worried about getting caught?

A:     Yes.

Q:     As a matter of fact, you were so worried about getting caught the next day when you found out about Mrs. Liveoak's death, you cut your hair to try and change your appearance?

A:     I started to run, yeah.

Q;     Mr. Dallas, isn't it true the first time you have shown any remorse or any worry about what you did on that day is when you found out that Mrs. Liveoak was dead.

A:     It wasn't supposed to happen.

Q:     You didn't show any remorse when you were hitting on a crack pot that night, were you?

A:     (No verbal response.)

Q:     Were you?

A:     (Witness shakes head negatively.)

Q:     You didn't show any remorse when you went up to Wal-Mart to steal more for crack, did you?

A:     No.

Q:     You didn't give her a thought?

A:     That's crack addiction.

Q:     You didn't give her a thought, did you?

A:     Excuse me?

Q:     You didn't give her a thought, did you?

A:     I was wanted for robbery now.[18]

---

[18] 8 SCR 820-26 testimony of Donald Dallas).

Because Petitioner's substantive claims and ineffective assistance claims are highly fact-sensitive and overlap substantially, analysis of those claims set forth below will repeat relevant portions of the evidence described in detail above, particularly the relevant portions of Petitioner's critically important trial testimony.

3.  <u>The Guilt-Innocence Phase Jury Charge and Verdict</u>

The trial judge instructed the jury at the conclusion of the guilt-innocence phase of Petitioner's capital murder trial that (1) capital murder as defined by state law "is basically intentional murder with something additional," (2) count one of the indictment against Petitioner charged intentional murder during a kidnaping, (3) count two charged intentional murder during a robbery, (4) in addition to the capital murder counts, the jury also had before it lesser-included offenses consisting of felony murder and manslaughter, (5) the jury could convict Petitioner of capital murder only if the jury concluded beyond a reasonable doubt that the Petitioner caused the death of Mrs. Liveoak and intended to kill her, (6) a person acts intentionally with respect to a result or conduct when it is his or her purpose to cause that result or to engage in that conduct, (7) the jury could convict Petitioner of capital murder only if it concluded beyond a reasonable doubt that the Petitioner abducted or robbed Mrs. Liveoak or intended to accomplish or aid in the commission of the kidnaping or robbery of Mrs. Liveoak or the flight therefrom, (8) evidence of intoxication is relevant to negate an element of the offense charged, (9) to convict when the defense of intoxication is raised, the prosecution must also prove beyond a reasonable doubt that at the time of the alleged offense, the defendant did not, as a

result of being intoxicated, lack the capacity to either appreciate the criminality of his alleged conduct or to conform his alleged conduct to the requirements of law, (10) a person acts intentionally when his purpose is to cause a specific result, (11) the jury could infer that a person intends the natural consequences of what he does if the act is done intentionally, (12) the jury could consider the Petitioner's conduct and demeanor immediately after the crime in his statements to aid in characterizing his intent, and (13) the jury's verdict must be unanimous.[19]

The jury retired to deliberate at the guilt-innocence phase of trial at 1:30 PM on October 19, 1995.[20]  At 1:50 PM the same date, the jury returned its verdict on all seventeen counts of the indictment, finding Petitioner guilty beyond a reasonable doubt on all counts.[21]  The trial judge instructed the jury to return to the jury room and to designate on the verdict form under which (or both) of the two theories of capital murder the jury had convicted Petitioner of that offense.[22]  The jury returned to the courtroom shortly thereafter, and the trial court asked the jury foreman in open court whether the jury's action in circling both kidnaping and robbery on the verdict

---

[19] 8 SCR 884-87, 899-908, 913-15, 917-18, 922.  The state trial court's guilt-innocence phase jury instruction also clearly distinguished between the intentional murder required for a conviction for capital murder and the reduced culpable mental state necessary to convict a defendant of felony murder or manslaughter under applicable state law.  *Id.,* at 908-12.

[20] 8 SCR 931.

[21] 8 SCR 931-34.

[22] 8 SCR 934.

form indicated the jury had concluded Petitioner was guilty of capital murder under both theories submitted in the jury charge; the jury foreman stated that was correct.[23]

## D. Punishment Phase of Trial

The punishment or sentencing phase of Petitioner's capital murder trial commenced at 2:45 PM the same date.

### 1. Prosecution's Punishment Phase Evidence

The prosecution presented only one witness at the punishment phase of Petitioner's trial – the victim's son Larry Liveoak. Mr. Liveoak testified briefly about (1) the stress and emotional duress he and his family suffered during the search for his mother after she went missing, (2) the important role his mother played in their family, (3) the good works his mother performed while alive, and (4) the impact his mother's death had on him and his family.[24]

### 2. Defense's Punishment Phase Evidence

Petitioner's older sister testified that (1) their family split up and there was a lot of violence involving guns and knives between their parents, (2) Petitioner was without parental guidance, supervision, or direction growing up, (3) their parents beat them, (4) Petitioner witnessed her being beaten, (5) their father was an alcoholic, (6) after their parents separated, she, their brother Paul, and Petitioner

---

[23] 8 SCR 935.

[24] 8 SCR 947-52 (testimony of Larry Liveoak).

went to live with their mother in a home she could best describe as "hell," (7) their mother and step-father ignored Petitioner, allowing him to do as he pleased, (8) Petitioner was aware that she was molested, (9) their mother was taken to an insane asylum on two occasions, (10) she and Petitioner were raised in bars and were lucky to have food in their home, sometimes going as long as a week without eating, (11) she ran away from home at age eighteen and got married, (12) Petitioner had two children with a woman named Pam with whom Petitioner lived for three years, (13) Pam was a good influence on Petitioner, (14) Petitioner began going out with Carolyn "Polly" Yaw about fourteen years before the date of trial, (15) Yaw got Petitioner into drugs, at which point Petitioner became "a different person," (16) Yaw dominated Petitioner, who took the blame for Yaw's criminal behavior, and (17) Petitioner's behavior vis-à-vis Mrs. Liveoak did not accurately reflect Petitioner's character.[25]

One of Petitioner's older brothers testified that (1) he has convictions for DUI and possession of marijuana, (2) their oldest brother went to live with another family at some point and grew up to become a counselor for children in New York, (3) Petitioner was gainfully employed at some point as an electrician, (4) Yaw was a bad influence on Petitioner, (5)  Yaw and an accomplice once stabbed a man and

---

[25] 8 SCR 955-66 (testimony of Cindy Knight).

stole the man's money and clothes, (6) Petitioner never got into trouble at school and made it to the sixth grade, (7) Petitioner was doing crack for two weeks prior to his capital offense, and (8) Petitioner was different when on crack.[26]

Petitioner's former common law wife testified that (1) she and Petitioner had two teenage daughters, (2) Petitioner was a kind person who worked with her older brother, (3) Polly Yaw caused their breakup at a time when Petitioner was working in Tuscaloosa, (4) their breakup happened after she and Petitioner argued and the next thing she knew, Petitioner was dating Yaw and doing drugs, (5) Yaw once struck her, (6) it was out of character for Petitioner to kill someone, (7) she had never known Petitioner to be violent, and (8) she did not believe Petitioner would be violent in prison.[27]

Polly Yaw's step-sister testified that (1) she had known Petitioner since she was sixteen, (2) Petitioner is not a violent person, (3) Polly Yaw's reputation in the community was "mean," (4) Yaw always nagged Petitioner, (5) Yaw got Petitioner on crack, and (6) Petitioner is sincerely remorseful for Mrs. Liveoak's death.[28]

---

[26] 8 SCR 966-73 (testimony of Paul Dallas).

[27] 8 SCR 973-77 (testimony of Pam Cripple).

[28] 8 SCR 977-80 (testimony of Rhonda Chavers).

3.  <u>Punishment Phase Jury Charge & Verdict</u>

The state trial court instructed the jury (1) it was to consider all of the evidence, including the evidence offered during both the guilt-innocence and punishment phases of trial, when making its sentencing recommendation, (2) it could consider only those aggravating factors which it determined had been established beyond a reasonable doubt, (3) more specifically, it could only consider the following aggravating factors (but only if the jury determined it had been established beyond a reasonable doubt): (a) the Petitioner had previously been convicted of another felony involving the use or threatened use of violence to another person, (b) the Petitioner committed capital murder while engaged in the commission or attempted commission or flight from either robbery in the first degree or kidnaping in the first degree, and (c) Petitioner's capital murder was especially heinous, atrocious, or cruel compared to other capital offenses, (4) "heinous" means "extremely wicked or shockingly evil," (5) "atrocious" means "outrageously wicked and violent," (6) "cruel" means "designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others," (7) for a capital offense to be  "especially heinous and atrocious" any brutality involved "must exceed that which is normally present in any capital offense," (8) for a capital offense to be "especially cruel," it must be "a conscienceless or pitiless crime which is unnecessarily torturous to the victim," (9) "all capital offenses are heinous,

atrocious, and cruel to some extent," (10) the jury instruction was intended to cover "only those cases in which the degree of heinousness, atrociousness or cruelty exceeds that [which] will always exist when a capital offense is committed," (11) before making a recommendation in favor of a death sentence, the jury must unanimously agree that the prosecution had presented evidence establishing beyond a reasonable doubt the existence of at least one of the foregoing aggravating factors, (12) the jury must weigh against any aggravating factors all mitigating circumstances presented, (13) a "mitigating circumstance" means any evidence which "indicates or tends to indicate the defendant should be sentenced to life imprisonment without parole instead of death," and includes, but is not limited to, such factors as (a) whether the Petitioner had no significant history of prior criminal activity, (b) whether the Petitioner was under the influence of extreme mental or emotional disturbance when he committed capital murder, (c) whether the victim was a participant in the petitioner's criminal conduct or consented to the act, (d) whether the Petitioner was an accomplice in the capital offense committed by another person and his participation was relatively minor, (e) whether the Petitioner acted under extreme duress or under substantial domination of another person, (f) whether the capacity of the Petitioner to appreciate the criminality of his conduct and to conform his conduct to the requirements of law was substantially impaired, and (g) any aspect of the Petitioner's character or record and any of the

circumstances of the offense the Petitioner offered as a basis for a sentence of life imprisonment without parole instead of death, including the Petitioner's prior kindness and good works toward others which indicate a possibility of redemption and rehabilitation, the love and caring shown towards Petitioner by his family and friends, and that Petitioner appears to function well in various kinds of penal institutions, indicating a probability that Petitioner can be integrated into long-term prison life without significant difficulty, (14) since his arrest, Petitioner has shown no tendency towards violence against others, (15) the burden is on the prosecution to disprove the existence of a mitigating circumstance offered by the Petitioner by a preponderance of the evidence, (16) only an aggravating circumstance must be proven beyond a reasonable doubt, (17) the jury's deliberations should be based upon the evidence and must avoid the influence of passion, prejudice, or any other arbitrary factor, (18) weighing aggravating and mitigating factors is not a mechanistic process – different circumstances may be given different weights or values in determining the sentence in a case, (19) in order to recommend a punishment of death, at least ten jurors must vote for death – any number less than ten cannot recommend death, (20) in order to recommend a sentence of life without parole, at least seven jurors must vote for that sentence, (21) the jurors should hear and consider the views of their fellow jurors and carefully weigh, sift, and consider

the evidence, realizing that a human life is at stake, and bring to bear their best judgment on the sole issue before the jury.[29]

The jury subsequently sent out a note requesting additional instructions on the definition of mitigating circumstances.[30]  From 5:30 to 5:36 p.m. the same date, the jury returned to the courtroom; the trial judge repeated his earlier instructions regarding the definition of mitigating circumstances and added, at the request of Petitioner's counsel, additional examples of mitigating circumstances offered by the defense, including Petitioner's good work record, poor family up-bringing, cooperation with police officers, emotional state at the time of the offense, and being under the influence of alcohol or drugs.[31]  At 5:55 p.m. the same date, the jury returned its sentencing recommendation, recommending by a vote of eleven to one that the punishment be fixed at death.[32]

### 4. Sentencing Hearing and Trial Court Findings

On November 16, 1995, the trial judge held the sentencing hearing. Petitioner's trial counsel made objections to the pre-sentence report.[33]  Petitioner's

---

[29] 8 SCR 990-1000, 9 SCR 1001-11.

[30] 9 SCR 1015-17.

[31] 9 SCR 1017-23.

[32] 9 SCR 1023-24.

[33] 9 SCR 1026-28.

court-appointed mitigation expert argued in favor of a sentence of life without parole, calling the court's attention to the trial testimony of Petitioner and Dr. Renfro and emphasized that (1) Petitioner had displayed poor judgment but had not intended to kill Mrs. Liveoak, (2) Petitioner was suffering from the pernicious effects of crack cocaine addiction at the time of his offense, (3) scientific evidence and media accounts suggested the "euphoric feeling is so intense that crack cocaine users quickly develop a habit on the drug that is almost impossible to overcome," (4) Petitioner was so dominated by Carolyn "Polly" Yaw that he took the blame for her, (5) Petitioner was contrite and cooperative with law enforcement after his arrest, (6) Petitioner was remorseful, (7) killing Petitioner will not bring back Mrs. Liveoak, and (8) a sentence of life without parole is worse than death.[34]

Petitioner's trial counsel argued that (1) Petitioner had great remorse for what he had done and had accepted responsibility for it, (2) some good could come out of Petitioner's life if he were permitted to live, (3) Petitioner experienced an extremely difficult childhood, (4) something about Petitioner's childhood "prevented him from developing the sense of responsibility that we are supposed to have, that sense of responsibility that tells us to follow the rules, to obey the law, to respect the dignity of others, and to avoid injuring others by our own selfish desires," (5) Petitioner's

---

[34] 9 SCR 1028-44.

desire for crack overwhelmed his judgment, (6) Petitioner's actions were not those of a rational human being, and (7) life without parole was the appropriate sentence.[35] Petitioner then addressed the court and stated that (1) he was deeply sorry for his offense and had never meant for it to happen, (2) since the time he and Mrs. Liveoak prayed for his crack habit, he had not done it, (3) he wanted to apologize to her family, and (4) with the court's permission, he would like the opportunity to tell others about the harmful effects of crack cocaine, specifically what this "destroying drug" had done to him and his family.[36]

The trial court imposed sentences of ten years on counts three through seventeen of the indictment.[37]  On the capital murder counts, the trial court imposed a sentence of death by electrocution.[38]  In its sentencing order, the trial court found that (1) Petitioner "never did a thing to rescue Mrs. Liveoak" despite having multiple opportunities to do so, (2) Mrs. Liveoak apparently did not die immediately but had a number of bruises and cuts on her hands consistent with attempts by her to free herself, (3) Petitioner let Mrs. Liveoak die in the trunk of her car while he and Yaw went to a crack house to purchase crack with money they obtained through the use

---

[35] 9 SCR 1044-50.

[36] 9 SCR 1050-51.

[37] 9 SCR 1052-53.

[38] 9 SCR 1053.

of Mrs. Liveoak's credit card, (4) the following day, Petitioner sarcastically told Dennis Bowen that he "hoped the old lady would die," (5) Petitioner knew from the earlier abduction of Mr. Portwood that he could cause the death of someone by leaving her in the trunk of a car, (6) "the inference can clearly be drawn that he left Mrs. Liveoak in the trunk of the car to prevent subsequent identification," (7) Petitioner's intent to kill was also shown through his testimony at trial, specifically when, in response to questions about why he placed Mrs. Liveoak in the trunk of her car, Petitioner emphasized he was concerned about getting caught, (8) *the jury concluded beyond a reasonable doubt that Petitioner committed his capital offense while engaged in the commission or attempted commission, or as an accomplice in the commission or attempted commission, or while in flight after the commission or attempted commission, of kidnaping and robbery*, (9) the prosecution proved beyond a reasonable doubt that Petitioner was previously convicted of another felony involving the use or threatened use of violence against another person, (10) the prosecution proved beyond a reasonable doubt that Petitioner's capital offense was especially heinous, atrocious, or cruel, specifically by proving Mrs. Liveoak suffered pre-mortem injuries suffering both physically and psychologically after being left in the trunk of an automobile on a summer afternoon, *i.e.,* "entombed in the trunk of her car," after Petitioner cruelly gave her false hope she would be rescued, (11) Petitioner failed to present sufficient evidence to establish either (a) he had no

significant history of prior criminal activity, (b) he committed his capital offense while under the influence of extreme mental or emotional disturbance (*i.e.,* while Petitioner presented evidence showing he was craving crack cocaine, he failed to present evidence showing he was under the influence of crack at the time he committed his capital offense), (c) he committed his offense as a mere accomplice, (d) he acted under extreme duress or under the substantial domination of another person, (e) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, or (f) his age at the time of the offense (*i.e.,* thirty) was a mitigating circumstance, (12) Petitioner did present evidence supporting a number of non-statutory mitigating circumstances but the trial court did not give great weight to any of these factors, specifically evidence showing (a) Petitioner was remorseful for his conduct, (b) Petitioner's post-arrest confession and cooperation with investigating officers, (c) Petitioner came from a poor family and did not have adequate adult role models or morals instilled in him (the court found there was no evidence Petitioner turned to a life of crime because of his upbringing in light of the absence of a criminal record for his sister who grew up in the same household), (d) Petitioner's good work record, (e) Petitioner was a good husband to his first wife, (f) Petitioner's prior kindness and good work toward others, (g) the love and caring shown Petitioner by his family and friends, (h) Petitioner's record of functioning well in penal institutions, and (i)

32

Petitioner's record of nonviolence since his arrest, and finally, (13) after considering the jury's recommendation and weighing the aggravating and mitigating circumstances, Petitioner's sentence should be fixed at death.[39]

## E. Direct Appeal

Petitioner appealed his conviction and sentence, presenting nine claims in his appellant's brief.[40]  The Alabama Court of Criminal Appeals affirmed Petitioner's conviction and sentence in an opinion issued March 21, 1997, rejecting on the merits all of Petitioner's grounds for appellate review.  *Dallas v. State,* 711 So. 2d 1101 (Ala. Crim. App. 1997).  Petitioner next filed a petition for certiorari with the

---

[39] 2 SCR 357-69.

[40] Petitioner's appellant's brief, filed April 11, 1996, appears among the state court records submitted to this Court at 10 SCR Tab 2.  As grounds for review, Petitioner's appellate counsel argued (1) the prosecution violated the equal protection principle announced in *Batson v. Kentucky* by using twelve of its sixteen peremptory strikes to remove black members of the jury venire, (2) the trial court erred in granting the prosecution's challenge for cause to juror 129 and in denying the defense's challenge for cause to juror 64, (3) the trial court erred in denying the defense's requests for guilt-innocence phase jury instructions on the lesser-included offenses of reckless murder and criminally negligent homicide, (4) the trial court erred in denying the defense's objections to the guilt-innocence phase jury charge commenting on (a) the defendant's credibility, (b) the impeachment of the defendant, and (c) the defendant's flight from the crime scene as evidence of consciousness of guilt, (5) the trial court erred in allowing the jury to consider as an aggravating circumstance whether the crime was especially heinous, atrocious, and cruel, (6) the trial court erred in considering improper victim impact testimony in the form of (a) testimony by the victim's son concerning the impact of his mother's death upon him and his family and (b) a letter from the victim's daughter, (7) Petitioner's lead trial counsel rendered ineffective assistance as a result of a conflict of interest, (8) the trial court erred in denying Petitioner's trial counsels' motions for continuance, which caused said counsel to constructively render ineffective assistance, and (9) there was insufficient evidence to support the jury's verdict at the guilt-innocence phase of trial, *i.e.,* insufficient evidence to show Petitioner possessed the specific intent to kill the victim.

Alabama Supreme Court.[41]   The Alabama Supreme Court affirmed Petitioner's

conviction and sentence in an opinion issued March 13, 1998, finding no reversible

error. *Ex parte Dallas*, 711 So. 2d 1114 (Ala. 1998).  The United States Supreme

Court denied Petitioner's petition for writ of certiorari on October 5, 1998. *Dallas

v. Alabama*, 525 U.S. 860 (1998).[42]

## F.  State Habeas Corpus Proceeding

Petitioner filed a sworn, *pro se* state habeas corpus petition, *i.e.,* a petition

pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.[43]  The state trial

---

[41] Petitioner's certiorari petition with the Alabama Supreme Court appears at 11 SCR Tab 6.  Petitioner's certiorari petition re-urged the same nine grounds for relief Petitioner had urged before the Alabama Court of Criminal Appeals.

[42] Petitioner's petition for writ of certiorari filed with the United States Supreme Court appears at 11 SCR Tab 10.

[43] Petitioner's *pro se* Rule 32 petition (signed September 23, 1999) appears at both 12 SCR (Revised) Tab 13-A & 15 SCR Tab 30.  As grounds for relief in his sworn *pro se* Rule 32 petition, Petitioner presented (1) a rambling 75-page series of conclusory ineffective assistance claims attacking the performance of his state trial counsel, (2) a series of conclusory complaints about the performance of the prosecution during his trial, including arguments the prosecution (a) used extraneous information to assist during jury selection, (b) presented unspecified prejudicial evidence, (c) improperly commented on unidentified irrelevant evidence, (d) elicited unidentified inadmissible hearsay evidence, (e) improperly commented on the credibility of witnesses, (f) improperly commented on the defense's failure to call certain witnesses, (3) the prosecution violated the rule in *Brady v. Maryland* by failing to disclose to the defense (a) notes, recordings, and other documents memorializing conversations between prosecution witness Bowen and law enforcement officers after July 14, 1994, (b) information regarding Bowen's probation status and prior convictions, and (c) the fact that during his post-arrest interview, Petitioner initially denied any involvement in Mrs. Liveoak's murder, (4) the trial court erred in admitting evidence of Petitioner's kidnaping and robbery of Mr. Portwood just days before Petitioner's kidnaping, robbery, and murder of Mrs. Liveoak, (5) the trial court erred in admitting photographs and videotaped images of Mrs. Liveoak's body in the trunk of her car, (6) the trial court erred in granting the prosecution's challenge for cause to juror 129 and in denying the defense's challenge for cause to juror 64, (7) the trial court erred in denying the defense's requested guilt-innocence phase jury instructions on the lesser-included offenses of reckless murder and criminally negligent

court summarily dismissed several of Petitioner's claims in an Order issued October

28, 1999.[44]  On June 21, 2001, the state trial court held an evidentiary hearing (during

---

homicide, (8) the trial court erred in the guilt-innocence phase jury instructions in commenting on Petitioner's credibility as a witness, (9) the trial court erred in permitting the jury to consider as an aggravating circumstance at the punishment phase of trial whether Petitioner's capital offense was especially heinous, atrocious, or cruel, (10) two jurors failed to truthfully answer voir dire questions, thereby depriving Petitioner of his right to intelligently exercise his peremptory challenges, (11) the trial court's denial of Petitioner's motions for continuance constructively caused Petitioner's trial counsel to render ineffective assistance because Petitioner's counsel were unable to adequately investigate the case against Petitioner and Petitioner's background for potentially mitigating evidence, (12) Petitioner's state appellate counsel rendered ineffective assistance on direct appeal by failing to present all of the foregoing claims for relief urged by Petitioner in his Rule 32 petition as grounds for relief in Petitioner's appellant's brief, and (13) the death penalty as administered in Alabama violates the Eighth Amendment's prohibition against cruel and unusual punishment.  Petitioner executed a separate verification of his pro se Rule 32 petition on March 22, 2000 (15 SCR Tab 38).

[44]  The state trial court's Order of October 28, 1999, appears at 15 SCR Tab 35.  The state trial court found that (1) Petitioner's constructive ineffective assistance claims based upon the Alabama fee schedule for defense counsel, the trial court's denial of Petitioner's lead trial counsel's pretrial motion to withdraw, and the trial court's denial of Petitioner's motions for continuance (a) could and should have been raised at trial and on direct appeal and (b) were unsupported by factual allegations showing how Petitioner was prejudiced thereby, (2) Petitioner alleged no facts showing how he was prejudiced by the performance of his counsel at a pretrial detention hearing, (3) Petitioner's complaints about the pretrial performance of his trial counsel were conclusory, (4) Petitioner's admissions during his videotaped confession and trial testimony, together with the trial testimony of Dennis Bowen, collectively foreclosed a finding of prejudice in connection with Petitioner's complaints of ineffective assistance during the guilt-innocence phase of trial, (5) Petitioner's complaint about the admission of his signed confession was procedurally defaulted because that claim could and should have been raised on direct appeal, (6) Petitioner's complaints of prosecutorial misconduct, *i.e.,* Petitioner's complaints about prosecutorial jury argument, were procedurally defaulted because they could and should have been raised on direct appeal, (7) Petitioner's *Brady* claim relating to the trial testimony of Detective Saint was procedurally defaulted because this claim could and should have been raised on direct appeal, (8) Petitioner's claims relating to the admission of evidence of Petitioner's prior criminal behavior and the admission of photographic and videotape evidence were procedurally defaulted because they could and should have been raised on direct appeal, (9) Petitioner's claims relating to trial court rulings on challenges for cause and the trial court's jury instructions had been raised and addressed by the Alabama Court of Criminal Appeals on direct appeal and could not be re-litigated in Petitioner's Rule 32 proceeding, (10) Petitioner's juror misconduct claim was not based on any identified newly discovered evidence and was subject to dismissal absent amendment [Petitioner did not subsequently amend his Rule 32 petition to address this issue], (11) Petitioner's complaint that his lead trial counsel suffered from an actual conflict of interest had been fully

35

which Petitioner was represented by counsel and Petitioner participated telephonically) and later received deposition testimony from additional witnesses.[45] The same trial court judge who presided over Petitioner's capital murder trial issued an Order on September 25, 2001, denying Petitioner's Rule 32 petition.[46]

---

addressed and denied during Petitioner's direct appeal and could not be re-litigated in his Rule 32 proceeding, (12) Petitioner's claim of ineffective assistance by his state appellate counsel was insufficiently specific to comply with Rule 32.6(b) of the Alabama Rules of Criminal Procedure and was subject to dismissal absent amendment by Petitioner [Petitioner did not subsequently amend his Rule 32 petition to address this issue], and (13) Petitioner's challenge to the constitutionality of Alabama's then-current method of execution (electrocution) was procedurally defaulted because it could and should have been raised on direct appeal and lacked arguable merit.

[45] On June 21, 2001, the state trial court heard testimony in connection with Petitioner's Rule 32 petition from (1) attorney Jeffery C. Duffey, Petitioner's former trial co-counsel, (2) Susan James, Petitioner's former mitigation specialist and co-counsel at the sentencing hearing, (3) John Mann, a Montgomery Police Sergeant, and (4) Danny Billingsley, an investigator with the Alabama Attorney General's Office. The foregoing testimony appears at 12 SCR Tab 13 and 12 SCR (Revised) Tab 13. The state habeas trial court also had before it the deposition testimony of (1) Petitioner's former lead trial counsel, attorney Algert Agricola (which appears at 13 SCR Tab 14 and 13 SCR (Revised) Tab 14) and (2) Petitioner's acquaintance Chester Foley (which appears at Doc # 187-1).

[46] The state trial court's Order of September 25, 2001, appears at both 13 SCR Tab 14-A & 16 SCR Tab 65. The trial court found that (1) Petitioner's complaints about the performance of his former counsel prior to trial (who withdrew or were dismissed from representation prior to trial) and many of Petitioner's complaints about the performance of his counsel at the guilt-innocence phase of trial were subject to summary dismissal (because they actually challenged pretrial rulings made by the trial court which could and should have been raised via direct appeal), (2) Petitioner's complaints about the performance of his trial counsel during the pretrial hearing on Petitioner's motion to suppress were refuted by Petitioner's videotaped confession, (3) Petitioner's complaints about the failure of his trial counsel to call Chester Foley to testify at the hearing on Petitioner's motion to suppress and at trial were refuted by Foley's deposition testimony (in which Foley denied any personal knowledge of the circumstances surrounding Petitioner's offense and was never asked whether he had any personal knowledge of the circumstances surrounding Petitioner's arrest), (4) there was more than sufficient evidence to support the jury's guilty verdict and proof of the specific intent to kill (specifically, viewed in the light most favorable to the jury's verdict, the evidence showed Petitioner (a) placed Mrs. Liveoak in the trunk of her car on a July afternoon in Alabama, (b) removed the keys from her vehicle, (c) parked the vehicle in a remote location of the K-Mart parking lot, and (d) made no attempt to summon help for Mrs. Liveoak despite having made numerous assurances to her that he would do so and in spite of his

knowledge of her age and heart problems), (5) Petitioner failed to show there was any evidence available at the time of trial showing Mrs. Liveoak was alive at the time her vehicle was discovered by police or that her fatal cardiac episode would have occurred even if she had not been left to die inside the trunk of her car in the middle of the summer in the middle of Alabama, (6) there was no showing law enforcement personnel were negligent in the manner they reacted after the discovery of Mrs. Liveoak's vehicle the day after Petitioner abandoned same the day before, (7) there was no evidence presented showing any deal or promises of leniency ever existed between the prosecution and witness Dennis Bowen, (8) there is no rule in Alabama which prevents either party from investigating the background of potential jurors for use during jury selection, (9) the prosecution's opening statement describing the evidence it believed would be presented at the guilt-innocence phase of trial was neither inflammatory nor unduly prejudicial, (10) the failure of Petitioner's trial counsel to object to the prosecution's closing jury argument was neither objectively unreasonable nor prejudicial to Petitioner (because there was no legitimate basis for objection to the prosecution's jury arguments), (11) Petitioner testified at the guilt-innocence phase of trial in his case-in-chief to the same facts he alleged the prosecution had introduced through hearsay testimony, (12) Petitioner presented no new or additional evidence (other than that presented at trial by Petitioner's trial counsel through the defense's mental health expert) showing Petitioner suffered from a mitigating mental state at the time of his capital offense, (13) Petitioner's trial counsel presented extensive mitigating evidence showing Petitioner (a) came from a broken home, (b) began drinking alcohol and using intravenous drugs at any early age, (c) only completed sixth grade, (d) had no direction in his life, (e) was nevertheless a good father, husband, and provider, (f) became hooked on cocaine after taking up with Polly Yaw, (g) took responsibility for Yaw's criminal actions, and (h) was dominated by Yaw, (14) Petitioner failed to present any new or additional mitigating evidence was available at the time of trial from his oldest brother, his mother, or others, (15) Petitioner's allegations that additional evidence was available at the time of trial to show specific instances of abuse, neglect or drug abuse during Petitioner's childhood and adult life would have been, at best, cumulative of the evidence Petitioner's trial counsel actually presented during Petitioner's capital murder trial, (16) there was no impropriety in the prosecution's punishment phase jury arguments (a) appealing to the jury for justice or (b) pointing out the jury had already found beyond a reasonable doubt that one aggravating circumstance existed, *i.e.,* Petitioner committed intentional murder during the course of committing or attempting to commit robbery and kidnaping, (17) the short duration of the jury's punishment phase deliberation did not establish that Petitioner was prejudiced by his trial counsel's performance at the punishment phase of trial, (18) Petitioner failed to present any evidence showing the outcome of his pre-sentence interview would have been any different had his trial counsel accompanied Petitioner to the interview or that the failure of his trial counsel to attend the pre-sentence interview was objectively unreasonable, (19) Petitioner failed to present any evidence showing it was objectively unreasonable for his state appellate counsel to have failed to raise all of the claims presented in Petitioner's *pro se* Rule 32 petition as part of Petitioner's appellant's brief on direct appeal, and (20) there was overwhelming evidence to support the jury's verdict at the guilt-innocence phase of trial and the jury's sentencing recommendation.

Petitioner filed a motion to alter or vacate the judgment on October 25, 2001.[47]  The state trial court denied Petitioner's motion.  Petitioner appealed on November 28, 2001,[48] but the Alabama Court of Criminal Appeals dismissed his appeal on December 7, 2001, as untimely.[49]

Petitioner filed motions seeking leave to file an out-of-time appeal[50] and requesting a finding that the filing of his motion to alter, vacate, and amend judgment tolled the applicable time for filing a notice of appeal.[51]  The state trial court granted the latter of these motions in an Order issued February 12, 2002.[52]  Petitioner filed a second Notice of Appeal on February 15, 2002.[53]  In an Order issued March 1, 2002, the Alabama Court of Criminal Appeals struck Petitioner's second appeal as untimely.[54]  Petitioner filed a petition for writ of certiorari with the Alabama

---

[47] Petitioner's motion to alter, vacate or amend appears at  both 13 SCR Tab 15 and 13 SCR (Revised) Tab 15.

[48] 13 SCR (Revised) Tab 15-A.

[49] 14 SCR Tab 19.

[50] 13 SCR (Revised) Tabs 17 & 17-A.

[51] 13 SCR (Revised) Tab 17-B.

[52] 13 SCR (Revised) Tab 17-D.

[53] 13 SCR (Revised) Tab 17-E.

[54] 14 SCR Tab 22 & 16 SCR Tab 75.

Supreme Court,[55] which that court dismissed without opinion on June 28, 2002, for

failure to comply with Rule 39(c)(1) of the Alabama Rules of Appellate Procedure.[56]

## G. Proceedings in Federal Court

Petitioner filed his original federal habeas corpus petition on July 9, 2002,

asserting seventeen categories of claims for relief (Doc. # 1).[57]  Petitioner filed a

---

[55] 14 SCR Tab 23 (Petition) & Tab 24 (Brief).

[56] 14 SCR Tab 27.

[57] As grounds for relief, Petitioner's federal habeas counsel argued (1) the prosecution improperly used peremptory challenges in a racially discriminatory manner in violation of the holding in *Batson v. Kentucky*, (2) the state trial court erred in denying the defense's requests for guilt-innocence phase jury instructions on the lesser-included offenses of reckless murder and criminally negligent homicide, (3) the trial court's denial of Petitioner's trial counsels' motions for continuance violated Petitioner's constitutional rights to due process and the effective assistance of counsel, (4) Petitioner's lead trial counsel suffered from an actual conflict of interest which denied Petitioner the effective assistance of counsel, (5) the state trial court erred in granting the prosecution's challenge for cause to juror 129 and in denying the defense's challenge for cause to juror 64, (6) the state trial court erred in overruling the defense's objections to guilt-innocence phase jury instructions (a) stating the jury "may infer that a person intends the natural consequences of what he does if the act is done intentionally" and (b) commenting on the credibility and impeachment of the Petitioner, (7) Petitioner's trial counsel rendered ineffective assistance before, during, and after trial (due to (a) limitations in the fee schedule for Alabama defense counsel, (b) the withdrawal or removal of several attorneys prior to Petitioner's trial, (c) the denial of Petitioner's motions for continuance, and (d) the failures of Petitioner's trial counsel to (i) adequately investigate the case against Petitioner [including the actual medical cause of Mrs. Liveoak's death] and Petitioner's background for mitigating evidence, (ii) challenge the prosecution's case and introduce exculpatory evidence, (iii) object to the medical examiner's testimony that Mrs. Liveoak's death was a homicide, (iv) adequately cross-examine prosecution witness Dennis Bowen regarding Bowen's prior statement to the police and the possibility of a deal between prosecutors and Bowen, (v) present expert medical testimony and evidence showing the actual cause of Mrs. Liveoak's death, (vi) object to the prosecution's use of undisclosed extraneous information during jury selection, (vii) object to the prosecution's derogation of Petitioner's character during opening and closing jury arguments at the guilt-innocence phase of trial, (viii) object to the prosecution's assertion during closing jury argument at the guilt-innocence phase of trial that the case against Petitioner was simple and uncomplicated, (ix) object to the prosecution's closing jury argument at the guilt-innocence phase of trial suggesting that portions of Petitioner's trial testimony were incredible, (x) object to the prosecution's closing jury argument at the guilt-innocence phase of trial suggesting that Dennis Bowen's credibility was superior to

39

that of Petitioner, (xi) object to the prosecution's closing jury argument at the guilt-innocence phase of trial suggesting that Petitioner's testimony that he attempted to return to the K-Mart parking lot but was unable to do so because the vehicle in which he was a passenger broke down was not credible because the driver of the vehicle had not appeared at trial and testified under oath, (xii) object to the prosecution's closing jury argument at the guilt-innocence phase of trial suggesting that Dennis Bowen's testimony was sufficient to establish that Petitioner intentionally murdered Mrs. Liveoak, (xiii) object to the prosecution's closing jury argument at the guilt-innocence phase of trial suggesting that Petitioner's admissions regarding his voluntary abuse of crack cocaine did not excuse his criminal actions or preclude a finding that Petitioner intentionally murdered Mrs. Liveoak, (xiv) object to the prosecution eliciting unspecified hearsay testimony, (xv) call the defense's court-appointed mitigation expert to testify at the punishment phase of trial, (xvi) adequately investigate Petitioner's medical history, correctional history, educational history, employment and training history, family and social history, and any religious or cultural influences in an effort to identify and develop potentially mitigating evidence, (xvii) adequately meet with Petitioner prior to trial, (xviii) adequately meet with potential defense witnesses prior to their testimony at the punishment phase of trial, (xix) elicit further potentially mitigating evidence from the witnesses actually called to testify by the defense at the punishment phase of trial about instances of neglect, physical and emotional abuse, marital infidelities, mental instability, alcoholism, and misbehavior by Petitioner's parents and Petitioner's difficult, neglected, and undisciplined childhood, (xx) present available mitigating evidence showing Petitioner's early exposure to and abuse of alcohol and narcotics, (xxi) present mitigating evidence showing Petitioner's strong moral character, (xxii) interview and present testimony from Petitioner's older brother Jimmy in New York, regarding Petitioner's difficult childhood [including evidence showing Jimmy once physically assaulted his mother, knocking her over a couch and had limited contact with Petitioner after their parents divorced and Petitioner's mother left New York with the three younger Dallas children], (xxiii) present additional testimony from Rhonda Chavers regarding Petitioner's good character and difficult childhood, (xxiv) present evidence showing the Dallas children were subjected to sexual abuse by babysitters, (xxv) interview and present the testimony of Petitioner's mother Elaine regarding her physical and emotional abuse of Petitioner, her infidelities and those of Petitioner's biological father and step-father, Petitioner's truancy, the Dallas family's extremely poor economic standing, and the negative influences of Petitioner's biological father and step-father upon Petitioner's development, (xxvi) present testimony showing that, on crack, Petitioner was a "different man," (xxvii) present expert testimony showing the likely causes of Petitioner's emotional and physical problems ["serious psychopathology including confused thinking, distorted perceptions, and other psychotic processes"], including the psychological assessment done on Petitioner at the Kilby Correctional Facility, (xxviii) present evidence showing Petitioner successfully completed a drug rehabilitation program in Texas, and (xxix) to attend Petitioner's pre-sentence interview, (8) the state trial court erred in admitting Petitioner's signed confession, which was obtained in violation of Petitioner's right to counsel, (9) the prosecution engaged in misconduct, including (a) using extraneous information about a juror as a basis for not striking the juror during jury selection, (b) presenting prejudicial evidence lacking in probative value, (c) commenting on irrelevant evidence, (d) eliciting hearsay testimony, and (e) improperly commenting on the credibility of witnesses and on the defense's failure to present certain witnesses, (10) the trial court erred in considering improper victim impact evidence in the form of a letter to the trial judge from Mrs. Liveoak's daughter urging the imposition of a sentence

brief on the merits in support of his claims for relief on June 7, 2007, arguing that he was entitled to *de novo* review on all of his claims for relief (Doc. # 88). The same date, Petitioner also filed an appendix to his merits brief accompanied by more than two dozen new exhibits (mostly addressing his claim that his trial counsel failed to adequately investigate and present then-available mitigating evidence) and a motion to supplement the record (Doc. # 86-87). The court granted Petitioner's motion to supplement the record in an Order issued June 8, 2007 (Doc. # 89).

Respondent filed a brief on August 14, 2007, responding to the merits of some, but not all, of Petitioner's claims for relief (Doc. # 92). Petitioner filed a response to Respondent's brief on September 28, 2007, arguing the ineffective assistance of Petitioner's state habeas counsel excused the Petitioner's procedural defaults on some of his claims for federal habeas corpus relief (Doc. # 95).

---

of death, (11) the prosecution failed to disclose beneficial information to the defense in violation of the rule in *Brady v. Maryland* in the form of notes, recordings, and other information regarding conversations between prosecution witness Dennis Bowen and law enforcement personnel after Bowen gave his statement on July 14, 1994, (12) the state trial court erred in admitting the testimony of Mr. Portwood regarding Petitioner's robbery and kidnaping of him days before Mrs. Liveoak's murder, (13) the state trial court erred in admitting videotape and photographic evidence of the victim's body, (14) the state trial court erred in permitting the jury to consider as an aggravating circumstance whether Petitioner's capital offense was especially heinous, atrocious, and cruel, (15) Petitioner was denied his right to exercise his peremptory challenges due to venire members who furnished untruthful information during voir dire [specifically one juror failed to disclose his brother was a crack addict and another juror failed to reveal he had testified as a witness in a civil trial], (16) the prosecution failed to present sufficient evidence showing Petitioner intentionally murdered Mrs. Liveoak, and (17) the Alabama capital sentencing scheme fails to conform to the constitutional requirements announced in *Ring v. Arizona* and *Apprendi v. New Jersey*.

On April 1 and May 5, 2009 (Doc. # 108-09), Petitioner filed a pair of motions to supplement the record along with numerous new affidavits and other documents in support of his claims. The court will grant those motions.

In an Order issued January 12, 2012, the Court addressed the merits of several of Petitioner's claims on which the parties agreed there was no procedural default (Doc. # 120). More specifically, the Order of January 12, 2012, applied the deferential standard of review mandated by the AEDPA and rejected on the merits Petitioner's claims that (1) the state trial court erred in overruling the defense's objections to the guilt-innocence phase jury instructions (a) permitting the jury to draw the inference that a person intends the natural consequences of an intentional act and (b) commenting on the impeachment and credibility of the Petitioner's trial testimony, (2) the state trial court erred in denying the defense's requested jury instructions on the lesser-included offenses of reckless murder and criminal negligent homicide, (3) the state trial court erred in denying the defense's motions for continuance, (4) his lead trial counsel suffered from an actual conflict of interest, (5) the state trial court erroneously permitted the jury to consider as an aggravating factor at the punishment phase of trial whether Petitioner's capital offense was especially heinous, atrocious, or cruel, (6) there was insufficient evidence to show the Petitioner intended to kill Mrs. Liveoak, (7) the state trial court erred in failing to grant the defense's challenge for cause to a prospective juror, (8) the state trial

42

court improperly considered victim-impact evidence, and (9) the prosecution used its peremptory strikes in a racially discriminatory manner.[58]

Petitioner filed a motion for reconsideration on May 25, 2012 (Doc. # 121), arguing for the first time in a coherent manner that (1) the prosecution's stated reasons for striking jurors 29 and 31 were pre-textual and (2) his lead trial counsel's simultaneous representation of Petitioner in his capital murder case and the Alabama Department of Mental Health and Mental Retardation in an unrelated civil lawsuit constituted a conflict of interest.  The same date, Petitioner filed another motion to supplement the record to include a copy of the motion to withdraw filed in the state trial court by Petitioner's lead trial counsel in February, 1995 (Doc. #122).  The court granted this motion to supplement in an Order issued September 30, 2016 (Doc. # 135).  Respondent filed a brief in opposition to reconsideration on June 6, 2012 (Doc. # 124).  Petitioner filed a reply to Respondent's brief in opposition to reconsideration on June 6, 2012 (Doc. # 125).

The Clerk reassigned this case to the undersigned judge's docket on July 19, 2016 (Doc. # 129).  In an Order issued August 9, 2016, the court directed the parties to file supplemental briefing (Doc. #130).

---

[58] The Order of January 12, 2012 disposed of the first four claims for federal habeas corpus relief contained in Petitioner's original federal habeas corpus petition, as well as a portion of the fifth claim, and claims six, fourteen, and sixteen in the order listed in *note* 57, *supra*.

On October 3, 2016, Petitioner filed (1) a supplemental brief addressing respondent's assertions that some of Petitioner's claims were untimely filed and procedurally defaulted (Doc. # 136) and (2) additional pleadings accompanied by twenty-three new exhibits (Doc. # 137-39).

On November 17, 2016, Respondent filed a supplemental brief (1) re-urging the court to dismiss Petitioner's federal habeas corpus petition as untimely filed and to deny relief on fifty-three of Petitioner's claims as procedurally defaulted and (2) argued Petitioner's procedurally defaulted claims were not subject to review on the merits under the holding in *Martinez v. Ryan* (Doc. # 144).

Petitioner filed a supplemental brief on timeliness and procedural default on December 1, 2016 (Doc. # 145).

Petitioner filed a motion on January 11, 2017, requesting leave to amend his original federal habeas corpus petition to include a claim that Petitioner's death sentence is inconsistent with the Supreme Court's holding in *Hurst v. Florida*, 135 S. Ct. 616 (2016) (Doc. # 146).

The briefing in this cause on the subjects of procedural default and timeliness has been extensive.[59]  Despite rejection of Respondent's motion to dismiss and the passage of considerable time, Respondent has yet to address the merits of many of

---

[59] *See, e.g.,* Doc. nos. 4, 5, 11, 12, 15, 17, 18, 20, 27, 29, 36, 40, 42, 43, 67, 70, 88, 92, 95, 113, 118, 121, 122, 124, 125, 136, 141, 144, 145.  This cause was reassigned to the undersigned on July 19, 2016, after all but four of the foregoing pleadings and briefs had been filed.

Petitioner's substantive claims.[60]  The record currently before the court is not bereft

of briefing and analysis from Respondent's perspective on the Petitioner's multi-

---

[60] *See* Doc. # 49 & Doc. # 92.  The pleadings filed in this cause are far from concise or clear.  Petitioner filed his original petition almost fifteen years ago (Doc. # 1).  As explained in *note* 57, supra, Petitioner identified seventeen claims for relief in his original petition.  In subsequent pleadings and briefs, however, Petitioner has referenced numerous factual and legal arguments made in support of his other numbered claims as if those arguments represented separate and independent claims for relief.  *See, e.g.,* Doc. # 136, p. 132, n. 517, where Petitioner argues a number of factual assertions made in support of Petitioner's complaints about the denial of his motion for continuance and other substantive claims are, in fact, separate and distinct ineffective assistance claims.  In the same footnote, Petitioner states cryptically that the list of claims contained in the parties' Joint Report "do not match the substance of the claims in the petition."  The confusion engendered by Petitioner's chaotic pleading practice has not been limited to the court.  In his brief on the merits, (Doc. # 92), Respondent identified more than fifty claims for relief which Respondent believes to be procedurally defaulted by virtue of the dismissal of Petitioner's allegedly untimely appeal from the denial of his state habeas corpus petition.  The parties' pleadings are replete with arguments about allegedly incorrectly designated or misidentified claims.  The two constants throughout this litigation have been the parties' inability to identify all of the ineffective assistance claims properly presented and Respondent's failure to address the merits of most of Petitioner's multi-faceted ineffective assistance claims.

The fundamental problem with Petitioner's multi-faceted ineffective assistance claims in his original petition is that Petitioner failed to identify with reasonable specificity each discrete act or omission (*i.e.,* exactly what it is he alleges his trial counsel either did or failed to do) which Petitioner argues satisfies both prongs of the *Strickland* standard.  Instead, the fourth and seventh major sections of Petitioner's original petition consist of a stream of consciousness list of assertions about the poor performance of Petitioner's trial counsel, investigators, expert witness, and others at various stages of Petitioner's trial court proceedings.

Petitioner has invoked the Supreme Court's holdings in *Martinez v. Ryan,* 566 U.S. 1 (2012), and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013), as justification for overruling the Respondent's assertions that Petitioner procedurally defaulted on the vast majority of Petitioner's claims of ineffective assistance by Petitioner's trial counsel because Petitioner's state post-conviction counsel failed to file a timely notice of appeal following denial of relief in Petitioner's state habeas corpus proceeding.  As the Eleventh Circuit has made clear, review of assertions of the equitable principle recognized in *Martinez v. Ryan* necessarily requires a federal court to examine the merits of the underlying claim of ineffective assistance by trial counsel.  *See Sullivan v. Secretary, Florida Dept. of Corrections,* 837 F.3d 1195, 1201 (11th Cir. 2016) ("Under *Martinez,* post-conviction counsel's failure to raise a claim in a state collateral proceeding can provide cause and prejudice to excuse a procedural default if: the procedural default is caused by post-conviction counsel's unconstitutionally ineffective assistance; the collateral proceeding in which post-conviction counsel erred was the first opportunity the defendant had to raise the procedurally defaulted claim; and the procedurally defaulted claim has at least 'some merit.'").  Thus, in order to resolve Petitioner's assertions of the equitable principle announced in *Martinez v. Ryan,* it is necessary to delve into the merits of Petitioner's underlying complaints about the

faceted ineffective assistance claim.  Respondent filed a pair of pleadings in response to Petitioner's expansive ineffective assistance claims presented in Petitioner's state habeas corpus proceeding.[61]  The state habeas trial court addressed the merits (or lack thereof) of Petitioner's ineffective assistance complaints in a thorough Order containing numerous findings of fact and conclusions of law fully supported by the record before that court.[62]  Having considered the parties' extensive briefing on the issue of procedural default, the court will address the merits of Petitioner's ineffective assistance claims *de novo* regardless of whether those claims are procedurally defaulted.

## II.  PETITIONER'S MOTION FOR RECONSIDERATION

In his motion filed May 25, 2012 (Doc. # 121), Petitioner urges reconsideration of the court's denial of federal habeas corpus relief on (1) Petitioner's conflict of interest claim and (2) Petitioner's complaint that two identified members of Petitioner's jury venire (numbers 29 & 31) were improperly stricken by the prosecution during jury selection in violation of the equal protection

---

performance of his state trial counsel.  Rather than wading through the quagmire that is the analytical approach mandated by the holding in *Martinez v. Ryan*, the court will apply Ockham's Razor and address the merits of all of Petitioner's ineffective assistance claims *de novo*, as requested by Petitioner.

[61] 15 SCR Tabs 33 & 34.

[62] 13 SCR (Revised) Tab 14-A.

principle announced in *Batson v. Kentucky*, 476 U. S. 79 (1986).  Having considered Petitioner's motion for reconsideration and briefs in support and opposition to same, the court will deny Petitioner's motion for reconsideration.

In *Batson v. Kentucky*, the United States Supreme Court extended the equal protection principle barring the purposeful exclusion of Blacks from criminal jury service to the prosecution's use of peremptory challenges during petit jury selection. *See Batson v. Kentucky*, 476 U. S. at 89 ("the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.").  Dallas is white.  *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race.  First, the defendant must make out a prima facie case of discriminatory jury selection by the totality of the relevant facts concerning a prosecutor's conduct during the defendant's own trial.  Second, once the defendant makes the prima facie showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging jurors within the arguably targeted class. Finally, the trial court must determine if the defendant established purposeful discrimination by the prosecution.  *Snyder v. Louisiana*, 552 U. S. 472, 476-77 (2008); *Miller-El v. Dretke*, 545 U. S. 231, 239 (2005); *Batson v. Kentucky*, 476 U. S. at 94-98.

With regard to the first step, *i.e.,* establishing a prima facie case, the Supreme Court has described that process as follows:

> [A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.  To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.  Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate."

*Batson v. Kentucky*, 476 U. S. at 96 (*citations omitted*).

With regard to the second step, *i.e.,* the prosecution's burden of presenting a neutral reason for the peremptory challenge, the Supreme Court has noted that, while there are any number of bases on which a prosecutor reasonably might believe it is desirable to strike a venire member who is not excused for cause, the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the peremptory challenge.  *Miller-El v. Dretke*, 545 U. S. at 239; *Batson v. Kentucky*, 476 U. S. at 98 n.20.

> It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is.  But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.  A *Batson* challenge does not call for a mere exercise in thinking up any rational basis.  If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

*Miller-El v. Dretke*, 545 U. S. at 252.

In the third and final step in the *Batson* process, the Supreme Court has emphasized the critical role of the trial court in evaluating the prosecutor's credibility.  *Snyder v. Louisiana*, 552 U. S. at 477.

> [T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike.  At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."  In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

*Miller-El v. Cockrell*, 537 U. S. 322, 338-339 (2003).

Consideration of a *Batson* objection, or the review of a ruling claimed to be *Batson* error, requires that all of the circumstances that bear upon the issue of racial animosity be consulted and considered.  *Snyder v. Louisiana*, 552 U. S. at 478.  In several recent opinions, the Supreme Court has examined a wide array of factors in resolving *Batson* claims. *See, e.g.*, *Snyder v. Louisiana*, 552 U. S. at 480-85 (holding a prosecutor's proffer of a pretextual explanation regarding the stricken venire member's scheduling conflicts, which were significantly less imposing than those of a white venire member whom the prosecutor accepted, permitted an inference of discriminatory intent); *Miller-El v. Dretke*, 545 U. S. at 240-66 (citing the prosecutor's differential questioning of black and white venire members throughout

the entire voir dire, the prosecution's "remarkable" use of ten of its fourteen peremptories to strike ten of the eleven black venire members who were not removed for cause or by agreement, the prosecutor's failure to strike white venire members who offered voir dire testimony similar to black venire members whom the prosecutor did strike, and the prosecution's selective requests for a jury shuffle only when black venire members were near the front of the list as evidence warranting a finding of purposeful discrimination).

As correctly noted by Petitioner, the state trial court implicitly determined Petitioner satisfied the initial prong of *Batson* analysis. The state trial court directed the prosecution to furnish reasons for each of its peremptory strikes exercised during jury selection. As explained above, such a directive is necessary only if a criminal defendant first makes a prima facie case of discriminatory jury selection by the totality of the relevant facts. The prosecution then furnished the state trial court with its reasons for each of its peremptory strikes. The state trial court considered these reasons and the argument furnished by Petitioner's trial counsel and ultimately denied all of Petitioner's challenges to the prosecution's peremptory strikes. This ruling constituted an implicit factual determination that the prosecution's proffered race-neutral reasons for all of its peremptory strikes were credible. *Hightower v. Terry*, 459 F.3d 1067, 1072 n.9 (11th Cir. 2006), *cert. denied*, 550 U.S. 952 (2007).

The fundamental analytical problem with Petitioner's *Batson* claims is Petitioner failed to furnish the state appellate courts and has failed to furnish this court with copies of the juror questionnaires filled out by all the members of Petitioner's jury venire.  *See* Doc. # 120, at p. 51 n.3 (noting the juror questionnaires were not included in the state appellate record or the state post-conviction record and are not before this court for consideration).[63]   This failure renders it virtually impossible for this court to second-guess the implicit credibility findings made by the state trial court when it rejected Petitioner's *Batson* claims.   The juror questionnaires furnish the context within which the credibility of a prosecutor's proffered race-neutral reasons for exercising a peremptory challenge are evaluated. *See Jasper v. Thaler*, 765 F. Supp. 2d 783, 816 n.62 (W.D. Tex. 2011) (discussing the analytical hurdles to evaluating a *Batson* claim without access to the juror questionnaires completed by the venire members whom the petitioner claimed had been improperly stricken by the prosecution), *aff'd*, 466 F. App'x 429 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 788 (2012).  Absent review of the juror questionnaires executed by all members of the jury venire prior to Petitioner's trial, this court, like

---

[63]   In an affidavit submitted to this court by Petitioner, the former Court Administrator of the 15th Judicial Circuit states that state retention rules permit destruction of juror questionnaire forms after four years unless they have been made a part of the case record.  *Affidavit of Robert Merrill*, Doc. # 87-1, Exhibit 3.  Unfortunately, Mr. Merrill does not claim to possess personal knowledge regarding the actual disposition of the juror questionnaires completed by Petitioner's venire members.

the state appellate courts, is not in a proper position to re-examine the implicit credibility findings made by the state trial court on Petitioner's *Batson* claims.

The complete absence of any of the juror questionnaires from the state court record in Petitioner's direct appeal is especially problematic given the extensive reliance on the juror questionnaire answers made on the record by counsel for both parties during individual voir dire examination of Petitioner's potential jurors. Counsel for both the prosecution and defense spent considerable time and effort during individual voir dire asking jury venire members about their answers to the juror questionnaires, which included at least 45 questions.[64]   The following discussion is hampered by the absence of the questionnaires from the record.   The prosecution accurately described a number of the jury venire members against whom it used peremptory strikes as having demonstrated great reluctance to vote in favor of the death penalty (or to sit in judgment of another human being).  The prosecution also accurately identified another group of the jury venire members against whom it utilized peremptory strikes as having serious criminal records or close relatives with serious criminal records.  There was nothing objectively unreasonable with the state trial court's acceptance of those proffered race-neutral reasons for the prosecution's peremptory strikes of jury venire members 20, 58, 73, 91, 95, 113, each of whom expressed serious reservations about his or her ability to vote in favor of the death

---

[64] *See, e.g.,* 4 SCR 152, 184, 197-98; 5 SCR 208, 232, 234, 244-45, 315-16.

penalty.[65]  *See Garcia v. Stephens*, 793 F.3d 513, 527 (5th Cir. 2015) (prospective juror's opposition to the death penalty a legitimate and racially neutral reason for prosecution's peremptory strike), *cert. denied*, 136 S. Ct. 897 (2016).  Likewise, the state trial court reasonably accepted as race-neutral the prosecution's explanations that jury venire members 26, 29, 45, and 67 had close relatives with serious criminal convictions.[66]

Furthermore, Petitioner's arguments in support of his motion for reconsideration of the denial of his *Batson* claims regarding jury venire members 29 and 31 are unpersuasive.  The prosecution stated on the record that its strike of juror 31 was based upon that venire member's disinterested demeanor throughout voir dire, including his arms crossed across his chest and the fact he rolled his eyes at

---

[65] 4 SCR 157-61 (voir dire examination of venire member 20); 5 SCR 249-55 (voir dire examination of venire member 58); 5 SCR 298-305 (voir dire examination of venire member 73); 5 SCR 332-39 (voir dire examination of venire member 91); 5 SCR 353-62 (voir dire examination of 95); 6 SCR 404-16 (voir dire examination of 113).  Each of these venire members expressed reluctance to vote in favor of imposing the death penalty ranging from a general disagreement with the death penalty to grave reservations about their ability to sit in judgment another human being.  While the reservations about imposing the death penalty expressed by these venire members may not have risen to a level sufficient to sustain a challenge for cause, the prosecution's exercise of peremptory challenges against these venire members was consistent with the prosecution's professional duty to seek the ultimate punishment for the ultimate crime.  Venire member 67 also expressed reservations about her ability to vote to impose a death sentence.  5 SCR 286-87.

[66] 4 SCR 180-88 (venire member 26 – brother convicted of murder); 4 SCR 193-99 (venire member 29 – cousin convicted of dealing drugs); 5 SCR 227-35 (venire member 45 – brother plea bargained a charge of murder down to a lesser offense); 5 SCR 283-89 (venire member 67 – two uncles killed a person and one uncle went to prison).  The state trial court's implicit factual finding that the prosecution's use of peremptory strikes against each of these individuals was race-neutral was itself eminently reasonable.

several points.[67]   Petitioner criticizes the state trial court's failure to make express factual findings regarding the demeanor of juror 31.   Significantly, however, Petitioner's trial counsel did not challenge the factual accuracy of those descriptions of the venire member's demeanor given by the prosecutor.[68]   Instead, Petitioner's trial counsel merely pointed out juror 31 was a teacher and the prosecution had failed to strike other teachers on the jury venire.[69]  The prosecution responded that it struck venire member 31 based upon his disinterested demeanor and not because of his occupation.[70]  Thus, resolving the *Batson* claim surrounding the striking of juror 31 did not require the state trial court to evaluate conflicting descriptions of that venire member's demeanor.

The prosecution stated on the record that its strike of juror 29 was based upon the fact he had a reading disorder that prevented him from completing his juror questionnaire and he had a cousin who had been convicted of selling drugs.[71] Petitioner's trial counsel did not challenge the prosecution's assertion that juror 29

---

[67] 6 SCR 484-85.

[68] 6 SCR 492.

[69] *Id.*

[70] 6 SCR  497.

[71] 6 SCR 487-88.

had a reading problem.[72]   In fact, during individual voir dire, Petitioner's trial counsel pointed out this venire member had failed to complete a few answers on his questionnaire and this venire member candidly admitted he had a reading problem.[73] Instead, Petitioner's trial counsel pointed out that another member of the jury venire had a relative who had a drug-related criminal conviction.[74]   The prosecution responded that (1) the other venire member identified by Petitioner's counsel had a wife who had been convicted of an offense while on diet pills and (2) he considered that offense different from the drug-trafficking offense committed by juror 29's cousin.[75]  Thus, once more, there did not appear to be any genuine issue of material fact regarding juror 29's reading disability or the fact this venire member had a relative with a conviction for a drug-related offense.

The state trial court had access to the juror questionnaires and the opportunity to examine first-hand the demeanor of the jury venire members during their individual voir dire examination.  When viewed under the AEDPA's deferential standard, the state trial court's implied credibility findings regarding the race-neutral reasons proffered by the prosecution for striking venire members 29 and 31 were

---

[72] 6 SCR 490.

[73] 4 SCR 197-98.

[74] 6 SCR 490.

[75] 6 SCR 498-99.

objectively reasonable.  "A trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercises those strikes." *Davis v. Ayala*, 135 S. Ct. 2187, 2201 (2015).  Given Petitioner's failure to present the juror questionnaires to the state appellate courts, which reviewed and rejected Petitioner's *Batson* claims on the merits in the course of his direct appeal, the state appellate courts' rejection on the merits of Petitioner's *Batson* claims were objectively reasonable under clearly established federal law and the evidence presented to those appellate courts.  This court is not in a position to evaluate the propriety of the trial court's implicit credibility findings on Petitioner's *Batson* claims under the AEDPA's deferential standard without access to the same information that was before the state trial court when it made its implicit credibility findings.  *See Davis v. Ayala*, 135 S. Ct. at 2201 (appellate judges cannot on the basis of a cold record easily second-guess a trial judge's decisions about the likely motivation of a prosecutor).  Even if reasonable minds might disagree about the prosecutor's credibility, on habeas review that does not suffice to supersede the trial court's credibility determination.  *Id.*  For the foregoing reasons, Petitioner's motion for reconsideration of the denial of his *Batson* claim is denied.

Petitioner originally presented his conflict of interest/constructive ineffective assistance claim to the state appellate courts in his direct appeal as his seventh claim

56

in his appellant's brief.[76]  The Alabama Court of Criminal Appeals denied that claim on the merits.  *Dallas v. State*, 711 So. 2d at 1111.  This Court applied the AEDPA's deferential standard of review in denying Petitioner's analogous claim in this federal habeas corpus proceeding (Doc. #120, at pp. 31-32).    In his motion for reconsideration, Petitioner relies upon new factual allegations, new affidavits,[77] and other new documentation purportedly supporting his conflict of interest claim which were not presented to the Alabama state appellate courts during Petitioner's direct appeal.  Under the Supreme Court's holding in *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."), this Court may not consider Petitioner's new evidence in the course of reviewing Petitioner's conflict of interest claim under the AEDPA.  For the reasons discussed in the Order

---

[76] 10 SCR Tab 2, at pp. 51-52.

[77] *See, e.g.,* Affidavit of Dr. Ken Benedict executed June 7, 2007 (Doc. # 87-2, Exhibit 15) and the undated, unsworn "Affidavit" of Dr. Joseph Schumacher (Doc. # 87-2, Exhibit 16).  Dr. Schumacher's unsworn statement specifically references a 2007 affidavit he reviewed in the course of preparing his own statement.  Petitioner's direct appeal concluded at the state appellate level on March 13, 1998, when the Alabama Supreme Court denied Petitioner's petition for writ of certiorari.  *Ex parte Dallas*, 711 So. 2d 1114 (Ala.), *cert. denied*, 525 U.S. 860 (1998).  Obviously, Petitioner never submitted either of these documents to the Alabama state appellate courts in support of Petitioner's conflict of interest claim.  They are not properly before this Court for the purposes of federal habeas corpus review of Petitioner's conflict of interest claim.  Because Dr. Schumacher's "affidavit" is undated and unsworn, it may not be considered as evidence in this proceeding.

issued January 12, 2012 (Doc. # 120), Petitioner's motion for reconsideration of the denial of his conflict of interest claim is denied.

### III.  <u>MOTION FOR LEAVE TO AMEND/SUPPLEMENT PETITION</u>

Petitioner has filed a motion for leave to amend his operative pleading but furnished as an attachment not a proposed *amended* federal habeas corpus petition but, rather, what amounts to a *supplemental* federal habeas corpus petition adding a single new claim to those already before this court.[78]  The Supreme Court's decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), was handed down January 12, 2016. Petitioner's motion for leave to amend his petition to include a new claim based on the holding in *Hurst*, which overruled several prior Supreme Court decisions, is timely.  Petitioner's motion for leave to amend requests permission to present an issue of significant constitutional gravity bearing upon the fundamental fairness of Petitioner's state court trial.  Moreover, Petitioner's proposed "amendment" of his petition to include a claim premised upon the Supreme Court's holding in *Hurst* does little more than expand and update the same arguments Petitioner raised as his final claim for relief in his original petition.  The Court will permit Petitioner to amend

---

[78] Petitioner's proposed amended petition does not comply with the requirements of Rule 15.1, Local Rules for the United States District Court for the Middle District of Alabama, in that it does not "reproduce the entire pleading, document or other papers as amended . . . ."  Instead, Petitioner's proposed amended petition accompanying his recent motion for leave to amend merely supplements his original petition by adding Petitioner's new *Hurst* claim.

his final claim in his original petition to include his legal arguments based upon *Hurst* and will address those arguments in the context of his final claim for relief.

## IV.  *HURST, RING, & APPRENDI* CLAIM

### A.  The Claim

In his seventeenth and final claim in his original petition (Doc. # 1, at pp. 77-81) and his "amended petition" submitted January 11, 2017 (Doc. # 146-1), Petitioner argues his sentence violates the Eighth Amendment because under the holdings in *Hurst v. Florida*, 136 S. Ct. 616 (2016), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), only a jury may make the factual findings necessary to impose a sentence of death.

### B.  The Constitutional Standard

Until recently, the Supreme Court's opinions addressing capital punishment offered a wide array of ambiguous analytical approaches to resolving Eighth Amendment claims.  For instance, in *Trop v. Dulles*, 356 U.S. 86 (1958), the Supreme Court addressed the issue of a former soldier sanctioned for desertion with loss of his citizenship.  In the course of an opinion that reflected his own views on the subject, Chief Justice Earl Warren wrote as follows:

> The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice.  The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta.  The basic concept

59

underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards.  Fines, imprisonment and even execution may be imposed depending upon the enormity of the crime, but any technique outside the bounds of these traditional penalties is constitutionally suspect. This Court has had little occasion to give precise content to the Eighth Amendment, and, in an enlightened democracy such as ours, this is not surprising.  But when the Court was confronted with a punishment of 12 years in irons at hard and painful labor imposed for the crime of falsifying public records, it did not hesitate to declare that the penalty was cruel in its excessiveness and unusual in its character. *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 [1910]. The Court recognized in that case that the words of the Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

*Trop v. Dulles*, 356 U.S. at 99-101, 78 S. Ct. at 597-98 *(Footnotes omitted)*.

Though often cited in subsequent Supreme Court opinions, Chief Judge Warren's "evolving standards of decency" standard proved to be difficult to apply consistently.  For example, in *Furman v. Georgia*, 408 U.S. 238 (1972), a bare majority of the Supreme Court struck down capital sentencing schemes in thirty-nine States but failed to reach any degree of consensus in terms of an analytical approach to the Eighth Amendment.  The result was nine separate opinions issued from the Supreme Court in *Furman*, each reflecting a different analytical approach to the Eighth Amendment claims presented therein.

The situation changed little when, four years later, a series of plurality opinions from the Supreme Court upheld the new capital sentencing schemes

adopted by Georgia, Texas, and Florida in response to *Furman*. *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (plurality opinion issued by Justice Stewart for himself and Justices Powell and Stevens with Chief Justice Burger and Justices White and Rehnquist concurring separately) (the death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders); *Gregg v. Georgia,* 428 U.S. at 195 ("Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner."); *Jurek v. Texas*, 428 U.S. 262, 268 (1976) (same plurality and concurrences) (holding imposition of the death penalty does not *per se* violate the Eighth Amendment's proscription of "cruel and unusual punishment"); *Proffitt v. Florida*, 428 U.S. 242, 252 (1976) (same plurality and concurrences) (holding the Supreme Court "has never suggested that jury sentencing is constitutionally required").  The same date, the Supreme Court struck down North Carolina's adoption of a mandatory death penalty scheme for all persons convicted of first-degree murder and Louisiana's adoption of mandatory death sentences for persons convicted of five categories of capital murder.  *See Woodson v. North Carolina*, 428 U.S. 280, 301-03 (1976 ) (plurality opinion by Justice Stewart for himself and Justices Powell and Stevens with Justices Brennan and Marshall concurring separately) (holding North Carolina's mandatory death sentence for first-

degree murder violated the Eighth and Fourteenth Amendments because mandatory death sentences are inconsistent with "the evolving standards of decency that mark the progress of a maturing society" and fail to "allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before imposition of a sentence of death"); *Roberts v. Louisiana*, 428 U.S. 325, 334 (1976) (same plurality and concurrences as in *Woodson*) ("The constitutional vice of mandatory death statutes lack of focus on the circumstances of the particular offense and the character and propensities of the offender is not resolved by Louisiana's limitation of first-degree murder to various categories of killings.").

A year later, in *Coker v. Georgia*, 433 U.S. 584, 592 (1977), a Supreme Court plurality (Justice White joined by Justices Stewart, Blackmun, and Stevens, joined separately by Justices Brennan and Marshall with Justice Powell concurring in part and dissenting in part) held "a sentence of death is grossly disproportionate and excessive punishment for the crime of rape and is therefore forbidden by the Eighth Amendment as cruel and unusual punishment."

In *Godfrey v. Georgia*, 446 U.S. 420 (1980), Justice Stewart wrote for himself and three other Justices with Justices Brennan and Marshall concurring separately (*i.e.,* the same plurality and concurrences as in *Coker v. Georgia*) to strike down as unconstitutionally vague Georgia's aggravating factor that a capital offense was "outrageously or wantonly vile, horrible and inhuman."   Relying upon Justice

62

White's concurring opinion in *Furman*, the Supreme Court held (1) a capital sentencing scheme must provide a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not and (2) the Georgia Supreme Court's construction of the aggravating factor in question failed to adequately channel the jury's discretion because a person of ordinary sensibility could fairly characterize almost every murder in such terms.  *Godfrey v. Georgia*, 446 U.S. at 427-29.  The Supreme Court concluded the state courts had not limited the meaning of the aggravating factor in question in a manner which avoided the "standardless and unchanneled imposition of death sentences."  *Id.*, 446 U.S. at 430-32.

Of great significance to Petitioner's case is the Supreme Court's opinion in *Enmund v. Florida*, 458 U.S. 782 (1982), which arose from the same jurisdiction as *Hurst*.  In *Enmund*, the Supreme Court (Justice White writing for himself and three other Justices with Justice Brennan joining but concurring separately) struck down a sentence of death for a criminal defendant who was convicted as an accomplice to a felony murder.  The Florida trial court instructed Enmund's jury that "the killing of a human being while engaged in the perpetuation of or in the attempt to perpetuate the offense of robbery is murder in the first degree even though there is no premeditated design or intent to kill."  *Enmund v. Florida*, 458 U.S. at 784-85.  The Florida Supreme Court later determined there was no evidence Enmund (1) was

present at the time and place of the murders, (2) killed anyone, (3) intended to kill anyone, or (4) anticipated that lethal force would or might be used during the robbery. *Id.*, 458 U.S. at 788. After carefully reviewing the nation's capital murder statutes and the practices of juries with regard to the imposition of a death sentence for felony murder absent a showing of intent to kill or reckless indifference to human life, the Supreme Court concluded the Eighth Amendment forbids the imposition of the death penalty on one such as Enmund "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.*, 458 U.S. at 789-97. The Supreme Court emphasized that the two principal social purposes for the death penalty, *i.e.,* retribution and deterrence, are not furthered by the imposition of a death penalty on a robber who did not take a human life, attempt to kill, or intend to kill. *Id.*, 458 U.S. at 797-801.

In *Tison v. Arizona*, 481 U.S. 137, 152-58 (1987), a majority of the Supreme Court clarified its holding in *Enmund*, holding that the sons of a convicted murderer who smuggled an arsenal of firearms into a state prison and actively assisted their father in an armed prison break and the subsequent kidnaping, robbery, and murder of a family (including a two-year-old child) could be sentenced to death because their participation in the capital offense was major and their mental state was one of

reckless indifference to the value of human life.[79]   The Supreme Court took great pains to distinguish its holding in *Enmund*, pointing out Enmund had been a minor actor in the armed robbery, was not physically present at the time of the murders, and did not intend to kill, attempt to kill, or kill.   *Tison v. Arizona*, 481 U.S. at 149-50.   The Supreme Court held the evidence showed (1) the Tison brothers' participation in their capital offense was "anything but minor" and (2) the brothers

---

[79] The facts in *Tison* set forth in the Supreme Court's opinion [481 U.S. at 139-43] are so extreme they deserve elaboration.  Unlike *Enmund*, in which the petitioner had been spotted sitting in a getaway vehicle along a highway while his accomplices robbed a residence and shot the occupants several hundred yards away, the Tison brothers were physically present and actively involved in both the prison break and the ensuing kidnaping and robbery of a family one of the brothers had flagged down along a highway after the Tisons' vehicle had a flat tire.  More specifically, the Tison brothers and their mother plotted to break their father and his cellmate, also a convicted murderer, out of an Arizona prison where he was serving a term for having killed a guard during a prior escape attempt.  The three Tison brothers obtained "a small arsenal" of weapons and smuggled them into their father's prison inside a large ice chest.  The Tison sons armed their father and his cellmate.  The five men brandished their weapons, locked the prison guards and visitors present in a storage closet, and fled the prison grounds in the Tisons' (Ford) vehicle.  After abandoning their initial getaway vehicle for a second (Lincoln) getaway vehicle the Tison sons had acquired and placed in close proximity to the prison, the five men spent two nights at an isolated house where they changed a flat tire on the Lincoln using the lone spare tire.  As the group drove back roads and secondary highways through the desert, another tire blew out.  The group flagged down a vehicle driven by a couple traveling with their two-year-old son and teenage niece.  After the group robbed and drove their captives into the desert, the elder Tison and his cellmate fatally shot all four of their captives with repeated blasts from shotguns.  The Tison sons later claimed they were surprised by the shooting.  Several days later, the group ran into a police roadblock resulting in a shootout.  The elder Tison managed to escape into the desert where he died of exposure.  One of the three Tison brothers was killed in the shootout.  The elder Tison's cellmate and the remaining two Tison brothers were apprehended.  The surviving Tison brothers were charged with car theft, robbery, kidnaping, and capital murder under Arizona's felony murder statute, which provided at that time that a killing occurring during the perpetuation of robbery or kidnaping was capital murder.  Each Tison brother was convicted of capital murder.  An Arizona judge, acting without a jury, found (1) each Tison brother's participation in the capital offense was "very substantial," (2) each could reasonably have foreseen that his conduct would cause a grave risk of death, and (3) there were no statutory mitigating factors applicable.  The trial judge sentenced both Tison brothers to death.

both subjectively appreciated their actions were likely to result in the taking of innocent life. *Id.*, 481 U.S. at 152. The Supreme Court ultimately held "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes the natural, though also not inevitable, lethal result." *Id.*, 481 U.S. at 157-58. The Supreme Court reversed the Arizona Supreme Court's opinion declaring that *Enmund* required a showing of intent to kill. *See Tison v. Arizona*, 481 U.S. at 158 ("major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.").

In *Maynard v. Cartwright*, 486 U.S. 356 (1988), the Supreme Court unanimously struck down an Oklahoma death sentence based upon a factual determination that the capital offense was "especially heinous, atrocious, or cruel." The Court relied upon Justice Stewart's and Justice White's concurring opinions in *Furman* and reasoned that "[s]ince *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action," *Maynard v. Cartwright*, 486 U.S. at 362 (*citing Gregg v. Georgia*, 428 U.S. at 189, 206-07, 220-22). The Supreme Court

noted that, at the time of the petitioner's trial, Oklahoma courts had not yet restricted the aggravating factor in question to those murders in which torture or serious physical abuse were present. *Id.*, 486 U.S. at 365. The Supreme Court concluded that its holding in *Godfrey* controlled the outcome in *Maynard* because Oklahoma's courts had not limited the "especially heinous, atrocious, or cruel" aggravating factor any more effectively than had the Georgia court limited the term "outrageously or wantonly vile, horrible or inhuman." *Id.*, 486 U.S. at 363-64.

The lack of Supreme Court consensus on an analytical approach to the Eighth Amendment continued in a case rejecting an "as applied" challenge to the Texas capital sentencing scheme. *See Franklin v. Lynaugh*, 487 U.S. 164, 172-73 (1988) (holding there is no constitutional right to have a capital sentencing jury consider "residual doubts" as to the defendant's guilt in an opinion by Justice White for himself, Chief Justice Burger, and Justices Scalia and Kennedy, with Justices O'Connor and Blackmun concurring separately).

A degree of consensus did begin to appear within the Supreme Court early the following decade when five Justices finally agreed on a single standard for reviewing the adequacy of jury instructions in a capital sentencing proceeding:

> We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the

67

Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde v. California*, 494 U.S. 370, 380-381 (1990) (footnotes omitted).

This baby-step forward toward analytical consensus quickly dissipated, however, in a series of opinions addressing the constitutionality of various state aggravating factors. For example in *Shell v. Mississippi*, 498 U.S. 1 (1990), in a terse *per curiam* opinion, the Supreme Court struck down as unconstitutionally vague a Mississippi trial court's jury instruction attempting to restrict the definition of the term "especially heinous, atrocious, or cruel" as used as an aggravating factor in that state's capital sentencing scheme. *See Shell v. Mississippi*, 498 U.S. at 1 (*citing Maynard v. Cartwright*, 486 U.S. 356 (1988)).

In *Arave v. Creech*, 507 U.S. 463 (1993), the Supreme Court upheld as constitutional against a vagueness challenge Idaho's aggravating circumstance that the defendant "exhibited utter disregard for human life" based upon the Idaho Supreme Court's limiting construction of that term as referring to "acts or

circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, *i.e.*, the cold-blooded, pitiless slayer." *Arave v. Creech*, 507 U.S. at 467-68.   "The terms 'cold-blooded' and 'pitiless' describe the defendant's state of mind: not his *mens rea*, but his attitude toward his conduct and his victim." *Id.*, 507 U.S. at 473.  "The 'utter disregard' factor refers not to the outrageousness of the acts constituting the murder, but to the defendant's lack of conscientious scruples against killing another human being." *Id.*, 507 U.S. at 478 (*quoting State v. Fain*, 116 Idaho 82, 99, 774 P.2d 252, 269, *cert. denied*, 493 U.S. 917 (1989)).

True consensus on an overarching analytical approach to Eighth Amendment claims did not fully appear, however, until eight Supreme Court Justices agreed in *Tuilaepa v. California*, 512 U.S. 967 (1994), on the principle that the Eighth Amendment addresses two different, but related, aspects of capital sentencing: the eligibility decision and the selection decision.  *Tuilaepa*, 512 U.S. at 971 (Justice Kennedy writing for himself, Chief Justice Rehnquist, and Justices O'Connor, Scalia, Souter, and Thomas, with Justices Stevens and Ginsburg concurring separately but not rejecting the analytical approach offered by Justice Kennedy). The Supreme Court's analysis of those two aspects of capital sentencing provided the first comprehensive system for analyzing Eighth Amendment claims that a clear majority of the Supreme Court had ever offered:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment.  To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase.  The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both).  As we have explained, the aggravating circumstance must meet two requirements.  First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder.  Second, the aggravating circumstance may not be unconstitutionally vague.  * * *
>
> We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.  "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."  That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U.S. at 971-73 (citations omitted).

In *Tuilaepa*, the Supreme Court clearly declared its view that States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion.  *Tuilaepa*, 512 U.S. at 974.  The Supreme Court also concluded, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978.

In *Loving v. United States*, 517 U.S. 748 (1996), the Supreme Court described

the first part of the *Tuilaepa* analysis, *i.e.,* the eligibility decision, as follows:

> The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving*, 517 U.S. at 755 (citations omitted).

The Supreme Court subsequently elaborated on the distinction between the

narrowing function or "eligibility decision" and the "selection phase" of a capital

sentencing proceeding in *Buchanan v. Angelone*, 522 U.S. 269 (1998):

> Petitioner initially recognizes, as he must, that our cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. *Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. *Ibid.* In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. *Id.,* at 972, 114 S.Ct., at 2634-2635. Petitioner concedes that it is only the selection phase that is at stake in his case. He argues, however, that our decisions indicate that the jury at the selection phase must both have discretion to make an individualized determination and have that discretion limited and channeled. *See*, *e.g., Gregg v. Georgia,* 428 U.S. 153, 206-207, 96 S.Ct. 2909, 2940-2941, 49 L.Ed.2d 859 (1976). He further argues that the Eighth Amendment therefore requires the court to instruct the jury on its obligation and authority to

consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.

No such rule has ever been adopted by this Court.  While petitioner appropriately recognizes the distinction between the eligibility and selection phases, he fails to distinguish the differing constitutional treatment we have accorded those two aspects of capital sentencing.  It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition.  In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. *Tuilaepa, supra,* at 971-973, 114 S.Ct., at 2634-2636; *Romano v. Oklahoma,* 512 U.S. 1, 6-7, 114 S.Ct. 2004, 2008-2009, 129 L.Ed.2d 1 (1994); *McCleskey v. Kemp,* 481 U.S. 279, 304-306, 107 S.Ct. 1756, 1773-1775, 95 L.Ed.2d 262 (1987); *Stephens, supra,* at 878-879, 103 S.Ct., at 2743-2744.

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence.  *Penry v. Lynaugh,* 492 U.S. 302, 317-318, 109 S.Ct. 2934, 2946-2947, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma,* 455 U.S. 104, 113-114, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973 (1978).  However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. *Johnson v. Texas,* 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993); *Penry, supra,* at 326, 109 S.Ct., at 2951; *Franklin v. Lynaugh,* 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988).  Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence.  Thus, in *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), we held that the standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.,* at 380, 110 S.Ct., at 1198; see also *Johnson, supra,* at 367-368, 113 S.Ct., at 2669.

But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence.  And indeed, our decisions suggest that complete jury discretion is constitutionally permissible.  *See Tuilaepa, supra*, at 978-979, 114 S.Ct., at 2638-2639 (noting that at the selection phase, the state is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion); *Stephens, supra*, at 875, 103 S.Ct., at 2741-2742 (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that accepting that argument would require the Court to overrule *Gregg, supra*).

*Buchanan v. Angelone*, 522 U.S. at 275-277.

## C. *De Novo* Review

Petitioner relies upon the Supreme Court's opinions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Hurst v. Florida*, 136 S. Ct. 616 (2016).  Petitioner misconstrues the holding in *Hurst*, as well as those in *Ring* and *Apprendi* as they apply to Alabama's capital sentencing scheme generally and his own trial in particular.

In *Apprendi v. New Jersey*, the Supreme Court struck down on due process grounds a state scheme that permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent.  *Apprendi*, 530 U.S. at 497.  The Supreme Court's opinion in *Apprendi*

emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States*, 526 U.S. 227, 252-53 (1999): other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. Put more simply, the Supreme Court held in *Apprendi* (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Id.*, 530 U.S. at 490.

Two years later, in *Ring v. Arizona*, the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (*i.e.,* the fatal shooting of an armored van guard during a robbery) and (2) the foregoing aggravating factor out-weighed the lone mitigating factor favoring a life sentence

(*i.e.*, the defendant's minimal criminal record).[80]  *Ring v. Arizona*, 536 U.S. at 609.

The Supreme Court emphasized, as it had in *Apprendi*, the dispositive question "is

not one of form, but of effect": [i]f a State makes an increase in a defendant's

authorized punishment contingent on the finding of a fact, that fact - no matter how

the State labels it - must be found by a jury beyond a reasonable doubt." *Id.*, 536

U.S. at 602.  "A defendant may not be exposed to a penalty *exceeding* the maximum

he would receive if punished according to the facts reflected in the jury verdict

alone." *Id.*, 536 U.S. at 602 (*quoting Apprendi*, 530 U.S. at 483).  Because Ring

would not have been subject to the death penalty under Arizona law based solely

---

[80] The Arizona trial judge instructed Ring's jury on alternative theories of premeditated murder and felony murder. *Ring v. Arizona*, 536 U.S. at 591.  The jury deadlocked on premeditated murder but convicted Ring of felony murder occurring in the course of armed robbery.  *Id.*  The trial court also instructed Ring's jury in accordance with Arizona law that (1) a person commits first-degree murder if, acting either alone or with one or more other persons, the person commits or attempts to commit one of several enumerated felonies including robbery and, in the course of and furtherance of the offense or immediate flight from the offense, the person or another person causes the death of any person and (2) a conviction for felony murder did not require a specific mental state other than what is required for the commission of the enumerated felonies. *Id.* (*citing* Ariz.Rev.Stat.Ann. § 13-1105(A) and (B) (West 2001)).  At the guilt-innocence phase of Ring's trial, there was no evidence presented showing Ring participated in the planning of the robbery or expected the killing of the armored car guard.  *Id.*, 536 U.S. at 592-93.  Between the guilt-innocence phase of trial and Ring's sentencing hearing, however, one of his accomplices entered into a plea agreement and agreed to testify at Ring's sentencing hearing.  *Id.*, 536 U.S. at 593.  At the sentencing hearing, the accomplice identified Ring as the primary planner of the robbery and the person who actually shot the guard.  *Id.*

The Arizona trial judge found a second aggravating factor applied in Ring's case, *i.e.,* Ring's comments after the fatal shooting in which he chastised his co-conspirators for their failure to praise Ring's marksmanship rendered his offense "especially heinous, cruel, or depraved."  The Arizona Supreme Court later held there was insufficient evidence to support the trial judge's finding of depravity but nonetheless re-weighed the remaining aggravating factor against the lone mitigating factor and affirmed Ring's death sentence.  *Ring v. Arizona*, 536 U.S. at 595-96.

upon the jury's verdict (and but for the trial judge's factual determination as to the existence of an aggravating factor), the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Id.*, 536 U.S. at 609.

In *Blakely v. Washington*, 542 U.S. 296, (2004), the Supreme Court struck down as a violation of the Sixth Amendment's right to jury trial a judge-imposed sentence of imprisonment that exceeded by more than three years the state statutory maximum of 53 months. *Blakely v. Washington*, 542 U.S. at 303-04. In so ruling, the Supreme Court relied upon its prior holding in *Apprendi,* 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). In *Blakely*, the Supreme Court also relied upon its prior opinion in *Ring v. Arizona*, *supra*, for the principle "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely v. Washington*, 542 U.S. at 303.

In *Hurst v. Florida*, the Supreme Court struck down as a violation of the principles announced in *Apprendi* and *Ring* a death sentence imposed by a Florida judge after the jury at the guilt-innocence phase of Hurst's trial convicted him of first-degree murder but failed to specify which of the two theories of murder

submitted (*i.e.,* premeditated murder or felony murder for an unlawful killing during a robbery) it believed. *Hurst*, 136 S. Ct. at 619-20. The Florida felony murder statute at the time of Hurst's trial, as was true for Arizona's felony murder statute at the time of Ring's trial, did not require a jury finding of the specific intent to kill.[81] Consistent with Florida's hybrid capital sentencing scheme, the sentencing court held an evidentiary hearing before the jury, and the jury recommended a sentence of death. After the Florida Supreme Court vacated Hurst's first sentence, the sentencing judge conducted a new evidentiary hearing, instructing the jury it could recommend a death sentence if it found at least one aggravating circumstance beyond a reasonable doubt, *i.e.,* either the murder was especially heinous, atrocious, or cruel, or the murder was committed while Hurst was committing a robbery. At the conclusion of the second sentencing hearing the jury recommended death by a vote of 7 to 5. In her sentencing order, the trial judge relied upon her independent determination that the evidence established statutory aggravating factors of (1) the capital felony was especially heinous, atrocious, or cruel and (2) the capital felony was committed while the defendant was engaged, or was an accomplice, in the

---

[81] Florida law provided at the time of Hurst's murder trial that first degree murder consisted of the unlawful killing of a human being (1) when perpetuated from a premeditated design to effect the death of the person killed or any human being, (2) when committed by a person engaged in the perpetuation of, or in the attempt to perpetuate any of nineteen listed felonies (including robbery and kidnaping), or (3) which resulted from the unlawful distribution of any controlled substance identified in the statute, when such drug is proven to be the proximate cause of the death of the user. Fla. Stat. § 782.04(1) (2010).

commission or an attempt to commit, or flight after committing or attempting to commit any robbery, *i.e.,* Fla. Stat. § 921.141(6)(d) & (h) (2010).  The Supreme Court held the Sixth Amendment and Due Process Clause jointly require that each element of a crime be proved to a jury beyond a reasonable doubt.  *Hurst*, 136 S. Ct. at 621.  The Supreme Court described its prior holding in *Apprendi* as follows: "any fact that 'exposes the defendant to a greater punishment *than that authorized by the jury's guilty verdict'* is an 'element' that must be submitted to a jury."  *Id.* (*emphasis added*).  The Supreme Court concluded Hurst's death sentence was invalid because the sentencing judge, not a jury, found the aggravating circumstance necessary for the imposition of the death penalty under Florida law.  *Id.*, at 624.

Alabama's capital sentencing scheme is very similar to the hybrid system that produced Hurst's death penalty.  As explained in detail in Section I.D.3. above, Petitioner's capital sentencing proceeding followed the same pattern as Hurst's: first, the trial judge instructed an advisory jury it could only consider specific aggravating circumstances it determined beyond a reasonable doubt existed in Petitioner's case; second, the jury recommended a sentence of death; and finally, the trial judge issued a written sentencing order containing factual findings, weighing aggravating factors he concluded had been established beyond a reasonable doubt against mitigating circumstances, and imposing a sentence of death.  There the similarities between Petitioner's trial and those in *Hurst, Ring*, and *Enmund* end, however.

What distinguishes Petitioner's trial from the constitutionally defective capital murder trials in *Hurst, Ring,* and *Enmund* discussed above, and what distinguishes the holding in *Apprendi* from the circumstances of Petitioner's case, is the fact Petitioner's capital sentencing *jury* made all the factual determinations at the guilt-innocence phase of Petitioner's trial (*unanimously* and *beyond a reasonable doubt*) necessary to render Petitioner eligible for the death penalty under Alabama law (*i.e.*, finding Petitioner (1) intentionally murdered Mrs. Liveoak and (2) did so in the course of committing her robbery and kidnaping).  As the Supreme Court explained in *Hurst*, its holding in *Apprendi* was that "any fact that 'exposes the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' of the offense that must be submitted to a jury." *Hurst*, 136 S. Ct. at 621.  The jury's factual findings at the guilt-innocence phase of Petitioner's capital murder trial rendered Petitioner *eligible* for the death penalty within the meaning of the Supreme Court's Eighth Amendment jurisprudence. *See Tuilaepa v. California*, 512 U.S. at 971-72 ("To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase.").   Petitioner's jury made guilt-innocence phase factual findings, unanimously and beyond a reasonable doubt, that he (1) intentionally killed Mrs. Liveoak and (2) committed her murder in the course of her robbing and kidnaping.

These factual findings were all that were necessary under applicable Alabama law and the Eighth Amendment to render Petitioner *eligible* to receive a sentence of death.

As explained at length above, the Supreme Court's Sixth and Eighth Amendment jurisprudence requires that all factual determinations necessary to render a defendant *eligible* for a sentence of death must be made unanimously and beyond a reasonable doubt by a jury. The juries in *Enmund, Ring*, and *Hurst* all rendered ambiguous guilty verdicts on charges of first-degree murder. Those charges were premised or potentially premised upon felony murder theories that did not require the prosecution to establish beyond a reasonable doubt that the defendant acted with the specific intent to kill, as required by the holding in *Enmund*. Likewise, the ambiguous guilty verdicts in *Enmund*, *Ring*, and *Hurst* did not establish that the juries in those cases had concluded unanimously and beyond a reasonable doubt the existence of an aggravating circumstance that both (1) did not apply to every defendant convicted of a murder and (2) was not unconstitutionally vague.[82]  *See*

---

[82] Enmund's jury was instructed it could convict him of first-degree murder for the killing of a human being while engaged in the perpetuation of or in the attempt to perpetuate the offense of robbery even though there was no premeditated design or intent to kill. *Enmund*, 458 U.S. at 784-85. Ring's jury was instructed on the dual theories of premeditated murder and felony murder; it deadlocked on premeditated murder but convicted on felony murder after receiving instructions permitting it to convict on that charge without making a finding of a specific mental state beyond that necessary to convict for robbery. *Ring*, 536 U.S. at 591-92. Hurst's jury convicted him of first-degree murder without specifying which of the two alternative theories (*i.e.,* premeditated murder or felony murder for an unlawful killing during a robbery) it had concluded the evidence

*Tuilaepa*, 512 U.S. at 972 (the aggravating circumstance must apply only to a subclass of defendants convicted of murder and may not be unconstitutionally vague).  In stark contrast, Petitioner's guilty verdict on the capital murder counts against him necessarily included factual findings (unanimously and beyond a reasonable doubt) that Petitioner intentionally killed Mrs. Liveoak in the course of both her kidnaping and robbery.  Petitioner's guilty verdict did not suffer from any of the ambiguities present in *Enmund, Ring,* or *Hurst*.  For this reason, Petitioner's death penalty does not suffer from the same constitutional defect that took place during the trials of *Enmund*, *Ring,* and *Hurst*.  Likewise, the Petitioner's death sentence does not violate the constitutional rule announced in *Apprendi*.  Petitioner's trial conformed in all respects to the Sixth and Eighth Amendment requirements applicable to the *eligibility* determination of the capital sentencing process.

---

established beyond a reasonable doubt.  *Hurst*, 136 S. Ct. at 619-20.  Thus, all of these guilty verdicts were highly ambiguous.

Another problematic element in both *Ring* and *Hurst* that is absent from Petitioner's case is the presence of the aggravating factor of premeditation.  It is far from clear whether a jury's finding that a murder was premeditated, standing alone, is sufficient to satisfy the Eighth Amendment requirement discussed in *Tuilaepa* that an aggravating circumstance must apply to only a subclass of defendants convicted of murder.  *See Tuilaepa*, 512 U.S. at 972 (*quoting Arave v. Creech*, 507 U.S. at 474 ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm.")).  Given the Supreme Court's holdings in *Enmund* and *Tison*, which compel a jury finding of an intentional killing (or at least reckless indifference to human life joined with major participation in the underlying crime) as a prerequisite to the imposition of the death penalty, it is uncertain whether a jury finding of premeditation can survive constitutional scrutiny if proffered as the sole basis for elevating a murder conviction to one which will support the imposition of a death sentence.  Petitioner's jury unanimously found beyond a reasonable doubt that Petitioner intentionally murdered Mrs. Liveoak during the course of robbing and kidnaping her.  There was no ambiguity in that finding.

The Supreme Court has distinguished the constitutional requirements of the *eligibility* decision, *i.e.*, the narrowing function, and the *selection* decision, *i.e.*, the individualized assessment of mitigating circumstances, holding the latter requires only that the sentencing jury be given broad range to consider all relevant mitigating evidence but leaving to the States wide discretion on how to channel the sentencing jury's balancing of mitigating and aggravating factors.  *See Kansas v. Marsh*, 549 U.S. 158, 174-75 (2007) (holding, in connection with the *selection* phase of a capital sentencing proceeding, the Constitution mandates only that (1) the defendant has a right to present the sentencing authority with information relevant to the sentencing decision and (2) the sentencing authority is obligated to consider that information in determining the appropriate sentence); *Tuilaepa*, 512 U.S. at 978 (holding, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment").

At the *selection* phase of a capital trial, the Supreme Court has left to the States the decision whether to channel a sentencing jury's weighing of mitigating evidence or grant the jury unfettered discretion to consider all relevant mitigating evidence and weigh that evidence in any manner the jury deems reasonable.  *See Kansas v.*

*Marsh*, 549 U.S. at 174 ("So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed.").  Likewise, the Supreme Court has not yet imposed a particular burden of proof requirement with regard to a capital sentencing jury's consideration of mitigating evidence when such consideration occurs exclusively within the selection process:

> In sum, "discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process.  "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment."  Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has been found that the defendant is a member of the class made eligible for that penalty."

*Tuilaepa v. California*, 512 U.S. at 979-80 (citations omitted).

"[T]here is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'"  *Johnson v. Texas*, 509 U.S. 350, 362 (1993) (*quoting Boyde v. California*, 494 U.S. at 377).  "We have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is

constitutionally required." *Kansas v. Marsh*, 549 U.S. at 175 (*quoting Franklin v. Lynaugh*, 487 U.S. at 179).

The Supreme Court has never categorically mandated *jury* resolution of all factors at the *selection* phase of a capital sentencing process. On the contrary, the Supreme Court's jurisprudence addressing the *selection* aspect of capital sentencing has focused on requiring consideration of all mitigating evidence, as well as the circumstances of the capital offense. *See Tuilaepa v. California*, 512 U.S. at 972 ("What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." (quoting *Zant v. Stephens*, 462 U.S. 862, 879 (1983)). "The selection decision, on the other hand, requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Tuilaepa v. California*, 512 U.S. at 973.

Petitioner received exactly the type of individualized assessment of his culpability in the context of all the mitigating evidence presented during trial when (1) the jury considered all relevant mitigating evidence presented during either phase of trial, (2) the jury made its sentencing recommendation (after weighing only those aggravating circumstances it determined had been established beyond a reasonable doubt against all the mitigating circumstances), and (3) the trial judge issued his findings and conclusions in his sentencing order (which findings were dictated, in

part, by the jury's unanimous finding beyond a reasonable doubt that the Petitioner's capital offense took place in the course of a kidnaping and robbery).[83]

The jury made the determination at the guilt-innocence phase of trial that Petitioner's intentional capital offense took place in the course of the kidnaping and robbery of Mrs. Liveoak.  The jury made these determinations unanimously and beyond a reasonable doubt.  Petitioner admitted during his testimony at the guilt-innocence phase of his trial that he committed the kidnaping and robbery of Mr.

---

[83] At the time of Petitioner's capital murder trial, Alabama law provided, and still provides, as follows:

> At the sentencing hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances.  Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.
> Ala. Code § 13A-5-45(e).

The state trial court's sentencing order, containing findings of fact and conclusions of law, appears at 2 SCR 357-69.  Judge Reese found the state had proven beyond a reasonable doubt three aggravating circumstances, *i.e.,* that (1) *as found by the jury*, the Petitioner's capital offense was committed while Petitioner was engaged in or was an accomplice in the commission or attempted commission, or during flight after committing or attempting to commit kidnaping and robbery, (2) Petitioner was previously convicted of a felony involving the use or threat of violence to a person, *i.e.,* the Portwood kidnaping and robbery, and (3) Petitioner's capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.  2 SCR 361-64.  Judge Reese found an absence of any statutory mitigating circumstances but did find a number of non-statutory mitigating circumstances, including (1) Petitioner's remorsefulness, (2) the fact Petitioner came from a poor family and lacked adequate role models who instill morals into him, (3) Petitioner's previous good work record, (4) the fact Petitioner was a good husband to his first wife and a good father to their children, (5) Petitioner's prior kindnesses and good works toward others, (6) the love and care shown Petitioner by his family and friends, (7) the fact Petitioner appears to function well in penal institutions, and (8) the lack of violence shown by Petitioner since his capital offense.  2 SCR 367-68.  The trial court did not give much weight to any of the Petitioner's mitigating circumstances when weighed against the aggravating circumstances and concluded the jury's advisory verdict together with the aggravating circumstances outweighed the mitigating circumstances and warranted imposition of a sentence of death.  2 SCR 368-69.

Portwood just days before the kidnaping, robbery, and murder of Mrs. Liveoak.  The state trial court was constitutionally obligated to consider the circumstances of Petitioner's offense when it made the selection determination at the punishment phase of Petitioner's capital murder trial.  This necessarily included consideration of the particularly tortured final hours Mrs. Liveoak spent without food, water, or ventilation inside the steel trunk of her car, which Petitioner parked in an isolated location bereft of shade on an asphalt parking lot in the middle of July in central Alabama.  After the jury unanimously made the determinations beyond a reasonable doubt at the guilt-innocence phase of trial that Petitioner intentionally murdered Mrs. Liveoak during the course of her kidnaping and robbery, Petitioner received from both the advisory jury and the trial court the individualized consideration of the circumstances of his offense and the mitigating aspects of his character and background at the punishment phase of his capital murder trial.  This is all the Eighth and Sixth Amendments required in connection with the selection decision. Petitioner's final claim for relief contained in his original petition, as supplemented by Petitioner's *Hurst* claim contained in his amended petition, does not warrant federal habeas corpus relief under a *de novo* standard of review.

# V. **TRIAL COURT RULINGS ON CHALLENGES FOR CAUSE**

## A. **The Claim**

In his fifth claim for relief in his original petition, Petitioner complained about both the state trial court's granting of the prosecution's challenge for cause to venire member 129 and the trial court's refusal to grant the defense's challenge for cause to venire member 64 (Doc. #1, at pp. 14-15).  The court rejected Petitioner's latter argument on the merits under the AEDPA's standard of review in the Order issued January 12, 2012 (Doc. #120, at pp. 23-24, 31-32).  This leaves only Petitioner's complaint about the state trial court's granting of the prosecution's challenge for cause to venire member 129 for *de novo* review.

The individual voir dire examination of venire member 129 included the following exchanges:

> THE COURT:  This is a capital murder case, meaning you may or may not be called upon to make a decision about capital punishment.  Do you understand that?
> PROSPECTIVE JUROR:  Yes, sir.
> THE COURT:  You may not be called upon because there are other lesser included offenses for you to consider.  However, if you are called upon to make that decision, I need to ask you these questions, because it would be too late at the end of the case to ask you these questions. Capital punishment means life without parole or the death penalty.  Do you have an opinion one way or the other about capital punishment?
> PROSPECTIVE JUROR:  Yes, sir.
> THE COURT:  What is that, please, ma'am?
> PROSPECTIVE JUROR:  I don't believe in capital punishment.
> THE COURT:  When you say you don't believe in capital punishment, I am assuming you are talking about the death penalty; is that right?
> PROSPECTIVE JUROR:  Yes, sir.

87

THE COURT:  You don't believe it serves an appropriate function in our society?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Let me ask you this.  Let me tell you this first.  In Alabama here the State of Alabama recognizes certain criminal offenses whereby the punishment may be the death penalty.  Now, I recognize that you may personally disagree with that.  But let me ask you this.  If you are selected as a juror in this case, and you are called upon to make that decision, do you think you could entertain the possibility of the death penalty as a sentence in this case?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  You don't think if I give you instructions that would tell you you need to consider and weigh these factors, that you could do that in deciding whether or not the death penalty could be imposed?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  What you are telling me then is your personal opinion is just so great and you just disagree with it so much you just couldn't rule and you couldn't consider that at all?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  State?

MR. MCNEIL:  No questions.

THE COURT:  Defense?

EXAMINATION BY MR. AGRICOLA:

Q:     Ms. Foy, do you understand that the Alabama Legislature passes the laws that we are governed by here in Alabama?

A:     Yes, sir.

Q:     And do you understand that the Alabama Legislature has passed a law that authorizes the death penalty in some cases where the circumstances are so bad that a judgment has been made by the Legislature that the death penalty ought to be authorized in those cases?  Do you understand that's the law?

A:     Yes, sir.

Q:     Now, you have expressed, I think, a pretty clear personal belief against the death penalty?

A:     Yes, sir.

Q:     Do you understand, Ms. Foy, when you enjoy the benefits of citizenship in this country and in this state, that it carries with it certain obligations?

A:     Yes, sir.

Q:     And one of those obligations is jury service?

A:     Yes, sir.

Q:     Now do you understand that in a civilized society we have to follow the law?

A:     Yes, sir.

Q:     And that if we don't follow the law, all of us will be in serious danger of our life and limb?

A:     Yes, sir.

Q:     Ms. Foy. What happens in cases like this is that the judge will explain to you what the law is.  And as a juror, you will be required to take an oath.  Do you understand that?

A:     Yes, sir.

Q:     And if you take that oath, you must abide by that oath to follow the law?

A:     Yes, sir.

Q:     If the Judge instructs you that if you make a finding as a juror that the defendant is guilty of capital murder, do you understand that you must follow his instructions and consider two punishments; one being life without parole, and one being the death penalty.

A:     Yes, sir.

Q:     And he would explain to you what the law is that you must apply to the evidence?

A:     Yes, sir.

Q:     Now, regardless of your personal feelings can you follow the law?

A:     Yes, sir.

Q:     Can you swear under oath that you will listen to the Judge and apply the law to the facts and the evidence that comes in from the witness stand?

A:     Yes, sir.

Q:     You are not saying here today, are you, that you would automatically vote against the death penalty if the facts are and if the jury finds that the facts satisfy the law about the death penalty?  You wouldn't automatically dismiss the death penalty as an option, would you?

A:     Yes, sir.

       MR. AGRICOLA:  That's all.

EXAMINATION BY MR MCNEIL:

Q:     Ms. Foy, I am a little confused now.  On the Judge's questions you said that you would not consider the death penalty as a punishment, that you would not consider it?

A:      No.

Q:      Let me ask you these questions then.  Maybe I misunderstood you.  Are you against the death penalty?

A:      Yes, sir.

Q:      You said a strong belief?

A:      Yes, sir.

Q:      Is that belief so strong that you feel like it would really get in the way with your ability to follow the Judge's instructions?

A:      Yes, sir.

Q:      The Judge is not going to tell you how to vote, Ms. Foy.  I want to make sure you understand that.  When it comes to the death penalty, that's something you have got to do on your own.  Do you ever foresee yourself being able to vote for the death penalty in any case?

A:      No, sir.

        MR. MCNEIL:  That's all.

THE COURT:  Thank you, ma'am.  You can return to the jury assembly room on the third floor.  State?

MR. MCNEIL:  Challenge Juror 129.[84]

## B.  The Constitutional Standard

The standard for determining the constitutional fitness of a capital sentencing juror is set forth in a series of Supreme Court opinions dating back several decades. In *Witherspoon v. Illinois*, 391 U.S. 510, 521-23 (1968), the Supreme Court held that prospective jurors may not be excused from sitting on a capital jury simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.  Rather, the Supreme Court held as follows:

The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote

_____

[84] 6 SCR 453-61 (voir dire examination of venire member 129).

against the penalty regardless of the facts and circumstances that might emerge in the course of the proceedings.

*Witherspoon v. Illinois*, 391 U.S. at 522 n.21.

In *Adams v. Texas*, 448 U.S. 38 (1980), the Supreme Court emphasized the limitations *Witherspoon* imposed on the ability of the State to exclude members of a jury venire from service on a petit capital jury:

> a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams v. Texas*, 448 U.S. at 45.

In *Adams*, the Supreme Court further discussed the many practical consequences of its *Witherspoon* holding:

> If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality. * * *
>
> [A] Texas juror's views about the death penalty might influence the manner in which he performs his role but without exceeding the "guided jury discretion" permitted him under Texas law. In such circumstances, he could not be excluded consistently with *Witherspoon*.
>
> The State could, consistently with *Witherspoon*, use § 12.31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths. But

the use of § 12.31(b) to exclude jurors on broader grounds based on their opinions concerning the death penalty is impermissible. * * *

[N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. * * * Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond a reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. * * * [T]he State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths.

*Adams v. Texas*, 448 U.S. at 46-50 (citations omitted).

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court further clarified its holdings in *Witherspoon* and *Adams*, holding that the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. at 424. In *Wainwright v. Witt*, the Supreme Court also emphasized that considerable deference is to be given the trial court's first-hand evaluation of the potential juror's demeanor and that no particular magical incantation or word choice need necessarily be followed in interrogating the potential juror in this regard. *Id.*, 469 U.S. at 430-35.

More recently, in *Uttecht v. Brown*, 551 U.S. 1 (2007), the Supreme Court reviewed its *Witherspoon-Witt* line of opinions and identified the following "principles of relevance":

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown*, 551 U.S. at 9 (citations omitted).

The Supreme Court has emphasized the critical inquiry for *Witherspoon-Witt* purposes is not whether a state appellate court properly reviewed the propriety of the exclusion but, rather, whether the trial court correctly applied the appropriate federal constitutional standard. *Uttecht v. Brown*, 551 U.S. at 16-17. Finally, the Supreme Court has admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror. *Uttecht v. Brown*, 551 U.S. at 20 ("where, as here there is a lengthy questioning of a prospective juror and the trial court has supervised a diligent and

thoughtful *voir dire*, the trial court has broad discretion."). "Courts reviewing claims of *Witherspoon-Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Uttecht v. Brown*, 551 U.S. at 22.

## C.  De Novo Review

Having independently reviewed the entirety of the voir dire examination of venire member 129, the state trial court's implicit factual finding of disqualifying bias is not merely objectively reasonable.  It is entirely compelling.  Venire member 129 was the quintessential vacillating venire member who responded in widely divergent ways to questions about her ability to consider and vote in favor of a sentence of death, depending upon the manner in which those questions were phrased.  This venire member did, however, make clear that her personal views on the propriety of the death penalty would impede her ability to follow the trial judge's instructions.  *Cf. Stewart v. Dugger*, 877 F.2d 851,  855 (11th Cir. 1989) (affirming a federal habeas court's deference to a state trial court's implicit factual findings in granting a challenge for cause to a venire member who insisted it would be extremely difficult for him to vote in favor of a death sentence), *cert. denied*, 495 U.S. 962 (1990).  In such circumstances, it is particularly critical that a federal habeas court defer to the implicit credibility findings made by the state trial judge who had the

opportunity to examine firsthand the vacillating venire member's demeanor during voir dire examination. *Uttecht v. Brown,* 551 U.S. at 22; *Sumner v. Mata*, 455 U.S. 591, 597 (1982). Petitioner's complaint about the state trial court granting the prosecution's challenge for cause to venire member 129 does not warrant federal habeas relief under a *de novo* standard of review.

## VI. ERRONEOUS ADMISSION OF PETITIONER'S CONFESSION

### A. The Claim

In his eighth claim in his original petition, Petitioner argues the state trial court erred in admitting into evidence *the signed copy* of Petitioner's statement to police given shortly after his arrest (Doc. #1, at pp. 63-65).

During a pretrial hearing held October 11, 1995, the state trial court heard evidence on Petitioner's motion to suppress his videotaped post-arrest statement to police.[85] The only two witnesses who testified at the hearing were a Montgomery

---

[85] The verbatim transcription from the pretrial hearing on Petitioner's motion to suppress appears at 4 SCR Tab 1, at pp. 1-70.

Police homicide detective and the Petitioner.[86]  In an Order issued October 11, 1995, the state trial court denied Petitioner's motion to suppress.[87]

As explained above, the state trial court admitted without objection Petitioner's post-arrest videotaped statement to police (in question and answer format); the jury saw and heard the videotaped recording played in open court during the guilt-innocence phase of Petitioner's capital murder trial.[88]  The trial court also

---

[86] More specifically, at the pretrial hearing, detective David R. Hill testified that (1) Hazel Liveoak's body was found at 21:13 hours on July 13, 1994, (2) Dennis Bowen furnished information which allowed police to identify Petitioner and Carolyn Yaw as suspects in Mrs. Liveoak's murder, (3) Petitioner was arrested and brought to police headquarters, where Petitioner was given his *Miranda* warnings, (4) Petitioner signed the form waiving his rights, (5) no promises or threats or coercion were used to induce Petitioner to make his statement, (6) a videotaped statement was taken from Petitioner, (7) several weeks later, Petitioner contacted Detective Hill and requested an opportunity to examine his statement, (8) Detective Hill arranged for Petitioner to be transported to the Montgomery Police Department on September 1, 1994, where Petitioner reviewed a written transcription of his statement and signed same, (9) at that time, Detective Hill was unaware counsel had been appointed for Petitioner and Petitioner informed him that he had not yet been appointed counsel [both men were apparently in error on that point], (10) Petitioner appeared entirely sober throughout his post-arrest interrogation, (11) initially, Petitioner denied committing the offense, (12) Petitioner appeared lucid and did not appear intoxicated during his post-arrest interrogation, and (13) Petitioner never requested an attorney during his post-arrest interrogation.  4 SCR at R-3-R-42, R-66-R-67 (testimony of David R. Hill).

Petitioner testified during the same hearing and stated (1) he was smoking crack the day of his arrest, (2) he was addicted to crack cocaine, (3) he was high at the time of his arrest, (4) he was high at the time of his post-arrest interrogation, (5) he did not recall signing the waiver of rights form admitted into evidence during the hearing, (6) he did not read any of the papers he signed that day, (7) he was never told he had been charged with capital murder, (8) he was never told he was facing the death penalty, (9) he was not given his *Miranda* warnings on either July 14 or September 1, 1994, (10) he was in his "own world" during his post-arrest interrogation, and (11) he was promised a four-year sentence in exchange for giving police his post-arrest statement.  4 SCR 42-66 (testimony of Donald Dallas).

[87] 2 SCR 356.

[88] 7 SCR 647-48.

96

admitted into evidence without objection a transcription of the audio portion of the videotaped recording.[89]  The copy of the verbatim transcription of the audio portion of the videotape recording admitted into evidence at trial as State Exhibit 41 included Petitioner's undated and unwitnessed signature at the bottom of each page.[90]

## B.  The Constitutional Standard

A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986).  The test for determining whether the admission of evidence warrants federal habeas corpus relief is whether the allegedly erroneous admission of evidence either (1) violated a specific federal constitutional right or (2) rendered the defendant's trial so fundamentally unfair that the conviction was obtained in violation of the Due Process Clause of the Fourteenth Amendment.  *Herring v. Secretary, Dept. of Corr.*, 397 F.3d 1338, 1335 n.8 (11th Cir.), *cert. denied*, 546 U.S. 928 (2005); *Thigpen v. Thigpen*, 926 F.2d at 1012.

---

[89] 7 SCR 648.

[90] 3 SCR 457-69.

Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law).  In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court.  *Estelle v. McGuire*, 502 U.S. at 67-68; *Lewis v. Jeffers*, 497 U.S. at 780; *Pulley v. Harris*, 465 U.S. at 41; *Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991).

> When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."  The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.

*Coleman v. Thompson*, 501 U.S. 722, 730 (1991).

## C. *De Novo* Review

Petitioner argues the admission of his signed confession violated his Sixth Amendment right to counsel because he signed the verbatim transcription of his

videotaped confession after the state trial court appointed counsel to represent him. This argument is meritless. The document admitted without objection into evidence during Petitioner's trial as State Exhibit 41 was a transcription of Petitioner's post-arrest interrogation conducted after *Miranda* warnings had been administered and Petitioner signed a waiver of his rights. The state trial court's Order overruling Petitioner's motion to suppress implicitly rejected as incredible Petitioner's testimony at the pretrial hearing that he was so intoxicated at the time of his post-arrest interrogation that he was incapable of understanding his constitutional rights and effectively waiving those rights. Petitioner does not allege any facts or identify any legal authority challenging the admission at trial of the videotaped recording of Petitioner's post-arrest interrogation. Nor does Petitioner allege any facts or identify any legal authority showing the state trial court erred in overruling Petitioner's motion to suppress his videotaped post-arrest statement to police. Under such circumstances, the fact the state trial court chose to admit a copy of the transcription of the audio portion of the videotaped recording that was played without objection for Petitioner's jury and which bore Petitioner's signature did not violate Petitioner's Sixth Amendment right to counsel.

An accused is denied the basic protections of the Sixth Amendment when there is used against him at his trial evidence of his own incriminating words which government agents deliberately elicited from him after he had been indicted and in

the absence of his counsel. *Fellers v. United* States, 540 U.S. 519, 523 (2004); *Massiah v. United* States, 377 U.S. 201, 206 (1964); *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1216 (11th Cir. 2009), *cert. denied*, 559 U.S. 1009 (2010). At Petitioner's request, several weeks after Petitioner gave his actual statement to police, the State permitted Petitioner to review the verbatim transcription of his videotaped interrogation and sign the transcription of his earlier statement. The state trial court did not admit into evidence any statement made by Petitioner on September 1, 1994, which law enforcement authorities "deliberately elicited' from Petitioner on that date and which differed in content from the videotaped statement Petitioner gave shortly after his July 14, 1994 arrest. Petitioner's Sixth Amendment rights were not violated by the admission, without objection, of his signed version of the transcription of his prior videotaped statement.

Likewise, the admission of State Exhibit 41 did not render Petitioner's trial fundamentally unfair. The jury saw and heard Petitioner's videotaped statement made just hours after his arrest. There is no argument currently before this court showing there was any error in connection with the admission of Petitioner's videotaped statement. The presence of Petitioner's unwitnessed, undated signature on the bottom of the transcribed pages of the exhibit admitted without objection at trial as State Exhibit 41 did not render Petitioner's trial fundamentally unfair. If Petitioner had made timely objection to the admission of the signed version of the

transcript, the state trial court could easily have substituted a redacted version of the same transcription, *i.e.*, one not bearing Petitioner's signature. The erroneous admission of evidence renders a trial fundamentally unfair only when the erroneously admitted evidence was material, *i.e.*, the evidence was a critical, crucial, highly significant factor to the outcome of the trial. *Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir.), *cert. denied*, 516 U.S. 956 (1995); *Thigpen v. Thigpen*, 926 F.2d at 1012; *Dobbs v. Kemp*, 790 F.2d 1499, 1504 (11th Cir. 1986), *modified on reh.*, 809 F.2d 750 (11th Cir.), *cert. denied*, 481 U.S. 1059 (1987). Given the admission without objection at trial of Petitioner's videotaped statement to police, the admission of the verbatim transcription of the videotaped recording (with or without Petitioner's signature on the transcription) was not a crucial, critical, or highly significant factor in the outcome of either phase of Petitioner's capital murder trial.

Finally, any error regarding the admission of State Exhibit 41 was harmless under the Supreme Court's standard for harmless error in federal habeas corpus proceedings. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict"). Admission of the undated, unwitnessed, but signed verbatim transcription of the audio portion of Petitioner's videotaped statement did not have a substantial or injurious effect or influence on the jury's verdict at either phase of

Petitioner's capital murder trial.  Petitioner's eighth claim does not warrant federal habeas relief under a *de novo* standard of review.

## VII. <u>ERRONEOUS ADMISSION OF EXTRANEOUS OFFENSES</u>

### A.  The Claim

In his twelfth claim in his original petition, Petitioner argues the state trial court erred in admitting the testimony of Wesley Orville Portwood concerning Petitioner's kidnaping and robbery of him just days before Petitioner's kidnaping, robbery, and murder of Mrs. Liveoak (Doc. # 1, at pp. 68-70).  Petitioner contends it was error for the state trial court to admit Mr. Portwood's testimony after the court admitted Petitioner's videotaped statement - because in that recording, Petitioner admitted the essential facts concerning his robbery and kidnapping of Mr. Portwood.[91]

At trial, Mr. Portwod testified that (1) after striking him with a knife, Petitioner forced his way into Mr. Portwood's car and drove him to an isolated location near Millbrook where Petitioner directed him to get out of the car and threatened to place Mr. Portwood in the trunk of his vehicle, (2) Mr. Portwood protested that he would "smother to death in there," (3) Petitioner then directed him

---

[91] In his videotaped post-arrest statement to police, Petitioner stated that he abducted an "old man" from a parking lot in Prattville, drove him to a wooded location near Lake Jackson in Millbrook, "laid him face down, and drove his car probably a quarter of a mile from him and got out and left." 3 SCR 465-67.

to lay down in the woods, (4) Petitioner then drove off, and (5) Mr. Portwood rose and walked about a mile down the road where he found his abandoned car but not the keys.[92]

## B.  The Constitutional Standard

The same legal principles discussed above in Section VI.B. in connection with Petitioner's complaint about the admission of his signed statement apply to this claim.  The Eleventh Circuit has held that evidence of an extraneous offense is admissible under Alabama law if it shows something more than the defendant's bad character and the likelihood he acted in conformity therewith by committing the charged crime.  *Thigpen v. Thigpen*, 926 F.2d at 1014.  The Eleventh Circuit has also declared Alabama law permits the admission of extraneous offense evidence when such evidence is relevant to (1) show either (a) the defendant's physical capacity, skill, or means to commit the charged crime, (b) the res gestae of the crime, (c) identity of person or crime, (d) scienter or guilty knowledge, (e) intent, (f) plan, design, scheme, or system, (g) motive, (h) malice, or (i) aspects of various particular crimes, (2) rebut special defenses, or (3) an aspect of the charged crime which is a "real and open issue" in the case.  *Id.*. 926 F.2d at 1014-15.

---

[92] 7 SCR 703-14 (testimony of Wesley Orville Portwood).

## C. *De Novo* Review

The admission of Mr. Portwood's trial testimony did not render Petitioner's capital murder trial fundamentally unfair. Admission of Mr. Portwood's testimony did not show merely Petitioner's bad character. Mr. Portwood's testimony supported the inference that Petitioner's actions in placing the elderly Mrs. Liveoak inside her car trunk only days later on the afternoon of July 12, 1994, and keeping her there were intended to result in her death. Only days before Petitioner's abduction and robbery of Mrs. Liveoak, the elderly Mr. Portwood informed Petitioner that he would likely "smother to death" if forced to get inside his own vehicle's trunk.[93] Petitioner's intent to kill Mrs. Liveoak was the only genuinely "real and open issue" before the jury at the guilt-innocence phase of Petitioner's capital murder trial.[94] *Cf. Thigpen v. Thigpen*, 926 F.2d at 1015-19 (holding

---

[93] 7 SCR at 708 (testimony of Wesley Orville Portwood).

[94] During Petitioner's state habeas corpus proceeding, all three of Petitioner's trial counsel testified that the defense's strategy at the guilt-innocence phase of trial was to attempt to convince the jury that Petitioner was so mentally and emotionally disturbed and intoxicated by his addiction to crack cocaine and his binging on that drug during the time frame that included Mrs. Liveoak's abduction and robbery that Petitioner could not and did not form the intent to kill her. 12 SCR Tab 13, at p. 37 (testimony of Jeffery C. Duffey); 12 SCR Tab 13, at pp. 75-76, 86-87, 98, 113 (testimony of Susan James); 13 SCR Tab 14, at pp. 159, 165, 169, 171, 181-82, 189, 228-29 (deposition testimony of Algert Agricola). Attorney Agricola, in particular, emphasized that, in light of Petitioner's confession to police to all elements of the offense of capital murder except intent and Petitioner's admissions during their pretrial conferences, the defense was left with little to argue at the guilt-innocence phase of trial other than that Petitioner was so intoxicated on crack that he could not form the intent to commit murder. 13 SCR Tab 14, at pp. 159, 165, 169, 171, 181-82, 228-29 (deposition testimony of Algert Agricola). Attorney Agricola testified the defense's punishment phase strategy was similar, *i.e.,*, to show Petitioner was intoxicated at the time of his capital offense and operating under the domination of Carolyn Yaw. *Id.*, at p. 189.

extraneous offense evidence admissible where relevant to show the defendant's and a co-defendant's relative motives). Furthermore, in light of the admission without objection of Petitioner's videotaped statement, in which he admitted to the essential elements of his abduction and robbery of Mr. Portwood, admission of Mr. Portwood's trial testimony was harmless error, at worst. *See Brecht v. Abrahamson*, 507 U.S. at 637 (holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict"). Petitioner's twelfth claim does not warrant federal habeas corpus relief under a *de novo* standard of review.

## VIII. ERRONEOUS ADMISSION OF PHOTOGRAPHS AND VIDEO

### A. The Claim

In his thirteenth claim in his original petition, Petitioner argues the state trial court erred in admitting the videotape showing Mrs. Liveoak's body inside the trunk of her car, as well as photographs showing the same (Doc. # 1, at pp. 71-73). Petitioner also complains about the admission of photographs showing Mrs. Liveoak's personal items, *i.e.*, an earring, a day planner, and groceries found inside the passenger compartment and the trunk of her vehicle.

The state trial court admitted without objection numerous photographs of the interior of Mrs. Liveoak's vehicle, the interior of her trunk, and Mrs. Liveoak's body

as it appeared upon its discovery in the trunk of her car.[95]  The trial court also

admitted without objection a videotape recording of the same scenes.[96]  Finally, the

state trial court admitted without objection several photographs taken during the

course of Mrs. Liveoak's autopsy which showed bruises and scratches on her hands,

right knee, and upper right arm.[97]

## B.  The Constitutional Standard

The same legal principles discussed in Section VI.B. apply to this claim.

## C.  *De Novo* Review

Petitioner argues the photographs and video in question are inherently

prejudicial:

> Both the pictures and the video also depicted close up shots of
> items completely irrelevant to the issue of guilt, engineered solely to
> bring the victim to life for the jury, to make the jurors imagine the life
> she would have led had she lived.  The pictures showed her eyeglasses,
> emphasizing for the jury her age and evoking an image of frailty; her

---

[95] 6 SCR at pp. R-590-91.  The photographs of Mrs. Liveoak's body, marked as State Exhibits 9-15, showed Mrs. Liveoak's body lying on her back with her legs bent at the knees and a portion of her stomach exposed.  Her shoes had been removed but, otherwise, her body was fully clothed.  These photographs show bruising on the back of her right hand and right knee and scratches on both her hands but do not contain any graphic images of open wounds or viscera.

The photographs of Mrs. Liveoak's vehicle and its contents, *i.e.*, State Exhibits 1-8, appear at 2 SCR at pp. 389-400 & 3 SCR at pp. 401-04.  There are no graphic images in any of these photographs.  There was nothing even remotely inflammatory about any of the photographs admitted during Petitioner's trial.

[96] 6 SCR at pp. R-590-91.

[97] 7 SCR at pp. R-619-23.  The autopsy photographs, admitted as State Exhibits 29-33, appear at 3 SCR at pp. 438-47.  The autopsy photographs likewise do not contain any graphic images or depictions of wounds or viscera.

106

earring, which had come out or was taken out of her ear, implying some
sort of struggle despite the testimony to the contrary; her daily planner,
emphasizing for the jury that she had a life, she had plans on which she
would now not be able to follow through, a package of brownie mix,
meant to evoke her son's testimony that she was going to bake for a
sick friend that day; and finally, some yarn, creating the image of Mrs.
Liveoak as a kindly grandmother.

(Doc. # 1, at pp. 71-72).

Contrary to Petitioner's assertions, however, there was nothing the least bit

graphic, gruesome, lurid, or inflammatory about any of the photographic evidence

admitted during Petitioner's trial.  The only injuries apparent on Mrs. Liveoak's

body in the photographs showing her lying in her automobile trunk or at autopsy

showed bruising and scratches to her hands.  None of the photographs admitted

showed Mrs. Liveoak's body nude, any exposed viscera, or the interior of any

portion of her body.  The photographs were necessary to demonstrate to the jury the

extent of the victim's injuries and admissible under state evidentiary standards.  *See,*

*e.g., Smith v. State*, ___ So. 3d ___, ___, 2017 WL 1033665, *20 (Ala. Crim. App.

2017) (holding photographs which were not unduly gruesome or unfairly prejudicial

admissible to distinguish between victim's injuries and postmortem animal and

insect activity); *Gobble v. State*, 104 So. 3d 920, 963-64 (Ala. Crim. App. 2010)

("Autopsy photographs depicting the character and location of the wounds on the

victim's body are admissible even if they are gruesome, cumulative, or relate to an

undisputed matter."), *cert. denied* (Ala. Sept. 14, 2012), *cert. denied*, 133 S. Ct. 1808

(2013).  The state trial court's admission without objection of all the photographic

evidence and videotape recordings showing the location and physical appearance of Mrs. Liveoak's body, her injuries, her vehicle, and her other possessions did not render Petitioner's capital murder trial fundamentally unfair.

Petitioner did not object to the admission of any of the photographic or videotaped evidence in question.  The photographs were admissible and relevant to show (1) the isolated location in which her vehicle was abandoned by Petitioner, (2) the condition of her lifeless body when discovered (which contradicted some of the more self-serving aspects of Petitioner's post-arrest statement to police, *i.e.*, the medical examiner testified the bruising to her upper right arm was consistent with someone having grabbed her right arm with considerable force, refuting Petitioner's assertion that he never employed any force against Mrs. Liveoak), and (3) that Mrs. Liveoak had been the victim of a robbery and kidnaping in a manner consistent with Petitioner's statement that he abducted her after she exited a grocery store and took her credit cards, bank card, and wallet (*i.e.*, the items found inside her vehicle and trunk did not include her wallet, bank card, or credit cards but did include a grocery receipt and perishable groceries).

Contrary to the arguments underlying Petitioner's thirteenth claim, Petitioner was not entitled to have the trial court *sua sponte* exclude any and all visual evidence which either tended to show Mrs. Liveoak had once been alive or portrayed her in a sympathetic light.  Even the admission of graphic photographic evidence rarely

renders a proceeding fundamentally unfair. *Baxter v. Thomas*, 45 F.3d at 1509; *Jacobs v. Singletary*, 952 F.2d 1282, 1296 (11th Cir. 1992). Petitioner confessed to abducting and robbing Mrs. Liveoak and locking her in the trunk of her car, which he admitted he abandoned in an isolated unshaded location on an asphalt parking lot in the middle of July in central Alabama. The admission of photographs and video showing the condition in which her lifeless body was discovered the day after Petitioner abandoned Mrs. Liveoak did not render Petitioner's trial fundamentally unfair. The photographic and videotaped evidence in question was not a crucial, critical, or highly significant factor to the jury's verdict at either phase of Petitioner's capital murder trial. Petitioner's thirteenth claim does not warrant federal habeas corpus relief under a *de novo* standard of review.

## IX. <u>VICTIM IMPACT EVIDENCE</u>

### A. The Claim(s)

In his tenth claim in his original petition, Petitioner argues the state trial judge improperly considered a letter from Mrs. Liveoak's daughter in which she pleaded with the court to impose a sentence of death (Doc. #1, at p. 66). Petitioner's brief on the merits furnished no argument or legal authorities in support of this claim (Doc. # 88). Despite that fact, the parties state in their Joint Report that there are two claims before the court addressing victim impact issues, *i.e.*, Petitioner's complaint about the alleged consideration of Mrs. Liveoak's daughter's letter and a complaint

about the admission at the punishment phase of trial of the testimony of Mrs. Liveoak's son, Larry Liveoak (Doc. # 56, at pp. 47-50).

## B.  State Court Disposition

In his appellant's brief, Petitioner argued the state trial court (1) erred in admitting victim impact testimony from Mrs. Liveoak's son and (2) improperly considered a letter written by Mrs. Liveoak's daughter asking the trial court to impose a sentence of death.[98]  On direct appeal, the Alabama Court of Criminal Appeals held (1) Larry Liveoak's victim impact testimony at the punishment phase of Petitioner's capital murder trial was relevant to the jury's decision whether to recommend that the death penalty be imposed, and (2) there was no indication the trial court considered the letter written by Mrs. Liveoak's daughter, which was received by the trial court approximately two weeks *after* the court entered its sentencing order.  *Dallas v. State*, 711 So. 2d at 1110.  Petitioner failed to present any claims regarding victim impact evidence in his pro se state habeas corpus petition (*i.e.*, his Rule 32 petition).

## C.  AEDPA Standard of Review

Because petitioner filed his federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

---

[98] 10 SCR Tab 2, at pp. 48-51.

this Court's review of those petitioner's claims for federal habeas corpus relief which were disposed of on the merits by the state courts is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d) (1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of

facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d) (1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court

believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

> As the Supreme Court has explained:

> Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, 132 S. Ct. 26, 27 (2011) (quoting *Harrington v. Richter,* 562 U.S. 86, 103 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Under the AEDPA, what constitutes "clearly established federal law" is determined through review of the decisions of the United States Supreme Court, not the precedent of the federal Circuit Courts. *See Lopez v. Smith*, 135 S. Ct. 1, 2 (2014) (holding the AEDPA

113

prohibits the federal courts of appeals from relying on their own precedent to conclude a particular constitutional principle is "clearly established").

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. 28 U.S.C. § 2254(d)(2) provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual

findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).  It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2).  *See Wood v. Allen*, 558 U.S. at 300 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

**D.  Clearly Established Federal Law**

In *Payne v. Tennessee*, 501 U.S. 808, 825-26 (1991), the Supreme Court held that (1) the admission of evidence of *the impact of a capital murder on the victim and his or her survivors* and (2) prosecutorial jury argument regarding same, are both constitutionally permissible at the punishment phase of a capital murder trial.

**E.  AEDPA Review**

The Alabama Court of Criminal Appeals' rejections on the merits during Petitioner's direct appeal of Petitioner's complaints about (1) the admission of Larry Liveoak's victim impact testimony at the punishment phase of petitioner's capital murder trial and (2) the state trial court's alleged consideration of the letter written by Mrs. Liveoak's daughter were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Larry Liveoak's testimony at the punishment phase of Petitioner's capital murder trial consisted of statements focused on the impact of Mrs. Liveoak's death upon himself and his family.  As such, the state appellate court reasonably concluded Larry Liveoak's punishment phase trial testimony was constitutionally permissible under the Supreme Court's holding in *Payne v. Tennessee*.

The state appellate court found, as a matter of fact, that the state trial court did not receive the objectionable letter from Mrs. Liveoak's daughter until approximately two weeks after it issued its sentencing order. Petitioner has alleged no specific facts, much less furnished clear and convincing evidence, showing the state trial court received the letter from Mrs. Liveoak's daughter prior to the date it issued its sentencing order. Under such circumstances, this court must defer to the state appellate court's factual finding. *Schriro v. Landrigan*, 550 U.S. at 473-74; *Rice v. Collins*, 546 U.S. at 338-39. Petitioner has failed to rebut the correctness of the state appellate court's factual finding. Petitioner's tenth claim does not warrant federal habeas corpus relief when viewed under the deferential standard of the AEDPA.

## F.  *De Novo* **Review**

Additionally, this court has conducted an independent review of Petitioner's complaints about the admission of Larry Liveoak's punishment phase trial testimony and the state trial court's alleged consideration of the letter written by Mrs. Liveoak's daughter. It concludes that neither complaint warrants federal habeas corpus relief relief under a *de novo* standard of review. Mr. Liveoak's punishment phase trial testimony was admissible under the standard announced in *Payne*. The admission of his punishment phase testimony did not render Petitioner's trial fundamentally unfair. There is no fact-specific allegation before the court, much less any clear and

convincing evidence, showing the state trial court ever received the letter from Mrs. Liveoak's daughter prior to the date it issued its sentencing order.

## X.  ALLEGEDLY FALSE TESTIMONY BY VENIRE MEMBERS

### A.  The Claim

In his fifteenth claim in his original petition, Petitioner argues he was denied his right to exercise his peremptory challenges in an intelligent manner when "several jurors failed to disclose crucial evidence despite direct and unambiguous questioning by the court" (Doc. # 1, at pp. 74-76).[99]

Petitioner included a similar set of complaints in his *pro se* state habeas corpus petition (*i.e.*, his Rule 32 petition).[100]   The state habeas trial court summarily dismissed this claim.[101]   Petitioner's brief in support of his federal habeas corpus

---

[99] More specifically, Petitioner alleges that (1) a venire member identified only as "A.B." "failed to reveal during voir dire examination that his brother had a severe crack addiction" and (2) another venire member identified only as "J.C." "failed to reveal that he had testified as a witness in more than one civil trial prior to being called for jury service" (Doc. # 1, at p. 75).

[100] 12 SCR (Revised) Tab 13-A, at pp. 99-102.  Petitioner cited to only state law authorities in support of his analogous claim in his state habeas corpus proceeding.

[101] The state trial court's Order issued September 25, 2001, states that the trial court dismissed Petitioner's claim identified in Petitioner's *pro se* state habeas corpus petition as claims "II.B. through II.K." because those claims were procedurally defaulted from review under Rule 32.  13 SCR (Revised) Tab 14-A, at p. 45.  Petitioner's complaint about allegedly false testimony by jury venire members was labeled claim "K" in his *pro se* state habeas corpus petition.  12 SCR (Revised) Tab 13-A, at pp. 99-102.  The state trial court's Order issued October 25, 1999, summarily dismissed several of Petitioner's pro se claims without prejudice based on inadequate pleading and explained that Petitioner's assertions of jury misconduct failed to allege any newly discovered evidence sufficient to satisfy Rule 32.  15 SCR Tab 35, at p. 13.  There is no evidence before this court establishing that Petitioner ever amended his *pro se* Rule 32 petition or otherwise

petition repeats the same conclusory assertions about the two unidentified venire members included in Petitioner's *pro se* state habeas corpus petition and Petitioner's original federal habeas corpus petition (Doc. # 88, at pp. 205-08).[102]

## B.  The Constitutional Standard

The only legal authorities presented by Petitioner in support of his analogous claim for state habeas corpus relief were state court authorities interpreting state law.[103]   Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *Estelle v. McGuire*, 502 U.S. at 67-68; *Lewis v. Jeffers*, 497 U.S. at 780; *Pulley v. Harris*, 465 U.S. at 41.

The only federal authorities germane to Petitioner's fifteenth claim cited in Petitioner's original petition or brief on the merits are the Supreme Court's holdings

---

furnished the state habeas court with any specific facts or evidence indicating any member of Petitioner's jury venire testified falsely during voir dire examination.

[102] Only one member of the jury venire who reached the group and individual voir dire stage had the initials "A.B.", *i.e.*, venire member 25.  Two members of the jury venire had the initials "J.C.", *i.e.*, venire members 84 and 88.  Petitioner does not offer any information from which this court can identify which of these two venire members Petitioner claims failed to raise his or her hand when the state trial judge asked the assembled jury venire members the following question: "Have any of you ever testified in a criminal trial or a civil trial or before the Grand Jury?  Have you ever testified as any kind of witness before a jury in a criminal civil trial or to the Grand Jury?" 4 SCR at p. R-102.  In response to the trial judge's questions about service as a trial witness or Grand Jury witness, venire members 16, 129, 10, 55, 13, 58, 120, and 35 all indicated on the record they had testified in various judicial proceedings.  4 SCR at pp. R-102-04.  None of those venire members had the initial "J.C."

[103] 12 SCR (Revised) Tab 13-A. at pp. 99-02.

in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), and

*Williams v. Taylor*, 529 U.S. 420 (2000).   The holdings in both cases will be

examined in detail.

In *McDonough*, the federal trial court asked potential jurors in a products

liability lawsuit whether any of them or their family had sustained any severe injury

in an accident that resulted in any disability or prolonged pain and suffering.[104]  One

venire member who eventually became a juror did not respond to this question,

which was addressed to the panel as a whole.  After the trial concluded and the jury

returned a verdict in favor of the plaintiffs, the defendant manufacturer filed a motion

for permission to approach members of the jury, alleging "upon information and

belief" that this juror's son may have been injured at one time, a fact which was not

revealed during voir dire.  After the District Court denied its initial motion, the

defendant manufacturer filed a second motion and attached an affidavit from the

father of the primary plaintiff who stated that, in the course of his duties as a Navy

---

[104] More specifically, the federal District Court asked the jury venire the following question:
"Now, how many of you have yourself or any members of your immediate family
sustained any severe injury, not necessarily as severe as Billy, but sustained any
injuries whether it was an accident at home, or on the farm or at work that resulted
in any disability or prolonged pain and suffering, that is you or any members of
your immediate family?"
*McDonough*, 464 U.S. at 550.
The Supreme Court assumed the venire member in question had not considered his son's
broken leg to have been sufficiently serious to require an affirmative answer to this question.
*McDonough*, 464 U.S. at 555.

recruiter, he had reviewed the enlistment application of the juror's son and that the applicant stated he had been injured in the explosion of a truck tire.  The District Court granted the motion for permission to approach the juror to inquire about the injuries allegedly sustained by his son.  The defendant moved for a new trial, citing, among other reasons, the District Court's initial denial of its motion to approach the juror.  The District Court denied the motion for new trial.  On appeal, the Tenth Circuit held the issue of the juror's good faith was irrelevant and reversed.  It ordered a new trial.  The Supreme Court noted that "jurors are not necessarily experts in English usage" and held "[t]o invalidate the result of a three-week trial because of a juror's mistaken though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give."  *McDonough*, 464 U.S. at 555.  The Supreme Court concluded it was error for the Tenth Circuit to reverse without first permitting an inquiry by the District Court into harmless error and set forth the following standard for obtaining a new trial premised upon a venire member's failure to reveal information: "We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and *then further show that a correct response would have provided a valid basis for a challenge for cause*."  *McDonough*, 464 U.S. at 556 (Emphasis added)

In *Williams v. Taylor*, a state prisoner convicted of capital murder and sentenced to death challenged his conviction based, in part, on allegations of jury bias and prosecutorial misconduct, arising from a venire member's failure to respond to questions asking whether the venire members were related to people likely to be called to testify at trial or had ever been represented by any of the attorneys involved in the case.   More specifically, the petitioner alleged, and *presented the federal District Court with affidavits* establishing the venire member who eventually served as the jury foreperson was the ex-spouse of the prosecution's lead-off witness and a former client of one of the prosecutors.[105]   The Supreme Court held the petitioner

---

[105] The Supreme Court's opinion describes the operative facts as follows:

Petitioner's claims are based on two of the questions posed to jurors by the trial judge at *voir dire*.  First, the judge asked prospective jurors, "Are any of you related to the following people who may be called as witnesses?  Then he read the jurors a list of names, one of which was "Deputy Sheriff Claude Meinhard." Bonnie Stinnett, who would later become the jury foreperson, had divorced Meinhard in 1979, after a 17-year marriage with four children.  Stinnett remained silent, indicating the answer was "no."  Meinhard, as the officer who investigated the crime scene and interrogated Cruse, would later become the prosecution's lead-off witness at trial.

After reading the names of the attorneys involved in the case, including one of the prosecutors, Robert Woodson, Jr., the judge asked, "Have you or any member of your immediate family ever been represented by any of the aforementioned attorneys?"  Stinnett again said nothing despite the fact Woodson had represented her during her divorce from Meinhard.  App. 483, 485.

In an affidavit she provided in the federal habeas proceedings, Stinnett claimed '[she] did not respond to the judge's [first] question because [she] did not consider [herself] 'related' to Claude Meinhard in 1994 [at *voir dire*] . . . .  Once our marriage ended in 1979, I was no longer related to him."  *Id.*, at 627.  As for Woodson's earlier representation of her, Stinnett explained as follows:

"When Claude and I divorced in 1979, the divorce was uncontested and Mr. Woodson drew up the papers so that the divorce could be completed.  Since neither Claude nor I was

had presented sufficient evidence to warrant an evidentiary hearing in the District Court on the issues of whether the juror in question was biased and whether the prosecution's silence "so infected the trial as to deny due process." *Williams v. Taylor*, 529 U.S. at 441-42. The Supreme Court emphasized the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias. *Id.*, 529 U.S. at 444.

## C. *De Novo* Review

Unlike the party seeking a new trial in *McDonough* and the federal habeas petition in *Williams v. Taylor*, Petitioner did not support his conclusory assertions before the state habeas court with any fact-specific allegations, affidavits, or other evidence showing any of the members of his jury venire actually testified falsely during individual voir dire examination. Petitioner likewise fails to allege any specific facts before this court, much less furnish any affidavits based upon personal knowledge or other evidence, showing any of the jury venire members whom he

---

contesting anything, I didn't think Mr. Woodson 'represented' either one of us." *Id.*, at 628.

Woodson provided an affidavit in which he admitted "[he] was aware that Juror Bonnie Stinnett was the ex-wife of then Deputy Sheriff Meinhard and [he] was aware that they had been divorced for some time." *Id.*, at 629. Woodson stated, however, "[t]o [his] mind, people who are related only by marriage are no longer 'related' once marriage ends in divorce." *Ibid.* Woodson also 'had no recollection of having been involved as a private attorney in the divorce proceedings between Claude Meinhard and Bonnie Stinnett." *Id.*, at 629-630. He explained that "[w]hatever [his] involvement was in the 1979 divorce, by the time of trial in 1994 [he] had completely forgotten about it." *Id.*, at 630.
*Williams v. Taylor*, 529 U.S. at 440-41.

alleges failed to accurately respond to the trial judge's questions directed to the assembled venire members actually failed to raise their hand when asked pertinent questions. Instead, with regard to the first of these venire members, Petitioner points to a series of questions the state trial court directed to the jury venire as a group and alleges, without any explanation, that venire member "A.B." failed to disclose he had a brother with a crack addiction. Petitioner offers no explanation for how he or his federal habeas counsel acquired personal knowledge of the fact that venire member A.B.'s brother was addicted to crack cocaine as of the date of Petitioner's 1995 capital murder trial. Nor does Petitioner or his federal habeas counsel allege any specific facts showing either of them has ever possessed personal knowledge of any facts showing either (1) venire member "A.B." was personally aware at the time of Petitioner's 1995 trial that venire "A.B." had a brother with a crack addiction, (2) venire member "A.B." understood the judge's series of ambiguous questions during group voir dire as asking whether he had a relative who had experienced a drug problem, or (3) the factual or evidentiary basis for Petitioner's assertion that venire member "A.B." had a brother who was addicted to crack cocaine in 1995.

The parties in *McDonough* and *Williams v. Taylor,* who sought new trials based upon allegations that venire members failed to respond truthfully to questions during voir dire, furnished the responsible reviewing courts with affidavits from the venire members in question. Petitioner did not present the state habeas court, and

does not present this court, with any affidavits from individuals possessing personal knowledge of relevant facts showing that either (1) venire member "A.B." actually had a brother who was addicted to crack cocaine at the time of Petitioner's 1995 capital murder trial or (2) venire member "J.C." testified as a witness in multiple civil trials prior to being called to serve on Petitioner's jury.  Moreover, Petitioner's conclusory assertions of concealed information by these poorly identified venire members fail to satisfy the standard set forth in *McDonough* for obtaining a new trial, *i.e.*, a showing not only that a juror failed to answer a material question on voir dire but that a correct response would have provided a valid basis for a challenge for cause.  *McDonough*, 464 U.S. at 556.  Neither the fact that a venire member had a relative with a crack addiction nor the fact that a venire member had previously testified in multiple civil proceedings would, standing alone, have justified a valid challenge for cause.  Because Petitioner has failed to furnish any fact-specific allegations or any affidavits supporting his conclusory assertions of juror bias, he is not entitled to an evidentiary hearing under the standard set forth in *Williams v. Taylor*.[106]

---

[106] Moreover, Petitioner's conclusory assertion that, if his trial counsel had known that venire member "J.C." had previously testified multiple times in judicial proceedings, Petitioner's defense team would have questioned "J.C." about same is not supported by this court's independent review of the record from the voir dire examination of Petitioner's venire members. As explained above in note 102, *supra*, eight members of Petitioner's jury venire responded affirmatively when asked by the trial judge whether they had ever testified in a judicial proceeding. 4 SCR at pp. R-102-04. Petitioner did not ask seven of those eight venire members any questions about their prior service as witnesses in judicial proceedings.  See 4 SCR at pp. R-128-36 (voir

Petitioner also complains that he was not able to intelligently exercise his peremptory challenges because of the failure of the poorly identified venire members to answer the questions at issue in the manner Petitioner now claims they should. There is, however, no federal constitutional right to the exercise of peremptory challenges. *See Georgia v. McCollum*, 505 U.S. 42, 57 (1992) (holding peremptory challenges are not constitutionally protected rights but, rather, one means to achieve a constitutionally required impartial jury and a prohibition on the use of peremptory challenges does not impair the constitutional guarantee of an impartial jury and fair trial). Petitioner's fifteenth claim does not warrant federal habeas corpus relief under a *de novo* standard of review.

---

dire examination of venire member 10); 4 S CR at pp. R-136-42 (voir dire examination of venire member 13); 4 S CR at pp. R-142-48 (voir dire examination of venire member 16); 5 SCR at pp. 212-18 (voir dire examination of venire member 35); 5 SCR at pp. R-241-49 (voir dire examination of venire member 55); 5 SCR at pp. R-249-55 (voir dire examination of venire member 58); 6 SCR at pp. R-452-62 (voir dire examination of venire member 13). The trial court sustained the prosecution's challenge for cause to venire member 129. 6 SCR at pp. R-461-62. The only venire member whom Petitioner's trial counsel did ask any questions regarding his or her prior service as a witness in a judicial proceeding was venire member 120. *See* 6 SCR at pp. R-435-36 (voir dire examination of venire member 120). Petitioner's trial counsel exercised a peremptory strike against venire member 120. 6 SCR at p. R-469. While Petitioner has alleged all manner of complaints about the performance of his trial counsel in both his *pro se* state habeas corpus petition and his federal habeas corpus petition, at no point has Petitioner complained about the failure of his trial counsel to question any of the members of his jury venire about their service as witnesses in prior judicial proceedings. Nor does Petitioner claim that his trial counsel should have exercised a peremptory strike against any other members of the jury venire who had testified previously in a judicial proceeding. Nor does Petitioner allege any specific facts showing that prior service as a witness in a judicial proceeding by venire member "J.C." furnished a legitimate basis for a viable challenge for cause.

# XI. *BRADY* CLAIMS

## A. The Claims

In his eleventh claim in his original petition, Petitioner argues the prosecution failed to disclose to the defense in conformity with the requirements of the Supreme Court's holding in *Brady v. Maryland* (1) "the records of any conversations or interviews that occurred between state witness Tony Bowen and either the police, the prosecution or his probation officer after his initial statement given on July 14, 1994," (2) "any information regarding Mr. Bowen's probation status or prior convictions," and (3) information showing that during his post-arrest interrogation, Petitioner initially denied placing Mrs. Liveoak in the trunk (Doc. # 1, at pp. 66-69; Doc. # 88, at pp. 191-96).

Petitioner presented the same basic complaints in his state habeas corpus petition, *i.e.*, his Rule 32 petition.[107]   The state habeas trial court summarily dismissed this claim, along with several others, as procedurally defaulted.[108]

---

[107] 12 SCR (Revised) Tab 13-A, at pp. 79-84.

[108] 13 SCR (Revised), Tab 14-A, at p. 45.  Petitioner's *Brady* claim was labeled claim "D" in his *pro se* state habeas corpus petition.  12 SCR (Revised) Tab 13-A, at pp. 79-84.  The state trial court's Order issued October 25, 1999 summarily dismissed several of Petitioner's *pro se* claims without prejudice based on inadequate pleading and explained that Petitioner's *Brady* claim had been rejected in part on direct appeal and the remainder of this claim "is such that it cannot constitute 'newly discovered evidence'" and, therefore, was barred from state habeas review under Rule 32.2(a)(5) of the Alabama Rules of Criminal Procedure.  15 SCR Tab 35, at p. 9.

**B. The Constitutional Standard**

"'[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, *i.e.*, the rule announced in *Brady v. Maryland*, applies even when there has been no request by the accused. *Banks v. Dretke*, 540 U.S. at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976).   This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676 & 685, (1985).

The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor.  *Strickler v. Greene*, 527 U.S. at 280-81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).   "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. at 281; *Kyles v. Whitley*, 514 U.S. at 437.

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because

128

it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," *i.e.*, prejudice must have ensued from its non-disclosure. *Banks v. Dretke*, 540 U.S. at 691; *Strickler v. Greene*, 527 U.S. at 281-82.   Evidence is "material" under *Brady* where there exists a "reasonable probability" that, had the evidence been disclosed, the result at trial would have been different. *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *Banks v. Dretke*, 540 U.S. at 698-99.   A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith v. Cain*, 565 U.S. at 75; *Kyles v. Whitley*, 514 U.S. at 434.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry.   First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley*, 473 U.S. at 682 (expressly adopting the "prejudice" prong of the *Strickland v. Washington*, 466 U.S. 668 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*).   Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles v. Whitley*, 514 U.S. at 434-35.   Third, once

materiality is established, harmless error analysis has no application. *Kyles v. Whitley*, 514 U.S. at 435-36.  Finally, materiality must be assessed collectively, not item by item.  *Kyles v. Whitley*, 514 U.S. at 436-37.

## C. *De Novo* Review

The burden to establish a *Brady* violation lies with the defendant, not the government.  *United States v. Stein*, 846 F.3d 1134, 1145 (11th Cir. 2017); *United States v. Esquenazi*, 752 F.3d 912, 933 (11th Cir.), *cert. denied*, 135 S. Ct. 293 (2014).  "A prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a *Brady* request for information regarding a government witness."  *United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011).

### 1. Petitioner's Oral, Unrecorded, Post-Arrest Statements to Police

Insofar as Petitioner complains that the prosecution failed to disclose information to the defense team which Petitioner himself disclosed to police during his post-arrest interrogation (*i.e.,* the fact Petitioner initially asserted that he had nothing to do with Mrs. Liveoak's murder before he ultimately gave his detailed videotaped confession to placing her in the trunk of her vehicle and then abandoning her vehicle in the K-Mart parking lot with her still locked in the trunk on a July

afternoon), his claim borders on sophistry.[109]  A criminal defendant who deliberately

conceals from his own defense counsel information he previously disclosed to law

enforcement officers during a post-arrest interrogation cannot later complain that the

prosecution failed to disclose the same information to defense counsel pursuant to

the prosecution's obligations under *Brady*.  *See Wright v. Sec'y, Fla. Dept. of Corr.*,

761 F.3d 1256, 1278 (11th Cir. 2014) (holding a defendant cannot meet the second

prong of the *Brady* analysis, *i.e.,* the suppression requirement, when prior to trial he

had within his knowledge the information by which he could have ascertained the

alleged *Brady* material), *cert. denied*, 135 S. Ct. 2380 (2015); *Maharaj v. Sec'y for

the Dept. of Corr.*, 432 F.3d 1292, 1315 & n.4 (11th Cir. 2005) (holding the same),

*cert. denied sub nom. Maharaj v. McDonough*,  549 U.S. 819 (2006).  By definition,

factual information that is personally known to the defendant cannot be "suppressed"

or "withheld" by the prosecution from the defense.  *See Wright v. Sec'y, Fla. Dept.

of Corr.*, 761 F.3d at 1280 (holding a defendant cannot prevail on a *Brady claim*

when he had "equal access" to the information forming the basis of the claim).  The

defendant is as much a part of the defense team at trial for *Brady* purposes as law

---

[109] At the guilt-innocence phase of Petitioner's capital murder trial, a Montgomery Police detective testified that, during Petitioner's interview, Petitioner (1) initially claimed that he found a red car in a parking lot in Prattville with the keys and food inside and that he drove it to the K-Mart in Montgomery before he opened the trunk and discovered Mrs. Liveoak's body but (2) later told a very different story, admitting he grabbed an old woman in a parking lot as she entered her car and drove her to Greenville as she kicked and hollered at him.  7 SCR at pp. R-641, R-645-47 (testimony of Steve Saint).

enforcement officers are part of the prosecution effort.  There is no allegation that Petitioner was mentally incompetent at the time of trial or at any point prior thereto or that Petitioner was unable to communicate to his defense team the same information he communicated to law enforcement officers during his post-arrest interrogation.

2.  Bowen's Post-July 14, 1994 Communications with Police and Others

Despite the passage of more than two decades since his conviction, Petitioner has never presented any court – state or federal – with evidence showing that any transcript, recording, notes, or other document existed at the time of his 1995 capital murder trial memorializing any post-July 14, 1994 communication between prosecution witness Dennis Anthony Bowen and any law enforcement officer or prosecutor that was not made available for inspection by Petitioner's defense team.[110]  Petitioner's rank speculation that such documentation may have

---

[110] It is undisputed that Bowen's formal statement to police regarding Petitioner's murder of Mrs. Liveoak was made available to Petitioner's trial counsel.  Petitioner's trial counsel cross-examined Bowen specifically on several discrepancies between Bowen's transcribed statement to police and Bowen's testimony on direct examination, including the fact that Bowen's statement did not include a recitation of Petitioner's statement that he wished or hoped "the old lady would die."  See 7 SCR at pp. R-675-98 (cross-examination of Dennis Anthony Bowen).  A copy of Bowen's unsigned statement to police appears at Doc. # 137-1, at pp. 32-47.  Bowen's "statement" is actually a verbatim transcription of the questions by Detectives Saint and Baldwin and Bowen's answers during his interview on July 14, 1994.

The practical problem with Petitioner's trial counsel's efforts to employ this statement to impeach Bowen's testimony on direct examination is that neither detective ever directly asked Bowen any question that would rationally have elicited a response from Bowen repeating Petitioner's alleged statement that he hoped or wished "the old lady died."  Simply put, Bowen was not asked anything during his July 14, 1994 interview which, in hindsight, might reasonably have compelled Bowen to restate Petitioner's alleged comment about hoping or wishing "the old

existed is unsubstantiated by any fact-specific allegations, much less an affidavit based upon personal knowledge. Petitioner's naked conjecture that some documentation existed at the time of his 1995 capital murder trial describing communications between Bowen and prosecutors or law enforcement officials is unsupported in the federal habeas record. The prosecution could not have suppressed documents that did not exist at the time of Petitioner's capital murder trial. Petitioner's conjecture that records or other documentation of Bowen's post-July 14, 1994 communications with law enforcement personnel existed at the time of Petitioner's 1995 capital murder trial is not a substitute for evidence. *See Zen Magnets, LLC, v. Consumer Product Safety Comm'n*, 841 F.3d 1141, 1152 (10th Cir. 2016) ("Conjecture is not a substitute for substantial evidence." (*quoting Vera-Villegas v. I.N.S.*, 330 F.3d 1222, 1231 (9th Cir. 2003)). *Cf. Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) ("Inferences based on speculation and a 'mere scintilla of evidence in support of the nomoving party will not suffice to overcome a motion for summary judgment.'"); *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) ("Speculation is no substitute for evidence at the summary judgment stage." (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014)); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1175 (9th

---

lady died." In fact, Bowen's statement to police suggests that most of his conversation on the evening in question about the woman who had been locked in her trunk were with Chester Foley and Carolyn Yaw, as opposed to Petitioner.

Cir. 2016) ("anecdotal speculation and supposition are not a substitute for evidence"); *Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 583 (6th Cir. 2016) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence . . . ."); *Graces v. U.S. Atty. Gen.*, 611 F.3d 1337, 1348 n.10 (11th Cir. 2010) (speculation about why a defendant entered into a plea agreement is not reasonable, substantial, and probative evidence); *Rodriguez v. Farrell*, 280 F.3d 1341, 1352 n.20 (11th Cir. 2002) ("An inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation."), *cert. denied*, 538 U.S. 906 (2003).  Petitioner has presented this court with no fact-specific allegations, much less any evidence, showing any undisclosed documentation of Bowen's post-July 14, 1994 communications with police, prosecutors, or other law enforcement officers existed as of Petitioner's 1995 capital murder trial.  Thus, this conclusory complaint fails to satisfy the materiality prong of *Brady* analysis.

  3.  Bowen's Probation and Conviction Records

  Petitioner and his trial counsel were well aware at the time of Petitioner's capital murder trial that Bowen had been arrested along with Petitioner and Yaw in connection with an attempted robbery at the Wal-Mart in Prattville, which took place

a day or two after Mrs. Liveoak's abduction.[111]  Petitioner's trial counsel cross-examined Bowen on this very point, as well as the rest of Bowen's criminal record and the fact Bowen had not disclosed Petitioner's statement that he hoped or wished "the old lady died" to anyone prior to Petitioner's trial.[112]  Even a cursory review of the record from Bowen's cross-examination at Petitioner's capital murder trial refutes Petitioner's assertion in his federal habeas corpus petition that the prosecution withheld from the defense information regarding Bowen's probation status and prior convictions.[113]  Petitioner's trial counsel obtained admissions on cross-examination that Bowen (1) had been convicted of theft in October, 1994

---

[111] Petitioner was physically present at the Prattville Wal-Mart at the time of the incident which later gave rise to Bowen's arrest and conviction for theft.  In fact, in his post-arrest statement to police, Petitioner discussed the incident in which he attempted to steal a television from the Wal-Mart and placed the stolen television in the back of a pickup truck driven by Bowen.  3 SCR at pp. 467-68.  Insofar as Petitioner claims his defense team was not furnished with the details of that incident, his *Brady* claim fails for the same reason his complaint about the alleged non-disclosure of his own, unrecorded, post-arrest assertions of innocence to police fail to satisfy the suppression prong of *Brady* analysis.  The prosecution cannot suppress or withhold information already in the personal knowledge of the defendant himself which the defendant communicated to law enforcement officials.

[112] 7 SCR at pp. R-693-98.  More specifically, Bowen admitted on cross-examination that (1) he pleaded guilty on October 25, 1994, to a charge of theft in the second degree in Autauga County, (2) he had initially been charged with the higher offense of robbery in the second degree, (3) he had engaged in other criminal activity prior to that offense, (4) he went to jail in November, 1994 because he wanted to get off drugs and to get into a drug program, (5) he then had a pending charge against him for violating his probation, (6) a warrant for his arrest based upon his probation violation had been issued in September of 1995, and (7) Petitioner's trial was the first time he had ever told anyone in Montgomery about Petitioner saying that he hoped or wished the old lady died.  *Id.*

[113] *Id.*

arising from an incident at the Prattville Wal-Mart, (2) had gone to jail in November, 1994, (3) had engaged in other criminal activity prior to his theft conviction, and (4) was then facing the possibly imminent revocation of his probated sentence.[114]

Petitioner does not explain how any additional documentation then-available concerning Bowen's probation status or prior criminal record could have been used to impeach Bowen further when he testified at Petitioner's capital murder trial in a manner reasonably likely to have resulted in a different outcome for either phase of Petitioner's capital murder trial. Petitioner admitted during his trial testimony he (1) locked Mrs. Liveoak - an elderly women with a known heart condition - in the trunk of her car on a July afternoon in Alabama, (2) drove her vehicle back to south Montgomery, (3) abandoned her vehicle with her still locked in the trunk on a parking lot in a location that the undisputed evidence showed was bereft of shade and at least fifty yards from any other structure, (4) repeatedly informed Mrs. Liveoak he would contact someone to come and rescue her, but (5) made no effort to call anyone to rescue her. When asked by his own trial counsel why he failed to notify someone of Mrs. Liveoak's location, Petitioner gave a rambling, largely unresponsive answer, which included no rational explanation for his failure to send help to Mrs. Liveoak.[115]   When asked repeatedly by the prosecutor on cross-

---

[114] *Id.*

[115] 8 SCR at pp. R-801-03 (testimony of Donald Dallas).  In another rambling answer to one of his trial counsel's questions, Petitioner stated that he made an unsuccessful attempt to return

examination why he failed to send help to Mrs. Liveoak, Petitioner again furnished no rational explanation.[116]   Under such circumstances, there is no reasonable probability that, but for the provision of additional documents to defense counsel regarding prosecution witness Bowen's probation status or criminal record, the outcome of either phase of Petitioner's capital murder trial would have been any different.   Thus, this complaint fails to satisfy the materiality prong of *Brady* analysis.   Petitioner's multi-faceted eleventh claim does not warrant federal habeas corpus relief under a *de novo* standard of review.

## XII.  <u>CONCLUSORY CLAIMS OF PROSECUTORIAL MISCONDUCT</u>

### A.  The Claims

In his ninth claim in his original petition, Petitioner argues in cryptic fashion that the prosecution engaged in the following acts of misconduct during trial: "using extraneous information about a juror as a basis for selection of that juror, presenting prejudicial evidence lacking in probative value, improperly commenting on irrelevant evidence, eliciting inadmissible hearsay from witnesses, and improperly commenting on the credibility of witnesses and on the defendant's failure to present

---

to the K-Mart parking lot where he abandoned Mrs. Liveoak and her vehicle because he wanted to make sure she was gone.  *Id.*, at p. R- 801.  Just moments before he made that statement, Petitioner testified he just assumed Mrs. Liveoak had somehow gotten out of her vehicle without his assistance.  *Id.*

[116] 8 SCR at pp. R-818-26 (testimony of Donald Dallas).  Petitioner did admit that he cut his hair after he learned of Mrs. Liveoak's death.  *Id.*, at p. R-825.

certain witnesses." (Doc. # 1, at p. 65; Doc. # 88, at pp. 190).  At no point in either his original petition or brief on the merits, however, does Petitioner identify with any reasonable degree of specificity either (1) the "prejudicial evidence lacking in probative value" that he claims the prosecution improperly presented at trial, (2) the "irrelevant evidence" on which he claims the prosecution improperly commented, (3) the "inadmissible hearsay" which he claims the prosecution elicited from unidentified witnesses, (4) the witnesses upon whose credibility he claims the prosecution improperly commented, or (5) the potential witnesses whom he claims the prosecution improperly pointed out the defense had failed to present.  Likewise, at no point in the portion of his original petition or brief on the merits discussing alleged prosecutorial misconduct does Petitioner clearly and unambiguously incorporate by reference any other portion of his rambling pleadings in this case.

In his *pro se* state habeas petition, *i.e.*, his Rule 32 petition, Petitioner included an even more cryptic version of the same set of complaints.[117]  The state habeas trial court summarily dismissed those complaints along with several others, for failure to comply with state procedural rules.[118]

---

[117] 13 SCR (Revised) Tab 13-A, at pp. 78-79.

[118] A copy of the state trial court's Order of October 25, 1999, dismissing as procedurally defaulted Petitioner's cryptic complaints of prosecutorial misconduct, appears at 15 SCR Tab 35, at pp. 8-9.  The state habeas trial court reaffirmed its summary dismissal of these complaints in its Order issued September 25, 2001, a copy of which appears at 13 SCR (revised) Tab 13-A. at p. 45.

Petitioner's first complaint in this group may be a cryptic reference to an exchange which occurred during jury selection. After the prosecutor proffered to the state trial court the prosecution's reasons for each of its peremptory strikes,[119] the defense argued the prosecution had attempted to justify its strike of venire member 29 by stating that black venire member had a relative with a criminal conviction but the prosecution had not used a peremptory strike against either venire members 108 or 84, who were white and also had relatives with a criminal conviction.[120] The prosecution responded that (1) the defense struck venire member 108 with a peremptory strike, (2) venire member 84 had a wife with a conviction for an unspecified offense when she was "on diet pills" and he believed there was a "big difference" between that situation and the venire members who had family members with murder convictions, (3) venire member 84 worked at the Department of Revenue where the prosecutor's wife also worked, and (4) he personally checked on the background of venire member 84 and, based upon the information he received, concluded venire member 84 would be a good juror.[121]

---

[119] 6 SCR at pp. R-479-89.

[120] 6 SCR at p. R-490.

[121] 6 SCR at pp. R-497-98.

## B. *De Novo* Review

Conclusory assertions such as those made by Petitioner against his prosecutors in his ninth claim do not furnish a basis for an evidentiary hearing, much less federal habeas corpus relief. *See Jones v. Sec'y, Fla. Dept. of Corr.*, 834 F.3d 1299, 1319 (11th Cir. 2016) (holding conclusory allegations are not enough to warrant an evidentiary hearing in a federal habeas corpus proceeding); *Chavez v. Sec'y, Fla, Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (holding the same), *cert. denied*, 565 U.S. 1120 (2012). Petitioner's conclusory assertions of prosecutorial misconduct do not warrant federal habeas relief.

Insofar as Petitioner argues his prosecutors engaged in actions that violated state procedural or substantive law (such as Petitioner's complaint that state prosecutors improperly relied upon extraneous evidence in making decisions on exercising the prosecution's peremptory challenges - which Petitioner argues violated the Alabama Court of Criminal Appeals' holding in *Kynard v. State*, 631 So. 2d 257 (Ala. Crim. App. 1993)), those assertions do not furnish a basis for federal habeas corpus relief.[122]   Federal habeas corpus relief lies only for violations of

---

[122] *Kynard* addressed a *Batson* challenge to a capital murder conviction in which the prosecution used eleven of its thirteen peremptory challenges to strike black members of the jury venire. The Alabama Court of Criminal Appeals carefully reviewed all of the prosecution's proffered reasons for striking various black venire members and concluded the striking of one black venire member was "improper" and three other prosecution strikes were "highly suspect." *Kynard v. State*, 631 So. 2d at 270. In reaching its conclusion, the Alabama Court of Criminal Appeals pointed to (1) several instances in which the prosecution failed to strike white venire members who expressed the same views as, or shared characteristics with, black venire members

federal constitutional rights, not for violations of state procedural rules, unless a federal issue is also presented.  *See Estelle v. McGuire*, 502 U.S. at 67-68 (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. at 780 (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. at 41 (holding a federal court may not issue the writ on the basis of a perceived error of state law).   Petitioner's complaint about the prosecution's reliance upon

---

whom the prosecution did strike, (2) the prosecution struck black venire members from across a wide variety of age groups, occupations, and positions in society, (3) there were many factual errors in the prosecution's proffered reasons for striking black venire members, including numerous references to a "Mr. Howard" whom the state appellate court concluded apparently did not exist and the prosecution's misidentification of one black venire member's gender, and (4) the prosecution's failure to engage in direct questioning of many black venire members on the very issue the prosecution cited for striking that venire member.  *Id.*, 631 So. 2d at 269-70.

While the prosecution did explain its use of a peremptory strike against one venire member was based, in part, upon an NCIC report that was not made available to the defense and the state appellate court concluded the person named in the report was likely not the venire member in question, the state appellate court did not conclude this particular venire member had been improperly stricken.  *Id.*, 631 So. 2d at 266.  The prosecution also offered as reasons for striking two other venire members information the prosecution had obtained from local law enforcement authorities.  *Id.*, 631 So. 2d at 261.  The state appellate court did not conclude the prosecution had improperly stricken either of these two venire members.  *Id.*, 631 So. 2d at 270.  Thus, *Kynard* does not stand for the proposition Petitioner urges, *i.e.,*, *Kynard* does not erect a blanket state procedural rule barring prosecutors from considering extraneous information about venire members when exercising peremptory strikes during jury selection.  The state habeas trial court reached the same conclusion in its Order issued September 25, 2001: "This Court is unaware of any rule that forbids either party in a criminal prosecution from asking family members or friends about prospective jurors they might know and giving a recommendation."  13 SCR (Revised), Tab 14-A, at p. 28.

extraneous information during jury selection does not furnish a basis for habeas corpus relief.  Petitioner's ninth claim does not warrant federal habeas corpus relief.

## XIII.  <u>INEFFECTIVE ASSISTANCE BY TRIAL COUNSEL</u>

**A**.  **The Claims**

In his third and seventh claims in his original petition, petitioner argues that his trial counsel rendered ineffective assistance through a plethora of acts and omissions (Doc. # 1, at pp. 8-10 & 17-63; Doc. # 88, at pp. 59-128 & 154-84).

As explained in Section I.F. above, Petitioner presented a rambling series of complaints about the performance of his state trial counsel in his state habeas corpus petition, *i.e.*, his Rule 32 petition, consisting of a cornucopia of conclusory complaints about alleged acts and omissions of his trial counsel.[123]  After conducting an evidentiary hearing, the state habeas trial court rejected all of Petitioner's complaints about the performance of Petitioner's trial counsel in its Order issued September 25, 2001.[124]

**B.  The Constitutional Standard**

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the

---

[123] 12 SCR (Revised) Tab 13-A, at pp. 2-77.

[124] 13 SCR (Revised) Tab 14-A.

circumstances of the defendant's case (*Wong v. Belmontes*, 558 U.S. 15, 16-17 (2009); *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, 558 U.S. 30, 38-40 (2009); *Wong v. Belmontes*, 558 U.S. at 19-20).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, *i.e.*, establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a

wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. at 7; *Strickland v. Washington*, 466 U.S. at 688-89. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534; *Strickland v. Washington*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. at 694.

144

In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is *de novo*. *See Porter v. McCollum*, 558 U.S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Ward v. Hall*, 592 F.3d 1144, 1163 (11th Cir.), *cert. denied*, 562 U.S. 1082 (2010); *Mills v. Singletary*, 63 F.3d 999, 1020 (11th Cir. 1995), *cert. denied*, 517 U.S. 1214 (1996); *Wiley v. Wainwright*, 709 F.2d 1412, 1413 (11th Cir. 1983). *See also Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) ("Petitioner continually bears the burden of persuasion on the constitutional issue of competence and further, (adding the prejudice element) on the issue of ineffective assistance of counsel."), *cert. denied*, 531 U.S. 1204 (2001). Under the well-settled *Strickland* standard, the

Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland v. Washington*, 466 U.S. at 690.

## C. *De Novo* Review

### 1. The Absence of "Prejudice" at Either Phase of Petitioner's Trial

The Supreme Court and Eleventh Circuit have both recognized it is unnecessary to address the performance prong of Strickland if a federal habeas petitioner has failed to make an adequate showing of prejudice. *See Strickland v. Washington*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Borden v. Allen*, 646 F.3d 785, 818 (11th Cir. 2011) ("[W]e may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied."), *cert. denied*, 132 S. Ct. 1910 (2012).

After a detailed examination of the record from Petitioner's trial, the evidence presented to the state habeas court during Petitioner's Rule 32 proceeding, and all of the new affidavits and other evidence presented by Petitioner during this federal habeas corpus proceeding, the court finds there is no reasonable probability that, but for any of the acts or omissions of Petitioner's trial counsel identified by Petitioner

in his rambling federal habeas corpus pleadings and briefs, the outcome of either phase of Petitioner's 1995 capital murder trial would have been any different.

### a. No Prejudice at Guilt-Innocence Phase

The evidence supporting the jury's finding of Petitioner's guilt was overwhelming. Petitioner has presented this court with no new or additional exculpatory *evidence* of any substance. The jury had before it Petitioner's videotaped statement to police in which he candidly admitted that (1) he locked Mrs. Liveoak inside the trunk of her car on a July afternoon and drove her vehicle back to Montgomery, (2) he abandoned her vehicle with Mrs. Liveoak still inside in an isolated location of a K-Mart parking lot, and (3) despite his repeated assertions to Mrs. Liveoak that he would contact police to let them know where she was, he failed to contact them or alert anyone else to Mrs. Liveoak's perilous predicament.[125]

---

[125] 3 SCR 457-69. There was also no evidence presented at trial suggesting Petitioner gave Mrs. Liveoak food or water before or after he locked her in the trunk of her vehicle (or that Petitioner even briefly raised the lid or released her from her steel coffin before he abandoned her vehicle). Likewise, the uncontradicted trial testimony of Detective Smith established Mrs. Liveoak's vehicle was discovered in an isolated location on the K-Mart parking lot parked more than fifty yards (166 feet) from East South Boulevard, more than sixty yards (202 feet) from the AmSouth Bank, and more than one hundred fifteen yards (350 feet) from the K-Mart store. 6 SCR 585-86 (testimony of S.Z. Smith). Even a cursory examination of the photographs admitted into evidence at Petitioner's trial established the location where Mrs. Liveoak's vehicle was discovered was bereft of shade. 2 SCR 389-400; 3 SCR 401-04.

Petitioner also complains about his trial counsel's failure to locate and call Tommy Earl Pilgrim to testify at the time of Petitioner's 1995 capital murder trial. Petitioner has furnished an affidavit dated October 27, 2008 from Mr. Pilgrim in which he recounts that (1) he is a relative of Chester Foley, (2) a day or two before July 14, 1994, "after the elderly woman was kidnapped and left in her trunk," Petitioner and Carolyn "Polly" Yaw asked him for a ride to the Coliseum Motel, (3) before he took them to the motel, they asked him to drive them to the K-Mart on South Boulevard but did not tell him why they wanted to go there, (4) he drove them part way there but

During his testimony at the guilt-innocence phase of trial, Petitioner repeated those same admissions, as well as his assertion that he did not intend to kill Mrs. Liveoak. Thus, there was no material factual issue with regard to any of the elements of Petitioner's capital offense except the issue of whether Petitioner intentionally murdered Mrs. Liveoak.

The problems with Petitioner's self-serving assertions that he did not intend to kill his victim include (1) Petitioner admitted on cross-examination he failed to leave the key to her vehicle inside the car when he left the K-Mart parking lot (despite claiming in his videotaped statement that he had done so),[126] (2) Petitioner admitted he knew Mrs. Liveoak had a heart condition,[127] (3) Petitioner testified on direct that he made an attempt to return to the K-Mart parking lot to "make sure" Mrs. Liveoak "was gone,"[128] (4) he testified he was well aware that he was likely

_____

his car overheated and he turned around and went back, dropping Petitioner and Yaw off at the Coliseum Motel, (5) at that time he did not know about Mrs. Liveoak's kidnaping or the involvement of his passengers in her abduction, and (6) he did not provide information at the time of Petitioner's trial because no one contacted him or asked him about it (Doc. # 187-1, at pp. 11-12). At no point in his 2008 affidavit does Mr. Pilgrim state that he was available to testify at the time of Petitioner's 1995 capital murder trial or that he would have done so if requested or subpoenaed. Furthermore, at best, Mr. Pilgrim's testimony would have corroborated Petitioner's account of their aborted effort to return to the K-Mary parking lot to, in Petitioner's words "make sure she was gone." Mr. Pilgrim's testimony, assuming it coincided with his 2008 affidavit, would have done nothing to counter the prosecution's contention that Petitioner passed up innumerable opportunities to contact police or notify anyone else of Mrs. Liveoak's perilous situation.

[126] 8 SCR 820 (cross-examination of Donald Dallas).

[127] 8 SCR 815-16 (cross-examination of Donald Dallas).

[128] "This is when Chester first came back with the drugs, because at the time I wanted to make sure she was gone." 8 SCR 801 (testimony of Donald Dallas). The jury was free to infer

then being pursued by police in connection with both his abduction and robbery of Mrs. Liveoak, as well as his prior abduction and robbery of Mr. Portwood,[129] (5) he admitted he wanted to avoid being captured,[130] (6) when asked on direct examination why he failed to call the police or inform anyone else about Mrs. Liveoak's situation, Petitioner offered no rational explanation for his failure to do so,[131] and (7) Petitioner admitted on cross-examination he had a plethora of opportunities to telephone authorities to notify them of Mrs. Liveoak's situation but failed to do so.[132]

In addition, Mr. Portwood testified he informed Petitioner only days before Petitioner's abduction of Mrs. Liveoak that he (Mr. Portwood) would likely "smother to death" if placed inside his vehicle's trunk.[133]

---

rationally from this testimony (contrary to Petitioner's assertion that he assumed Mrs. Liveoak "was okay," *Id.*) that Petitioner's rambling non-response to his trial counsel's question about why Petitioner did not "make the phone call" revealed Petitioner wanted to make certain Mrs. Liveoak was dead.

[129] "I had assumed she had gotten out and I was wanted by now for kidnapping and robbery." 8 SCR 801 (testimony of Donald Dallas). Petitioner also admitted on cross-examination that he was worried about getting caught. 8 SCR 825 (cross-examination of Donald Dallas).

[130] "But I didn't want to call a cab, because I didn't want to get caught, because I had took a cab away from there. I knew if I called the Yellow Cab Company or any cab company, that they would be looking out for me." 8 SCR 801-02 (testimony of Donald Dallas).

[131] 8 SCR 801-03 (testimony of Donald Dallas).

[132] 8 SCR 816-26 (cross-examination of Donald Dallas).

[133] 7 SCR 708 (testimony of Wesley Orville Portwood).

Finally, Dennis Bowen testified that when he confronted Petitioner and Carolyn Yaw about Chester's Foley's assertion that Petitioner and Yaw had robbed and locked an old woman in the trunk of her car, Petitioner sarcastically responded that he hoped or wished the old lady would die.[134]   Petitioner argues his trial counsel should have obtained additional documentation relating to Bowen's probation status from Autauga County and further cross-examined Bowen about the possibility Bowen received some benefit in exchange for his testimony against Petitioner. Petitioner has presented this court with no additional documentation *available at the time of Petitioner's capital murder trial* that would have furnished any additional bases for impeaching Bowen.[135]   As explained above, Petitioner's trial counsel elicited a great deal of impeachment information from Bowen on cross-examination, including admissions by Bowen that he (1) had been convicted of theft, (2) was then on probation, and (3) was the subject of an active arrest warrant relating to his failure to comply with the conditions of his probation.[136]   Furthermore, despite the passage

---

[134] 7 SCR 671-73 (testimony of Dennis Anthony Bowen).

[135] Petitioner presented a 2016 report from Autauga County which describes Bowen (1) as having (1) been charged with robbery, (2) been convicted pursuant to a guilty plea in November, 1994 of theft, (3) served a 24-month term of probation, and (4) been the subject of a probation arrest warrant issued September 5, 1995 (Doc. # 139-1, at pp. 76-80).  The same report states, however, the warrant for Bowen's arrest was recalled October 19, 1995.  *Id.*  The reason this report fails to satisfy the prejudice prong of *Strickland* is that Bowen candidly admitted to all of the foregoing facts during his cross-examination at Petitioner's capital murder trial.  Thus, the report furnishes no *additional* bases for impeaching Bowen.

[136] 7 SCR 675-98 (cross-examination of Dennis Anthony Bowen).  Petitioner's trial counsel also elicited testimony from Bowen on cross-examination establishing that (1) he had abused crack

of more than two decades since Petitioner's capital murder trial, Petitioner has failed to present this court with an affidavit from any person possessing personal knowledge establishing that Bowen received anything from anyone in exchange for his testimony at Petitioner's trial.[137]   In fact, Petitioner fails to allege any specific facts suggesting the existence of a *quid pro quo* for Bowen's testimony at Petitioner's trial.

Petitioner also complains in conclusory fashion that his trial counsel failed to investigate the "actual cause" of Mrs. Liveoak's death and failed to present expert medical testimony or other evidence establishing either that (1) Mrs. Liveoak would have died of a heart attack even if Petitioner had not placed her in the trunk of her car, (2) the cause of her death was anything other than homicide, (3) the exact time of Mrs. Liveoak's death, or (4) Mrs. Liveoak was alive at the time law enforcement officials discovered her vehicle on the evening of July 13, 1994, and died thereafter

---

cocaine, (2) he failed to tell police during his July, 1994 interview that Petitioner made a statement about wishing or hoping the old lady would die, (3) he was high on crack at the time he claimed to have heard Petitioner make that statement, and (4) Petitioner's trial was the first time he had ever told anyone in Montgomery about Petitioner's alleged statement.  *Id.*

[137] Petitioner has not furnished any affidavits from Bowen, Bowen's trial judge, Bowen's prosecutor, or the criminal defense attorney who represented Bowen in connection with the Autauga County robbery/theft charge suggesting anyone in that jurisdiction offered Bowen anything in exchange for his testimony against Petitioner.  Nor has Petitioner identified any Montgomery County official whom Petitioner alleges made any promise to induce Bowen's trial testimony against Petitioner.  Simply put, Petitioner has neither alleged any specific facts nor presented any evidence establishing Bowen was offered anything by anyone in exchange for his testimony against Petitioner.

because police failed to immediately open the trunk of her car upon its discovery. The fundamental problem with these complaints is Petitioner has alleged no specific facts and presented this court with no evidence establishing there was any medical testimony or other evidence available at the time of his 1995 capital murder trial establishing any of these matters.

As explained at length above in Section I.C.2., Petitioner was the best witness the prosecution had available. His refusal to offer any rational explanation for his failure to call police or anyone else to rescue Mrs. Liveoak after he left her inside her car trunk in an isolated, unshaded, location on an Alabama parking lot on a July afternoon permitted only one reasonable inference.[138]   Once Petitioner's cross-examination was complete, the outcome of the guilt-innocence phase of Petitioner's trial was not in genuine doubt.   The thrust of Petitioner's trial testimony was essentially that he abducted, robbed, and locked an elderly woman with a heart

---

[138] Petitioner admitted during his cross-examination that (1) he was aware of Mrs. Liveoak's heart condition, (2) his own father had died of a heart attack, (3) he was aware that he was robbing Mrs. Liveoak and he would spend a lot of time in jail if he got caught, (4) he and Carolyn Yaw spent a long time in the K-Mart parking lot before they left the scene, (5) he did not leave the keys to Mrs. Liveoak's car inside the vehicle, (6) he passed "a bunch" of pay phones on the way from the K-Mart parking lot to the crack house but never asked the cab driver to stop, (7) he passed a number of pay phones when he and Carolyn Yaw left the crack house and went to the motel where they spent the night, (8) he never used the phone at the motel, (9) he did not take a cab back to the K-Mart because he did not want to call attention to himself, (10) he intended to abduct and rob Mrs. Liveoak, (11) he intended to place her inside the trunk of her car, (12) he intentionally left Mrs. Liveoak inside the trunk of her car when he left the K-Mart, (13) he was worried about being caught, and (14) when he learned of Mrs. Liveoak's death, he cut his hair.  8 SCR 816-25 (cross-examination of Donald Dallas).

condition in the trunk of her car and then abandoned her without ever notifying anyone of her perilous condition because he could not think about anything other than his own need to get high on crack cocaine.[139]   Yet Petitioner also testified he had sufficient mental acuity not to call a cab to return to the K-Mart parking lot because he might be traced back to Mrs. Liveoak's vehicle and he did not want to get caught.[140]   Petitioner testified he assumed the day after his abduction of Mrs. Liveoak that she had somehow managed to escape because he had not heard any news reports about the discovery of her body[141] but he offered no rational basis for such a belief in view of the fact (which he admitted on cross-examination) that he

---

[139] Petitioner admitted on direct examination that (1) he used a wide variety of narcotics, (2) he began abusing crack cocaine in 1992, (3) he pawned everything he had to buy crack, (4) he stole cigarettes and meat to pay for drugs, which he bought from Chester Foley, (5) he robbed Mr. Portwood to get money to buy crack, (6) he had been doing crack consistently for two weeks before he encountered Mrs. Liveoak, (7) he traded a stolen bicycle for crack the night before he abducted Mrs. Liveoak, (8) he told Mrs. Liveoak he had a crack problem and she prayed for him, (9) he left Mrs. Liveoak in the trunk of her car at the K-Mart, and (10) he did not "have a reason for doing it other than a dope addict."  7 SCR 786-91, 793, 795; 8 SCR 801-03 (testimony of Donald Dallas).

On cross-examination, Petitioner repeatedly blamed his drug addiction for his criminal behavior: "It was my way of life." 8 SCR 807; "I was thinking about getting the money." 8 SCR 815; "Like I say, I wasn't thinking about too many things but one thing.  I am robbing somebody, and I am going to be in big trouble.  I am going to spend a lot of time in jail if I get caught doing this." 8 SCR 816; "I wasn't even thinking.  I just wanted to get the money and get the dope and get in my own world." 8 SCR 817; "Sooner or later, everybody knows when they are doing a crime they are going to get caught.  With the drugs, you don't comprehend it." 8 SCR 817; "That's crack addiction." 8 SCR 825.  When asked why he failed to park Mrs. Liveoak's car in a position where someone might happen upon it, Petitioner answered "I wasn't thinking about that." 8 SCR 820.

[140] 8 SCR 801-02 (testimony of Donald Dallas).

[141] 8 SCR 801 (testimony of Donald Dallas).

did not leave her car keys inside her vehicle when he left the K-Mart parking lot.[142] Petitioner stated to police during his post-arrest interrogation, however, that when he awoke the morning after Mrs. Liveoak's abduction, he assumed it was too late to help her.[143]   He also testified on direct examination that he made an unsuccessful attempt to return to the K-Mart to check on Mrs. Liveoak because he "wanted to make sure she was gone."[144]   Even ignoring the highly inculpatory testimony of Dennis Bowen, Petitioner's jury could reasonably and rationally infer from the totality of Petitioner's post-arrest statement to police and Petitioner's trial testimony that he intended to "make sure" Mrs. Liveoak did not live to identify him as her assailant or to testify against him.  In fact, in view of Petitioner's refusal to offer any rational explanation for his failure to notify the police or anyone else of Mrs. Liveoak's perilous situation, no other reasonable inference is rationally possible.

---

[142] 8 SCR 820 (cross-examination of Donald Dallas).

[143] When asked during his post-arrest interrogation why he didn't call the police, Petitioner stated:

> I went straight to a crack house and got a bunch of dope and did it and I tried to go over there one time and, ended back at the dope house, and then I went back to the motel where I had rent, rented the room and just Od'd down there and then it was too late the next day when I got up.

3 SCR 463.

[144] 8 SCR 801 (testimony of Donald Dallas).

Petitioner did insist during his trial testimony that he did not intentionally kill Mrs. Liveoak.[145]  By choosing to testify on his own behalf, Petitioner ran the risk that the jury might conclude the opposite of his testimony was true.  *Rhode v. Hall*, 582 F.3d 1273, 1287 (11th Cir. 2009), *cert. denied*, 560 U.S. 958 (2010); *Atkins v. Singletary*, 965 F.2d 952, 961 n.7 (11th Cir. 1992), *cert. denied*, 515 U.S. 1165 (1995).  This is precisely what happened.  The jury had the opportunity to examine Petitioner's demeanor firsthand twice - first when it watched the videotaped recording of his post-arrest police interrogation and then again when Petitioner testified at trial.  Petitioner's jury had ample opportunity to evaluate his credibility and compare it to that of Dennis Bowen, whom Petitioner's trial counsel cross-examined extensively.  Petitioner's jury returned its guilty verdict on all seventeen counts in twenty minutes, including its implicit finding that Petitioner *intentionally* murdered Mrs. Liveoak.

There is no reasonable probability that anything Petitioner's trial counsel could have done within the limits of applicable law would have (1) kept any of the overwhelming, highly inculpatory evidence outlined above from reaching Petitioner's jury, (2) resulted in the presentation of any additional exculpatory

---

[145] "I didn't intend to kill nobody."  8 SCR 803 (examination of Donald Dallas); "Never in my mind have I ever thought about killing anybody." 8 SCR 818 (cross-examination of Donald Dallas).

evidence,[146] or (3) otherwise resulted in a verdict different from the guilty verdict

Petitioner's jury actually rendered at the guilt-innocence phase of his capital murder

_____

[146] Petitioner presents this court with the affidavit of neuropsychologist Dr. Ken Benedict (Exhibit 15 in Doc. #87-2) in which Dr. Benedict opines that (1) two prior mental health evaluations performed on Petitioner in April, 1995 [by Dr. Renfro] and in June, 1995 [at the Kilby Correctional Facility] were invalid, in part, because they relied upon written testing and Petitioner's reading level [below the fifth grade] is insufficient to permit accurate testing based upon written test instruments, (2) Petitioner is of average intellectual ability, (3) Petitioner suffers from severe impairments in the areas of reading, spelling, written language, and reading comprehension, (4) Petitioner suffers from Attention Deficit Hyperactivity Disorder ("ADHD") with a history of polysubstance abuse and dependence that was in remission at the time of Dr. Benedict's evaluation [presumably near the time Dr. Benedict executed his affidavit in 2007], (5) Petitioner has a strong family history of substance abuse and preadolescent exposure to substance abusing role models, (6) Petitioner exhibits reading problems similar to severe dyslexia along with attention spectrum disorder, which cause him difficulties with impulse control and planning functions, (7) Petitioner suffers from several comorbid developmental disorders, including learning and attention disorders, which are amenable to remediation and accommodation, (8) Petitioner experienced psychosocial problems as a child and adolescent which led to Petitioner's polysubstance abuse and dropping out of school, (9) Petitioner shows depressive and anxiety symptoms, including depression, anxiety, low self-esteem, shame, and cognitive difficulties in the form of inattention, disorganization, and confusion in the face of stress, (10) Petitioner displays deficient executive brain functions, (11) Petitioner is a "follower" and has a personality which does not fit the profile of someone who would act solely or take the lead in a crime such as Mrs. Liveoak's abduction and murder, (12) Petitioner's cognitive disorders are such that that he would have been engaged in drug-seeking behavior with the intent to steal to obtain money for drugs without intending to hurt another individual or even considering the potential for harm to another individual, (13) Petitioner likely did not desire or plan the death of the victim, and (14) individuals such as Petitioner are highly likely to become disorganized and forgetful in their thinking and are prone to miscommunication with their peers.

Petitioner also presents a signed but unsworn statement of Dr. Joseph Schumacher (Exhibit 16 in Doc. # 87-2), a researcher in the field of chemical dependency, who opined that (1) people who abuse crack cocaine experience memory problems, (2) when used in small amounts, cocaine results in feelings of well-being, euphoria, decreased appetite, and relief from fatigue, (3) cocaine can be extremely addictive, (4) prolonged cocaine abuse can cause severe personality disturbances, inability to sleep, appetite loss, and paranoid psychoses, (5) persons on a drug binge typically do not sleep, do not eat, and can stay up for several days, (6) persons on a drug binge are preoccupied with obtaining the drug he or she needs in larger quantities to maintain the same high, (7) crack cocaine use would not cause a person to forget a horrific act that may have been committed, (8) a person using crack cocaine may know right from wrong but when crack is not available, he or she will be preoccupied by the "withdrawal syndrome," which includes (a) being hyper-alert, awake for extended periods of time, and tense, (b) having an elevated pulse rate, and (c) having an elevated heart rate, similar to a person withdrawing from nicotine or caffeine but much more severe and magnified, (9) withdrawal has a negative impact on judgment and behavior almost at the same

trial. Petitioner's myriad, multi-faceted complaints about the performance of his trial counsel do not satisfy the prejudice prong of *Strickland* with regard to the outcome of the guilt-innocence phase of Petitioner's capital murder trial.

_____

intensity as the actual high from using the drug, (10) based upon his review of Dr. Renfro's 1995 evaluation and Dr. Benedict's 2007 evaluation, he believed Petitioner's drug addiction "would be clinically described as severe and significant," and (11) while binging on crack cocaine, Petitioner would have been preoccupied with getting more cocaine to get high and avoid withdrawal, a state which would most certainly would have interfered with his judgment and behavior concerning other events. Because this document is unsworn, this court may not consider it as evidence.

The fundamental problems with the efforts of Dr. Benedict to explain away Petitioner's horrific crime are that (1) despite his alleged binging on crack cocaine, Petitioner testified that he understood the criminal nature of his behavior and took steps to avoid being captured, (2) the expert opinions expressed by Dr. Benedict simply parrot the trial testimony of Petitioner, who insisted he never intended to kill Mrs. Liveoak but simply did not care about anything except getting high, yet (3) Petitioner candidly admitted he made an attempt to drive back to the K-Mart parking lot but offered no rational explanation for his failure to call anyone to rescue Mrs. Liveoak once the vehicle in which he was riding overheated. Thus, Petitioner's own trial testimony refutes the suggestion offered by Dr. Benedict that Petitioner simply "forgot" about Mrs. Liveoak after he got more crack. Furthermore, the opinions expressed by Dr. Benedict in his new affidavit offer very little of substance beyond those to which Dr. Renfro testified at the guilt-innocence phase of Petitioner's capital murder trial. More specifically, Dr. Renfro testified that (1) Petitioner was likely functioning at an intellectual level below average at the time of his offense, (2) while not physically addictive, crack cocaine abuse leads to a very intense psychological craving for more and more of the drug, (3) Petitioner had been binging on crack for twelve days prior to meeting Mrs. Liveoak, and (4) nonetheless Petitioner still knew the difference between right and wrong (a point Petitioner himself admitted during his cross-examination).

There is no reasonable probability that, but for the failure of Petitioner's trial counsel to call experts to testify at Petitioner's trial in the manner Dr. Benedict opines in his new affidavit, the outcome of either phase of Petitioner's trial would have been any different. Mr. Benedict simply repeats in a slightly more eloquent and detailed manner the same contentions Dr. Renfro and Petitioner voiced at trial, *i.e.*, the argument that Petitioner was so fixated on getting money to get high on crack that he ignored the clear danger to Mrs. Liveoak of stuffing her inside the trunk of her car and abandoning her vehicle on a July afternoon in an unshaded location in central Alabama where she was unlikely to be discovered or rescued. Had Dr. Benedict been called to testify at Petitioner's capital murder trial he would have likely faced cross-examination which included questions asking (1) whether the Petitioner "forgot" about Mrs. Liveoak when he sarcastically told Dennis Bowen that he hoped or wished the old lady died, (2) whether the Petitioner was still completely focused on binging on crack when he attempted to return to the K-Mart parking lot to make sure Mrs. Liveoak "was gone," and (3) whether Petitioner was completely focused on getting high on crack when he decided against calling a cab to return to the K-Mart parking lot because he wanted to avoid being captured.

b.  No Prejudice at Punishment Phase

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course).  *Wong v. Belmontes*, 558 U.S. at 20; *Wiggins v. Smith*, 539 U.S. at 534.  *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different.  *Wong v. Belmontes*, 558 U.S. at 27.  Within the context of *Strickland* analysis, "prejudice" means a reasonable probability the result of the proceeding would have been different. *Hinton v. Alabama,* 134 S. Ct. 1081, 1089 (2014).  To satisfy the prejudice prong, the likelihood of a different result must be substantial, not just conceivable.  *Harrington v. Richter*, 562 U.S. 86, 112 (2011); *Strickland v. Washington*, 466 U.S. at 693.

In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence - such as mental illness or a history of childhood abuse - may be available.  *See Porter v. McCollum*, 558 U.S. 30, 39-40 (2009) (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored

information in a report on the defendant's competency evaluation suggesting possible mitigating evidence - including evidence of mental illness - could be gleaned from investigation into the defendant's family background and military service); *Wiggins v. Smith*, 539, U.S. 510, 524-26 (2003) (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released from prison).

With regard to the prejudice prong of *Strickland*, the Supreme Court held  the petitioners in *Wiggins*, *Porter*, and *Williams v. Taylor* were prejudiced by the failure of their trial counsel to fully investigate, develop and present available mitigating evidence.  More specifically, the Supreme Court found in *Wiggins* that his trial counsel failed to discover, develop, and present available mitigating evidence showing:

> Wiggins experienced severe privation and abuse in the first six years of
> his life while in the custody of his alcoholic, absentee mother.  He

suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care.  The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case.  Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

*Wiggins v. Smith,* 539 U.S. at 253.

In *Porter v. McCollum*, the new mitigating evidence undiscovered and undeveloped by trial counsel included lay and expert testimony showing (1) Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child, (2) Porter's father was violent every weekend and Porter was his father's favorite target, particularly when Porter tried to protect his mother, (3) on one occasion, Porter's father shot at him for coming home late but missed and beat Porter instead, (4) Porter attended classes for slow learners until he left school at age 12 or 13, (5) to escape his horrible family life, Porter enlisted in the Army at age 17 and fought in the Korean War, (6) Porter suffered a gunshot wound to the leg yet fought heroically through two battles, (7) after the war, Porter suffered dreadful nightmares and would attempt to climb his bedroom walls at night with knives, (8) Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all, (9) Porter suffered from brain damage that could manifest in impulsive, violent behavior, (10) at the time of the capital offense, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional

disturbance, and (11) Porter had substantial difficulties with reading, writing, and memory. *Porter v McCollum*, 558 U.S. at 449-51.

Prejudice was established in *Williams v. Taylor* through testimony showing trial counsel failed to discover and develop available mitigating evidence showing (1) Williams experienced a nightmarish childhood, (2) Williams' parents had been imprisoned for criminal neglect of Williams and his siblings, (3) Williams had been severely beaten by his father, committed to the custody of the social services bureau for two years during his parents' incarceration, and then returned to his parents after they were released from prison, (4) Williams was borderline mentally retarded and did not advance beyond the sixth grade in school, (5) Williams received commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, (6) Williams was among the inmates least likely to act in a violent, dangerous or provocative way, (7) Williams seemed to thrive in a more regimented and structured environment, and (8) Williams earned a carpentry degree while in prison. *Williams v. Taylor,* 529 U.S. at 395-96.

Unlike defense counsel in the capital murder trials the Supreme Court described in *Wiggins*, *Porter*, and *Williams v. Taylor*, Petitioner's trial counsel presented a substantial case in mitigation during Petitioner's capital murder trial. Petitioner, Dr. Renfro, and attorney James all testified during the guilt-innocence phase of trial concerning Petitioner's addiction to crack cocaine and its impact upon

him.  Petitioner testified at the guilt-innocence phase of his capital murder trial regarding (1) his chaotic childhood, during which he moved around the country, was left to fend for himself much of the time, and had no positive parental role models or adult supervision, (2) his long term alcohol and drug abuse, (3) his long history of criminal behavior to fuel his drug addiction, and (4) the circumstances of his abductions of Mr. Portwood and Mrs. Liveoak.  In addition, as explained above in Section I.D.2., Petitioner's trial counsel presented testimony from Petitioner's older sister Cindy and older brother James concerning the many difficulties they and Petitioner faced growing up in a household with a pair of alcoholic parents and the additional difficulties they faced after their parents divorced and they and Petitioner began living with their alcoholic, physically abusive, mentally unstable mother in Florida and then Alabama.

Petitioner's trial counsel also presented a pair of character witnesses at the punishment phase of trial who testified to Petitioner's good qualities and the loving relationship he had with his daughters and friends as well as the parasitic, pernicious influence Carolyn "Polly" Yaw had on his life.  Petitioner had the opportunity at his trial to testify regarding the role Polly Yaw played in Mrs. Liveoak's abduction, robbery, and murder but offered no testimony suggesting Yaw was the mastermind or moving influence behind those crimes.

Petitioner has presented the court with a significant number of new affidavits and documentary evidence in support of his *Wiggins* claim, *i.e.*, his complaint that his trial counsel could have done a better job more thoroughly investigating Petitioner's background and presenting the trial court with then-available mitigating evidence.[147]  The problem with Petitioner's *Wiggins* claim is that, after carefully reviewing all of Petitioner's new mitigating evidence, the court finds that the case for mitigation now before this court is, in some respects, substantially less compelling than the case for mitigation Petitioner's trial counsel actually presented during Petitioner's 1995 trial.  For example, Petitioner's sister Cindy testified at trial that their mother had been sent to "an insane asylum" on two occasions and described her and Petitioner's dysfunctional childhood in nightmarish terms (*i.e.*, their alcoholic parents often chased each other around the house with knives, there was often no food in the home, and their parents beat the children).   The medical records of Petitioner's mother, presented for the first time to this court, do not show any diagnosis or treatment of long-term mental illness, however.[148]  Likewise, as

---

[147] *See, e.g.,* the affidavits and documents contained in Petitioner's Appendix to his Merits Brief (Doc. # 87); the affidavit and documents accompanying Petitioner's Motion to Supplement the Record filed April 1, 2009 (Doc. #108); the documents accompanying Petitioner's Motion to Supplement the Record filed May 25, 2012 (Doc. # 122); and the affidavits, deposition transcript of Chester Foley, and other documents filed separately but designated as attachments to Petitioner's Brief/Memorandum filed October 3, 2016 (Doc. # 137, 137-1, 138, 138-1, 139, 139-1).

[148] The medical records of Elaine Dallas appear as exhibits 28-A and 28-B in the Appendix to Petitioner's Merits brief (Doc. # 87) at Doc. # 87-10 and Doc. # 87-11.  Those records reveal that Mrs. Dallas (1) was hospitalized from May 26, 1969, to June 5, 1969, (2) was treated during

explained above, the affidavit of Dr. Benedict offers little of substance in terms of mitigating evidence beyond the same information Dr. Renfro, Petitioner, and Petitioner's family and friends offered during their 1995 trial testimony.  There is no reasonable probability the jury's verdict or the trial court's factual findings at the punishment phase of trial would have been any different had the jury heard (1) testimony from Dr. Benedict similar to the information contained in his 2007 affidavit,[149] (2) testimony from Petitioner's mother similar to the information

---

that time for anxiety and depression (specifically situational adjustment disorder with anxiety and depressive features), (3) responded well to medication (Thorazine), and (4) was discharged (Exhibit 28-A to Doc. # 87-10).  There is nothing in the medical records now before this court showing Mrs. Dallas was ever again hospitalized, diagnosed, or treated for depression.

A year later, Mrs. Dallas was (1) hospitalized from September 6 through September 7, 1970, (2) admitted in a state of acute alcoholic intoxication and hysterical agitation, (3) diagnosed with alcoholic intoxication after she became hysterical and drank excessively because her husband went out with another woman, (4) responded satisfactorily to a sedative, and (5) was discharged with a recommendation that she return for follow-up counseling (Exhibit 28-B to Doc. # 87-11). Once again, there is no evidence now before the court suggesting Petitioner's mother was ever again diagnosed, treated, or hospitalized for acute intoxication or ever treated for alcoholism.

The medical records of Petitioner's mother do record the foregoing hospitalizations, as well as a lengthier hospitalization from June 24 to July 4, 1972 for treatment of a torn left medial meniscus (Exhibit 28-B to Doc. # 87-11).  Significantly, however, while Petitioner's mother claims in her 2007 affidavit that she was diagnosed with chronic depression, there are *no medical records* before this court showing Petitioner's mother has ever been diagnosed with *chronic* alcoholism, *chronic* depression, or any other serious mental illness.  Thus, the information currently before the court is far less compelling than the trial testimony of Petitioner's sister, who stated simply that her mother had been sent to "an insane asylum" on two occasions and suggested her mother was mentally unstable.  Petitioner's sister's assertion that their mother had been sent to an insane asylum bordered on the deceptive.  That assertion grossly overstated the extent of her mother's documented history of mental illness.  More significantly, there is no evidence before the court showing Petitioner inherited anything in terms of mental illness from his parents beyond a propensity for substance abuse - a propensity Dr. Benedict noted was in remission at the time of Petitioner's 2007 evaluation.

[149] Dr. Benedict's diagnoses of Petitioner's ADHD and learning disabilities (the only genuinely new mental health evidence offered in this case) simply pale in comparison to the

contained in her 2007 affidavit,[150] (3) testimony from Petitioner's eldest brother

James (Jimmy) Dallas, Jr. similar to the information contained in his 2007

---

evidence of serious mental illness, mental retardation, and other powerful mitigating evidence which trial counsel failed to present in *Wiggins*, *Porter*, and *Williams v. Taylor*.

[150] The 2007 affidavit of Elaine Dallas appears as Exhibit 14 in Doc. # 87-2.  In her affidavit, she avers that (1) Petitioner's father was an abusive man who consumed a lot of alcohol, ran around with other women, and once had an affair with a 19-year-old babysitter, (2) Petitioner's father beat and kicked her and was physically abusive toward their children, (3) during all of her pregnancies, she smoked tobacco and consumed alcohol, up to four or five screwdrivers a day,  (4) the children frequently ate soup because of a lack of money, (5) many times her mother brought food for the children, (6) she could not afford clothing for her children, (7) other children were cruel to the Dallas children because they were poor, (8) Petitioner was treated by a doctor for severe pneumonia at age one, (9) she was first diagnosed with chronic depression when Petitioner was two years old, (10) around that time, she began consuming larger amounts of alcohol to cope with her depression, (11) at times she hallucinated  and screamed at her children, (12) because of her alcoholism and depression, she was unable to work, (13) Petitioner was once bitten by a rat inside their home, (14) she spanked her children with a paddle, (15) she left Petitioner's father at least three times prior to their divorce, (16) after leaving Petitioner's father, she became involved with a musician named Chesley (Chick) Collier who was also an alcoholic, (17) she lived with Collier in Florida and they moved to Prattville, Alabama when Petitioner was nine, (18) she became aware that Petitioner and Paul were using alcohol and abusing marijuana when Petitioner was age twelve, (19) Petitioner quit school in the seventh grade, (20) she lived in Hope Hull, Alabama with a man named Wayne Cripple for about four years, (21) she later moved to Texas and cared for a man she met there named Marty Martinez, (22) Petitioner and his children moved in with her in Texas while Polly Yaw was in prison, (23) Polly beat her when she got the children up to go to school, (24) "I put my children through hell when they were growing up," (25) "I exposed them to alcohol abuse by their father and by me," (26) "They witnessed their father beating me on many, many occasions," (27) "They were around me when I was out of my head and I am certain they must have been afraid of my behavior," and (28) "My children were also forced to live in poverty and as a result they had very little security when they were growing up."

Other than furnishing some additional details, Mrs. Dallas' 2007 affidavit offers very little new information that was not furnished to the jury and trial judge by Petitioner's sister Cindy and brother Paul through their punishment phase testimony at Petitioner's 1995 capital murder trial. Additionally, had she testified at Petitioner's 1995 trial in the same manner as her 2007 affidavit, Elaine Dallas would have been subject to cross-examination and impeachment based upon her admissions that she neglected her children, failed to furnish them with adequate food and clothing, abandoned her children emotionally as well as physically, permitted her husband to physically abuse them, drank to excess, failed to seek adequate medical and dental care for her children, and failed to furnish Petitioner and his siblings a suitable home in which to grow and mature.  Finally, while her affidavit states that, had she been contacted by Petitioner's trial counsel she would have furnished them with the same information contained in her 2007 affidavit, at no point in her 2007 affidavit does she unequivocally state that she would have been willing to travel to Alabama in

1995 and testify at Petitioner's capital murder trial.  Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a lay witness or an expert witness) satisfy the prejudice prong of *Strickland* only by naming the witness, *demonstrating the witness was available to testify and would have done so*, setting out the content of the witness' proposed testimony, and showing the testimony would have been favorable to a particular defense.  *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  *See also Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1262 (11th Cir. 2014) (holding federal habeas petitioner who failed to show an uncalled witness was available to testify at the time of trial failed to satisfy prejudice prong of *Strickland*), *cert. denied*, 135 S. Ct. 1563 (2015).

affidavit,[151] (4) additional testimony from Petitioner's sister Cindy and other brother

Paul similar to the information contained in their 2007 affidavits,[152] and (5)

_____

[151] The affidavit of James (Jimmy) Dallas, Jr. is Exhibit 4 in Doc. #87-1. Petitioner's eldest brother averred that (1) his father was an alcoholic who had multiple adulterous relationships and was often not at home, (2) his mother was "very unstable throughout most of Donald's life," drank heavily with their father, and "had several nervous breakdowns," (3) his mother was "very morbid and depressed, sometimes would scream and become violent, broke things in the house, and once got a butcher knife and threatened to kill all her children, (4) his mother used "vast amounts of prescriptions drugs every day," including Valium, (5) his mother was taken to a mental hospital at least twice, (6) his mother did not take good care of their home and allowed stray animals to live in the house, resulting in a stench, (7) it was "torture living with my mother," (8) after his parents divorced, his mother hooked up with a man named Chick who was also a drunk, (9) in high school James was a good athlete and had good role models, (10) Petitioner lacked good role models, (11) after high school, James entered the military and developed problems with alcohol and drugs, (12) at age 29, James entered Alcoholics Anonymous, (13) James subsequently became a counselor, (14) during his childhood, James and his siblings were not taught right from wrong or how to care for themselves, (15) James was forced to undergo a tooth extraction when he was nine without anesthetic, (16) as a child James was once hospitalized for an extended period because his father refused to take him to the hospital until after James' appendix reached an advanced stage of disease, (17) the Dallas children were not furnished any dental care by their parents, (18) there was frequently a lack of food in the house, (19) the Dallas children did not have proper clothing, and (20) all of the Dallas children suffered because of the neglect of their parents -- Cindy became pregnant at a young age and has struggled with drinking and eating disorders; Paul has struggled with drinking; and Donald has had problems with alcohol and drugs.

Analysis of proffered new testimony from uncalled witnesses like James (Jimmy) Dallas, Jr. under the prejudice prong of *Strickland* requires consideration of (1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses, (2) the interplay of the uncalled witnesses with the actual defense witnesses called, and (3) the strength of the evidence actually presented by the prosecution. *Armstrong v. Kemna*, 590 F.3d 592, 596 (8th Cir.), *cert. denied*, 560 U.S. 945 (2010); *McCauley-Bey v. Bowersox*, 97 F.3d 1102, 1106 (8th Cir. 1996), *cert. denied*, 520 U.S. 1178 (1997). Insofar as James (Jimmy) Dallas, Jr.'s affidavit addresses his childhood, his affidavit reiterates much of the trial testimony of Petitioner's sister Cindy and brother Paul, albeit with some additional details, concerning the neglect and abuse the Dallas children suffered from their alcoholic parents. Moreover, the sworn *pro se* state habeas corpus petition Petitioner filed September 23, 1999, states that Jimmy Dallas once assaulted their mother, knocking her over a couch. 12 SCR (Revised) Tab 13-A, at pp. 60-61. The 2007 affidavits of Petitioner's sister Cindy, brother Paul, and mother Elaine presented to this court for the first time and the Petitioner's sworn *pro se* state habeas corpus petition establish that Petitioner's older brother Jimmy only saw Petitioner once (at a family funeral) after Petitioner's mother divorced Petitioner's father and moved (with Cindy, Paul, and Donald) away from New York. Thus, there is ample basis in the record now before this court for impeaching the proffered testimony of Jimmy Dallas through evidence showing (1) Jimmy had very little contact with Petitioner after Petitioner left the State of New York with their mother around age six or seven, (2) Jimmy experienced the

same type of neglected, abused, childhood as Petitioner but has never been convicted of killing anyone, (3) Jimmy was able to get help for his substance abuse and become clean and sober, while Petitioner gave into the urge to binge on crack cocaine no matter the consequences to anyone else, and (4) Jimmy's own propensity for violence even before he joined the military and began having problems with alcohol and drugs. While Petitioner argues that Jimmy Dallas could have testified as an expert "counselor" on the negative effects of abuse upon children, nothing in the 2007 affidavit of James (Jimmy) Dallas, Jr. establishes that he was qualified, either by training or through experience, at the time of Petitioner's 1995 capital murder trial to testify as an expert witness on any subject.

[152] The 2007 affidavit of Cindy Dallas appears as Exhibit 6 in Doc. #87-1. Cindy Dallas' 2007 affidavit states that (1) her father was a very violent man who was a drunk and messed around with other women, (2) she and her siblings were often left alone while their parents were out drinking, (3) many times their parents returned home and there was a lot of fighting, (4) their father beat their mother in front of them and chased their mother around the house with knives and guns, (5) her father threatened to kill her mother and sometimes the children were certain he would do so, (6) the bartenders at the bars where their father took them gave the Dallas children food so they would not go hungry, (7) sometimes their father made the Dallas children unload his truck because he was drunk, (8) other drivers would give the Dallas children food from their trucks so they would have something to eat, (9) her father spent all of his money on alcohol, (10) her father took the Dallas children to the homes of women with whom he had affairs, (11) during some of his infidelities, their father would leave the Dallas children outside in the cold car while he went inside and engaged in extramarital relations, (12) their mother once caught their father having extramarital relations with a woman in a car and chased their father through their yard naked, (13) twice people came to their home and took their mother away in a straight-jacket, (14) her mother beat the Dallas children many times while their parents were together, (15) there were times the Dallas family did not have enough food to eat and their maternal grandmother brought food, (16) her mother occasionally had hallucinations, (17) her mother had been molested by a brother, (18) the home in which they lived was infested by rats, one of which bit Petitioner, (19) their mother took Petitioner to the hospital after the rat bit him, (20) the Dallas family moved around a lot, (21) Petitioner was always a follower, (22) after their parents' divorce, her mother went with a man named Chesley (Chick) Collier who drank a lot, ignored her, but was good to her brothers, (23) Petitioner began playing the drums when he was very young, (24) Petitioner and Pam met when Petitioner was fourteen and have two daughters, (25) Petitioner worked steadily when he was with Pam, (26) her brother Paul introduced Petitioner to Polly and Petitioner left Pam to live with Polly, (27) she observed a big change in Petitioner after he took up with Polly, (28) Polly got Petitioner into drugs, (29) Petitioner tried to maintain a relationship with the daughters he had with Pam but conflict between Pam and Polly interfered, (30) Petitioner and Polly have four children, (31) Polly is physically violent with Petitioner and very manipulative, often threatening to take away their children from him, and (32) while she testified at Petitioner's trial, she only answered the questions his attorney asked her.

Cindy Dallas' 2007 affidavit adds some new details regarding the dysfunctional Dallas household but does not offer any truly new substantial mitigating evidence beyond that contained in (1) her 1995 trial testimony in which she described life in her alcoholic mother's home as "hell," (2) the 1995 trial testimony of Paul Dallas, and (3) Petitioner's own 1995 trial testimony, in which he also described his rebellious behavior as an adolescent

testimony from any of Petitioner's the family members and friends who furnished affidavits in 2007 similar to that contained in their affidavits.[153]

---

The 2007 affidavit of Paul Dallas appears as Exhibit 6 in Doc. # 87-1. In his 2007 affidavit, which mirrors many aspects of Cindy Dallas' 2007 affidavit, Paul Dallas states that (1) his father was a very abusive, mean man who consumed a lot of alcohol, ran around with other women, and once threw Paul against a wall when Paul was in kindergarten, (2) their parents often abandoned the Dallas children to go drinking, (3) their mother beat the Dallas children many times, (4) their father routinely spent all of his money on alcohol, leaving the family nothing to pay for food, (5) their mother worked, sometimes two jobs, to furnish food for the family, (6) they were so poor they had to wear clothes with patches and shoes with cardboard covering holes in the sole, (7) their mother often hallucinated, (8) his mother was molested by her brother, (9) the homes they lived in were full of rats, one of which bit Petitioner (10) their mother took Petitioner to the hospital, (11) the Dallas family moved around a lot, (12) when Petitioner was about fourteen he began cutting school, drinking alcohol, smoking cigarettes, and using marijuana, (13) Petitioner was a follower, (14) Chick Collier drank a lot but also taught Petitioner to play the drums, (15) while they lived with Chick Collier, Paul Dallas and Petitioner were sexually assaulted at least four times, *i.e.*, anally raped and forced to perform fellatio upon a male friend of Patricia Mefford, (16) Paul has had problems with alcohol throughout his life and is an alcoholic, (17) he testified at Petitioner's trial and would have helped in any way necessary during his brother's trial, and (18) he did not furnish all of the information in his 2007 affidavit to Petitioner's trial counsel because he was not asked to do so.

Other than allegations of multiple sexual assaults by a family acquaintance, Paul Dallas' 2007 affidavit offers very little that was not contained in the trial testimony of Petitioner, the trial testimony of Petitioner's sister Cindy, or the trial testimony of Paul Dallas. Paul Dallas does not aver in his 2007 affidavit that he ever told anyone about the alleged sexual assaults upon himself and Petitioner at or near the time they took place. Nor does Paul Dallas state with any degree of clarity exactly when or where the sexual assaults took place or the exact identity of the perpetrator. Had Paul Dallas offered this new assertion at Petitioner's trial, he would have been subject to cross-examination and possible impeachment based upon his failure to make a timely outcry and the absence of any record of a criminal prosecution of the alleged perpetrator. Moreover, the close personal relationship between Petitioner and his older brother Paul and the serious consequences of an unfavorable jury verdict at the punishment phase of Petitioner's capital murder trial furnish "a potential bias and a motive to provide false information." *See Armstrong v. Kemna*, 590 F.3d at 602-03 (holding that the credibility of a criminal defendant's brother as an uncalled trial witness must be evaluated for purposes of *Strickland* prejudice with full awareness of their close personal relationship and the inherent bias which flows therefrom).

[153] Petitioner's federal habeas counsel has furnished a number of affidavits from Petitioner's relatives and acquaintances. Brandi Ray, who identified herself as a child of Carolyn "Polly" Yaw and who was fourteen at the time of Petitioner's 1995 capital murder trial, stated in her affidavit that (1) her biological father died before she was born and she considers Petitioner to be her father, (2) she loves Petitioner very much, (3) Petitioner worked to earn money for their family, never hit the children, spent time with her and her siblings, taught them manners, and was the more stable

parent in her family, (4) she believes her mother is an alcoholic and drug addict who only worked as a stripper, (5) her mother took her and her siblings to crack houses to buy crack and hold drugs for her, (6) her mother argued with Petitioner until he started using crack with her, (7) her mother constantly demanded money from Petitioner and became physically assaultive until she got it, (8) her mother stabbed a man seventeen times behind a bar and went to prison, (9) Petitioner took her and her siblings to Texas while her mother was in prison, (10) Petitioner worked and cared for her and her siblings, (11) she has suffered mental illness (Bipolar disorder), nervous breakdowns, and has made two suicide attempts, (12) she has maintained contact with Petitioner, who has been a positive influence on her life, and (13) if she had been contacted at the time of Petitioner's 1995 trial she would have furnished the same information as in her 2007 affidavit (Exhibit 7 in Doc. # 87-1). The efficacy of calling Petitioner's fourteen year-old step-daughter to testify in 1995 in the same manner as her 2007 affidavit is dubious given the fact that Petitioner's sister Cindy and friend Rhonda Chavers offered essentially the same type of testimony at the punishment phase of Petitioner's capital murder trial, *i.e.*,, testimony that (1) Petitioner was a good father and a responsible parent and (2) contrasted Petitioner's stability, non-violent nature, and good parenting skills with those of Carolyn "Polly" Yaw. Ms. Ray does not state in her affidavit that she would have been willing to testify at Petitioner's 1995 capital murder trial had she been asked to do so.

Marge DeBottis states in her affidavit that (1) she was a neighbor of the Dallas family in Cato, New York, (2) she did not spend a lot of time with the Dallas family, (3) James Dallas, Sr, drove a truck and Elaine stayed home, (4) the Dallas house was filthy, (5) numerous animals - goats, cats, and dogs - wandered in and out of the Dallas home, (6) Elaine was a sloppy and lazy person, and (7) had she been contacted at the time of Petitioner's trial, she would have furnished the same information as in her affidavit (Exhibit 8 to Doc. #87-1). In her 2007 affidavit, Mrs. DeBottis did not mention Petitioner or any of the other Dallas children specifically or by name and did not claim to have any contact with the Dallas children after they left New York when Petitioner was six or seven years old. Mrs. DeBottis also does not state that she would have been willing to testify at Petitioner's 1995 trial had she been asked to do so.

Gary Fellows stated in his 2007 affidavit that (1) he was acquainted with the Dallas family and lived in the same area of New York state as them, (2) he knew Petitioner's parents and paternal grandparents, (3) Petitioner's father worked as a truck driver who was not home much of the time, (4) until about 1958, he and Petitioner's father drank together regularly, (5) Petitioner's father continued to drink and stay out away from home even after his children were born, (6) Petitioner's mother had some affairs, (7) there were questions about whether the two younger Dallas children were the children of James Dallas, Sr., (8) Petitioner's paternal grandfather was a frequent drinker, (9) Petitioner's paternal grandmother was "a hypochondriac" whom the Dallas family needed to wait on hand and foot, (10) Petitioner's mother was "an oddball," a frequent drinker, and "had a few marbles missing," and (11) had he been contacted at the time of Petitioner's trial, he would have been willing to testify on Petitioner's behalf (Exhibit 9 to Doc. # 87-1). Other than making cryptic accusations of "frequent drinking" by Petitioner's parents and grandparents and asserting that Petitioner's father was not home often, Mr. Fellows' affidavit offers very little fresh insight into Petitioner's family life. Mr. Fellows does not mention or reference Petitioner or any of Petitioner's siblings in his affidavit.

Kenneth Paul Lee states in his 2007 affidavit that (1) he knew Petitioner's parents when they lived in Cato, New York, (2) Petitioner's father was an alcoholic whose drinking led to his death, (2) petitioner's mother was also a drinker, (3) both of Petitioner's parents were wild, (4)

Petitioner's parents created an environment for their children that was not healthy or typical, (5) the Dallas children had no supervision or guidance in the home, (6) the Dallas children "were basically left to care for themselves in the best way they knew how," and (7) had he been contacted at the time of Petitioner's trial, he would have furnished the same information as in his affidavit (Exhibit 10 to Doc. # 87-1). Mr. Lee does not state that he would have been willing to testify at Petitioner's 1995 capital murder trial had he been asked to do so.

Robert McCadden stated in his 2007 affidavit that (1) he was in the same high school graduating class as Petitioner's father and served as a volunteer with the local Fire and Rescue Department in Cato, New York, (2) Petitioner's father was a truck driver and very heavy drinker, (3) Petitioner's mother frequently drank with her husband, (4) on one occasion, Petitioner's father passed out at a bar and Petitioner's mother physically carried Petitioner's father out of the bar, (5) he witnessed similar incidents on other occasions, (6) Petitioner's mother was not a stable person and "definitely had some mental issues," (7) local Fire and Rescue personnel were dispatched to the Dallas home on at least three occasions because Petitioner's mother had a "nervous breakdown" and the squad was sent to attempt to gain control of her, (8) on one of those occasions, Petitioner's mother ran into a field and it took more than an hour to locate her, (9) during each incident in which Fire and Rescue personnel arrived at the Dallas home, Petitioner's mother was "hitting, screaming, belligerent, irrational and uncontrollable," (10) in his opinion "the situation and home-life for the Dallas children could not have been very good, as their father was always drunk or away from home driving a truck and their mother suffered from mental illness," (11) many times "the Dallas children were left at home alone to fend for themselves," and (12) had he been contacted at the time of Petitioner's trial, he would have been willing to provide the same information as that contained in his affidavit (Exhibit 11 in Doc. #87-2). Nothing in the affidavit of Mr. McFadden establishes that he possessed the expertise in 1995, through training or experience, to render an expert opinion regarding Petitioner's mother's mental condition. Mr. McFadden also does not state that he would have been willing to testify at Petitioner's 1995 capital murder trial.

Rosemund Myers states in her 2007 affidavit that (1) she was acquainted with the Dallas family, (2) at the request of his parents, she cared for Paul Dallas from about age five to seven months until age ten to twelve months, (3) it was her understanding that, at that time, Petitioner's parents were separated, (4) during the months she cared for Paul Dallas, his father came to visit him at her home and gave her a small amount of money but Paul's mother did not visit, (5) Paul's father directed her to contact Paul's mother if she needed help, (6) she did contact Paul's mother on one occasion but she said she was not feeling well, (7) Paul's mother came to her home one day without warning and took Paul away, (8) Paul's father was a heavy drinker and had several D.U.I. convictions but nonetheless managed to keep driving, (9) Paul's mother also drank, (10) Paul's parents were "party people," and (11) had she been contacted at the time of Petitioner's trial she would have been willing to furnish the same information as in her affidavit (Exhibit 12 to Doc. #87-2). Ms. Myers does not mention Petitioner in her affidavit and does not state she would have been willing to testify at Petitioner's capital murder trial had she been asked to do so.

Shirley J. Pollay states in her 2007 affidavit that (1) she went to high school with Petitioner's mother and her estranged husband worked with Petitioner's husband, (2) Petitioner's mother's parents kicked her out of their home when she was pregnant with her first child, (3) she lived in the same apartment building as Petitioner's mother, (4) "the more people helped her the more she expected from people and the less she did for herself," (5) on one occasion, Petitioner's

Weighed against the new mitigating evidence Petitioner presented to his state habeas court and the additional mitigating evidence Petitioner's federal habeas counsel has presented are the aggravating circumstances of Petitioner's capital offense.  It is undisputed that Petitioner (1) put an elderly woman with a known heart condition into the trunk of her car on a July afternoon in central Alabama with promises he would release her once he obtained money from her bank account, (2) drove her vehicle to a parking lot in south Montgomery, (3) induced her to reveal the procedure for utilizing her bank card to get money from a teller machine by

---

mother called her and asked her to come to the Dallas home because she was ill and needed help putting her children to bed, (6) the Dallas children slept on a mattress with no sheets, pillows, or blankets, (7) she later learned Petitioner's mother had been out drinking and dancing the following evening, (8) the Dallas children were allowed to go to bed whenever they wanted and no one watched over them, (9) Petitioner's sister Cindy failed first grade because no adults made sure she did what the school needed her to do, (10) she and her estranged husband frequently socialized with Petitioner's parents when they were first married, (11) Petitioner's mother continued to party and stay out drinking even after her children were born, (12) Petitioner's paternal grandfather was known as an alcoholic and Petitioner's father "followed in his footsteps," (13) had she been contacted at the time of Petitioner's trial she would have furnished the same information as in her affidavit (Exhibit 13 in Doc. #87-2).  Ms. Pollay does not state in her affidavit that she would have been willing to testify at Petitioner's capital murder trial.

Significantly, all but one of these affiants fail to aver that they would have been willing to testify at Petitioner's 1995 capital murder trial had they been asked to do so.  Most of these affiants do not purport to possess any detailed information concerning Petitioner's actual upbringing.  None of them other than Brandi Ray claim to have any knowledge of Petitioner's life after he left New York State with his mother, sister Cindy, and brother Paul when Petitioner was six or seven years old.  Other than confirming the testimony of Petitioner's sister and brother Paul at the punishment phase of Petitioner's 1995 capital murder trial regarding the dysfunctional nature of the Dallas household in New York, these affidavits offer very little in terms of genuinely new mitigating evidence.  Petitioner's jury was well aware from the punishment phase testimony of Petitioner's sister Cindy and brother Paul that Petitioner's parents were both alcoholics who neglected their children, were prone to acts of violence, and furnished their children no adult supervision.  The affidavits do, however, furnish a great deal of information that could have been used to impeach Petitioner's mother had she testified at Petitioner's capital murder trial.

172

promising to call police to notify them of her location once he obtained money from her bank account, (4) thereafter abandoned his victim inside the trunk of her vehicle which he parked in an unshaded, isolated, location of the parking lot, and (5) never called anyone to alert them to his victim's perilous predicament despite having multiple opportunities to do so, including an opportunity when his attempted trip back to the parking lot to "make sure she was gone" prematurely ended due to car problems.   In addition, viewed in the light most favorable to the jury's guilt-innocence phase verdict, the evidence at trial shows that, when asked by Dennis Bowen about Chester Foley's statement that Petitioner and Yaw locked an old lady in the trunk of her car after robbing her, Petitioner sarcastically told Bowen that he hoped or wished the old lady would die.

Petitioner locked Mrs. Liveoak inside what was essentially a steel coffin on a July afternoon in central Alabama and then parked her in an unshaded location where she was unlikely to be discovered.   Setting aside the horrific physical torture the elderly Mrs. Liveoak endured while locked inside the trunk of her car on a July afternoon in central Alabama, the state trial judge accurately noted that Mrs. Liveoak died waiting for the rescue Petitioner repeatedly promised her would come but which Petitioner knew would never come.   A more psychologically sadistic (heinous, atrocious, and cruel) method of murder is difficult to imagine.

When determining whether prejudice exists within the context of *Strickland*, it is necessary to consider all of the relevant evidence that the jury would have had before it if Petitioner's counsel had pursued the different path - not just the new or additional mitigation evidence Petitioner's counsel could have presented, but also the aggravating evidence that almost certainly would have come in with it.  *Wong v. Belmontes*, 558 U.S. at 20; *Strickland v. Washington*, 466 U.S. at 700.

In 1995, Petitioner's jury and trial judge heard testimony from (1) Dr. Renfro and Petitioner himself concerning Petitioner's addiction to crack cocaine and the deleterious effects of crack cocaine, (2) Petitioner, his siblings, and an acquaintance regarding (a) the difficult childhood Petitioner endured growing up in a household with an alcoholic, abusive, absentee, father and an alcoholic, physically abusive, mentally unstable, mother and (b) the negative changes in Petitioner's behavior which accompanied Petitioner's decision to abandon his common law wife and their daughters and begin using crack cocaine with Polly Yaw, and (3) Petitioner's siblings and acquaintance regarding Petitioner's good character traits.  There is no reasonable probability the jury's advisory verdict or the trial judge's findings at the punishment phase of trial would have been any different had Petitioner's trial counsel presented all of the new potentially mitigating evidence which Petitioner presented in his state habeas corpus proceeding and Petitioner's federal habeas counsel presented to this court, most of which simply reiterates or elaborates upon

the information furnished through the testimony of Petitioner, Dr. Renfro, and other defense witnesses at Petitioner's 1995 capital murder trial.

2.   <u>Specific Complaints of Ineffective Assistance</u>

Petitioner's original federal habeas corpus petition includes a 46-page stream of consciousness complaint about the performance of his trial counsel (Doc. #1, at pp. 17-63).  Out of an abundance of caution, the court will address all of Petitioner's complaints in roughly the same order in which they appear in his original petition.

a.   <u>Pretrial Matters</u>

Petitioner complains in his seventh claim in his original petition that he was "denied effective legal representation prior to the commencement of his trial" by virtue of (1) the state trial court appointing, and then permitting to withdraw, a series of defense counsel, (2) low funding for pretrial representation by his defense counsel from the State of Alabama, (3) the dismissal of one of his counsel over Petitioner's objection, and (4) delay in any of his court-appointed counsel meeting with him, which he contends resulted in the involuntariness of his confession (Doc. # 1, at pp. 17-26, □□ 42-63).  For the reasons discussed below, as well as the reasons discussed at length above in Section XIII.C.1., all of these complaints fail to satisfy the prejudice prong of *Strickland*.

## (1) Deficiencies in the Performance of Former Counsel

Insofar as Petitioner complains about the performance of several attorneys appointed to represent him who were subsequently permitted to withdraw from Petitioner's representation, those complaints do not satisfy the prejudice prong of *Strickland*. None of the attorneys who withdrew or were dismissed prior to trial actually represented Petitioner at trial. Petitioner alleges no facts, and presents no evidence, showing any act or omission by any of these attorneys caused any exculpatory, impeachment, or mitigation evidence to become unavailable to Petitioner's eventual trial counsel.[154] Thus, any deficiencies in the performance of Petitioner's former counsel did not "prejudice" Petitioner within the meaning of *Strickland*. The state trial court appointed Petitioner's lead trial counsel in February 1995, almost eight months before the start of Petitioner's trial. The state trial court appointed co-counsel for Petitioner about a month prior to the start of trial. The trial court appointed a third attorney to serve as Petitioner's mitigation specialist on the

---

[154] Petitioner does not allege that any documentary evidence available between July 1994 and October 1995 became unavailable due to any act or omission of any of his former court-appointed counsel. Petitioner does not allege that any of his former counsel lost or allowed to disappear any irreplaceable documents or other tangible evidence which might have proven helpful to Petitioner's trial counsel. Nor does Petitioner identify any potentially beneficial witness whose testimony became unavailable at trial due to the misfeasance or nonfeasance of any of his former court-appointed counsel. For example, petitioner does not allege that any witnesses died or otherwise became unavailable (without having been deposed or having had their testimony otherwise preserved in admissible form) during the timeframe between his arrest in July 1994 and the start of his trial in October 1995 because of the actions or inactions of his former counsel.

eve of trial, *i.e.*, October 11, 1995.  It is the performance of these three attorneys which must be the focus of any ineffective assistance claims asserted by Petitioner.

### (2)  Low Pay for Defense Counsel

Petitioner complains that, at the time of his trial, Alabama law allowed his trial counsel to receive not more than one thousand dollars in compensation for out-of-court work for each phase of his capital murder trial, based upon a twenty dollar hourly rate.  This complaint is *non sequitur*.  The same constitutional standard of effectiveness, *i.e.*, the *Strickland* standard, applies to the performance of Petitioner's trial counsel regardless of whether they appeared pro bono or represented their client pursuant to a contract or court-appointment entitling them to considerable compensation.  The allegedly low level of pay an attorney received for representing a criminal defendant does not *per* se satisfy either prong of the *Strickland* analysis.

### (3)  Denial of Petitioner's Counsel of Choice

In his seventh claim in his original petition and his brief in support (Doc. #1, at pp. 19-21, ☐☐ 49-53), Petitioner argues that he was denied his constitutional right to the counsel of his choice when the state trial court dismissed an attorney who had been appointed to represent Petitioner over Petitioner's objection.  An indigent criminal defendant does not have a constitutional right to have a particular lawyer represent him nor to demand a different appointed lawyer except for good cause.  *United States v. Garey*, 540 F.3d 1253, 1263 (11th Cir. 2008), *cert. denied*, 555 U.S.

1144 (2009); *Thomas v. Wainwright*, 767 F.2d 738, 742 (11th Cir. 1985). Petitioner did not possess a constitutional right to the court appointed counsel of his choice.

(4) <u>Motions for Continuance/Announcements of "Not Ready"</u>

In his third claim in his original petition and his briefs on the merits, Petitioner points to the motions for continuance filed on the eve of trial by his counsel and their announcements in open court that they were not prepared to proceed to trial as evidencing their ineffective assistance (Doc. # 1, at pp. 8-10; Doc. #88, at pp. 59-128). The deficient performance prong of *Strickland* is an objective standard, however. For that reason, admissions by trial counsel that their performance was deficient matter little. *Chandler v. United States*, 218 F.3d at 1315 n.16; *Tarver v. Hopper*, 169 F.3d 710, 716 (11th Cir. 1999); *Atkins v. Singletary*, 965 F.2d 952, 960 (11th Cir. 1992). The announcement by Petitioner's trial counsel that they were not ready for trial and the state trial court's denial of their motions for continuance do not establish Petitioner's trial counsel rendered ineffective assistance at Petitioner's ensuing trial.

(5) <u>Involuntary Confession</u>

Petitioner waived his right to legal representation and gave a videotaped statement on the day of his arrest (on July 14, 1994) in which he admitted to all the elements of his capital offense save for intending to kill Mrs. Liveoak. As explained above at length in Section VI., the admission at trial of a signed, undated, written

178

copy of the verbatim transcript of Petitioner's videotaped statement was, at most, harmless error. Petitioner's complaint that he was not visited by court-appointed counsel until *after* he signed the verbatim transcription of his videotaped statement does not satisfy the prejudice prong of *Strickland*. It is undisputed that Petitioner (1) initiated contact with law enforcement officers on or about September 1, 1994, (2) was transported to Montgomery police headquarters, and (3) was permitted to review and sign the transcription of the videotaped statement he had given July 14, 1994. Petitioner's trial counsel filed a motion to suppress all of Petitioner's statements, both the videotaped and transcribed versions, and fully litigated that motion at a pretrial hearing held October 11, 1995, including presenting Petitioner's testimony.[155]

Petitioner offered the state habeas court and offers this court no affidavit or other evidence showing that, but for the failure of his court-appointed trial counsel to contact Petitioner prior to September 1, 1994, the outcome of the pretrial hearing on Petitioner's motion to suppress would have been any different. Likewise, even if Petitioner's trial counsel had managed to convince the state trial court to exclude the verbatim transcription of Petitioner's July 14, 1994 videotaped statement at trial, such an effort would not have materially assisted Petitioner at trial. Petitioner has

---

[155] 4 SCR 3-72 (transcription of all proceedings October 11, 1995 on motion to suppress).

presented no evidence showing there was any legitimate legal basis for excluding the videotaped statement recorded July 14, 1994. Once Petitioner's videotaped statement was admitted into evidence at trial, the prosecution could have sought, and would in all likelihood have been permitted to introduce, a verbatim transcription of the Petitioner's July 14, 1994 videotaped statement, which did not bear Petitioner's signature. There is no reasonable probability that anything Petitioner's trial counsel could have done after the date the state trial court first appointed counsel to represent Petitioner (*i.e.*, on July 18, 1994) would have resulted in the exclusion at trial of Petitioner's videotaped statement of July 14, 1994 or otherwise changed the outcome of either phase of Petitioner's capital murder trial.

b. Guilt-Innocence Phase Matters

In his seventh claim in his original petition, Petitioner argues in conclusory fashion that he was denied effective assistance during the guilt-innocence phase of trial by virtue of (1) the failures of his trial counsel to (a) adequately investigate the case against Petitioner, (b) adequately meet with Petitioner prior to trial, (c) adequately prepare for trial, (d) meet with and interview prosecution witnesses, including Detective Hill, Detective Cleghorn, Detective Smith, Detective Fuller, Danny Smith, and Dr. Stillwell, (e) discover and present evidence showing Petitioner was high on crack cocaine at the time of his offense, (f) call Dale Blake, Carlton Morrison, Chester Foley, and Carolyn Yaw to testify to Petitioner's drug-induced

180

intoxication at the time of his capital offense (to negate the intent to kill), (g) adequately cross-examine unidentified prosecution witnesses, (h) challenge the testimony of state experts, (i) object to unidentified irrelevant and prejudicial evidence, (j) adequately investigate the cause of Mrs. Liveoak's death, (k) investigate Mrs. Liveoak's overall health and the possibility Mrs. Liveoak died as a result of the failure of law enforcement officers to force open the trunk of her car as soon as it was discovered, rather than waiting two hours to get the key, (l) present a medical expert to challenge the prosecution's theory that Petitioner's actions alone caused Mrs. Liveoak's death or establish the exact time of her death, (m) object to the medical examiner's opinion that the cause of Mrs. Liveoak's death was "homicide," (n) adequately cross-examine the medical examiner regarding (i) whether it was possible Mrs. Liveoak would have died of a heart attack regardless of whether she had been placed in the trunk, (ii) how many patients who had undergone heart bypass and open-heart surgery survive in the long-run and what the chances are they will suffer another heart attack, and (iii) whether there was any basis for the medical examiner's trial testimony that Mrs. Liveoak was getting along quite well in her everyday activity, (o) adequately cross-examine prosecution witness Dennis Bowen regarding the variation between his trial testimony and his original statement to police, his criminal record, and the possibility of a deal between Bowen and Petitioner's prosecutors, (p) object to improper jury selection methods

181

utilized by the prosecution, *i.e.,*, the prosecution's use of extraneous information to help the prosecutors select which venire members to strike peremptorily, (q) object to improper jury argument by the prosecution during both opening and closing arguments, *i.e.,* the prosecution (i) characterizing of Petitioner as a heartless animal as contrasted to its description of Mrs. Liveoak as a good Christian woman, (ii) arguing the evidence to convict was very strong and it would not be hard to convict Petitioner, (iii) commenting on the credibility of witnesses, (iv) expressing a personal opinion as to Petitioner's guilt, (v) commenting upon the defense's failure to present as a witness the person Petitioner testified had tried to give Petitioner a ride back to the K-Mart parking lot, (vi) arguing Petitioner's statement to Dennis Bowen (about hoping or wishing the old lady died) was sufficient to prove Petitioner's intent to kill, and (vii) arguing Petitioner's choice to use crack cocaine did not mitigate what he did, and (r) object to the prosecution eliciting hearsay testimony and (2) conceding in opening argument that Petitioner was responsible for Mrs. Liveoak's death (Doc. #1, at pp. 26-38, ☐☐ 64-99).  For the reasons discussed below, as well the reasons discussed above in Section XIII.C.1.a., none of these complaints (whether viewed separately or collectively) satisfy the prejudice prong of *Strickland*.

(1)  <u>Failure to Investigate the Case Against Petitioner</u>

Petitioner's complaint that his trial counsel failed to adequately investigate the case against Petitioner ignores the fact that the prosecution's case against Petitioner consisted primarily of Petitioner's videotaped statement to police.  Both Petitioner's lead trial counsel and co-counsel testified *without contradiction* during Petitioner's state habeas corpus proceeding that they (1) reviewed Petitioner's statement to police and (2) concluded the best defense they could present at the guilt-innocence phase of trial was one which focused on attempting to convince the jury Petitioner had not intended to kill Mrs. Liveoak but, rather, had been so intoxicated and intent on getting high on crack that he could not form the intent to kill.[156]

---

[156] Petitioner's co-counsel at trial testified at length during Petitioner's state habeas corpus proceeding.  More specifically, attorney Jeffery C. Duffey testified that (1) he was able to consult with Petitioner, obtain discovery, and develop a defensive strategy prior to trial, (2) the defense strategy was to present evidence, primarily through Dr. Renfro, showing Petitioner could not form the intent to kill because he was intoxicated at the time of his offense, (3) during his pretrial conversations with Petitioner, the Petitioner expressed great remorse for his crime, (4) he prepared the defense's requested jury instructions for both phases of trial while attorney Susan James served as the defense's investigator, (5) *Petitioner specifically asked him not to speak with Petitioner's mother*, (6) the defense team knew Petitioner came from a dysfunctional family and presented evidence of same at the punishment phase of trial, (7) he did not sit in during Petitioner's pre-sentence interview, (8) the defense team was surprised at trial by the testimony of Dennis Bowen when he testified the Petitioner said he hoped Mrs. Liveoak died, and (9) the defense's trial strategy at the guilt-innocence phase of trial was to try to get a conviction for a lesser-included offense.  11 SCR 6-68 (testimony of Jeffery C. Duffey).

Petitioner's court-appointed investigator, attorney Susan James, testified that (1) she learned Petitioner had recently served a prison sentence in Texas and had participated in some sort of drug treatment program, (2) Lorilee Mills did most of the actual interviews of potential witnesses, (3) Petitioner gave a full confession to police long before she ever became involved in the case, (4) she contacted Dr. Renfro several times in preparation for trial, (5) the guilt-innocence phase of trial was preparation for the punishment phase of trial as there was no doubt as to who had done it, (6) she spoke with Carolyn Yaw's attorneys, (7) the defense team's investigation focused on Petitioner's drug addiction and on finding proof Petitioner was high on crack at the

time of his offense, (8) she spoke with Petitioner's family members before they testified at trial, (9) she did not have adequate time to subpoena Petitioner's correctional, medical, or school records, (10) Petitioner reported his father was dead, (11) she would have liked more time to investigate Petitioner's mother's mental illness, (12) Petitioner consistently admitted the offense conduct so the only issue before the jury was whether Petitioner had the intent to cause Mrs. Liveoak's death, (13) the most significant mitigating evidence the defense was able to develop was that Petitioner was addicted to crack cocaine and had a habit of over eight hundred dollars per day, (14) while the focus of the defense's case in mitigation was on Petitioner's crack cocaine addiction, the defense also presented evidence Petitioner had a terrible family life, a "pretty tortured childhood," and fathered his first child when he was only fourteen, (15) Petitioner was smoking, drinking, and doing dope when he was ten or eleven years old, (16) she went to Chester Foley's house to look for people who had been present when Petitioner learned of Mrs. Liveoak's death, (17) the defense team was unable to locate Petitioner's former employer Bo Stevens but did learn Petitioner had a reputation for stealing from his employers and getting fired, (18) Petitioner played down his connections with his family, (19) Petitioner told her he had a sixth grade education and had worked on a GED while in Texas, (20) Petitioner confessed to everything except intentionally causing Mrs. Liveoak's death, (21) she did not speak with anyone who was present when Mrs. Liveoak's trunk was opened, (22) she tried to locate Chester Foley and others who had been with Petitioner at or near the time of his offense, (23) she has an undergraduate degree in social rehabilitation and a masters in criminology and a great deal of experience dealing with the difference between crack and powder cocaine, and (24) she relied upon the information furnished by Lorilee Mills regarding her interviews of potential witnesses.  11 SCR 68-118 (testimony of Susan James).

Petitioner's lead trial counsel testified through a deposition which the state trial judge considered in making his factual findings during Petitioner's state habeas corpus proceeding. Petitioner's lead trial counsel testified that (1) he was appointed to represent Petitioner on February 1, 1995, (2) he saw Petitioner on February 28, 1995, (3) he did nothing to prepare for Petitioner's trial during May through July 1995, (4) he reviewed the Montgomery Police Department's evidence file in Petitioner's case on August 31, 1995, (5) Petitioner's case was his first capital murder case, (6) he recalled Petitioner had a very unhappy childhood, began drinking heavily from a very young age, began using drugs from an early age, and was on his own in terms of discipline his entire life, (7) his punishment phase preparation consisted of hiring Dr. Renfro to testify for the defense, (8) he met with Petitioner prior to trial both out of court and in conjunction with court appearances, specifically on February 28, March 7, July 26, August 24, September 5, and October 11, 1995, (9) he cross-examined Dennis Bowen extensively at trial regarding Bowen's assertion that Petitioner said he hoped or wished the old lady died, (10) the trial court ruled that he could use a 1985 DUI conviction to further impeach Bowen, (11) he felt certain the defense team spoke with Petitioner regarding his background and family life, (12) Petitioner admitted he put Mrs. Liveoak in the car trunk, (13) Petitioner discussed with him the circumstances under which Petitioner gave his statement to the Montgomery Police Department, (14) the evidence of Petitioner's guilt was overwhelming, leaving the only issue for the defense an attempt to avoid the death penalty, (15) the defense's strategy at the guilt-innocence phase of trial was to show Petitioner was so high on crack cocaine that he could not have formed the intent to commit murder, (16) he had no problems communicating with Petitioner, (17) Petitioner was very cooperative with the defense, (18) the defense's strategy at the punishment phase of trial was to show Petitioner was

Petitioner complains that his trial counsel failed to investigate, develop, and present expert medical testimony and other exculpatory evidence at the guilt-innocence phase of trial showing (1) the exact time of Mrs. Liveoak's death, (2) Mrs. Liveoak was alive at the time police discovered her vehicle, (3) Mrs. Liveoak died as a result of the failure of law enforcement officers to force open her trunk immediately once they discovered her vehicle, (4) Petitioner's actions alone did not cause Mrs. Liveoak's death, (5) Mrs. Liveoak would have died of a heart attack regardless of whether she was placed in the trunk of her car, (6) the medical examiner erroneously opined that the cause of Mrs. Liveoak's death was "homicide," (7) how many patients who have undergone heart bypass and open-heart surgery survive in the long run, (8) what the chances are such patients will suffer another heart attack, and (9) the medical examiner erroneously testified Mrs. Liveoak was getting along quite well in her everyday activities.

These complaints do not satisfy the prejudice prong of *Strickland* because Petitioner does not allege any specific facts, much less present any evidence, showing that any evidence favorable to the defense addressing these subjects was

---

intoxicated at the time of his offense and Carolyn Yaw dominated him, (19) evidence showing Petitioner had successfully completed a drug rehabilitation program in Texas would not have been helpful to the defense at trial, (20) he believed Petitioner's desire for money to buy crack cocaine was the most important thing to Petitioner at the time Petitioner met Mrs. Liveoak, (21) he believed Petitioner got high and forgot to call the police to let them know about Mrs. Liveoak - thus making Petitioner responsible for her death.  13 SCR (Revised) 4-230 (deposition testimony of Algert Algricola).

available at the time of his 1995 capital murder trial.  Rank speculation and conjecture that exculpatory or favorable evidence might have been discovered had trial counsel undertaken a more thorough or searching investigation is not a substitute for hard evidence that such evidence actually existed at the time of Petitioner's trial. *See Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) (the prejudice burden erected by *Strickland* is heavy where the petitioner alleges ineffective assistance in failing to call a witness because "often allegations of what a witness would have testified to are largely speculative"), *cert. denied*, 549 U.S. 1286 (2007).

As discussed in more detail below, Petitioner has identified a number of individuals (including several of the police detectives and the medical examiner who testified for the prosecution at Petitioner's 1995 trial) he complains his trial counsel failed to interview prior to trial.  Petitioner does not allege any facts, much less furnish any evidence, showing any of these individuals could have furnished testimony or information favorable to the defense had his trial counsel conducted such pretrial interviews.  Moreover, Petitioner alleges no facts and presents no evidence showing any of these witnesses would have been willing to submit to a pretrial interview by Petitioner's defense team.[157]  *See United States v. Manor*, 936

---

[157] Specifically, Petitioner furnishes no fact specific allegations, much less any evidence in the form of an affidavit or a sworn statement from either Dr. Stillwell, Detective Saint, Detective Hill, Detective Cleghorn, Detective Smith, Detective Fuller, Danny Smith, Sergeant Mann, Dale

Blake, Carlton Morrison, Chester Foley, or Carolyn Yaw stating either that (1) they were willing to submit to a pretrial interview by Petitioner's defense team or (2) they possessed personal knowledge of any facts or information favorable or beneficial to the defense with regard to the issues before the jury at the guilt-innocence phase of petitioner's trial.

Montgomery Police Lieutenant John Mann testified during Petitioner's state habeas corpus proceeding that (1) in July 1994, he was temporarily assigned to the FBI Task Force which investigated Mrs. Liveoak's death, (2) he arrived at the K-Mart parking in south Montgomery after the trunk was opened, (3) he subsequently interviewed Carolyn Polly Yaw, (4) Yaw informed him that she and Petitioner stayed with the Foleys on July 13, 1994, (5) Yaw informed him she and Petitioner stole property on the morning of July 14 to get money, (6) Yaw said she and Petitioner stole property to pay for their crack habits, (7) inexplicably he allowed Yaw and Petitioner to confer while they were being interviewed by police (because Yaw did not believe petitioner had confessed to Mrs. Liveoak's murder), and (8) it was his understanding that the high from a hit of crack lasts only about three minutes. 12 SCR (Revised) at pp. 120-29 (testimony of John Mann).

Lieutenant Mann, then a Sergeant, also testified during a preliminary hearing held September 2, 1994 in Petitioner's capital murder case that (1) he *Mirandized* and interviewed Carolyn Yaw following her arrest with Petitioner, (2) Yaw stated to him that Petitioner grabbed her arm and forced her to go with him when he abducted Mrs. Liveoak, (3) during the interview he observed bruises on Yaw's arm which Yaw attributed to Petitioner grabbing her, (4) Yaw informed him Petitioner held Mrs. Liveoak at knifepoint as they drove to Hope Hull, where Petitioner put Mrs. Liveoak in the trunk of the car, (5) Yaw said they returned to Montgomery where they obtained information from Mrs. Liveoak about her account number and got about eight hundred dollars using Mrs. Liveoak's bank card, (6) Yaw said they left the parking lot in a cab after disposing of Mrs. Liveoak's property in a trash can, (7) Yaw said they bought drugs and bragged to Chester about what they had done, (8) Yaw said Chester got somebody to drive them to a motel, (9) Yaw said Petitioner and a friend went to a Wal-Mart in Wetumpka and stole an air compressor, brought it back to Montgomery, and sold it, (10) initially, Yaw denied any knowledge of Mrs. Liveoak, (11) Yaw said "Tony" picked them up and they went to the Wal-Mart in Prattville, where Petitioner stole a television set, (12) Yaw said Petitioner got into a struggle with a security guard and they left the scene, (13) when he informed Yaw that Petitioner had admitted to the abduction of Mrs. Liveoak, Yaw said she didn't believe it, (14) he arranged for Yaw to meet with Petitioner, who told her he had informed police what had happened, (15) Yaw told Petitioner "what have you gotten me into, that woman begged for her life and you held that knife and scratched her -- or cut her in the neck," (16) at that point he and other officers ended the conversation between Yaw and Petitioner, (17) he did not know the exact time of Mrs. Liveoak's death, (18) he was unaware of anyone who did have that knowledge, (19) Yaw said Mrs. Liveoak begged Petitioner to take her money and let her go, (20) Yaw changed her story only after she met with Petitioner and he told her what he had told police, and (21) Yaw said she was under duress throughout their encounter with Mrs. Liveoak.  9 SCR Tab 1, at pp. 72-102 (testimony of John Mann).

Chester Foley did submit a deposition taken July 3, 2001, which was presented to the state trial court during Petitioner's state habeas corpus proceeding and which appears in the record at Doc. # 138-1.  In his deposition, Mr. Foley specifically denied any personal knowledge of any facts relating to Petitioner's capital offense, claiming that (1) he was "on dope" at the time of Petitioner's offense and (2) everything he knew about Petitioner's offense he learned from his spouse, Rhonda Chavers.  Doc. 138-1, at pp. 17-20 (cross-examination of Chester Foley).  Mr.

Foley's testimony that (1) Petitioner once saved Foley from a knife-wielding assailant, (2) Petitioner was a gentle person, kind to children, and would never hurt anyone, and (3) he saw Petitioner upset and crying "because that woman done died," might arguably have had some relevance to the issues before the jury at the punishment phase of trial but very likely would have little value at the guilt-innocence phase of Petitioner's trial. Mr. Foley's deposition testimony on that latter subject was ambiguous at best. Doc. # 138-1, at pp. 9-10 (deposition of Chester Foley). Mr. Foley never stated in his deposition whether he could tell that Petitioner was grieving Mrs. Liveoak's demise or merely fearful for his own fate because the police had discovered her lifeless body in the place where Petitioner left her. Mr. Foley did state in his deposition that he never told Dennis Bowen that Petitioner had robbed and left an old lady in the trunk of her car. Doc. # 138-1, at pp. 9, 11, 13 (deposition of Chester Foley). Given the Petitioner's admissions in his post-arrest statement to police and his trial testimony, Foley's denial that he told Bowen about Petitioner's offense would have had little value in terms of impeaching Bowen's guilt-innocence phase testimony at Petitioner's trial. Regardless of who told Bowen about Petitioner's offense, it was undisputed at trial that, as early as July 14, 1994, Bowen knew exactly what Petitioner had done. It is also significant that, despite the length and breadth of Petitioner's guilt-innocence phase trial testimony, Petitioner never contradicted Bowen's testimony that Bowen confronted Petitioner and Yaw about their robbery of an old woman whom they locked in the trunk of her car. In fact, *strikingly absent from Petitioner's trial testimony is any mention of Dennis Bowen.* Petitioner's trial counsel never asked Petitioner to refute the most damaging aspect of Bowen's trial testimony, *i.e.,* Bowen's assertion that Petitioner said he hoped or wished the old lady would die. While Petitioner has identified dozens, if not hundreds, of alleged deficiencies in the performance of his trial counsel, Petitioner has not complained in his state habeas corpus proceeding or federal habeas corpus proceeding that his trial counsel should have asked Petitioner to address this aspect of Bowen's trial testimony during the course of Petitioner's own subsequent guilt-innocence phase trial testimony. Petitioner's silence on this point, both in his trial testimony and state and federal habeas pleadings, speaks volumes.

Moreover, had he testified at Petitioner's trial, Chester Foley would have been subject to cross-examination, and likely devastating impeachment, based upon his admitted drug use and his close personal relationship with the Petitioner. Petitioner testified without contradiction at the guilt-innocence phase of his trial that (1) he obtained crack from Foley, (2) he smoked crack at Foley's residence, (3) he and Foley stole items together which they sold to pay for drugs, and (4) Foley fenced property Petitioner had stolen to pay for crack. 7 SCR 787-88, 791 (testimony of Donald Dallas).

Viewed in the context of all the evidence now before the court, there is no reasonable probability the outcome of the guilt-innocence phase of Petitioner's trial would have been any different had (1) Lieutenant Mann testified at Petitioner's trial in the same manner as he did during Petitioner's state habeas corpus proceeding and preliminary hearing and (2) Mr. Foley testified at Petitioner's trial that he saw Petitioner upset and crying "because that woman done died." In fact, Lieutenant Mann's testimony about the short duration of the high from a hit of crack would have greatly undermined the efforts of Petitioner's trial counsel to convince Petitioner's jury that Petitioner was so high on crack Petitioner could not form the intent to commit murder. Lieutenant Mann's testimony during Petitioner's preliminary hearing would have undermined the efforts of Petitioner's trial counsel to show (at both phases of trial) that Petitioner was under the domination of Yaw at the time of Mrs. Liveoak's abduction and robbery. "Counsel are not required to present

F.2d 1238, 1242 (11th Cir. 1991) ("If a defendant wishes to speak with a Government witness prior to trial he is free to do so *providing the Government witness agrees to the meeting.*" (emphasis added)); *United States v. Fischel*, 686 F.2d 1082, 1092 (5th Cir. 1982) ("no witness is obligated to honor a defendant's request for an interview").  Prosecution witnesses are under no legal obligation to talk with the defense prior to trial.  *United States v. Brown*, 555 F.2d 407, 425 (5th Cir. 1977) (holding a criminal defendant's right of access to any prospective prosecution witness is counter-balanced by the witness's right to refuse to be interviewed or to dictate the circumstances under which he will submit to an interview), *cert. denied*, 435 U.S. 904 (1978); *United States v. Rice*, 550 F.2d 1364, 1374 (5th Cir.) ("All that a defendant is entitled to is access to a prospective witness. This right, however, exists co-equally with the witnesses' right to refuse to say anything."), *cert. denied*, 434 U.S. 954 (1977); *United States v. Benson*, 495 F.2d 475, 479 (5th Cir.) ("[A] government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so."), *cert. denied*, 419 U.S. 1035 (1974).[158]

---

cumulative evidence or evidence incompatible with the defense strategy." *Rhode v. Hall*, 582 F.3d 1273, 1287 (11th Cir. 2009), *cert. denied*, 560 U.S. 958 (2010).

[158] "Pursuant to *Bonner v. City of* Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), opinions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent in the Eleventh Circuit." *United States v. Sparks*, 806 F.3d 1323, 1342 n.16 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 2009 (2016).

Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a lay witness or an expert witness) satisfy the prejudice prong of *Strickland* only by naming the witness, *demonstrating the witness was available to testify and would have done so*, setting out the content of the witness's proposed testimony, and showing the testimony would have been favorable to a particular defense. *Woodfox v. Cain*, 609 F.3d at 808; *Day v. Quarterman*, 566 F.3d at 538. *See also Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d at 1262 (federal habeas petitioner who failed to show an uncalled witness was available to testify at the time of trial failed to satisfy prejudice prong of *Strickland*). Petitioner has neither identified, nor furnished an affidavit from, a medical expert or anyone else who (1) was available to testify at the time of Petitioner's capital murder trial and (2) could have furnished any testimony at the guilt-innocence phase of trial which would have supported Petitioner's exculpatory theories regarding the cause of Mrs. Liveoak's death. "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical." *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984). Counsel is not required to present every possible theory that might be helpful to his client. *Butts v. GDCP Warden*, 850 F.3d 1201, 1204-08 (11th Cir. 2017). Petitioner's conclusory assertions of inadequate investigation by his defense team vis-a-vis the prosecution's guilt-innocence case against Petitioner do not satisfy the prejudice prong of *Strickland*.

Petitioner's conclusory assertions that his trial counsel failed to adequately investigate the case against Petitioner and prepare for the guilt-innocence phase of trial also fail to satisfy the deficient performance prong of *Strickland.* Petitioner's sworn *pro se* state habeas corpus petition (*i.e.*, his Rule 32 petition) contains a number of potential witnesses whom Petitioner identifies as possessing personal knowledge of facts relating to his capital offense. Yet Petitioner does not allege any specific facts, nor furnish any evidence, showing that he ever informed his trial counsel or mitigation specialist of either (1) the names of the potential witnesses identified in his state habeas petition or (2) any information which might have proven helpful in gathering exculpatory or impeachment evidence for use at the guilt-innocence phase of trial. In sum, Petitioner fails to allege any specific facts, or furnish any evidence, showing exactly what information he claims he conveyed to his defense team which would reasonably have led his defense team to conduct further investigation into particular defensive theories. *See Strickland v. Washington*, 466 U.S. at 691:

> The reasonableness or counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe

that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.   In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Petitioner's trial counsel cannot reasonably be faulted for failing to pursue exculpatory or impeachment evidence relevant to the guilt-innocence phase of trial when the Petitioner had personal knowledge of the existence of such evidence but failed to either (1) inform his trial counsel that such evidence existed or (2) furnish information suggesting that inquiry into specific areas might produce exculpatory or impeachment evidence.  Petitioner does not allege any specific facts or present any evidence showing he was unable to communicate any specific information to his trial counsel relevant to the guilt-innocence phase of his trial.  Petitioner's trial counsel cannot reasonably be faulted for failing to discover information which was within the personal knowledge of Petitioner but which Petitioner failed to disclose to his trial counsel.  Petitioner does not identify any information available prior to Petitioner's trial which would have suggested that further inquiry into the cause of Mrs. Liveoak's death would likely have produced exculpatory or impeachment evidence.  To be effective, a lawyer is not required to pursue every path until it bears fruit or until all hope withers.  *Ledford v. Warden, Georgia Diagnostic and Classification Prison*, 818 F.3d 600, 649 (11th Cir. 2016), *cert. filed* Oct. 18, 2016

(No. 16-6444); *Puiatti v. Sec'y, Fla. Dep't of Corr.*, 732 F.3d 1255, 1280 (11th Cir. 2013), *cert. denied*, 135 S. Ct. 68 (2014).

Petitioner does not allege any facts or present any evidence showing it was objectively unreasonable for his trial counsel not to pursue medical evidence showing Mrs. Liveoak died as a result of some proximate cause other than Petitioner's actions.  No such evidence was presented at his 1995 trial.  In his pleadings before this court Petitioner identifies no such evidence that was available at the time of his capital murder trial.[159]  In conclusion, at no point in his state habeas corpus proceeding or in this federal habeas corpus proceeding has Petitioner identified any medical expert or other person who could have offered testimony at Petitioner's 1995 capital murder trial which would have contradicted the trial testimony of the medical examiner or supported any of Petitioner's speculative

---

[159] For example, Petitioner argues in conclusory fashion that "If the defense had put on evidence showing that the average person *would* not have died in the time Mrs. Liveoak spent in the trunk, the state's theory would have been seriously called into question and the jury likely would have found Mr. Dallas guilty only of manslaughter." Doc. # 1, at p. 30, ⸫ 76. Yet Petitioner has not alleged any specific facts or presented any evidence showing there was any evidence available at the time of Petitioner's 1995 capital murder trial to support Petitioner's conclusory assertion that "the average person" would not have died if left without food, water, or ventilation in the trunk of a car parked in an unshaded Alabama parking lot for more than twenty four hours in July.  Absent a showing that a witness or some scientific data existed at the time of Petitioner's 1995 trial to support this bizarre contention, Petitioner's conclusory complaint fails to satisfy the prejudice prong of *Strikcland*.  Counsel is not required to do the impossible.  *United States v. Cronic*, 466 U.S. at 656 n.19.  Furthermore, even if Petitioner's 1995 trial counsel could have presented evidence showing that "the average person" could have survived such an ordeal, Mrs. Liveoak was not an "average person."  Petitioner was well aware of the fact that she was elderly and had a bad heart.  He admitted during his trial testimony that (1) Mrs. Liveoak communicated the fact she had a heart condition and (2) his own father, whom Petitioner described as a strong man, had died suddenly of a heart condition.  8 SCR 815-16 (cross-examination of Donald Dallas).

exculpatory theories regarding the cause of Mrs. Liveoak's death.   Likewise, Petitioner identifies no other medical or scientific evidence available at the time of his capital trial which would have challenged the medical examiner's trial testimony or supported any of Petitioner's speculative defensive theories regarding the cause of Mrs. Liveoak's death.

Moreover, the state trial court noted in its findings in the course of Petitioner's state habeas corpus proceeding that Alabama law does not require a criminal defendant's unlawful act or omission be the sole cause of the victim's death.[160]   *See Carden v. State*, 621 So.2d 342, 349 (Ala. Crim. App. 1992) ("The wound or wounds inflicted by a defendant need not be the sole cause of death, only a partial cause, or a contributing factor that accelerated death.  The fact that there are other contributing causes of death does not prevent the wound or wounds inflicted by the defendant from being the legal cause of death -- the other contributing causes of death may precede, be synchronous with, or follow the commission of the offense charged."), *cert. denied* (May 28, 1993).  Under Alabama law, whatever may have been the physical condition of Mrs. Liveoak at the time Petitioner abducted her, Petitioner

---

[160] 13 SCR (Revised) Tab 14-A, at pp. 23-24:

Even if the defendant's act was only a partial cause accelerating death, the defendant is responsible.  Therefore, even if other contributing causes did exist, such as the time it took to open the trunk or a pre-existing disease, they are irrelevant.  The reason these alleged contributing causes are irrelevant is because, even if true, they would be a direct result of Dallas locking Liveoak in the trunk of her car.  (Citations omitted).

cannot benefit therefrom; an accused must take his victim as he finds them. *Carden v. State*, 621 So.2d at 349; *Reynolds v. State*, 484 So.2d 1171, 1173 (Ala. Crim. App. 1985). Petitioner's speculative defensive theories fail to take into consideration the Alabama law of criminal responsibility applicable to his capital offense: "A person is criminally liable if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient." *Ala. Code* § 13A-2-5(a) (1975). Thus, even if Petitioner could have presented evidence showing Mrs. Liveoak's pre-existing heart condition contributed to her demise, such evidence would not have exonerated Petitioner. In fact, it was undisputed at trial that Mrs. Liveoak's pre-existing medical condition did contribute to her demise. Dr. Stillwell testified without contradiction that Mrs. Liveoak's heart was failing, her cause of death was cardiac failure, and she lacked the cardiac reserve to be able to handle the extremely stressful confines in which Petitioner admitted he placed her, *i.e,*, a hot, dark, unventilated, confined space.[161] Petitioner's complaint that his trial counsel failed to pursue, develop, and present Petitioner's speculative defensive theories about other contributing causes to her death does not satisfy the prejudice prong of *Strickland.*

---

[161] 7 SCR 615-18 (testimony of Allan Stillwell).

(2)  <u>Failure to Meet Adequately with Petitioner Prior to Trial</u>

Insofar as Petitioner alleges that his trial counsel  failed to adequately meet with him prior to trial, Petitioner's naked assertion that he met only once with his lead trial counsel prior to October 1995 was refuted by the uncontroverted deposition testimony of his lead defense counsel during Petitioner's state habeas corpus proceeding.  Petitioner's lead trial counsel identified no less than five specific dates on which he consulted with Petitioner prior  to  the  October  11,  1995,  pretrial meeting identified in Petitioner's original petition.[162]  Petitioner's co-counsel at trial and  investigator/mitigation  specialist  both  testified  without  contradiction  during petitioner's state habeas corpus proceeding that they met with and conferred with petitioner prior to trial.[163]  Petitioner offered the state habeas court and offers this

---

[162] Attorney Agricola testified during his deposition taken June 26, 2001, in the course of Petitioner's state habeas corpus proceeding that (1) he met and conferred with Petitioner on February 28, March 7, July 26, August 24, September 5, and October 11, 1995, (2) his meetings and conferences with Petitioner on each of those dates were reflected in his time sheets submitted to the trial court, (3) his time sheets did not reflect all of the work he did preparing for Petitioner's trial, (4) he and Petitioner discussed the circumstances under which Petitioner gave his statement to the Montgomery Police Department, (5) Petitioner admitted that he put Mrs. Liveoak in the trunk, (6) the evidence of Petitioner's guilt was overwhelming, and (7) the only defense strategy available was to argue Petitioner could not have formed the intent to commit murder because he was high on crack.  13 SCR (Revised Tab 14, at pp. 155, 159, 165, 169, 171-72, 181-82 (Deposition of Algert Agricola).

[163] Attorney Duffey testified without contradiction that (1) he was able to consult with Petitioner, get discovery, and develop a trial strategy, (2) Susan James was approved to serve as the defense team's investigator, (3) attorney Algricola was heavily involved in another case but did consult with the defense team, (4) the defense team chose Dr. Renfro to serve as their testifying mental health expert, (5) Petitioner expressed "great remorse" for his crime, (6) the only surprise the defense experienced at trial was Dennis Bowen's testimony that the Petitioner had told Bowen he hoped Mrs. Liveoak died or didn't care if she died, (7) the defense cross-examined Bowen on the discrepancy between his trial testimony and prior statement to police, i.e.,, the absence of a

196

court no specific facts or evidence showing Petitioner was unable to communicate

to his defense team any of the information contained in Petitioner's lengthy, sworn,

*pro se* state habeas corpus petition.  Nor does Petitioner allege any specific facts, or

present any evidence, showing that, but for the failure of his defense team to meet

with him more often (or at greater length) prior to trial either (1) new or additional

exculpatory or impeachment evidence could have been developed and presented at

trial or (2) new defensive strategies could have been developed and implemented at

trial.  *See Roberts v. Commn'r. Ala. Dep't of Corr.*, 677 F.3d 1086, 1092-94 (11th

Cir. 2012) (trial counsel's failure to investigate and present an insanity defense did

---

recitation of Petitioner's alleged statement anywhere in Bowen's statement to police, (8) Petitioner specifically asked Duffy not to contact Petitioner's mother, and (9) the defense still learned that Petitioner came from a dysfunctional family and presented evidence of same at the punishment phase of trial.  12 SCR Tab 13, at pp. 11-14, 27-28, 30, 46-47, 55, 58-59, 65-66 (testimony of Jeffery C. Duffey).

    Susan James, Petitioner's court-appointed investigator, testified without contradiction that (1) the defense team's investigation focused on Petitioner's drug addiction and the contention Petitioner was high on crack at the time of his offense, (2) she consulted several times with Dr. Renfro with regard to that subject, (3) she spoke with Carolyn Yaw's attorney, (4) based on Yaw's statement to police, the defense believed Carolyn Yaw would be a very damaging prosecution witness if called to testify at trial, (5) during her consultations with petitioner, he consistently admitted the offense conduct but denied intending to cause Mrs. Liveoak's death, (6) while the focus of the defense was on Petitioner's drug addiction, the defense team also became aware that Petitioner had a terrible family life and fathered his first child at age fourteen, and (7) because of time constraint she was unable to obtain any documentation on Petitioner's background prior to trial.  12 SCR 75-81, 84, 86-90, 95, 97 (testimony of Susan James).

    Petitioner presented the state habeas court with no affidavit alleging specific facts in support of his conclusory ineffective assistance claims.  Instead, Petitioner presented only his sworn, *pro se* state habeas corpus petition, in which he made wholly conclusory assertions of ineffective assistance but offered no specific facts or evidence showing how he was prejudiced by his trial counsel's alleged failure to adequately meet with him prior to trial.  Petitioner presents this court with no affidavit establishing that he was unable to communicate any information relevant to the guilt-innocence phase of trial to his defense team prior to trial due to inadequate meetings and pretrial conferences.

not prejudice petitioner within the meaning of *Strickland* where the only evidence presented to federal habeas court supporting Petitioner's insanity defense consisted of a report stating (1) the petitioner did not have a major and debilitating mental illness and (2) despite the petitioner's history of substance abuse, suicide attempts, and auditory hallucinations, his personality disorder and past substance abuse would not substantially interfere with his understanding of right from wrong), *cert. denied*, 133 S. Ct. 949 (2013).  Petitioner's conclusory complaint about his trial counsels' alleged failure to meet sufficiently with him prior to trial fails to satisfy the prejudice prong of *Strickland.*

(3)  Failure to Interview Prosecution Witnesses Prior to Trial

Petitioner complains that his trial counsel failed to interview various law enforcement officers prior to trial, including Detective Hill, Detective Cleghorn, Detective Smith, Detective Fuller, Sergeant Mann, Danny Smith, and Dr. Stillwell. Petitioner does not, however, allege any specific facts or present any evidence showing what potentially helpful information his defense team could have gleaned through pretrial interviews of these individuals.  This complaint is especially problematic in view of the fact Sergeant Mann, Detective Hill, and Detective Fuller did not testify at Petitioner's capital murder trial and Petitioner's trial counsel cross-examined Dr. Stillwell and Detective Saint, but not Detective Cleghorn or Danny Smith, when they did testify for the prosecution.  Petitioner has presented the court

with no affidavits from Detective Hill, Detective Fuller, Detective Saint, or Dr. Stillwell stating (1) they would have submitted to a pretrial interview by Petitioner's defense team if requested to do so or (2) what information helpful to the defense they could have furnished if they had been interviewed prior to trial. Likewise, Petitioner offers no specific factual allegations or evidence suggesting what information helpful to the defense Lieutenant (then Sergeant) Mann could have furnished if he had submitted to a pretrial interview. While Petitioner's trial counsel did not cross-examine either Detective Cleghorn or Danny Smith following their direct trial testimony, Petitioner has not furnished an affidavit from either of these persons stating (1) he would have submitted to a pretrial interview by Petitioner's defense team if requested to do so or (2) what he could have testified to on cross-examination that would have proven helpful to the defense if he had submitted to such a pretrial interview.

Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *Buckelew v. United States*, 575 F.2d 1226, 1227 (5th Cir. 1977). "To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v.*

*Thaler,* 601 F.3d 347, 352 (5th Cir.), *cert. denied,* 562 U.S. 911 (2010).   "An

applicant 'who alleges a failure to investigate on the part of his counsel must allege

with specificity what the investigation would have revealed and how it would have

altered the outcome of the trial.'"   *Id.*   Petitioner's conclusory complaints about his

trial counsels' failure to interview these individual prior to trial fail to satisfy either

of these requirements and do not satisfy the prejudice prong of *Strickland.*

### (4)   Failure to Call Lay Witnesses

Petitioner complains that his trial counsel failed to call Dale Blake, Carlton

Morrison, Chester Foley, and Carolyn Yaw to testify at trial.   Petitioner does not,

however, furnish an affidavit from any of these individuals establishing (1) they

were available and willing to testify at the time of Petitioner's 1995 capital murder

trial or (2) they possessed personal knowledge of any facts favorable to the defense

relevant to the issues before the jury at the guilt-innocence phase of trial.[164]   For the

---

[164] In his June 26, 2001 deposition, Chester Foley did state that he would have been willing to testify at the time of petitioner's trial had he been subpoenaed. Doc. # 138-1, at p. 16 (deposition testimony of Chester Foley).   In the same deposition, however, Mr. Foley repeatedly denied that he possessed any personal knowledge of the facts or circumstances of Petitioner's capital offense, claiming (1) he was "hung over" or "in jail" during the relevant time period and (2) everything he knew about Petitioner's abduction and robbery of Mrs. Liveoak he learned from his wife Rhonda Chavers. Doc. # 138-1, at pp. 9-11, 13-14, 17-21.   Petitioner has not furnished any affidavits from Blake, Morrison, or Yaw stating they would have been willing to testify had they been called to do so at Petitioner's 1995 capital murder trial or establishing they could have furnished any testimony helpful to the defense.   As explained in note 158, *supra,* the testimony of Montgomery Police Sergeant John Mann during the preliminary hearing in Petitioner's capital murder trial establishes that if Carolyn Yaw had testified in a manner similar to the statement she gave police following her arrest, she would have furnished testimony with the potential to devastate the defense at both phases of Petitioner's capital murder trial.   Petitioner's court-appointed investigator testified without contradiction during Petitioner's state habeas corpus proceeding that she believed

same reasons discussed above in Section XIII.C.2.b. in connection with Petitioner's complaints about the failures of his trial counsels' to interview prosecution witnesses prior to trial, Petitioner's conclusory complaints about his trial counsels' failures to call any of these lay witnesses also fail to satisfy the prejudice prong of *Strickland*. Petitioner has failed to allege any specific facts, much less furnish any affidavits or other evidence, showing any of these individuals could have furnished any testimony helpful to the defense had they been called to testify at the guilt-innocence phase of Petitioner's capital murder trial.[165]   Therefore, these conclusory complaints fail to satisfy the prejudice prong of *Strickland*.

---

Carolyn Yaw "would be the most damaging witness in all regards, because Mr. Dallas had initially taken responsibility for this, exculpating Ms. Yaw."  12 SCR Tab 13, at p. 77 (testimony of Susan James).

[165] Furthermore, based upon the testimony of Lieutenant (then Sergeant) Mann at the preliminary hearing in Petitioner's capital murder case, there is every reason to believe Carolyn "Polly" Yaw would have devastated the defense had she testified at Petitioner's trial.  *See* note 158*, supra.*  Likewise, also as explained in note 158, *supra*, the deposition of Chester Foley in June 2001 did not furnish any (1) new exculpatory or impeachment evidence or (2) other new information which showed a reasonable probability that, but for the failure of Petitioner's trial counsel to call Mr. Foley to testify at trial, the outcome of the guilt-innocence phase of Petitioner's capital murder trial would have been any different.  To reiterate, during his June 2001 deposition Mr. Foley repeatedly disavowed any personal knowledge of the facts or circumstances of Petitioner's capital offense.  Doc. # 138-1, at pp. 9-11, 13-14, 17-21.  Thus, contrary to Petitioner's conclusory assertion, there is no evidence currently before this court establishing that Chester Foley could have testified Petitioner was high on crack cocaine at the time of Petitioner's capital offense.

(5)  <u>Failure to Show Petitioner was "High" at the Time of His
Capital Offense</u>

Petitioner argues his trial counsel should have discovered and presented evidence showing Petitioner was "high" on crack cocaine at the time of his capital offense.  The fundamental problem with this argument is that this is precisely what Petitioner's trial counsel attempted to do when they called Dr. Renfro and Petitioner himself to testify at the guilt-innocence phase of Petitioner's 1995 capital murder trial.  While Petitioner has produced the affidavit of Dr. Benedict, this expert does not claim to have any personal knowledge of Petitioner's condition at the time of his capital offense.  Moreover, in relevant part Dr. Benedict merely parrots the trial testimony of Dr. Renfro insofar as he suggests Petitioner was motivated by a very intense "craving" to get high on crack at the time of his offense, as opposed to being directly under the influence of a crack "high" throughout the entire time frame in which the Petitioner abducted Mrs. Liveoak from a Prattville parking lot, drove her to Hope Hull, locked Mrs. Liveoak in the trunk of her car, drove her back to Montgomery, convinced her to divulge information on how to access her bank account electronically, and then abandoned her vehicle in an unshaded isolated portion of a central Alabama parking lot on a July afternoon.  Petitioner offers no evidence showing it was possible for him to remain "high" on crack throughout that entire time frame, rather than to be suffering from a "craving" for more crack.  As intense as that "craving" may have been (Dr. Renfro and Dr. Benedict each suggest

it was quite strong), neither they nor any other witness who has furnished an affidavit in this case suggesting Petitioner was actually "high", *i.e*., experiencing the euphoric effects of crack cocaine, throughout the entire July afternoon during which he abducted, robbed, and abandoned Mrs. Liveoak to die in the trunk of her car.[166]

Petitioner's own trial testimony furnished the most devastating evidence undermining his assertion that he was "high," *i.e.,* experiencing the euphoric effects of crack, throughout his capital offense. During his trial testimony Petitioner did his best to assert that he was "high" on crack at the time of his offense, yet he admitted that (1) he had genuine concern over being captured,[167] (2) he was aware of the wrongful nature of his actions,[168] (3) he was able to drive Mrs. Liveoak's vehicle from Prattville to Hope Hull and then back to Montgomery,[169] (4) he was able to negotiate with Mrs. Liveoak to convince her to get into the trunk of her car and to

---

[166] On cross-examination, prosecution witness Dennis Bowen, an admitted long-time crack abuser, testified without contradiction that the high from crack cocaine is very intense but wears off very fast and leaves a user with a "craving." 7 SCR 676 (cross-examination of Dennis Bowen).

[167] "Like I say, I wasn't thinking about too many things but one thing. I am robbing somebody, and I am going to be in big trouble. I am going to spend a lot of time in jail if I get caught doing this. And wasn't really -- if I had been thinking, it would never have happened." 8 SCR 816 (cross-examination of Donald Dallas). Petitioner also admitted he was worried about getting caught and cut his hair when he learned of Mrs. Liveoak's death. 8 SCR 825 (cross-examination of Donald Dallas).

[168] *Id.* In addition, Dr. Renfro testified without contradiction at the guilt-innocence phase of Petitioner's 1995 capital murder trial that Petitioner, despite his craving for crack, still knew it was wrong to abduct and rob Mrs. Liveoak and leave her in the trunk of her car. 7 SCR 762-63 (cross-examination of Dr. Guy Renfro).

[169] 7 SCR 794-99 (testimony of Donald Dallas).

divulge the information necessary to access her bank account electronically,[170] (5) he took steps to avoid being captured, *i.e.*, avoiding using the phone and arranging with Chester Foley to have someone (not a cab driver) take him back to the parking lot "to make sure she was gone,"[171] and (6) his primary focus throughout his abduction of Mrs. Liveoak was the desire to get money so he could get high on crack, *i.e.*,,[172] "I just wanted to get the money and get the dope and get in my own world."[173] Petitioner has failed to present any evidence to this court showing there was any admissible evidence (other than his own, far-from-convincing, testimony) available at the time of his trial showing Petitioner was actually "high" on crack cocaine at the time of his offense. For these reasons, Petitioner's complaint fails to satisfy the prejudice prong of *Strickland*.

(6) Failure to Adequately Cross-Examine Dennis Bowen

Petitioner argues his trial counsel failed to adequately cross-examine Dennis Bowen. Even a cursory review of the record from Petitioner's 1995 capital murder trial refutes this assertion. Petitioner's trial counsel cross-examined Dennis Bowen extensively, eliciting admissions that (1) Bowen began using crack cocaine in 1992,

---

[170] 7 SCR 796-99 (testimony of Donald Dallas).

[171] 8 SCR 801-03 (testimony of Donald Dallas).

[172] 8 SCR 801-03 (testimony of Donald Dallas); 8 SCR 817-18 (cross-examination of Donald Dallas).

[173] 8 SCR 817 (cross-examination of Donald Dallas).

(2) Bowen did not tell police about Petitioner's statement that he wanted the old lady to die when interviewed in July 1994, (3) he pleaded guilty to theft on October 25, 1994 in Autauga County, (4) he was initially charged with robbery in that case, (5) an arrest warrant was then outstanding against him for failing to comply with the terms of his probation, (6) he was high on crack at the time he confronted Petitioner and allegedly heard Petitioner say he hoped or wished the old lady would die, and (7) the first time Bowen ever told anyone in Montgomery County about Petitioner's statement (that he hoped or wished the old lady would die) was when he testified at Petitioner's trial.[174]   Petitioner does not allege with any reasonable degree of specificity exactly what additional questions his trial counsel should have asked Dennis Bowen on cross-examination or present any evidence showing that additional cross-examination of Bowen would have furnished any additional impeachment evidence or any exculpatory evidence.  *See Hunt v. Commn'r, Ala. Dep't of Corr.*, 666 F.3d 708, 725 (11th Cir. 2012) (holding petitioner's complaint about the scope of his trial counsel's cross-examination of a prosecution witness failed to satisfy prejudice prong of *Strickland* where the petitioner failed to present evidence showing either (1) an agreement between the witness and the state or (2) that further probing the witness's criminal history would have revealed anything

---

[174] 7 SCR 675-98 (cross-examination of Dennis Bowen).

significantly more damaging to the witness's credibility than the information already known to the jury), *cert. denied*, 133 S. Ct. 611 (2012).  This conclusory complaint fails to satisfy either prong of *Strickland*.[175]

(7)  <u>Failure to Object to Prosecution's "Improper" Jury Selection</u>

Petitioner complains that his trial counsel failed to object to the prosecution's use of extraneous information during jury selection, *i.e.*, the prosecutor placing a call to his spouse at the Department of Revenue to get background information on a venire member who also worked there.  As explained at length above in Section XII.B., however, there was no legitimate legal basis for an objection by Petitioner's defense counsel to the prosecutor's actions.[176]  The Alabama Court of Criminal

---

[175] Insofar as Petitioner complains generically about his trial counsels' failure to cross-examine prosecution witnesses adequately, his complaints are wholly conclusory.  Other than Bowen and Dr. Stillwell, Petitioner does not identify with reasonable specificity any prosecution witnesses whom he claims his trial counsel should have asked additional questions on cross-examination.  As explained above and below, Petitioner does not allege any facts or *present any evidence* showing that additional cross-examination of either Bowen or Dr. Stillwell would have produced any additional impeachment evidence or exculpatory testimony.  Thus, Petitioner's complaints about his trial counsels' failure to cross-examine Bowen and Dr. Stillwell adequately fail to satisfy the prejudice prong of *Strickland*.  *Hunt v. Comm'r, Ala. Dep't of Corr.*, 666 F.3d at 725.  As explained above in Section XIII.C.1.a., Petitioner has presented no evidence showing Bowen ever made a deal with Petitioner's prosecutors (or anyone else) for anything in exchange for his testimony at Petitioner's capital murder trial.

[176] As explained above in Section XII.B., during Petitioner's *Batson* hearing, the prosecution explained that it struck several members of the jury venire because they had relatives with criminal convictions.  6 SCR 479-89.  In response, Petitioner's trial counsel protested that the prosecution had not stricken white venire members 108 or 84 even though they both had relatives with drug problems and specifically pointed out that the wife of venire member 84 was convicted of "a drug problem."  6 SCR 490.  In point of fact, the defense struck venire member 108 with its second peremptory strike; Petitioner's trial counsel explained the defense did so because venire member 108 had a close relative who had drug problems in the past.  6 SCR 468, 500.  In response to the observations of Petitioner's trial counsel, the prosecutor explained it did not strike venire

206

Appeals' opinion in *Kynard* cited by Petitioner in his state and federal habeas corpus pleadings simply does not stand for the legal principle for which Petitioner asserts it does.[177] The failure of Petitioner's trial counsel to raise such a futile or meritless objection did not constitute deficient performance and did not prejudice Petitioner within the meaning of *Strickland*. *See Hittson v. GDCP Warden*, 759 F. 3d 1210, 1262 (11th Cir. 2014) (failure of collateral counsel to raise a meritless claim does not prejudice petitioner), *cert. denied*, 135 S. Ct. 2126 (2015); *Brown v. United*

---

member 84 because it had obtained information which convinced him venire member 84 would be favorable to the prosecution:

> Judge, in regards to [venire member 84], who I did leave on the jury and made a conscious decision to leave on the jury, I checked into the background of [venire member 84]. He works at the Department of Revenue. My wife works at the Department of Revenue, so I found out some information on [venire member 84], whether he would be a good juror or not. I got a good recommendation, so I left him on my jury for that reason. I knew something on him. There is a big difference from striking someone who has got [sic] people in their family with murder convictions and someone whose wife was on diet pills. There is a big difference between that.

6 SCR 497-98.

The state trial judge specifically found during Petitioner's state habeas corpus proceeding as follows: "This Court is unaware of any rule of law that forbids either party in a criminal prosecution from asking family members or friends about prospective jurors they might know and giving a recommendation." 13 SCR (Revised) Tab 14-A. at p. 28. Petitioner alleges no facts showing that (1) counsel in his capital murder case were precluded by court order, statute, or rule from revealing the identities of jury venire members to persons outside of officers of the court, *i.e.,*, Petitioner does not allege that he was tried by an anonymous jury, or (2) any court order, rule, or statute precluded counsel for either party from conducting a background investigation into the members of Petitioner's jury venire. Thus, Petitioner does not allege that his trial was conducted under any special procedures mandating anonymity for members of the jury venire. Under such circumstances, Petitioner's allegations that one of the prosecutors called his spouse to seek background information about venire member 84 do not allege a violation of any state or federal constitutional or statutory right.

[177] *See note 122, supra.*

*States*, 720 F.3d 1316, 1335 (11th Cir. 2013) ("It is also crystal clear that there can be no showing of actual prejudice from an appellate attorney's failure to raise a meritless claim."), *cert. denied*, 135 S. Ct. 48 (2014); *Freeman v. Atty. Gen*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim"), *cert. denied*, 555 U.S. 1110 (2009); *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir.) ("it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance"), *cert. denied*, 513 U.S. 1022 (1994); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) ("a lawyer's failure to preserve a meritless issue plainly cannot prejudice a client").

> (8) <u>Failure to Object to the Medical Examiner's Opinion that Mrs. Liveoak's Death was a "Homicide" & Failure to Adequately Cross-Examine the Medical Examiner</u>

Petitioner complains in conclusory fashion that his trial counsel failed to (1) object to the medical examiner's opinion that Mrs. Liveoak's death was a "homicide" and (2) adequately cross-examine Dr. Stillwell.

Petitioner does not, however, offer any legal basis for such an objection beyond the conclusory assertion in his original petition that the medical examiner's testimony addressed "a legal determination he was, of course, not permitted to make." (Doc. #1, at p. 30, ☐ 77). Petitioner's original petition and subsequent merits brief are bereft of any legal authority supporting Petitioner's conclusory assertion that Dr. Stillwell's opinion of "homicide" was inadmissible or otherwise subject to

legitimate objection.  The state trial judge noted in his findings in Petitioner's state habeas corpus proceeding that (1) under Alabama evidentiary rules, Dr. Stillwell was qualified to give his opinion concerning the cause and manner of Mrs. Liveoak's death, (2) Petitioner's trial counsel did not object to Dr. Stillwell's opinion regarding "homicide," but (3) Petitioner's trial counsel did vigorously cross-examine Dr. Stillwell and elicited a concession that the term "homicide" included instances in which the perpetrator did not intentionally cause a victim's death.[178]  This Court's independent review of the record from Petitioner's cross-examination of Dr. Stillwell confirms the accuracy of the state trial judge's findings.[179]  Petitioner's trial counsel also obtained another relevant concession from Dr. Stillwell on cross-examination - an admission that Dr. Stillwell could *not* testify as to the Petitioner's intent.[180]  Petitioner does not allege any facts or cite any legal authority showing the state habeas trial court's finding regarding Dr. Stillwell's qualifications to express the opinion that Mrs. Liveoak's death was a "homicide" was in any manner inaccurate under applicable state law and state evidentiary rules.  Rulings by the state courts on matters of state law, such as the propriety of a state trial court's evidentiary rulings, made during the course of a state habeas corpus proceeding are binding upon

---

[178] 13 SCR (Revised) Tab 14-A. at p. 22.

[179] 7 SCR 622-24 (cross-examination of Allan Stillwell).

[180] 7 SCR 623 (cross-examination of Allan Stillwell).

federal habeas courts.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Loggins v. Thomas*, 654 F.3d 1204, 1228 (11th Cir. 2011) ("Alabama law is what the Alabama courts hold that it is."); s*ee also Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) ("The Texas habeas court's interpretation of Texas evidentiary rules is therefore binding in this case.  We will not disturb the state habeas court's conclusion that trial counsel's failure to attempt to introduce inadmissible evidence did not amount to deficient performance."), *cert. denied*, 134 S. Ct. 2876 (2014).

Because Petitioner has failed to identify a legal basis for objecting to (or excluding) Dr. Stillwell's opinion testimony that Mrs. Liveoak's death was a "homicide," Petitioner's complaint about his trial counsel's failure to do so fails to satisfy either prong of *Strickland*.  *See Hittson v. GDCP Warden*, 759 F. 3d at 1262 (failure of collateral counsel to raise a meritless claim does not prejudice petitioner); *Brown v. United States*, 720 F.3d at 1335 ("It is also crystal clear that there can be no showing of actual prejudice from an appellate attorney's failure to raise a meritless claim."); *Freeman v. Atty. Gen*, 536 F.3d at 1233 ("A lawyer cannot be deficient for failing to raise a meritless claim.").

While Petitioner does identify a number of additional topics or subjects he believes his trial counsel should have explored with Dr. Stillwell on cross-examination (Doc. # 1, at pp. 30-31, ☐ 77), Petitioner does not present an affidavit from Dr. Stillwell or any other evidence establishing how Dr. Stillwell would have addressed those additional subjects had he been asked about them on cross-examination.  Thus, Petitioner has failed to show additional cross-examination of Dr. Stillwell in these or other topics would have produced any testimony helpful to the defense.  For this reason, Petitioner's complaints about the scope of his trial counsel's cross-examination of Dr. Stillwell fail to satisfy the prejudice prong of *Strickland.  Hunt v. Commn'r, Ala. Dep't of Corr.*, 666 F.3d at 725.

### (9)  Failure to Object to Prosecutorial Jury Arguments

Petitioner complains that his trial counsel failed to object to allegedly improper jury arguments, *i.e.*. the prosecution (1) characterizing of Petitioner as a heartless animal as contrasted to its description of Mrs. Liveoak as a good Christian woman, (2) arguing the evidence to convict was very strong and it would not be hard to convict Petitioner, (3) commenting on the credibility of witnesses, (4) expressing a personal opinion as to Petitioner's guilt, (5) commenting upon the defense's failure to present as a witness the person Petitioner testified had tried to give Petitioner a ride back to the K-Mart parking lot, (6) arguing Petitioner's statement to Dennis Bowen (about Petitioner hoping or wishing the old lady died) was sufficient to prove

211

Petitioner's intent to kill, and (7) arguing Petitioner's choice to use crack cocaine did not mitigate what he did (Doc. # 1, at pp. 34-37, ☐☐ 86-96).

Generally speaking, the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to

opposing counsel's argument, and pleas for law enforcement.[181]  Alabama law is not

to the contrary.[182]

---

[181] *See, e.g., Norris v. Davis*, 826 F.3d 821, 832 n.10 (5th Cir. 2016) (recognizing these four areas as permissible subjects for jury argument under Texas law), *cert. denied*, 2017 WL 737858 (Feb. 27, 2017); *United States v. Flounoy*, 842 524, 528 (7th Cir. 2016) (holding it was appropriate for prosecutor to respond to defense counsel's argument about the government's failure to call a witness by pointing out the defendant had the power to subpoena witnesses); *United States v. Miller*, 799 F.3d 1097, 1106-07 (D.C. Cir. 2015) (holding the prosecutor's closing arguments about a witness's testimony amounted to a proper summary of that testimony and the prosecutor's references to the defendant as a "con man" or "con artist" were permissibly tied to specific conduct charged in the indictment charging conspiracy to defraud), *cert. denied*, 137 S. Ct. 47 (2016); *United States v. Alcantrara-Castillo*, 788 F.3d 1186, 1195 (9th Cir. 2015) (prosecutor's argument that the testimony of a particular prosecution witness was "consistent, believable, and logical," a proper instance of the prosecutor drawing an inference from the evidence rather than offering an impermissible personal opinion on the witness' credibility); *United States v. Vazquez-Larrauri*, 778 F.3d 276, 283-84 (1st Cir. 2015) (while it is improper for the prosecutor to personally vouch for the credibility of a witness or to assert a personal belief in the defendant's guilt, it is permissible for the prosecution to offer specific reasons why a witness ought to be accepted as truthful by the jury - such as fact cooperating witness's testimony put him and his family in danger or witness's plea bargain agreement required witness to testify truthfully); *United States v. Johnson*, 767 F.3d 815, 824-25 (9th Cir. 2014) (prosecution may not comment on the defendant's failure to testify but may properly call attention to the defendant's failure to present exculpatory evidence -- such as expert testimony rebutting prosecution's DNA evidence), *cert. denied*, 136 S. Ct. 688 (2015); *United States v. Woods*, 764 F.3d 1342, 1247 (10th Cir. 2014) (holding it was proper for prosecutor to argue the fact prosecution witnesses had pleaded guilty to conspiring to distribute methamphetamine rendered their trial testimony more credible in meth conspiracy trial), *cert. denied*, 135 S. Ct. 1866 (2015); *United States v. Garcia*, 758 F.3d 714, 724 (6th Cir.) (prosecutor's argument that prosecution witness accused by defense of testifying falsely would have spun a more persuasive yarn had the witness decided to lie was proper responsive jury argument and not an improper personal comment on witness's credibility), *cert. denied*, 135 S. Ct. 498 (2014); *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014) (prosecutor's jury argument which quoted trial testimony of victim (identifying the defendant as the assailant) and then asserted the defendant "did it" not an improper assertion of prosecutor's personal opinion as to defendant's guilt); *United States v. Adkins*, 743 F.3d 176, 187 (7th Cir.) (prosecutor may comment on veracity of a witness if that comment is immediately preceded by the prosecutor's argument that corroborating evidence showed the witness's testimony to be truthful), *cert. denied*, 134 S. Ct. 2864 (2014); *United States v. Poole*, 735 F.3d 269, 277 (5th Cir. 2013) (as long as a prosecutor's characterization of the testifying defendant "as a liar" is reasonably seen as drawing conclusions from, and is actually supported by, the evidence, the prosecutor does not commit error); *United States v. Runyon*, 707 F.3d 475, 513-14 (4th Cir. 2013) (prosecutor's opening and closing jury arguments contrasting the criminal justice system's treatment of criminal defendant with the defendant's treatment of his murder victim was proper; the prosecutor's argument that the jury should not grant the defendant mercy because the defendant showed no mercy to his victim

or the victim's family was proper; "It is, of course, perfectly permissible for the prosecution to urge the jury not to show a capital defendant mercy."; and prosecutor's argument suggesting kidnaping, robbery, and murder victim suffered "mental torture" while being held at gunpoint by the defendant prior to victim's death a proper inference from the evidence presented), *cert. denied*, 135 S. Ct. 46 (2014); *United States v. Phillips*, 704 F.3d 754, 766-67 (9th Cir. 2012) (holding is neither unusual nor improper for a prosecutor to voice doubts about the veracity of a defendant who has taken the stand and it is proper for the prosecutor to refer to a defendant's lies if he is commenting on the evidence and asking the jury to draw reasonable inferences), *cert. denied*, 133 S. Ct. 2796 (2013); *United States v. Jones*, 674 F.3d 88, 93 (1st Cir.) (prosecutor's closing argument that the "defendant chose the witnesses" and "We don't need drugs; we need evidence," were proper responses to defense counsel's closing arguments discrediting the testifying co-conspirators motives and asking "why are there no drugs, why is there no gun?"), *cert. denied*, 133 S. Ct. 363 92012); *Bryant v. Caldwell*, 484 F.2d 65, 66 (5th Cir. 1973) (prosecutor's reference to the defendant's character and his appeal to the jury to convict for the sake of the safety of the community were well within the permissible scope of jury argument for a Georgia prosecutor), *cert. denied*, 415 U.S. 981 (1984).

[182] *See Henderson v. State*, ___ So. 3d ___, ___, 2017 WL 543134, *34 (Ala. Crim. App. Feb. 10, 2017) (there is no impropriety in a prosecutor appealing to the jury for justice and to properly perform its duty - such comments are nothing more than proper pleas for justice); *Bohannon v. State*, ___ So. 3d ___, ___, 2015 WL 6443170, *36 (Ala. Crim. App. Oct. 23, 2015) (holding (1) "The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument." and (2) a prosecutor may present his impressions from the evidence, argue every legitimate inference from the evidence, and examine, collate, sift, and treat the evidence in his own way), *aff'd*, *Ex parte Bohannon*, ___ So. 3d ___, 2016 WL 5817692 (Ala. Sept. 30, 2016), *cert. denied*, 137 S. Ct. 831 (2017); *Bohannon v. State*, ___ So. 3d at ___, 2015 WL 6443170, *54-*55 (holding prosecutor may properly (1) argue to the jury that a death sentence is appropriate and (2) respond in rebuttal to the arguments of defense counsel); *Shanklin v. State*, 187 So. 3d 734, 793 (Ala. Crim. App. 2014) (prosecutor properly argued that, based upon other evidence presented at trial, a witness was incorrect in some of the details of her trial testimony but correct about other details - such argument was a reasonable inference from the totality of the evidence presented), *cert. denied*, (Ala. Aug. 28, 2015), *cert. denied*, 136 S. Ct. 1467 (2016); *Brown v. State*, 74 So. 3d 984, 1017 (Ala Crim. App. 2010) ("While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence." (*quoting Allen v. State*, 659 So. 2d 135, 139 Ala. Crim. App. 1994)), *aff'd*, 74 So. 3d 1039 (Ala. 2011), *cert. denied*, 565 U.S. 1111 (2012); *Gobble v. State*, 104 So. 3d at 970 (prosecutor's opening statement that defendant did not want her child back and that the child's injuries occurred one of two ways - through abuse or an automobile accident - were supported by evidence showing the defendant relinquished her parental rights and a medical expert opined at trial the child's injuries could have been caused either in an automobile accident or from child abuse); *Minor v. State*, 914 So. 2d 372, 421 (Ala. Crim. App. 2004) (holding pleas for justice appropriate), *cert. denied*, 914 So. 2d 372 (Ala. 2004), *cert. denied*, 548 U.S. 925 (2006).

(a)  <u>Opening Statement</u>

Petitioner complains that during opening statement at the guilt-innocence

phase of trial, the prosecution argued as follows (Doc. # 1, at p. 34, ☐ 87):

> Because, ladies and gentlemen, there was [sic] some other people out
> there shopping that day in that parking lot at Food World, but they
> weren't shopping for groceries or running errands.  They were out
> shopping for victims, elderly people to prey upon to feed their crack
> habit.  There sits one of them right there, Donald Dallas.
>         What Donald Dallas did, ladies and gentlemen, he sees Mrs.
> Liveoak carefully putting the groceries in her car, about to get into her
> car, which was a Chrysler New Yorker.  She is carefully getting in.  He
> comes rushing up to her with his co-defendant, Carolyn Yaw, pushes
> her on into her own car, forces her to lay down into [sic] the floorboard
> of the car with her face down.[183]
> * * * * *
>         While this defendant and Mrs. Liveoak were together and he was
> trying to get the money and trying so he could get his crack and go on,
> the evidence is going to show that Mrs. Liveoak was not yelling at him,
> swearing at him, trying to do anything.  She prayed for him, prayed for
> him, prayed for him so that the Lord would free him from his addiction.
> That was the thanks she got.[184]

Petitioner's complaint that these arguments improperly contrasted Petitioner's

predatory behavior with the Christian behavior of Mrs. Liveoak lacks any arguable

merit.  The comments quoted above accurately summarized, or drew reasonable

inferences from, the contents of Petitioner's post-arrest videotaped statement to

---

[183] 6 SCR 931.

[184] 6 SCR 536-37.

police,[185] which the prosecution could reasonably have anticipated would be admitted into evidence - especially after the trial court denied Petitioner's motion to suppress. The arguments in question were unobjectionable. *See, e.g.*, *Gobble v. State*, 104 So.3d at 970 (prosecutor's opening statement which merely summarized or drew reasonable inferences from the evidence the prosecution reasonably expected to be admitted at trial was wholly proper). There is not even a remote possibility, much less a reasonable probability, a timely defense objection to either of these prosecutorial arguments would have been sustained. Petitioner's trial counsel cannot reasonably be faulted for failing to make such a futile, meritless, objection. This complaint fails to satisfy either prong of *Strickland*. *See Butts v. GDCP Warden*, ___ F.3d at ___, 2017 WL 929749, *2-*5 (appellate counsel not ineffective for failing to urge point of error on appeal suggesting trial counsel had been ineffective where trial counsel was not ineffective); *Brown v. United States*, 720 F.3d at 1335 ("It is also crystal clear that there can be no showing of actual

---

[185] In its findings made during Petitioner's state habeas corpus proceeding, the state trial court found as follows: "This Court has reviewed the cited portion of the State's opening statement and concludes the State was simply explaining to the jury what it expected the evidence to reveal at trial." 13 SCR (Revised) Tab 14-A, at p. 28.

In his videotaped statement, Petitioner admitted that (1) he had abducted and robbed Mr. Portwood just days before he abducted and robbed Mrs. Liveoak from a grocery store parking lot, (2) he approached Mrs. Liveoak from behind, pushed her into her car, grabbed her keys, and told her that he was robbing her, (3) he drove her to Greenville, where he put her into the trunk, (4) he repeatedly told her that he would call someone to free her, and (5) Mrs. Liveoak prayed for him that God would help him with his problem and he would go take care of his family. 3 SCR 458-61, 463-67.

prejudice from an appellate attorney's failure to raise a meritless claim."); *Freeman v. Atty. Gen*, 536 F.3d at 1233 ("A lawyer cannot be deficient for failing to raise a meritless claim.").

(b)  <u>Allegedly Inflammatory Closing Arguments</u>

Petitioner complains about several specific instances in the prosecution's closing guilt-innocence phase jury argument in which the prosecution allegedly made improper statements designed to inflame the jury against Petitioner (Doc. # 1, at p. 34, ⬚ 88), including the following:

> But before I do that, I want to talk a little bit about the testimony from yesterday.  Mr. McNeill is probably going to talk to you about this more, but I want to point out a piece of testimony from the defendant that I thought was particularly unbelievable.  Most of it was -- a lot if it was unbelievable, but this one piece want [sic] incredible to me.
>
> He wants you to believe that he took Mrs. Liveoak down to Greenville and told her, you can leave, you can go out in the woods, but she was so enthralled with this defendant, that she wanted to stay with him.  You know, if you are a seventy-three year old woman -- if you are a twenty-seven year old man, let me get to that first.  Why does he rob and kidnap elderly people?  Why doesn't he do it to twenty-year-olds, thirty-year-olds, forty-year-olds, and fifty-year-olds?  I'll tell you why, because he is a coward.  That's exactly what he is.  He preys on the most vulnerable members of our society, elderly people.
>
> If you are a seventy-three year old woman minding your own business getting your groceries, and this animal comes up to your car and pushes your head down into the floorboard and drives with you, and he gives you a chance to get away, are you going to want to stay?  No.  You are going to say, thank you very much, goodbye; I'll take my chances in the woods.
>
> Mr. Portwood did.  Mr. Portwood had that option.  Mr. Portwood had the option between the trunk and the woods.  He took the woods.  Mrs. Liveoak had one option, and it was death.

Mr. Walker, Richard Walker, testified where that car was parked, and every police officer testified that's where that car was parked. This is going to intent. That is a piece of evidence. You might say, well, it is a fact that he put a seventy-three year old woman in the trunk of a car who had a heart condition. Is that enough? You darn right it is. That's absolutely enough.

When he took Mrs. Liveoak and put her in the trunk of that car and closed that trunk, that was it. He knew she had a heart condition. He absolutely knew it, and he says he knew it. You intend the natural consequences of your act if that act is intentional.

What are the natural consequences of putting a seventy-three year old woman with a heart condition in a trunk, driving around having a good time with his thieving, robbing wife and parking her in the K-Mart parking lot in an isolated place on a hot summer day on hot asphalt and leaving her? What is the natural consequence of that? The natural consequences [sic] is that that lady was bound to die.

Did he take any steps whatsoever? Does he show you any evidence that he intended for her to live? Did he give one -- did he care at all about that?

I want you to look at a photo of him that day they picked him up and put him in jail and took his statement. Is that the same man that got up here and blubbered yesterday, got up here and cried big crocodile tears? No, it is not. It is absolutely not, because, you see, that day he kidnapped and robbed and murdered Hazel Liveoak, he was a different man altogether. He was a man that day, because he was doing what he does best, preying on elderly people. That's this man's modus operandi. That's what he does. He had already left one witness three days before, and by God, he was not going to leave another one.

He told you yesterday he was trying to get away. He cut his hair the next morning. And if he cried at all, it was only because he knew he got caught. He was nailed, and he knew it, and he knows it today. He is crying because he knows he has victimized the last person he is going to victimize.

Intent, that all goes to intent. How many pay phones did the man pass? Mrs. Liveoak gave him her son's telephone number. That woman was -- can you imagine the terror she was going through? But I didn't write it down. He didn't write it down, because he had absolutely no intention of calling anybody. When you put somebody into the trunk of a car and don't lift a pinkey [sic] to help them, it is over. Y'all know it is over; I know it is over; and he knows it is over.

218

More intent, he drives all over town.  He is in a cab.  His friend gives him a ride.  They go to the motel.  There is a phone in the motel.  There are phones everywhere.  There are friends everywhere who he has a good time telling things to.

You know, the reason y'all sit right there and the reason the witness stand is right here is so you can evaluate the credibility of witnesses.  It is up to you to determine whether they are telling you the truth.  We do that every day when we talk to people on the street.  We determine if they are telling us the truth.

Now, Tony Bowen came in here yesterday, and he told you everything he told the police when he went to them the next day.  He told you everything.  But he told you one other thing he didn't tell the police.  Well, I am sorry.  This is not a perfect world, and I don't pick my witnesses.  I wish he had.  But what he did tell the police was this defendant was talking about putting a woman in the trunk, and he was being sarcastic about it.  That's what he told the police.  Is that enough intent?  Well, I think so.  But let me tell you something.  If you listen to him, and you determine that he is telling you the truth, this case is over.  You don't even have to add up all the intent I am telling you about.  If you believe that this defendant said, I hope she dies, it is over.  That is capital murder.  Was Tony Bowen being forthright?  Absolutely, he was being forthright.  Did Tony Bowen try to evade any questions?  No.  Did Tony Bowen tell you that he had been in trouble before?  Yes.  Did you believe him when he said he was straightening up his life?  That's your call.  You are the fact finder.  You know, what Tony Bowen said to you, did it ring true?  Did it sound right?  I submit to you it absolutely sounded right.  It goes right along with a defendant being sarcastic about putting a woman in a trunk, a defendant that could care less about anybody but himself and his filthy crack habit.

Who deserves more credibility, Tony Bowen who went to the police the next morning, or him?  Who put a woman in a trunk?  Tony Bowen was on crack.  He said it sickened him when he found out about it.  It made him sick, and it makes me sick.

More, Wesley Portwood.  I can't say much about him.  His testimony spoke for itself.  The defendant told him to get in the woods.  He says, you mean you want me to go out there?  Either there or in the trunk.  Mr. Portwood got a choice.  Mrs. Liveoak didn't.  Well, I can't go in the trunk; I would smother to death in there.  Ladies and gentlemen, this defendant, when he said that, is on notice that an elderly person will die in that trunk.  What more do we need?

This is not a hard case.  You intend the natural consequences of your act if that act is intentional.  Did he intentionally put her in the trunk?  Did he intentionally drive back to Montgomery and drive around the parking lot?  Look at those ATM photos.  It will make you sick, too.

Did he intentionally leave that lady in that trunk scratching and clawing to get out?  Absolutely.

That defense may put up about crack use, that is a smoke screen.  The Judge will tell you the law.  I am not going to tell you the law on that.  The Judge will tell you the law.

Let me tell you something.  If smoking crack is a defense to capital murder, there is no evidence he was on crack the day he did this to her.  There was no evidence that he had nothing but a clear mind the day he did that to that lady, none.

You know, Dr. Renfro is going to have to come in here and testify every time we have a lawn mower stolen in this county, because people do steal for crack cocaine.  Absolutely, it is an addictive horrible drug, absolutely; and they get addicted, and I feel sorry for them when they try to help themselves.  But they don't put elderly women in trunks of cars, and they don't take eighty year old men out to the woods and terrorize them.  And that's what he does.  That's what he does best.  He is an animal.

Today you are the conscience of this community.[186]

* * * * *

You know, he came up here yesterday.  He started crying when he said, I haven't seen my kids in a year.  Well, I am sorry, Mr. Dallas, at least you had the opportunity to see your kids.  Mrs. Liveoak does not, because you didn't want to get caught.

When he said those words, what Tony Bowen said rings true.  Yes, he hoped she died.  When he placed her in that trunk and left her in that trunk, he hoped that Hazel Liveoak would die.  That's capital murder, ladies and gentlemen.  That's an intent to kill.  He intended the natural consequences of his act.  He leaves a woman he knows has a heart condition in a stale, stuffy, hot trunk, and there he goes and takes off.  Time after time after time if he wanted Mrs. Liveoak to live, he had the chance.  Every pay phone that he passed, he had that chance, and he didn't take it, because he didn't want to get caught.  For every

---

[186] 8 SCR 848-57.

friend that he bragged about what he did, he had that choice. He could have said, go back there and help that woman, but he didn't, because he didn't want to get caught.

The only testimony we have heard that he had any hopes or plans to rescue Hazel Liveoak came out of his own mouth. Where is this boy that he was trying to get the ride from to go back there? I didn't see him testify. He didn't because he doesn't exist. Where is Chester Foley? Where are all these people? They didn't come in here, because they are not going to say that he wanted to help that helpless woman.

He intended to kill her. It is that plain, and it is that simple. Mr. Agricola talks what drove him, what is the motivation behind what he did. Well, let's see. He didn't have a good upbringing. He didn't go to church. It was crack cocaine. It is his drug usage. It is this and that, excuse after excuse after excuse. Well, ladies and gentlemen, Donald Dallas sits here accused of a heinous crime because of his choices. He is a free, rational thinking being with a soul who knows right from wrong. Dr. Renfro said that. He knows right from wrong. He knows exactly what he was doing. I don't see any of his family members, his brothers or sisters ir [sic] stepfather or anybody else sitting along there with him, and they led the same type of life he led. He is there because of the choices he made. And the choice that he made in July of last year was to be a predator. The choice that he made was to put his own selfish needs above everybody else. That was his choice. And now he is paying for this choice.

You know, ladies and gentlemen, if Donald Dallas had abducted Hazel Liveoak and taken her out to Lake Martin and threw her overboard, knowing that she couldn't swim, we would all be saying, hey folks, that's murder, plain and simple. What is the difference? What is the difference from that scenario and what he did, by placing a woman that he knows has a heart condition into a trunk of an automobile? You know, God had mercy on Hazel Liveoak that she died the way she died. At least she had a heart attack and didn't have to suffocate in that trunk.

He made choices and his choices is [sic] what is going to convict him.

The only tragedy in this entire case is not the life of Donald Dallas; it is what happened to Hazel Liveoak. That is the tragedy in

this case.  No one deserves to die in that manner.  He made his choice.
He had the intent.[187]

Insofar as Petitioner complains that the prosecution's closing guilt-innocence phase arguments quoted above improperly inflamed the jury by characterizing Petitioner as an unfeeling animal or predator and charitably commenting on the quality of Mrs. Liveoak's life, Petitioner's complaints do not furnish a basis for a legitimate objection to the prosecution's jury argument.  There was no legitimate basis for any objection to most of the foregoing jury argument.  Unflattering characterizations of a defendant will not provoke a reversal where such descriptions are supported by the evidence.  *See United States v. Tisdale*, 817 F.2d 1552, 1555 (11th Cir.) (prosecutor's argument that identified both a prosecution witness and the petitioner as "a dirty, low-life criminal" did not warrant reversal where the evidence showed the petitioner and the witness in question had known each other for many years and had joined together to commit armed robbery), *cert. denied*, 484 U.S. 868 (1987).  The prosecutor's characterization of Petitioner's conduct, *i.e.*, selecting elderly victims to abduct and rob at knife-point, as akin to that of a predator was a reasonable inference drawn from the evidence before the jury at the guilt-innocence phase of trial.  There was no legitimate basis for an objection to the prosecutor's characterization of Petitioner's criminal conduct as predatory.

---

[187] 8 SCR 875-79.

As explained above, appeals for justice are a legitimate subject of prosecutorial closing argument. Likewise, appeals to the jury to act as the "conscience of the community" are not per se impermissible and do not constitute a direct suggestion that the jury has a personal stake in the outcome of the case. *United States v. McGarity*, 669 F.3d 1218, 1246 n.38 (11th Cir. 2012). Prosecutorial appeals for the jury to act as the "conscience of the community" are not impermissible when they are not intended to inflame. *United States v. Smith*, 918 F.2d 1551, 1562-63 (11th Cir. 1990). There is nothing inherently prejudicial in an appeal to the jury to act as the conscience of the community. In fact, the Supreme Court has described the role of the jury in a capital trial as serving as "the conscience of the community." *See McCleskey v. Kemp*, 481 U.S. 279, 310 (1987) ("Thus, it is the jury that is a criminal defendant's fundamental 'protection of life and liberty against race and color prejudice.' Specifically, a capital sentencing jury representative of a criminal defendant's community assures a 'diffused impartiality,' in the jury's task of 'expressing the conscience of the community on the ultimate question of life or death.'" (citations omitted)). The prosecutor's lone reference during closing argument to the jury's role as "the conscience of this community" was not objected to by Petitioner's trial counsel. Thus, the trial court never had the opportunity to give a corrective instruction. Petitioner did not raise any complaint on direct appeal about this aspect of the prosecution's jury argument. Having

reviewed the entire trial record, this court finds the prosecutor's reference to "the conscience of this community" was not so inflammatory as to render Petitioner' trial fundamentally unfair.

More problematic are the prosecutor's inflammatory references to Petitioner as "an animal."  Even when a prosecutor makes an improper comment during jury argument, however, the Constitution is not violated unless the improper comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (holding prosecutor's reference to the defendant as "an animal" who should be on the end of "a leash," while improper, did not warrant reversal of criminal conviction, even when combined with prosecutorial comments that the defendant was on a weekend furlough at the time of the offense, the death penalty was the only guarantee against a future similar act, and the prosecutor wished someone had "blown away" the defendant with a shotgun); *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1182 (11th Cir. 2010) ("we consider 'the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused,' and 'the strength of the competent proof to establish the guilt of the accused'"), *cert. denied*, 562 U.S. 1203 (2011); *Land v. Allen*, 573 F.3d 1211, 1291-20 (11th Cir. 2009) ("In determining whether arguments are sufficiently egregious to result in the denial of due process, we have considered the statements in the context of the entire proceeding, including

factors such as : (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors."), *cert. denied*, 559 U.S. 1072 (2010). Where the evidence of guilt is overwhelming, an improper comment by a prosecutor usually does not render the trial fundamentally unfair in violation of the Constitution. *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d at 1182; *Land v. Allen*, 573 F.3d at 1220.

As explained above, the evidence of Petitioner's guilt was overwhelming, even disregarding the testimony of Dennis Anthony Bowen. Even if Petitioner's trial counsel had made a timely objection to the prosecutor's inflammatory references to Petitioner as "an animal," in all reasonable likelihood the trial court would have sustained the objection and minded the jury as it did in the formal jury instructions that the comments of counsel are not evidence. Such an instruction would not have altered the overwhelming weight of the evidence showing Petitioner's knowledge of the obvious danger of locking an elderly individual inside an unventilated automobile trunk and leaving her in an isolated location in the heat of a July afternoon in central Alabama. Had his trial counsel made a timely objection, Petitioner's inability to justify his conduct in a rational manner during his guilt-innocence phase testimony (in which he repeatedly acknowledged that he falsely promised his elderly victim he would send help) would still have remained

before the jury as a glaring sign of Petitioner's wanton disregard for Mrs. Liveoak's life.

Petitioner admitted he intentionally kidnaped and robbed Mrs. Liveoak, intentionally locked her in the trunk of her car, and then intentionally abandoned her vehicle (without furnishing Mrs. Liveoak food, water, or ventilation) in an isolated location on an asphalt parking lot on a Summer afternoon in central Alabama.  The state trial court accurately instructed the jury that it is permissible to infer a criminal defendant intended the natural consequences of his own intentional act.  *See Humphrey v. Boney*, 785 F.2d 1495, 1497 n.2 (11th Cir. 1986) (upholding as constitutional a state court jury charge instructing that "a person of sound mind and discretion intends to accomplish the natural and probable consequences of his intentional acts" in the context of an instruction on the intent to kill).   The prosecutor's inappropriate references to Petitioner as "an animal" and to the jury as "the conscience of this community" did not render Petitioner's trial fundamentally unfair.  "[T]he Supreme Court has never held that a prosecutor's closing arguments were so unfair as to violate the right of a defendant to due process." *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 322 (2012).  There is no reasonable probability that, but for the failure of Petitioner's trial counsel to object to any of the foregoing prosecutorial jury arguments as improper or inflammatory, the outcome of the guilt-innocence phase of Petitioner's

capital murder trial would have been any different.  This complaint fails to satisfy the prejudice prong of *Strickland.*

(c)  <u>Comments on the Strength of the Evidence</u>

Petitioner next complains that the prosecutor suggested during closing jury arguments at the guilt-innocence phase of trial that the evidence against Petitioner was strong and that it would not be difficult for the jury to convict Petitioner.  More specifically, Petitioner complains the prosecutor made the following comments:

> * * * Each time that ATM card was used, a crime was committed.  I want to point you specifically when you go back to the jury room to deliberate to State's Exhibits 26, 27, and 28.  State's Exhibit 27 you didn't get to see during the course of the trial, but it is the ATM bank record, and they will show you how many times that card was used.  You are not going to have much problem with any of this, because the defendant freely admits that that happened, that his co-defendant used that card and stole that money.
>
> State's Exhibit Number 28 is an affidavit from AARP, and that's the corporation that's out the money in this case.  It was their credit card that was used.  That affidavit will just prove as our proof that that money was taken.  And the defense attorneys have stipulated to that evidence.  You will have a chance to look at that.  It is going to take you about ten seconds to convict on those charges, maybe less.
>
> It is not going to take you very long to convict on capital murder either, because the key in this case has been intent.  And, ladies and gentlemen, this case is loaded with intent.  Everywhere you look there is intent from this defendant.  Every witness you heard from, almost, except for the police officers that were out there that investigated the crime, told you about intent.  I want to talk to you a little bit about that.[188]

---

[188] 8 SCR 846-48.  This language quoted in the text above immediately preceded the language quoted at length in the text accompanying note 187, *supra.*

227

The prosecutor's argument that the evidence of intent underlying Petitioner's capital murder was prevalent throughout the testimony before the jury was a reasonable inference drawn from the evidence before the jury.  A prosecutor may express a personal opinion during closing argument on the merits of the case or the credibility of witnesses if the opinions are based upon the evidence in the case.  *See United States v. Tisdale*, 817 F.2d at 1556 (prosecutor's comment that he believed government had "proven its case beyond a reasonable doubt" was a mere attempt to argue the weight of the evidence); *United States v. Wayman*, 510 F.2d 1020, 1028 (5th Cir.) (prosecutorial argument that the evidence showing the defendant's guilt "was overwhelming" not a basis for reversal where based solely on evidence adduced at trial), *cert. denied*, 423 U.S. 846 (1975).  *Cf. United States v. Ceballos*. 789 F.3d 607, 624 (5th Cir. 2015) (prosecutor may express opinions on the merits of the case or credibility of witnesses only to the extent the prosecutor bases any opinion on the evidence in the case).  This court's independent review of the entirety of the prosecution's closing guilt-innocence phase jury argument establishes that the prosecution's arguments and comments concerning the weight of the evidence showing Petitioner's intent to kill were accompanied by the prosecutors' discussions of the facts in evidence, which supported just such an inference.[189]  Insofar as the

---

[189] *See* notes 187 & 189, *supra*, and accompanying text.

prosecution argued the evidence (including Petitioner's statement to Dennis Bowen) showed Petitioner intentionally left Mrs. Liveoak to die in the trunk of her car, that argument was a reasonable inference from the evidence before the jury and discussed by the prosecution in its closing guilt-innocence phase argument.   There is no legitimate legal basis for an objection to this aspect of the prosecution's closing argument at the guilt-innocence phase of trial.   This complaint fails to satisfy either prong of *Strickland*.  *See Paredes v. Quarterman*, 574 F.3d at 291 & n.13 (failure to make a futile or meritless objection satisfies neither prong of *Strickland*).

(d)   <u>Comments on the Credibility of Witnesses</u>

Petitioner complains that the prosecution commented favorably on the credibility of prosecution witness Dennis Bowen's trial testimony while suggesting portions of Petitioner's trial testimony were incredible.   As even a cursory review of the jury argument quoted at length above reveals, the prosecution's comments on the relative credibility of Bowen and Petitioner were tied to discussions of the evidence properly before the jury.   The prosecutors' comments consisted of wholly appropriate suggestions that the jury should (1) reject portions of Petitioner's testimony as inconsistent with the other evidence in the record and common sense and (2) accept Bowen's testimony concerning Petitioner's allegedly inculpatory statement (that Petitioner hoped or wished the old lady died) as credible because the evidence showed Bowen came forward to police the day after Petitioner allegedly

229

made the statement, Bowen candidly admitted his history of drug abuse and legal problems, and Bowen's demeanor while testifying at trial was anything but evasive.

This was appropriate prosecutorial comment on the credibility of the witnesses based upon the evidence in the record.[190]  *See United States v. Rivera*, 780 F.3d 1084, 1109-10 (11th Cir. 2015) (holding (1) "An attorney's statements that indicate his opinion or knowledge of the case as theretofore presented before the court and jury are permissible if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence." and (2) prosecutor properly pointed out inconsistencies in the defendant's trial testimony, contrasted same with the internally consistent testimony of a prosecution witness, and urged the jury to draw conclusions from the evidence); *United States v. Sosa*, 777 F.3d 1279, 1297 (11th Cir. 2015) (holding (1) "the prosecutor may suggest what the jury

---

[190] The state trial court found in the course of Petitioner's state habeas corpus proceeding that "the credibility of witnesses is a legitimate subject of criticism and discussion by either party during closing arguments." 13 SCR (Revised) Tab 14-A, at p. 33.  The state trial court cited *Smith v. State*, 756 So. 2d 892, 930 Ala. Crim. App. 1997), and *Owens v. State*, 586 So. 2d 958, 960 Ala. Crim. App. 1990), in support of this conclusion.  *Id.*  Alabama law has not changed on this subject. *See Johnson v. State*, 120 So. 3d 1130, 1169-70 (Ala. Crim. App. 2009) (holding prosecutor's argument that a prosecution witness, while a murderer, had testified truthfully because "the evidence showed he did" was appropriate jury argument), *cert. quashed,* (Ala. Feb. 22, 2013), *cert. denied*, 134 S. Ct. 192 (2013); *Smith v. State*, 838 So. 2d 413, 456 (Ala. Crim. App.) ("the credibility of a witness is a legitimate subject of comment during closing arguments" (quoting *Price v. State*. 725 So. 2d 1003, 1030 (Ala. Crim. App. 1997), *aff'd*, 725 So. 2d 1063 (Ala. 1998), *cert. denied*, 526 U.S. 1133 (1999))), *cert. denied,* (Ala. Jun. 28, 2002*), cert. denied*, 537 U.S. 1090 (2002).  Thus, under Alabama law, there was no legitimate basis for an objection to the prosecutor's comments on the relative credibility of Petitioner's testimony versus that of Bowen. Viewed in proper context, the prosecutor's comments were plainly directed to the evidence properly before the jury and did not constitute an expression of the prosecutor's personal opinion.

should find from the evidence before it" and (2) the prosecutor properly urged jury to consider prosecution witness's credibility in light of the witness's willingness to admit to his own wrongdoing, drug use, and use of aliases); *United States v. Adkins*, 743 F.3d at 187 (prosecutor may comment on veracity of a witness if that comment is immediately preceded by the prosecutor's argument that corroborating evidence showed the witness's testimony to be truthful); *United States v. Poole*, 735 F.3d at 277 (as long as a prosecutor's characterization of the testifying defendant "as a liar" is reasonably seen as drawing conclusions from, and is actually supported by, the evidence, the prosecutor does not commit error).

Petitioner's prosecutors did not engage in improper vouching, as Petitioner implicitly suggests. *See United States v. Gonzalez*, 834 F.3d 1206, 1226 (11th Cir. 2016) ("A prosecutor commits improper vouching by 'arguing credibility based on evidence not before the jury,' or by placing 'the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity.'" (Citations omitted)); *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009) (holding (1) a prosecutor's remarks are improper if they attempt to bolster the credibility of a witness based on the government's reputation or through alluding to evidence not admitted at trial and (2) the prohibition against vouching does not forbid prosecutors from arguing credibility), *cert. denied*, 562 U.S. 981 (2010).

There was no legitimate legal basis for objection to the prosecution's comments on Petitioner's and Bowen's credibility. This complaint fails to satisfy either prong of *Strickland*. *See Paredes v. Quarterman*, 574 F.3d at 291 & n.13 (failure to make a futile or meritless objection satisfies neither prong of *Strickland*).

(e) <u>Comment on Failure of Defense to Present a Witness</u>

Petitioner complains the prosecution improperly pointed out the failure of the defense to call any witnesses other than Petitioner who could testify about Petitioner's aborted attempt to return to the K-Mart parking lot and suggests this was the equivalent of an improper comment on a defendant's failure to testify (Doc. # 1, at pp. 36-37, ☐☐ 94-95). Because Petitioner testified at the guilt-innocence phase of his capital murder trial, nothing the Prosecution said during closing argument could rationally have been construed by the jury as a comment on the defendant's failure to testify. There was nothing improper with the prosecution's argument that no witness other than the Petitioner himself had testified at trial regarding Petitioner's aborted attempt to return to the K-Mart parking lot. This argument accurately summarized the evidence then before the jury. The prosecution's suggestion that the missing witness did not exist was reasonable inference based on the trial evidence.[191]

---

[191] As explained above in note 125, *supra*, the 2008 affidavit of Tommy Earl Pilgrim does not include a statement establishing Mr. Pilgrim's availability and willingness to testify at the time of Petitioner's 1995 capital murder trial. Even if Mr. Pilgrim had testified in the same manner as

A prosecutor may properly comment on the failure of the defense to present evidence supporting a defensive theory.  *See Gaddy v. State*, 698 So .2d 1100, 1124 (Ala. Crim. App. 1995) ("Moreover, while the appellant is under no obligation to present witnesses, the prosecutor could properly comment on evidence that would presumably have been presented by a defendant to substantiate his defense, if the defendant testifies in his own behalf."), *aff'd*, 698 So.2d 1150 (Ala. 1997), *cert. denied*, 522 U.S. 1032 (1997).  The failure of the defense (rather than the defendant) to support its defensive theory with witnesses is a proper matter for jury argument. *Lavernia v. Lynaugh*, 845 F.2d 493, 497-98 (5th Cir. 1988); *United States v. Dearden*, 546 F.2d 622, 625 (5th Cir.) ("A comment on the failure of the *defense,* as opposed to the defendant, to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's fifth amendment privilege."), *cert. denied sub nom. Goldstein v. United States*, 434 U.S. 902 (1977).  "Counsel cannot err for failing to object to a correct statement of the evidence" *Koch v.*

---

his affidavit, his testimony would not have explained Petitioner's admitted failure to contact police or anyone else after their aborted effort to return to the K-Mart parking lot failed.  At best, Mr. Pilgrim's trial testimony, had it tracked his 2008 affidavit, would have removed two sentences from the prosecution's lengthy closing argument.  It would have done nothing to refute the prosecution's primary argument, *i.e.*, that Petitioner's failure to contact anyone to notify them of Mrs. Liveoak's perilous plight permitted the inference that Petitioner intended to leave her to die in the trunk of her car.  Nor would Mr. Pilgrim's testimony have refuted the trial testimony of Dennis Bowen that Petitioner told Bowen he hoped or wished the old lady died.  Thus, there is no reasonable probability that, but for the failure of Petitioner's trial counsel to locate and call Tommy Earl Pilgrim to testify, the outcome of the guilt-innocence phase of Petitioner's capital murder trial would have been any different.

*Puckett*, 907 F.2d 524, 526 (5th Cir. 1990) ("counsel is not required to make futile motions or objections").

The state trial court instructed the Petitioner's jury at the conclusion of the guilt-innocence phase of trial that (1) the State bore the burden of proving the Petitioner's guilt beyond a reasonable doubt,[192] (2) *the comments and arguments of the lawyers were not evidence*,[193] (3) the jurors were the sole and exclusive judges of the credibility of the witnesses who had come into court and testified,[194] (4) in assessing the Petitioner's trial testimony, the jurors could consider the fact the Petitioner was the defendant and, as such, had an interest in the outcome of the case,[195] (5) if the jury found from the evidence that any witness had been impeached by a prior inconsistent statement or by giving contradictory testimony in court, the

---

[192] 8 SCR 887.

[193] 8 SCR 888.

[194] 8 SCR 890.  In making their credibility findings, the state trial court instructed the jury it could consider a wide variety of factors:

> * * * In passing upon the credibility of a witness in this case, you have the right to consider any bias, interest, prejudice that might have been exhibited to you while the witness testified.  You have the right to consider the demeanor of the witness; that is, their appearance.  How did they appear to you?  How did they testify?  You also have the right to consider what basis they had for their testimony.  In other words. Did they have an opportunity to discern the facts about which they testified?  These things you may look into in passing upon the credibility of the witnesses.
>
> You have one final tool, ladies and gentlemen, and that is your common sense.  You have the right to utilize that in passing upon all of the testimony in this case.

8 SCR 890-91.

[195] 8 SCR 891-92.

jury could, in its discretion, consider that in evaluating and weighing that witness's testimony,[196] (6) the defendant should not be convicted unless the evidence excludes every reasonable hypothesis but that of the defendant's guilt,[197] and (7) the burden is never upon the defendant to establish his innocence.[198]  Juries are presumed to follow their instructions.  *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993).

In view of the state trial court's jury instructions, Petitioner's complaint about the failure of his trial counsel to object to the prosecution's suggestion that Petitioner never really made an effort to return to the K-Mart parking lot satisfies neither prong of *Strickland*.  *See Paredes v. Quarterman*, 574 F.3d at 291 & n.13 (failure to make a futile or meritless objection satisfies neither prong of *Strickland*).

(f)  Voluntary Intoxication Not "Mitigating"

Petitioner argues his trial counsel should have objected when the prosecution argued Petitioner's abuse of crack cocaine should not mitigate Petitioner's actions.  More specifically, Petitioner argues the prosecution improperly instructed the jury on the provisions of Alabama law when the prosecutor argued as follows:

> Don't minimize this case and call it something less than what it is.  Don't you let crack cocaine, a choice that he made when he put that crack pot to his mouth, don't let that be some way to mitigate what he

---

[196] 8 SCR 892.

[197] *Id*.

[198] *Id.*

did, because under the law it is not. He intended it, and you should find him guilty.[199]

The prosecutor's comment was a correct statement of Alabama law, under which voluntary intoxication is not a defense to a criminal charge unless the degree of intoxication amounts to insanity and renders the defendant incapable of forming an intent to injure:

> In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. The same standard is applicable in homicide cases. Although intoxication in itself does not constitute a mental disease or defect within the meaning of *§ 13A-3-1, Code of Alabama 1975*, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill.

*Ex parte Bankhead*, 585 So. 2d 112, 121 (Ala. 1991) (Citations omitted).

Viewed in proper context, the prosecutor's argument quoted above was a proper response to defense counsel's suggestions during closing argument that Petitioner was so intoxicated or under the influence of withdrawal from crack cocaine that he could not form the intent to kill.[200] There was no legitimate basis for an objection to this portion of the prosecution's closing guilt-innocence phase jury

---

[199] 8 SCR 880 (prosecution's rebuttal argument at close of guilt-innocence phase).

[200] 8 SCR 864-66 (defense counsel's guilt-innocence phase closing argument).

argument.  Thus, this complaint fails to satisfy either prong of *Strickland*.  *See Paredes v. Quarterman*, 574 F.3d at 291 & n.13 (failure to make a futile or meritless objection satisfies neither prong of *Strickland*).

(10)  <u>Failure to Object to Hearsay Testimony</u>

Petitioner complains that his trial counsel failed to object to the prosecution eliciting "back door" hearsay testimony (Doc. # 1, at pp. 37-38, ☐☐ 97-98).  The only allegedly hearsay testimony specifically identified by Petitioner in his pleadings in state or federal court consists of testimony by a Montgomery Police Detective concerning what police did after they met with and obtained information from Dennis Bowen, *i.e.*, police identified Petitioner and Carolyn Yaw as suspects and began searching for them, as well as for a subject named "Chester."[201]  The state trial court noted in its findings in Petitioner's state habeas corpus proceeding that Petitioner himself testified to essentially the same facts during his direct testimony as those offered by the Detective.[202]  This court's independent review of the record reveals Petitioner also admitted the same information during his videotaped post-arrest statement to police.  The fact law enforcement officers received information from Dennis Bowen shortly after Mrs. Liveoak's abduction was not in genuine dispute; nor was the content of Bowen's statement to police.  Bowen testified at

---

[201] 7 SCR 632-34 (testimony of Steve Saint).

[202] 13 SCR (Revised) Tab 14-A, at p. 35.

237

length about his conversations with law enforcement officers and his identification of Petitioner and Yaw as the people responsible for Mrs. Liveoak's abduction and robbery. There was no genuine dispute at trial that Petitioner and Yaw abducted and robbed Mrs. Liveoak, locked her in the trunk of her car, and then abandoned her.

Petitioner has not identified any testimony furnished by the Detective on direct examination which might have been excluded had Petitioner's trial counsel raised a timely hearsay objection. Nor has Petitioner alleged any facts showing that, but for the failure of his trial counsel to raise a timely hearsay objection to the Detective's testimony about the manner in which the investigation by law enforcement officers into Mrs. Liveoak's abduction, robbery, and murder proceeded, the outcome of the guilt-innocence phase of Petitioner's capital murder trial would have been any different. Under such circumstances, this conclusory ineffective assistance complaint fails to satisfy either prong of *Strickland*.

(11)   Conceding that Petitioner Caused Mrs. Liveoak's Death

Petitioner complains that is trial counsel conceded in his opening statement at the guilt-innocence phase of trial that Petitioner was responsible for the death of Mrs. Liveoak (Doc. # 1, at p. 29, □ 74). There was nothing objectively unreasonable with Petitioner's trial counsel admitting up front that Petitioner's actions caused Mrs. Liveoak's demise. As explained at length above in Sections XIII.C.2.b.(1) & (8), Petitioner has failed to present any medical evidence showing Petitioner's actions

238

were not a cause of her death or that there was any supervening event for which Petitioner bore no responsibility which effected Mrs. Liveoak's death. The Petitioner's videotaped post-arrest statement to police and trial testimony established beyond any doubt that Petitioner (1) intentionally abducted and robbed Mrs. Liveoak, (2) intentionally placed her in the trunk of her car despite knowing she was elderly and had a heart condition, (3) intentionally drove her vehicle back to Montgomery, (4) intentionally abandoned her vehicle in an isolated, unshaded, location on an asphalt parking lot on a July afternoon in central Alabama with Mrs. Liveoak still inside the trunk, and (5) to garner her cooperation, Petitioner repeatedly promised Mrs. Liveoak he would call police or someone else to notify them of her location. Petitioner's trial counsel requested and obtained jury instructions on the lesser-included offenses of felony murder and manslaughter.[203]

Petitioner's entire defense team testified without contradiction during Petitioner's state habeas corpus proceeding that they developed a trial strategy designed to attempt to convince the jury that, while Petitioner's actions may have caused Mrs. Liveoak's death, Petitioner was so intoxicated or otherwise under the

---

[203] 8 SCR 885, 907-12. The guilt-innocence phase verdict form also reflects these two lesser-included offenses. 2 SCR 350.

influence of crack cocaine that he could not develop the specific intent to kill.[204]

This court independently concludes this strategy was objectively reasonable. Given the uncontroverted evidence contained in Petitioner's videotaped statement to police (which trial counsel reasonably assumed would be admitted into evidence at trial), the decision by Petitioner's trial counsel to admit up front that Petitioner's actions caused Mrs. Liveoak's death, while asserting Petitioner had not intended to kill, was objectively reasonable. *See Saunders v. State*, ___ So. 3d ___, ___, 2016 WL 7322336, *9 (Ala. Crim. App. Dec. 16, 2016) (trial counsel does not render ineffective assistance by conceding the defendant committed the act that resulted in the victim's death where (1) trial counsel did not concede defendant had any intent to kill, (2) defendant made a detailed confession to police which was admitted into evidence, (3) prosecution's evidence connecting defendant to the murder was overwhelming, and (4) trial counsel presented evidence and argued (a) defendant was under the influence of crack cocaine at the time of the murder and, thus, unable to form a specific intent, and (b) defendant was guilty, at most, of manslaughter.) The use of such concessions as a trial strategy is eminently reasonable:

> Any competent trial lawyer understands that in order to mount a successful case before a jury, credibility must never be sacrificed. To retain credibility, defense counsel must often make concessions that, viewed narrowly, may appear detrimental to the client's case. But, as

---

[204] 12 SCR Tab 13, at pp. 37, 65-66 (testimony of Jeffery C. Duffey); 12 SCR Tab 13, at pp. 75-76, 79-80, 86-87, 98, 113 (testimony of Susan James); 13 SCR (Revised) Tab 14, at pp. 159, 165, 169, 171, 181-82, 228-29 (deposition testimony of Algert Agricola).

the Supreme Court has acknowledged, "by candidly acknowledging defense counsel's client's shortcomings, counsel might build credibility with the jury and persuade it to focus on the relevant issues in the case." *Yarborough v. Gentry*, 540 U.S. 1, 6, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2002) (citing J. Stein, Closing Argument § 204, p. 10 (199201996) ("[I]f you make certain concessions showing that you are earnestly in search of the truth, then your comments on matters that are in dispute will be received without the usual apprehension surrounding remarks of an advocate.")).

This tried-and-true strategy applies not only to capital cases to preserve credibility with the jury during the penalty phase, but also where, as here, defendant faces an unwinnable battle against one set of charges brought against him. Defense counsel would reasonably find it strategically advantageous to concede guilt on those charges to preserve credibility in defending against others. This classic tactic dates back to the likes of Aristotle ("a speech should indicate to the audience that the speaker shares the attitudes of the listener, so that, in turn, the listener will respond positively to the views of the speaker"), Peter C. Lagarias, Effective Closing Argument §§ 2.05-2.06, pp. 99-101 (1989), and Clarence darrow, who famously conceded his clients' guilt during closing argument in a capital case to save their lives at sentencing, *see* Clarence S. Darrow, *Closing Argument for the Defense in the Leopold-Loeb Murder Trial*, FAMOUS AMERICAN JURY SPEECHES 1086 (Frederick C. Hicks ed., Legal Classics Library (1989) (1925).

*Darden v. United States*, 708 F.3d 1225, 1229-30 (11th Cir), *cert. denied*, 133 S. Ct. 2871 (2013).

Furthermore, Petitioner has alleged no facts and presented no evidence showing there is a reasonable probability that, but for his trial counsel's decision to concede up front that Petitioner's actions caused Mrs. Liveoak's death, the outcome of the guilt-innocence phase of Petitioner's capital murder trial would have been any different. This complaint fails to satisfy either prong of *Strickland*.

c. Punishment Phase Matters

Petitioner argues that, had his defense team done a better job investigating Petitioner's background, they would have discovered a wealth of additional mitigating evidence which could have been presented during the punishment phase of trial  (Doc. # 1, at pp. 38-63, ⬜⬜ 100-65).  For the reasons discussed above at length in Section XIII.C.1.b., Petitioner's complaints about uncalled witnesses and undeveloped mitigating evidence do not satisfy the prejudice prong of *Strickland*.

A defense attorney preparing for the sentencing phase of a capital trial is not required "to scour the globe on the off chance something will turn up."  *Rompilla v. Beard*, 545 U.S. 374, 382-83 (2005); *Everett v. Sec'y, Fla. Dep't of Cirr.*, 779 F.3d 1212, 1250 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 795 (2016).  Rather, diligent counsel may draw the line when they have good reason to think that further investigation would be a waste.  *Rompilla v. Beard*, 545 U.S. at 383; *Everett v. Sec'y, Fla. Dep't of Corr.*, 779 F.3d at 1250.

(1) Documentary Evidence

Moreover, insofar as Petitioner complains that his trial counsel failed to obtain documents addressing Petitioner's educational background, medical history, institutional history, and employment history, Petitioner's ineffective assistance claim fails because Petitioner has failed to either furnish this court with any of the missing documents in question or show how they could have impacted the outcome

of the punishment phase of his capital murder trial. For instance, Petitioner complains that his defense team failed to obtain unidentified records relating to his employment and training but fails to present copies of any such records that were available through a reasonably diligent investigation at the time of Petitioner's 1995 capital murder trial. Petitioner's court-appointed investigator testified without contradiction during Petitioner's state habeas corpus proceeding that Petitioner's defense team was aware that he had served a prison sentence in Texas (where Petitioner participated in some sort of drug treatment program) and Petitioner had a reputation for stealing from his employers and getting fired.[205] Petitioner has not presented this court with any documents available in October 1995 relating to Petitioner's prison stay in Texas, drug treatment program participation, education, medical history, correctional history, or employment/training history which could have furnished Petitioner's trial counsel any additional mitigating evidence.[206]

---

[205] 12 SCR Tab 13, at pp. 71, 89 (testimony of Susan James).

[206] For instance, Petitioner makes reference to a report on a psychological evaluation performed on him in June 1995 at the Kilby Correctional Facility but has not furnished a copy of that report. Moreover, Dr. Benedict's June 2007 affidavit (Doc. # 87-2, Exhibit 15, affidavit of Dr. Ken Benedict, at p. 2, ¶¶ 6, 8) states that (1) "there is no evidence as to how the results were interpreted or integrated to form a diagnostic opinion given that the only record is of a computer-generated report" and (2) "the report contains a statement that reads 'interpretive hypotheses based on clinical scale scores in the remainder of this report have a very high probability of being inaccurate.'" Thus, Petitioner has failed to show that his trial counsels' failure to obtain a copy of the report on Petitioner's June 1995 Kilby Correctional Facility evaluation prejudiced Petitioner within the meaning of *Strickland*. Based on the testimony of Dr. Renfro at trial, Petitioner's trial counsel apparently did have access to records relating the April 1995 psychological evaluation Dr. Renfro performed on Petitioner also mentioned in Dr. Benedict's 2007 affidavit.

Petitioner's lead trial counsel testified without contradiction during Petitioner's state habeas corpus proceeding that evidence showing Petitioner had successfully completed a drug treatment program would have undermined the defense's strategy at both phases of trial (which was to show Petitioner was overwhelmed by his addiction to crack cocaine at the time of his offense).[207]   Because he has failed to show how further investigation by his defense team into documentary evidence would have produced additional mitigating evidence, this complaint fails to satisfy the prejudice prong of *Strickland*.

Insofar as he complains that his defense team failed to obtain and present unidentified evidence showing Petitioner was incarcerated in Texas and successfully completed a drug treatment program, Petitioner's complaint also fails to satisfy the deficient performance prong of *Strickland*.  "[C]ounsel is not required to present all mitigating evidence, even if the additional mitigating evidence would not have been incompatible with counsel's strategy.  Counsel must be permitted to weed out some arguments to stress others and advocate effectively."  *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644. 659 (11th Cir. 2014) (*quoting Halliburton v. Sec'y for Dep't of Corr.*, 342 F.3d 1233, 1243-44 (11th Cir. 2003), *cert. denied*, 541 U.S. 1087 (2004)), *cert. denied*, 136 S. Ct. 155 (2015).  *Accord Debruce v. Commn'r, Ala. Dep't of*

---

[207] 13 SCR (Revised) Tab 14, at pp. 171, 181-82, 189, 191, 228-29 (testimony of Algert Algricola).

*Corr.*, 758 F.3d 1263, 1299 (11th Cir. 2014) ("Counsel is not required to present every nonfrivolous defense, nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy."), *cert. denied*, 135 S. Ct. 2854 (2015).[208]

(2)   Uncalled Witnesses

Petitioner complains that his trial counsel failed to call Denise Williams, Patricia Medford, and Vicky Medford to testify at the punishment phase of trial (Doc. # 1, at pp. 57-58, ¶¶ 150, 152-54).   Petitioner does not present an affidavit from any of these uncalled witnesses attesting to either (1) their availability and willingness to testify at the time of Petitioner's 1995 capital murder trial, or (2) facts showing they possessed any personal knowledge of admissible evidence relevant to the issues before the jury and trial court at the punishment phase of Petitioner's trial. Furthermore, had Patricia Medford been called to testify at Petitioner's trial, she would have been subject to cross-examination and possible impeachment based

---

[208] Nothing in this opinion should be construed as approving in any manner the failure of Petitioner's trial counsel to secure the service of a mitigation specialist/investigator until practically the eve of Petitioner's trial.  An investigation into mitigating evidence is adequate if it comprises efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.  *Wiggins v. Smith*, 539 U.S. 510, 514 (2003); *Ledford v. Warden, Georgia Diagnostic and Classification Prison*, 818 F.3d 600, 649 (11th Cir. 2016), *cert. filed Oct. 18, 2016 (No. 16-6444).*   Nonetheless, for the reasons discussed at great length in Sections XIII.C.1.b. & XIII.C.2.c., none of the alleged deficiencies in the performance of Petitioner's trial counsel in connection with the punishment phase of Petitioner's 1995 capital murder trial satisfy the prejudice prong of *Strickland*.

upon the new information contained in Paul Dallas's June 2007 affidavit, *i.e,*, his allegation that a male friend of Patricia Medford sexually assaulted both Petitioner and Paul Dallas at least four times.[209]

Petitioner also complains his trial counsel failed to properly interview Rhonda Chavers prior to trial and failed to elicit from Ms. Chavers testimony relating to Petitioner's relationship with his family and other matters that went beyond the scope of Ms. Chavers' 1995 punishment phase trial testimony. Petitioner does not furnish an affidavit from Ms. Chavers attesting to her personal knowledge of any facts beyond those to which she testified at the punishment phase of Petitioner's 1995 capital murder trial. Furthermore, in light of the new evidence before this Court, including the deposition testimony of Ms. Chavers' former spouse Chester Foley, Ms. Chavers is now subject to cross-examination and possible impeachment based upon Mr. Foley's attestations that it was Ms. Chavers who informed him of Petitioner's and Carolyn Yaw's abduction and robbery of an elderly woman they locked in the trunk of a car.[210]

---

[209] Doc. # 87-1, Exhibit 6, affidavit of Paul Dallas, at p. 3, ☐ 20.

[210] Doc. 138-1, deposition of Chester Foley, at pp. 19-20. Mr. Foley's insistence that he had no personal knowledge of the facts or circumstances of Petitioner's and Yaw's abduction and robbery of an elderly woman and he learned those facts solely through his wife raises questions the prosecution could ask Rhonda Chavers, specifically why she failed (unlike Dennis Bowen) to report the Petitioner's crime to law enforcement authorities. With the information currently before the court, an aggressive prosecutor might also have inquired on cross-examination as to whether Ms. Chavers received anything of value from the Petitioner or Yaw in exchange for remaining silent about their crimes. In sum, the evidence now before this court furnishes a wealth of potential

Petitioner complains that his trial counsel failed to contact his mother Elaine Dallas, and thereby failed to learn a wealth of information regarding Petitioner's abusive childhood, but Petitioner offers no evidence to refute the uncontroverted testimony of Petitioner's co-counsel at trial given during Petitioner's state habeas corpus proceeding that Petitioner specifically asked said counsel not to contact his mother.[211]   Furthermore, while Mrs. Dallas does furnish an affidavit dated June 4, 2007, nowhere in that affidavit does she state she was willing to travel from Texas to Alabama in 1995 to testify at Petitioner's capital murder trial.[212]   More significantly, as explained above in Section XIII.C.1.b., had she testified at Petitioner's capital murder trial, Mrs. Dallas would have been subject to cross-examination, and possible impeachment, based upon all of the assertions of child abuse and neglect contained in Petitioner's sworn *pro se* state habeas corpus petition. Finally, as discussed above, the testimony would have been cumulative.

Petitioner's eldest brother James (Jimmy) Dallas, Jr. does attest in his affidavit that, had he been contacted at the time of Petitioner's trial, he "was willing to help

---

impeachment evidence with regard to Rhonda Chavers that was not available at the time of Petitioner's 1995 capital murder trial.

[211] 12 SCR Tab 13, at p. 55 (testimony of Jeffery C. Duffey).

[212] Mrs. Dallas' affidavit states only that, had she been contacted, she "would have provided the same information that is contained in this affidavit." Doc. # 87-2, Exhibit 14, affidavit of Elaine Dallas, at p. 4, ☐ 34.  This statement is not an unequivocal indication she would have been willing to travel from Texas and testify, subject to cross-examination, at Petitioner's 1995 capital murder trial.

in any way that I could."[213]  As explained above in Section XIII.C.1.b., however, James Dallas, Jr. would have been subject to cross-examination, and possible impeachment, had he testified at Petitioner's 1995 trial, based upon the fact that, at that time, he had not seen Petitioner since their father's funeral in 1976 (Doc. # 1, at p. 52, ☐ 138).[214]  Furthermore, had he testified at trial (as he states in his affidavit) that he was able to get clean and sober after experiencing drug and alcohol problems, James (Jimmy) Dallas, Jr.'s testimony would likely have implicitly undermined the efficacy of the defense team's trial strategy at Petitioner's capital murder trial, which was to show Petitioner was a slave to his crack addiction.  Moreover, like Elaine Dallas, James Dallas's testimony would have been cumulative.

Petitioner also complains that his trial counsel failed to call Chester Foley to testify as a character witness at the punishment phase of Petitioner's 1995 capital murder trial, specifically to testify about the incident in which Petitioner allegedly took a knife to the chest to protect Foley from an assailant.  Had Mr. Foley testified at Petitioner's 1995 capital murder trial in the same manner as his June 2001

---

[213] Doc. 87-1, Exhibit 4, affidavit of James Dallas, Jr., at p. 3, ☐ 20.  James Dallas, Jr.'s affidavit does not contain an unequivocal assertion that he was available and willing to travel from New York to testify in Alabama at Petitioner's 1995 capital murder trial.

[214] In his sworn *pro se* state habeas corpus petition, Petitioner states "Jimmy had limited contact with the family after they moved.  Sometimes he did not even know where they were because Mrs. Dallas rarely called to find out how he was doing."  12 SCR (Revised) Tab 13-A. at p. 61.

deposition, he would have been subject to cross-examination and possible impeachment based upon (1) Petitioner's trial testimony[215] that Foley (a) supplied Petitioner with drugs, (b) furnished Petitioner with a place to smoke crack, (c) stole property with Petitioner, and (d) fenced property Petitioner stole to buy crack, (2) Petitioner's trial testimony that Foley arranged for someone to drive Petitioner back to the K-Mart parking lot, and (3) the fact Foley admitted during his deposition that he learned from his wife about Petitioner's abduction and robbery of an old lady whom Petitioner and Yaw locked in the trunk of her car, yet Foley never contacted law enforcement authorities to notify them to Mrs. Liveoak's whereabouts or alert them to her perilous predicament.  Under such circumstances, there is no reasonable probability Mr. Foley would have made a compelling character witness.

### (3)  Failure to Prepare a Psycho-Social History

Insofar as Petitioner complains that his trial counsel failed to prepare a psycho-social history of Petitioner, there is no evidence currently before this court showing Petitioner was unable to communicate all of the potentially mitigating information contained in Petitioner's sworn *pro se* state habeas corpus petition (*i.e.*, his Rule 32 petition) to his defense team prior to trial.  The reasonableness of the scope of an attorney's investigation for mitigating evidence depends, at least

---

[215] 7 SCR 787-88, 791 (testimony of Donald Dallas).

partially, on the information furnished by the defendant himself.  *See Burger v. Kemp*, 483 U.S. 776, 795 (1987) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information." (quoting *Strickland v. Washington*, 466 U.S. at 691)).  Petitioner does not allege any specific facts showing that he ever communicated any information to his defense team suggesting that further investigation into his background or family history would disclose mitigating evidence showing Petitioner had repeatedly been sexually assaulted as a child.

While Petitioner's brother Paul states in his 2007 affidavit that he "would have helped in any way necessary during my brother's trial,"[216] Paul Dallas's ambiguous affidavit does not unequivocally state that he was willing to testify in 1995 that he and Petitioner had been sexually assaulted on unspecified dates, at unspecified locations, by an unidentified "male friend" of Patricia Medford.  Furthermore, when asked during his trial testimony whether "you have any differences in what she said about your upbringing, your background" than his sister Cindy had given during her

---

[216] Doc. # 87-1, Exhibit 6, affidavit of Paul Dallas, at p. 3.

trial testimony, Paul Dallas responded "No, sir."[217]   Thus, when given the opportunity at Petitioner's 1995 capital murder trial to volunteer additional information about his or the Petitioner's upbringing, Paul Dallas did not testify that he and his younger brother had each been sexually assaulted "at least four times" by an unidentified male friend of Patricia Medford.

An attorney does not render ineffective assistance by failing to discover and develop mitigating evidence of childhood abuse that his client does not mention to him. *Puiatti v. Sec'y, Fla. Dep't of Corr.*, 732 F.3d 1255, 1281 (11th Cir. 2013), *cert. denied*, 135 S. Ct. 68 (2014); *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999), *cert. denied*, 530 U.S. 1246 (2000); *Porter v. Singletary*, 14 F.3d 554, 560 (11th Cir. 1994), *cert. denied*, 513 U.S. 1104 (1995).   Petitioner alleges no specific facts, and furnishes no evidence, showing that he ever informed his trial counsel or mitigating specialist that he had been sexually assaulted in the manner alleged in his brother Paul's 2007 affidavit.

As explained above, had Paul Dallas testified in 1995 in the same manner as his 2007 affidavit, his allegation of his and Petitioner's repeated sexual assaults on unspecified dates, in unspecified locations, by an ill-defined male acquaintance of Patricia Medford would have been subject to cross-examination and possible

---

[217] 8 SCR 967 (testimony of Paul Dallas).

impeachment, based upon Paul's admissions of alcohol and marijuana abuse and the absence of any evidence in the record now before this court showing either (1) Paul or Petitioner ever made any outcry about the alleged repeated sexual assaults in question or (2) there was ever any investigation into the alleged sexual assaults by law enforcement or child welfare authorities. Petitioner alleges no specific facts and furnishes no affidavit in which he states he was unable, despite the exercise of due diligence on his part, to communicate all of the information contained in his sworn *pro se* state habeas corpus petition to his defense team. Petitioner's trial counsel cannot reasonably be faulted for failing to discover information about Petitioner's social and family background which Petitioner possessed but failed to communicate to his defense team.

### 3. Conclusions

The most compelling piece of new mitigating evidence presented by Petitioner to this court is the assertion by Petitioner's brother Paul Dallas in his June 2007 affidavit that both he and Petitioner were sexually assaulted on unspecified dates, at unidentified locations, at least four times by an unidentified male friend of Patricia Medford. Viewed within the context of all the new mitigating evidence now available to this court and weighed against the totality of the aggravating evidence now before the court, especially the egregiously heinous nature of Petitioner's capital offense, Paul Dallas's affidavit alleging repeatedly sexual

assaults upon himself and Petitioner by an unidentified male friend of Patricia Medford, Chester Foley's good character testimony, and the other new mitigating evidence now before the court still does not satisfy the prejudice prong of *Strickland*.

Based on the testimony and other evidence presented his 1995 capital murder trial, Petitioner's jury and sentencing court were well aware that (1) Petitioner endured a chaotic childhood as the youngest child of a pair of alcoholics, (2) his parents divorced when he was young, (3) he thereafter lived with his mentally unstable and physically abusive mother and one older brother and one older sister in New York, Florida, and eventually Alabama in a household that was frequently bereft of food, totally lacking in adult supervision, and which his older sister described succinctly as "hell," (4) he had a long history of truancy and theft, as well as alcohol and drug abuse, (5) he dropped out of school in the sixth grade, (6) began spending time and playing drums in bars at an early age, (7) Petitioner was binging on crack cocaine during the two weeks leading up to his abduction of Mrs. Liveoak, (8) he had a record of working regularly as an electrician and supporting his common law wife and their children, (9) he abandoned his wife and children to begin using crack cocaine with a vicious psychopath named Carolyn "Polly" Yaw, and (10) he nonetheless still attempted to maintain a relationship with his daughters by Pam Cripple.  Thus, the case in mitigation presented by Petitioner's trial counsel was

vastly different from the bare bones or even non-existent mitigation cases presented at the original trials in *Wiggins*, *Porter*, and *Williams v. Taylor.*

The evidence before the court at present includes affidavits and testimony from Petitioner's mitigation specialist/investigator and others, including Petitioner's own family members, establishing that (1) Petitioner had a long history of petty theft to support his drug habit and fathered a child at age fourteen,[218] (2) he abandoned his common law wife Pam Cripple and their two daughters about fourteen years before his capital offense to use crack cocaine with Polly Yaw,[219] (3) Petitioner subsequently was convicted of a criminal offense in Texas,[220] (4) during his incarceration in Texas, Petitioner participated in a drug treatment program,[221] (5) Petitioner stole from his employers to pay for his drug habit,[222] (6) while Petitioner did have a learning disability as a child,[223] he improved his ability to read and write to the point he was able to furnish the state habeas court with a 108-page, sworn *pro se* state habeas corpus petition detailing the history of abuse and neglect he suffered

---

[218] 12 SCR Tab 13, at pp. 86-87 (testimony of Susan James).

[219] Doc. # 87-1, Exhibit 5, affidavit of Cindy Dallas, at p. 3; Doc. # 87-1, Exhibit 7. Affidavit of Brandie Ray, at p. 2.

[220] 12 SCR Tab 13, at p. 71 (testimony of Susan James).

[221] 12 SCR Tab 13, at p. 71 (testimony of Susan James).

[222] 12 SCR Tab 13, at p. 89 (testimony of Susan James).

[223] Doc. #87-2, Exhibit 15, affidavit of Dr. Ken Benedict, at pp. 2-5.

as a child,[224] and (7) *Petitioner demonstrates average intellectual ability*.[225]   As explained at length above, Petitioner's jury and the state trial court were aware of the thrust of most of the purportedly new mitigating evidence presented by Petitioner, even if not all the details.   Despite Petitioner's conclusory arguments, the new evidence does not establish Petitioner was intoxicated on crack cocaine, substantially impaired, or otherwise unable to conform his conduct within the

---

[224] 12 SCR (Revised) Tab 13-A.   Perhaps the most damning aggravating evidence currently before the court (and any subsequent court) consists of Petitioner's sworn *pro se* state habeas corpus petition, which reflects (1) a complete and total refusal by Petitioner to accept any responsibility for his own criminal conduct, (2) an unwillingness to express sincere contrition for his capital offense, and (3) a lack of empathy for any other human being, including the members of his own family, *i.e.,* Petitioner's pro se pleading demonstrates a clear willingness to throw practically every member of his family under the bus in a last gasp attempt to avoid his fate. Petitioner accuses (1) his mother of being an alcoholic, mentally unstable, and physically abusive, as well as criminally neglectful, (2) his older brother Jimmy or being violent and abusive toward both their mother and Petitioner, and (3) his older sister Cindy and older brother Paul of both being alcoholics.   Even more harsh than the substance of his rambling *pro se* state habeas petition is its tone, which is permeated by vitriolic and vituperative invective toward his own family members, as well as his defense team.   Petitioner's sworn *pro se* state habeas petition is little more than a 108-page rant against Petitioner's family and everyone who participated in Petitioner's defense during his 1995 capital murder trial.   Nowhere in Petitioner's sworn *pro se* state habeas corpus petition is there any indication Petitioner has genuinely accepted responsibility for his capital offense.

Moreover, the highly offensive tenor of Petitioner's sworn *pro se* state habeas corpus petition is fully consistent with (1) Petitioner's pretrial testimony at the hearing on his motion to suppress (*i.e.*, that he was high at the time of his post-arrest interview, did not read any of the documents he signed, was never informed of the charge against him, was never Mirandized prior to giving his videotaped statement, and was promised a four-year sentence if he gave a statement)[4 SCR 43-50, 56, 62], which the state trial court implicitly rejected when it denied his motion to suppress, (2) Petitioner's trial testimony that he did not intend to kill Mrs. Liveoak [8 SCR 803, 818], which the jury implicitly yet emphatically rejected when it determined unanimously and beyond a reasonable doubt that Petitioner intentionally murdered Mrs. Liveoak in the course of kidnaping and robbing her, and (3) Petitioner's allocution at his sentencing hearing, during which he asserted on the record that after Mrs. Liveoak prayed for him, he stopped using crack [9 SCR 1050].

[225] Doc. #87-2, Exhibit 15, affidavit of Dr. Ken Benedict, at p. 3.

parameters of the distinction between "right and wrong," which both Dr. Renfro and Dr. Benedict admitted Petitioner did comprehend at the time of his capital offense. On the contrary, Petitioner's own trial testimony established beyond any doubt that he fully recognized the wrongful nature of his actions against Mrs. Liveoak but chose, instead, to seek illicit gain because he wanted to buy and consume more crack.

Viewed in the light most favorable to the jury's guilt-innocence phase verdict, the evidence at trial established that Petitioner (1) kidnaped, robbed, and locked an elderly heart patient in the trunk of her car on a July afternoon in central Alabama, (2) drove Mrs. Liveoak a considerable distance back to Montgomery,[226] (3) convinced Mrs. Liveoak (with promises to call police or others to rescue her) to furnish information allowing him and Yaw to obtain money from Mrs. Liveoak's bank account using her bank cards, (4) intentionally left Mrs. Liveoak to die in what amounted to a steel coffin parked in an isolated, unshaded, location on an asphalt parking lot, and (5) only days before abandoning Mrs. Liveoak to suffer her horrific demise, was informed by Mr. Portwood that locking him in the trunk of his car would likely result in Mr. Portwood smothering to death.   Perhaps only the narrator of Edgar Allan Poe's *The Premature Burial* could fully appreciate the torturous

---

[226] Regardless of whether one chooses to believe Petitioner's account that he placed Mrs. Liveoak in the trunk of her car in Greenville or Carolyn Yaw's account, in which Mrs. Liveoak was placed in the trunk of her car in Hope Hull, Petitioner drove a substantial distance to get back to Montgomery.

suffering Mrs. Liveoak endured as she waited for the rescue she had been promised repeatedly by Petitioner (a person with whom she had cooperated and for whom she had prayed) would come but which Petitioner knew would never arrive.

The court has reweighed the totality of the new mitigating evidence, *along with all the mitigating evidence presented at Petitioner's capital murder trial*, against the aggravating factors, including (1) Petitioner's admissions during his trial testimony that he kidnaped and robbed Mrs. Liveoak during the same criminal episode which culminated in her horrific death and (2) Petitioner's prior criminal offenses (including those committed against Mr. Portwood only days before Mrs. Liveoak's abduction and robbery).  There is no reasonable probability that, but for the failure of Petitioner's trial counsel to more fully investigate Petitioner's background and present evidence showing Petitioner had (1) been sexually assaulted as a child, (2) been convicted of a crime in Texas, (3) participated in a drug treatment program while incarcerated in Texas, and (4) suffered the innumerable other privations and abuses detailed in either Petitioner's sworn *pro se* state habeas corpus petition or his federal habeas corpus petition, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.  For the foregoing reasons, as well as those discussed above in Section XIII.C.1., judged under a *de novo* standard of review, Petitioner's complaints about the performance of his trial

counsel in connection with the punishment phase of Petitioner's 1995 capital murder trial do not satisfy the prejudice prong of *Strickland*.

## XIV.  REQUEST FOR EVIDENTIARY HEARING

Petitioner requests an evidentiary hearing.  Insofar as Petitioner's claims in this federal habeas corpus proceeding were disposed of on the merits during the course of Petitioner's direct appeal, Petitioner is not entitled to a federal evidentiary hearing to develop new evidence attacking the state appellate court's resolution of Petitioner's claims on direct appeal.   Under the AEDPA, the proper place for development of the facts supporting a claim is the state court.  *See Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir.) (holding the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court), *cert. denied*, 522 U.S. 984 (1997).  Furthermore, where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U.S. 170  181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law.  This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Thus, petitioner is not entitled to a federal evidentiary hearing on any of his claims herein which were rejected on the merits by the state courts, either on direct appeal or during Petitioner's state habeas corpus proceeding.

With regard to the many claims for which this court has undertaken *de novo* review, Petitioner is likewise not entitled to an evidentiary hearing. In the course of conducting *de novo* review, this court has assumed the factual accuracy of all the specific facts alleged by Petitioner in support of his claims for relief, including the factual accuracy of all the new potentially mitigating information contained in the affidavits and other documents submitted by Petitioner in support of his multi-faceted ineffective assistance claims. In light of these assumptions, Petitioner is not entitled to an evidentiary hearing in this court. *See Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016) ("the burden is on the petitioner in a habeas corpus proceeding to allege sufficient facts to support the grant of an evidentiary hearing and that a federal court will not blindly accept speculative and inconcrete claims as the basis upon which a hearing will be ordered) (quoting *Dickson v. Wainwright*, 683 F.2d 348, 351 (11th Cir. 1982)); *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011) (the burden is on the petitioner to establish the need for an evidentiary hearing), *cert. denied*, 565 U.S. 1120 (2012). If a habeas petition does not allege enough specific facts that, if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing. *Jones*

*v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d at 1319; *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d at 1060. For the reasons discussed at length above, Petitioner has failed to satisfy this standard. Where a petitioner fails to allege sufficient facts to satisfy the prejudice prong of *Strickland*, it is unnecessary to hold an evidentiary hearing to resolve disputed facts relating to the allegedly deficient performance of trial counsel. *Bester v. Warden*, 836 F.3d 1331, 1339-40 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 819 (2017).

## XV. CERTIFICATE OF APPEALABILITY

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a Certificate of Appealability ("CoA"). *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. §2253(c) (2). A CoA is granted or denied on an issue-by-issue basis. *Jones v. Sec'y, Fla. Dep't of Corr.*, 607 F.3d 1346, 1354 (11th Cir.) (no court may issue a CoA unless the applicant has made a substantial showing of the denial of a constitutional right and the CoA itself "shall indicate which specific issue or issues satisfy" that standard), *cert. denied*, 562 U.S. 1012 (2010); 28 U.S.C. §2253(c) (3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the

petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282; *Miller-El v. Johnson*, 537 U.S. at 336. This court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338 (*quoting Slack v. McDaniel*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484 (holding

when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

Reasonable minds could not disagree with this Court's conclusions that (1) all of petitioner's conclusory complaints about the performance of his trial counsel fail to satisfy the prejudice prong of *Strickland*, (2) Petitioner's *Wiggins* claim also fails to satisfy the prejudice prong of *Strickland*, (3) the state appellate courts reasonably rejected Petitioner's *Batson* claim on the merits, (4) Petitioner's *Brady* claim is frivolous, (5) Petitioner's *Hurst* claim is without arguable merit, (6) the state appellate courts reasonably rejected Petitioner's insufficient evidence claim, and (7) all of Petitioner's remaining complaints (about either the state trial court's evidentiary or procedural rulings, the prosecution's alleged misconduct, or the allegedly inaccurate voir dire testimony of two venire members) fail to furnish an arguable basis for federal habeas corpus relief.  Under such circumstances, Petitioner is not entitled to a CoA on any of his claims for relief in his original or supplemental federal habeas corpus petitions.

# XVI.  ORDER

Accordingly, it is hereby **ORDERED** that:

1.  Petitioner's motions to supplement the record, filed April 1, 2009 (Doc. #'s 108 & 109), are **GRANTED.**

2.  Petitioner's motion for reconsideration, filed May 25, 2012 (Doc. # 121), is in all respects **DENIED**.

3.  Petitioner's motion for leave to amend, filed January 11, 2017 (Doc. # 146), is **GRANTED**; the Clerk shall file Petitioner's First Amended Petition, *i.e.,* Doc. # 146-1, as a separate pleading.

4.  All relief requested in Petitioner's original federal habeas corpus petition (Doc. # 1), as supplemented or amended by Petitioner's "amended petition" (*i.e.*, Doc # 146-1), is **DENIED.**

5.   Respondent's motions to dismiss (Doc. #'s 4, 49, 92, 113) are **DISMISSED** AS MOOT.

6.  All other pending motions are **DISMISSED** AS MOOT.

7.  Petitioner is **DENIED** a Certificate of Appealability on all of his claims.

DONE this 14th day of July, 2017.

_____
/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE